2014-1331, -1371

VOLUME I OF III

(Pages 1 - 4583)

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

HOYT A. FLEMING,

Plaintiff-Appellant,

v.

ESCORT, INC. and BELTRONICS USA, INC.,

Defendants-Cross Appellants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO IN CV-09-105, JUDGE B. LYNN WINMILL**

---

**JOINT APPENDIX**

Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
mike@parklegal.com

Counsel For Plaintiff-Appellant

Gregory F. Ahrens
Wood, Herron & Evans, L.L.P.
441 Vine Street, 2700 Carew Tower
Cincinnati, Ohio 45202
(513) 241-2324
gahrens@whe-law.com

Counsel For Defendants-Cross Appellants

# TABLE OF CONTENTS

Protective Orders
    Stipulated Protective Order (Dkt. No. 35) ........................................................ 1
    Memorandum Decision And Order (Dkt. No. 82) ........................................ 18

Judgments
    Memorandum Decision (Dkt. No. 336) ........................................................ 25
    Memorandum Decision And Order (Dkt. No. 376) ...................................... 33

Patents
    U.S. Patent No. RE39,038 ............................................................................. 53
    U.S. Patent No. RE40,653 ............................................................................. 62

District Court's Docket Sheet ........................................................................... 70

Docket
    Complaint For Patent Infringement (Dkt. No. 1) ......................................... 109
    U.S. Patent No. RE39,038 (Dkt. No. 1-3) .................................................... 123
    Defendants' Brief In Support Of Motion For S. J. (Dkt. No. 122) ............... 307
    Plaintiff's Motion For Entry Of Judgment and Injunction (Dkt. No. 130).... 372
    Declaration Of Hoyt A. Fleming (Dkt. No. 139-2) ...................................... 699
    Plaintiff's Reply In Support Of His Motion For S. J. (Dkt. No. 151) ......... 3402
    Memorandum Decision And Order (Dkt. No. 169) ...................................... 3784
    Motion For Allocation Of Trial Time (Dkt. No. 222) .................................. 3939
    Special Verdict Form (Dkt. No. 304) ........................................................... 4056
    Jury Instructions (Dkt. No. 305) .................................................................. 4067
    June 18, 2012 Trial Transcript (Dkt. No. 326-2) ........................................ 4230
    June 19, 2012 Trial Transcript (Dkt. No. 326-3) ........................................ 4296
    July 2, 2012 Trial Transcript (Dkt. No. 345-1) ........................................... 4503
    June 22, 2012 Trial Transcript (Dkt. No. 345-3) ........................................ 4577

Trial Transcripts
    June 15, 2012 Trial Transcript ..................................................................... 5656
    June 18, 2012 Trial Transcript ..................................................................... 5694
    June 19, 2012 Trial Transcript ..................................................................... 5955
    June 21, 2012 Trial Transcript ..................................................................... 6023
    June 22, 2012 Trial Transcript ..................................................................... 6097
    June 27, 2012 Trial Transcript ..................................................................... 6174
    June 28, 2012 Trial Transcript ..................................................................... 6234

# TABLE OF CONTENTS
## (Continued)

June 29, 2012 Trial Transcript ................................................................. 6317
July 2, 2012 Trial Transcript ................................................................... 6396

Trial Exhibits
  Plaintiff Exhibit No. 1040 ................................................................. 6461
  Plaintiff Exhibit No. 1043 ................................................................. 7079
  Defendant Exhibit No. 2121 .............................................................. 7231
  Defendant Exhibit No. 2158 .............................................................. 7268
  Defendant Exhibit No. 2160 .............................................................. 7284
  Defendant Exhibit No. 2161 .............................................................. 7306
  Defendant Exhibit No. 2173 .............................................................. 7320
  Defendant Exhibit No. 2174 .............................................................. 7321
  Defendant Exhibit No. 2191 .............................................................. 7322
  Defendant Exhibit No. 2192 .............................................................. 7344
  Defendant Exhibit No. 2211 .............................................................. 7345
  Defendant Exhibit No. 2220 .............................................................. 7346
  Defendant Exhibit No. 2230 .............................................................. 7347
  Defendant Exhibit No. 2231 .............................................................. 7348
  Defendant Exhibit No. 2232 .............................................................. 7349
  Defendant Exhibit No. 2233 .............................................................. 7350
  Defendant Exhibit No. 2281 .............................................................. 7351
  Defendant Exhibit No. 2282 .............................................................. 7356
  Defendant Exhibit No. 2283 .............................................................. 7362
  Defendant Exhibit No. 2284 .............................................................. 7434
  Defendant Exhibit No. 2285 .............................................................. 7494
  Defendant Exhibit No. 2286 .............................................................. 7519
  Defendant Exhibit No. 2334 .............................................................. 7704
  Defendant Exhibit No. 2324A ............................................................ 7757
  Defendant Exhibit No. 2324B ............................................................ 7758
  Defendant Exhibit No. 2380 .............................................................. 7796

Jury Charge ............................................................................................. 7797

Jury Verdict ........................................................................................... 7834

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HOYT A. FLEMING, | ) | |
| | ) | Case No. CR-09-105-S-BLW |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| ESCORT INC., and BELTRONICS USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### STIPULATED PROTECTIVE ORDER

1. <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation would be warranted.  Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order (Docket No. 33). The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords extends only to the limited information or items that are entitled under the applicable legal principles to treatment as confidential.  The parties further acknowledge, as set forth in Section 11, below, that this Stipulated Protective Order creates no entitlement to file confidential information under seal; Civil Local Rule 5.3 sets forth the procedures that must be followed and reflects the

**Protective Order - 1**

standards that will be applied when a party seeks permission from the court to file material under seal.

2. <u>DEFINITIONS</u>

2.1 <u>Party</u>:  any party to this action, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

2.2 <u>Disclosure or Discovery Material</u>:  all items or information, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced or generated in disclosures or responses to discovery in this matter.

2.3 <u>"Confidential" Information or Items</u>:  information (regardless of how generated, stored or maintained) or tangible things that qualify for protection under standards developed under F.R.Civ.P. 26(c).

2.4 <u>"Highly Confidential – Attorneys' Eyes Only" Information or Items</u>:  extremely sensitive "Confidential Information or Items" whose disclosure to another Party or nonparty would create a substantial risk of serious damage that could not be avoided by less restrictive means.

2.5 <u>Receiving Party</u>:  a Party that receives Disclosure or Discovery Material from a Producing Party.

2.6 <u>Producing Party</u>:  a Party or non-party that produces Disclosure or Discovery Material in this action.

**Protective Order - 2**

2.7. Designating Party:  a Party or non-party that designates information or items that it produces in disclosures or in responses to discovery as "Confidential" or "Highly Confidential— Attorneys' Eyes Only."

2.8 Protected Material:  any Disclosure or Discovery Material that is designated as "Confidential" or as "Highly Confidential – Attorneys' Eyes Only."

2.9. Outside Counsel:  attorneys who are not employees of a Party but who are retained to represent or advise a Party in this action.

2.10 House Counsel:  attorneys who are employees of a Party.

2.11 Counsel (without qualifier):  Outside Counsel and House Counsel (as well as their support staffs).

2.12 Expert:  a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action and who, at the time of retention, is not anticipated to become an employee of a Party or a competitor of a Party's.  This definition includes a professional jury or trial consultant retained in connection with this litigation.

2.13 Professional Vendors:  persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; etc.) and their employees and subcontractors.

**Protective Order - 3**

3. SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel to or in court or in other settings that might reveal Protected Material.

4. DURATION

Even after the termination of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.

5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection.  Each Party or non-party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  A Designating Party must take care to designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified, or that have been made for an improper purpose (e.g., to unnecessarily

**Protective Order - 4**

encumber or retard the case development process, or to impose unnecessary expenses and burdens on other parties), expose the Designating Party to sanctions.

If it comes to a Party's or a non-party's attention that information or items that it designated for protection do not qualify for protection at all, or do not qualify for the level of protection initially asserted, that Party or non-party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2 <u>Manner and Timing of Designations</u>.  Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a), below), or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before or at the time the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) <u>for information in documentary form</u> (apart from transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" on each page that contains protected material.

A Party or non-party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced.  During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  After the inspecting Party has identified the documents it wants

**Protective Order - 5**

copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order, then, before or at the time of producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY")  on each page that contains Protected Material.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Party or non-party offering or sponsoring the testimony identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony, and further specify any portions of the testimony that qualify as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." When it is impractical to identify separately each portion of testimony that is entitled to protection, and when it appears that substantial portions of the testimony may qualify for protection, the Party or non-party that sponsors, offers, or gives the testimony may invoke on the record (before the deposition or proceeding is concluded) a right to have up to 20 days after receipt of the transcript to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").  Only those portions of the testimony that are appropriately designated for protection within the 20 days after receipt of the transcript shall be covered by the provisions of this Stipulated Protective Order.

Transcript pages containing Protected Material must be separately bound by the court reporter, who must affix to the top of each such page the legend "CONFIDENTIAL" or "HIGHLY

**Protective Order - 6**

CONFIDENTIAL – ATTORNEYS' EYES ONLY," as instructed by the Party or nonparty

offering or sponsoring the witness or presenting the testimony.

(c) <u>for information produced in some form other than documentary, and for any other tangible</u>

<u>items</u>, that the Producing Party affix in a prominent place on the exterior of the container or

containers in which the information or item is stored the legend "CONFIDENTIAL" or

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  If only portions of the

information or item warrant protection, the Producing Party, to the extent practicable, shall

identify the protected portions, specifying whether they qualify as "Confidential" or as "Highly

Confidential – Attorneys' Eyes Only."

5.3 <u>Inadvertent Failures to Designate</u>.  If timely corrected, an inadvertent failure to designate

qualified information or items as "Confidential" or "Highly Confidential – Attorneys' Eyes

Only" does not, standing alone, waive the Designating Party's right to secure protection under

this Order for such material.  If material is appropriately designated as "Confidential" or "Highly

Confidential – Attorneys' Eyes Only" after the material was initially produced, the Receiving

Party, on timely notification of the designation, must make reasonable efforts to assure that the

material is treated in accordance with the provisions of this Order.

6. <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1 <u>Timing of Challenges</u>.  Unless a prompt challenge to a Designating Party's confidentiality

designation is necessary to avoid foreseeable substantial unfairness, unnecessary economic

burdens, or a later significant disruption or delay of the litigation, a Party does not waive its right

**Protective Order - 7**

to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 <u>Meet and Confer</u>.  A Party that elects to initiate a challenge to a Designating Party's confidentiality designation must do so in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) with counsel for the Designating Party.  In conferring, the challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.  A challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first.

6.3 <u>Judicial Intervention</u>.  A Party that elects to press a challenge to a confidentiality designation after considering the justification offered by the Designating Party may file and serve a motion under Civil Local Rule 7.1 (and in compliance with Civil Local Rule 5.3, if applicable) that identifies the challenged material and sets forth in detail the basis for the challenge.  Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements imposed in the preceding paragraph and that sets forth with specificity the justification for the confidentiality designation that was given by the Designating Party in the meet and confer dialogue.

**Protective Order - 8**

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Until the court rules on the challenge, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles.  A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a non-party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 12, below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

Any individual who obtains, receives, has access to, or otherwise learns, in whole or in part, technical information designated ATTORNEYS' EYES ONLY under this Protective Order shall not prepare, prosecute, supervise, or assist in the prosecution of any patent application claiming radar detector technology within two (2) years from the disclosure of such technical information or one (1) year after the conclusion of this litigation, including any appeals, whichever period is longer.  To ensure compliance with this provision, the parties shall create an ethical wall between those persons with access to technical information designated ATTORNEYS' EYES ONLY under this Protective Order and those individuals who prepare, prosecute, supervise, or

**Protective Order - 9**

assist in the prosecution of any patent application claiming radar detector technology.  This

paragraph shall apply to Outside Counsel regardless of the manner in which said counsel gain

access to the information in question.  With respect to individuals other than Outside Counsel for

the parties, this paragraph shall not apply to an individual who obtains, receives, has access to, or

otherwise learns technical information designated ATTORNEYS' EYES ONLY if (1) the

disclosure is the result of Designating Party or its agent showing or revealing the information to

that individual, whether intentionally or inadvertently, including through use of the information

at his or her deposition or during his or her testimony at a hearing or trial; or (2) the disclosure

occurs after the information is produced, but before the Designating Party causes the information

to be marked at ATTORNEY'S EYES ONLY.  To the extent that technical material designated

ATTORNEYS' EYES ONLY, or testimony regarding the same, is offered in evidence at a

hearing or trial at which the Designating Party is present, the Designating Party must advise the

Court of the designation of the material at the time it is offered, and request that individuals not

authorized to access the information be excluded from the courtroom, for this paragraph to apply

to that material.

7.2 <u>Disclosure of "CONFIDENTIAL" Information or Items</u>.  Unless otherwise ordered by the

court or permitted in writing by the Designating Party, a Receiving Party may disclose any

information or item designated CONFIDENTIAL only to:

(a) the Receiving Party's Outside Counsel of record in this action, as well as employees of said

Counsel to whom it is reasonably necessary to disclose the information for this litigation;

**Protective Order - 10**

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A) and have been identified to all Parties no less than five (5) days in advance of any disclosure, thereby providing the Producing Party with an opportunity to object to such disclosure;

(d) the Court and its personnel;

(e) court reporters, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation; and

(f) the author of the document or the original source of the information, or an employee or agent of the Producing Party.

7.3 <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>.  Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of record in this action, as well as employees of said Counsel to whom it is reasonably necessary to disclose the information for this litigation;

**Protective Order - 11**

**11**

(b) Experts (as defined in this Order) to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A) and have been identified to all Parties no less than five (5) days in advance of any disclosure, thereby providing the Producing Party with an opportunity to object to such disclosure;

(c) the Court and its personnel;

(d) court reporters, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation; and

(e) the author of the document or the original source of the information or an employee or agent of the Producing Party who has access to the document or information.

This section shall not be construed to prevent counsel for either party from advising their client generally regarding the amount of damages likely to be at issue in the action, or the volume of sales likely to be impacted by this action, notwithstanding the fact that such advice may be based upon counsel's analysis of financial or business documents designated ATTORNEYS' EYES ONLY.  In no event, however, shall counsel disclose the actual contents of any document labeled ATTORNEYS' EYES ONLY in rendering such advice, either directly or indirectly.

8. <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>.

If a Receiving Party is served with a subpoena or an order issued in other litigation that would compel disclosure of any information or items designated in this action as "CONFIDENTIAL"

**Protective Order - 12**

or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," the Receiving Party must so notify the Designating Party, in writing (by fax, if possible) immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

The Receiving Party also must immediately inform in writing the Party who caused the subpoena or order to issue in the other litigation that some or all the material covered by the subpoena or order is the subject of this Protective Order.  In addition, the Receiving Party must deliver a copy of this Stipulated Protective Order promptly to the Party in the other action that caused the subpoena or order to issue.

The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.  The Designating Party shall bear the burdens and the expenses of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL.

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of

**Protective Order - 13**

**13**

this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

10.  <u>INADVERTANT DISCLOSURE OF MATERIAL COVERED BY THE ATTORNEY-CLIENT PRIVILEGE OR WORK-PRODUCT PROTECTION ("SNAP BACK")</u>

Disclosure of material covered by the attorney-client privilege or work-product protection shall not operate as a waiver of privilege or protection if (1) the disclosure was inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

If an inadvertent disclosure is made, the Producing Party must notify the Receiving Party of the inadvertent disclosure and the privilege or protection claimed.  The Receiving Party must then promptly return or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; and must take reasonable steps to retrieve the information if the Receiving Party disclosed it before being notified.  The Receiving Party may promptly present the information to the court under seal for a determination of the claim of privilege or protection.  The Producing Party must preserve the information until the claim is resolved.

11. <u>FILING PROTECTED MATERIAL</u>.

**Protective Order - 14**

Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material.  A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 5.3.

12. <u>FINAL DISPOSITION</u>.

Unless otherwise ordered or agreed in writing by the Producing Party, within sixty days after the final termination of this action, each Receiving Party must return all Protected Material to the Producing Party.  As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries or any other form of reproducing or capturing any of the Protected Material.  With permission in writing from the Designating Party, the Receiving Party may destroy some or all of the Protected Material instead of returning it.  Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the sixty day deadline that identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and that affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or other forms of reproducing or capturing any of the Protected Material.  Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence or attorney work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION), above.

**Protective Order - 15**

13. <u>MISCELLANEOUS</u>

13.1 <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

13.2 <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED:  **August 5, 2009**

B. LYNN WINMILL
Chief Judge
United States District Court

**Protective Order - 16**

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of
_____ [print or type full
address], declare under penalty of perjury that I have read in its entirety and understand
the Stipulated Protective Order that was issued by the United States District Court for the
District of Idaho on [date] in the case of *Hoyt A. Fleming v. Escort Inc. and Beltronics
USA, Inc.* (Case No. 1:09-cv-00105-BLW). I agree to comply with and to be bound by all
the terms of this Stipulated Protective Order and I understand and acknowledge that
failure to so comply could expose me to sanctions and punishment in the nature of
contempt. I solemnly promise that I will not disclose in any manner any information or
item that is subject to this Stipulated Protective Order to any person or entity except in
strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the
District of Idaho for the purpose of enforcing the terms of this Stipulated Protective
Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of
_____ [print or type full address and telephone
number] as my agent for service of process in connection with this action or any
proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

[printed name]

Signature: _____

[signature]

**Protective Order - 17**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | |
| Plaintiff, | Case No.  CV 09-105-S-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| ESCORT, INC. and BELTRONICS USA, INC., | |
| Defendants. | |

**INTRODUCTION**

Plaintiff Fleming alleges that defendants Escort and Beltronics (hereinafter collectively referred to as Escort) are infringing its patents on radar detectors.  The parties have discovery disputes that the Court's staff attempted unsuccessfully to mediate.  The Court will resolve the disputes below.

**ANALYSIS**

<u>**Protective Order**</u>

The parties have raised – in a formal motion and by informal discovery mediation conference – a question about the Protective Order.  Specifically, the plaintiff Fleming asks to modify the Protective Order to allow him to view information the defendants have designated "attorneys eyes only."  The defendants object, claiming Fleming has no need to see the documents and that he could use the information to obtain a competitive

**Memorandum Decision & Order - 1**

advantage over defendants.

The Court's analysis begins with the undisputed fact that the material Fleming wants to view is sensitive proprietary and trade secret material. Originally, Fleming agreed to screen himself from viewing confidential material because he was pursuing a radar detector patent application in the United States Patent Office. But Fleming has now represented that all his patent prosecution activities came to a complete and permanent close on July 20, 2010. *See Fleming Declaration Dkt. 70-2* at ¶ 8. Due to this change of events, Fleming seeks to modify the Protective Order so that he is no longer subject to that ban.

The standard the Court must use to resolve this dispute is set out in *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). The Court must "balance the risk to [defendants] of inadvertent disclosure of trade secrets to competitors against the risk to [Fleming] that protection of [defendants'] trade secrets [will] impair[] prosecution of [Fleming's] claims."

Defendants argue that Fleming does not need to see this information because he has technical experts who can review the material for him. But this is not the typical case where the plaintiff is an assignee of the inventor; here, the plaintiff claims to be the inventor and to have more technical expertise than even his own experts. *See Fleming Declaration* at ¶ 10. In this case, more than most, the plaintiff would have special insight into infringement and prior art issues that would make it meaningful for him to examine the confidential information on these issues.

**Memorandum Decision & Order - 2**

**19**

The defendants' argument picks up more strength when applied to financial documents.  Here Fleming has no special expertise to bring to bear.  As Fleming's counsel conceded at the informal conference, his client does not have the same critical need to see financial documents as he had to see infringement and prior art related documents.

This discussion establishes that Fleming has a real need to see documents related to infringement and prior art.  The question under *Brown Bag* is whether that need outweighs the risk to defendants that trade secrets will be disclosed to competitors.

Whatever risk existed when Fleming was pursuing a radar detection patent is now over since it is undisputed that Fleming has closed that pursuit.  Moreover, after viewing the confidential information, Fleming cannot "prepare, prosecute, supervise, or assist in the prosecution of any patent application claiming radar detector technology within two (2) years from the disclosure of such technical information…." *See Protective Order Dkt. 35.*

Defendants argue that Fleming has a business relationship with defendants' competitor K40.  But that relationship involves nothing more than Fleming licensing his patent to K40.  While defendants point to a Non-Disclosure Agreement (NDA) whereby Fleming and K40 agree to exchange confidential information, the NDA relates entirely to the license agreement, and there is no other relationship between K40 and Fleming.  *See Finley Declaration Dkt. 75-1.*

The Court cannot find that Fleming has business interests in competition with

**Memorandum Decision & Order - 3**

**20**

defendants that might preclude him from viewing this information.  Under *Brown Bag,* the Court must also consider whether Fleming might inadvertently disclose the secrets to defendants' competitors.  *Brown Bag*, 960 F.2d at 1470.  The Court can find nothing in the record to support such a risk.

In balancing the *Brown Bag* factors, the Court finds that Fleming has a real need to see infringement and prior art related documents because his technical expertise could give him a unique insight into the meaning of the material.  The record shows no danger of inadvertent disclosure and no connection with competitors that would suggest the material might be transferred.

After balancing these factors, the Court finds good cause for modifying the Protective Order to allow Fleming to view information the defendants have designated "attorneys eyes only" regarding infringement and prior art.

**Interrogatory 16**

The parties agreed that defendants shall provide on or before October 27, 2010, a supplemental response to Interrogatory 16 that focuses on Orr's alleged prior invention.

**Interrogatory 17**

The parties have agreed that defendants will supplement their answer to Interrogatory 17 on or before October 27, 2010.  To guide the defendant in its supplementation, the Court will discuss its view of the dispute.

Interrogatory 17 seeks financial information from the defendants such as (1) the cost of the accused products, (2) their sales price, (3) the gross and net profit figures, and

**Memorandum Decision & Order - 4**

(4) fixed and variable costs.  In their answer, the defendants did not specifically respond to each request but instead cited to more than 1,300 documents as containing the answers.

The Court finds the answer objectionable.  For the most part, the question seeks basic financial information that every company could easily provide.  Indeed, some of the information seems so basic and easily ascertainable (like sales price) that it should be answered directly, referring to documents only as corroboration.

Other parts of the request may seek information contained in a large number of documents.  Federal Rule of Civil Procedure 33(d) authorizes a party to answer an interrogatory by providing business records from which the answer may be "derived or ascertained."  To comply with Rule 33(d), the "responding party must affirm that the information sought by the interrogatory in fact is available in the specified records."  8A Wright, Miller and Marcus, *Federal Practice & Procedure*, § 2178 at p. 330 (1994).

If some of the information sought has not been calculated or tracked by defendants, they can appropriately point that out in their answer and provide documents from which the plaintiff may calculate the figures.  *See Rule 33(d) Advisory Committee Notes ("this subdivision gives the party an option to make the records available and place the burden of research on the party who seeks the information").*  But if the defense has calculated the figures asked for – or has exclusive knowledge on how to calculate those figures from the documents provided – it is not proper to simply point to hundreds of documents and say that the figures can be found somewhere in those documents, or derived from them.  *Id. ("a respondent may not impose on an interrogating party a mass*

**Memorandum Decision & Order - 5**

*of records as to which research is feasible only for one familiar with the records").*  If the

burden is too great for the respondent to produce the figures or identify the precise

documents, the respondent needs to explain that in their answer.  *Id. (noting that the*

*respondent retains his protection "against oppressive or unduly burdensome or expensive*

*interrogatories").*  The Court has the authority to order cost-sharing or some other

creative solution.  *Id. ("the Court is not deprived of its usual power, in appropriate cases,*

*to require that the interrogating party reimburse the respondent for the expense of*

*assembling his records and making them intelligible).*

     This discussion should guide the defendants in providing their supplementation.

## Meet and Confer Standards

     The parties agreed that it would helpful to set standards for responses when

discovery issues arise so long as some flexibility is built in to accommodate busy

schedules.  Accordingly, the Court will direct counsel to respond within 3 days when one

party raises a discovery issue by e-mail or letter.  In addition, once the meet and confer

session has occurred, any party producing discovery shall do so within 3 days from that

meeting.  Again, the parties are free to work out other deadlines, but these shall be the

standard deadlines in the absence of any other agreement.

### ORDER

     In accordance with the Memorandum Decision set forth above,

     NOW THEREFORE IT IS HEREBY ORDERED, that the motion to amend protective

order (docket no. 70) is GRANTED, and that the Protective Order (docket no. 35) is

**Memorandum Decision & Order - 6**

modified to allow Plaintiff Hoyt Fleming to view information the defendants have designated "attorneys eyes only" regarding infringement and prior art.

IT IS FURTHER ORDERED, that on or before October 27, 2010, the defendants shall supplement their answers to Interrogatories 16 and 17 in accordance with the discussion above.

DATED:  **October 19, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order - 7**

24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>        Plaintiff,<br><br>   v.<br><br>ESCORT, INC. and BELTRONICS<br>USA, INC.,<br><br>        Defendants. | Case No.  CV 09-105-S-BLW<br><br>MEMORANDUM DECISION |

## INTRODUCTION

Following a jury trial in this patent infringement case, the jury found that defendants (collectively referred to as Escort) infringed certain claims of two patents held by plaintiff Fleming, and awarded damages of $750,000.  Some legal claims remained, and the Court ordered further briefing that has now been received.  In that briefing, Escort raises three legal defenses to Fleming's claims.  For the reasons explained below, the Court rejects all three defenses.  The Court will also grant Fleming's motion that Escort pay the $750,000 into an escrow account, and will deny Escort's motion to redact a portion of the transcript.  The case is now fully resolved, and the Court will issue a separate Judgment as required by Rule 58(a).

**Reissued Patents**

Both of Fleming's patents were "reissued" pursuant to 35 U.S.C. § 251.  Escort claims that both patents are invalid because they were improperly reissued under that statute. Determining whether a reissued patent violates § 251 is a question of law.  *See Medtronic Inc. v. Guidant Corp.,* 465 F.3d 1360, 1373 (Fed. Cir. 2006).

To resolve this issue, the Court will first review the reissue process in this case.  In

**Memorandum Decision - 1**

2001, Fleming received his original patent, the '798 patent.  Later, Fleming became aware of

another patent – the Ross patent – and new products on the market, made by Uniden, Cobra, and

Escort.  In light of these discoveries, Fleming reviewed his '798 patent and realized that some of

its claims were too broad and others too narrow.  More specifically, he decided to narrow some

claims because they might be invalid as written in light of the Ross patent, and he decided to

broaden other claims to encompass the new products on the market.

     To make these changes, Fleming asked the PTO to reissue his '798 patent.  He filed two

reissue applications, and the PTO granted both, resulting in the reissued patents '038 and '653.

     Under the reissue statute, a patentee may surrender a patent and seek reissue if

"through error without any deceptive intent" he claimed "more or less than he had a right

to claim in the patent." See 35 U.S.C. § 251. The statute "is remedial in nature, based on

fundamental principles of equity and fairness, and should be construed liberally." *MBO

Labs, Inc. v. Becton, Dickinson & Co.*, 602 F.3d 1306 (Fed. Cir. 2010).  Notwithstanding its

remedial nature, the reissue statute has limits. "The reissue statute was not enacted as a panacea

for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to

prosecute de novo his original application." *In re Weiler*, 790 F.2d 1576, 1582 (Fed.Cir.1986).

For example, reissue claims are invalid when the patentee broadens the scope of a claim in

reissue to cover subject matter that he surrendered during prosecution of the original claims. *See

Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1480 (Fed.Cir.1998).  A related limit is that an

"error" under § 251 cannot include the deliberate action of an inventor or attorney during

prosecution. *See In re Serenkin*, 479 F.3d 1359, 1362 (Fed.Cir. 2007).  "The distinction is

between a genuine error, or mistake, and a deliberate, but subsequently found to be

**Memorandum Decision - 2**

disadvantageous, choice." Id.

Based on the trial testimony, the Court finds that Fleming made a genuine error rather than a deliberate choice that later proved disadvantageous.  The Court finds credible Fleming's testimony that he did not discover his drafting errors until almost two years after the '798 patent issued.  When the inventor has made a genuine mistake, there is nothing improper about seeking a reissue to ensure that the patent covers a competitor's products.  *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed.Cir. 1988).  Indeed, one of the most commonly asserted "errors" in support of a broadening reissue is the failure of the patentee "to appreciate the full scope of the invention during the prosecution of the original patent application."  *Hester,* 142 F.3d at 1479. "This form of error has generally been accepted as sufficient to satisfy the 'error' requirement of §251."  *Id.*  That is the type of error that Fleming committed here.

Escort argues that Fleming failed to explain how he "only came to appreciate his inventions at some later time."  *See Reply Brief (Dkt. No. 328)* at p. 3.  But Fleming did explain this – he testified that in the process of checking for errors in his '798 patent, years after it issued, he discovered for the first time the Ross patent and analyzed for the first time competitor's products that had just entered the market.  It was these discoveries that led him to "appreciate" the errors he had made in his '798 patent and prompted him to seek reissued patents.

The Court cannot find merit in any of the arguments raised by Escort on this issue. Escort has not identified anything in the record which undermines Fleming's claim that these were innocent errors, rather than a calculated decision intended to obtain some tactical

**Memorandum Decision - 3**

advantage.   And, Flemings' testimony to that effect at trial was credible.   Accordingly, the Court

finds that the '038 and '653 patents satisfy the requirements of 35 U.S.C. § 251.

**Intervening Rights**

Escort argues that it has established the defense of intervening rights. Under this defense,

Escort argues that it engaged in substantial research and development of its products before the

date of Fleming's reissued patents, giving it certain intervening rights to engage in what would

otherwise be infringing conduct.

The Court disagrees.   Intervening rights cannot arise where a party is found to infringe

original claims in a reissue patent.   *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc*., 1 F.3d

1214, 1220 (Fed. Cir. 1993) ("The accused infringer may raise the defense of intervening rights

only when none of the infringed claims of the reissue patent were present in the original

patent."); 35 U.S.C. § 252.  It is undisputed that claims 3, 5, 6, and 7 in the '038 patent are

identical to claims 3, 5, 6, and 7 in the original '798 patent.  Moreover, the jury found each of

those claims valid and infringed.  *See Special Verdict (Dkt. No. 304).*  Thus, as a matter of law,

Escort is not entitled to intervening rights.

**Indefiniteness**

Escort claims that the phrase "data received from the button" in the '653 patent is too

indefinite to be enforced.   Indefiniteness is a purely legal issue.   *Star Scientific Inc. v. R.J.*

*Reynolds Tobacco Co.,* 655 F.3d 1364, 1372 (Fed. Cir. 2011).

A claim is indefinite "if the construction remains insolubly ambiguous, meaning it fails to

provide sufficient clarity about the bounds of the claim to one skilled in the art."  *Id.*  "Absolute

clarity is not required to find a claim term definite."  *Id*.  A claim "may be definite even when

**Memorandum Decision - 4**

discerning the meaning is a 'formidable [task] and the conclusion may be one over which reasonable persons will disagree.'" *Id.* (quoting *Source Search Tech., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076 (Fed.Cir.2009)). Claims with meanings that are in dispute will be interpreted in a *Markman* hearing, while other claims that have a plain and ordinary meaning are definite in themselves and require no further elaboration or interpretation. *See Pagemelding Inc. v. Feeva Technology, Inc.*, 2009 WL 2588883 at *10 (N.D. Cal. Aug. 19, 2009).

In the present case, prior to the *Markman* hearing, Escort offered interpretations of 26 phrases from the two patents. Specifically, Escort claimed that the phrase "data received from the button" contained in the '653 patent was indefinite and that it should be interpreted as "information received in relation to use or operation of a user interface." *See Escort's Claim Construction Brief (Dkt. No. 37)* at pp. 16-17. In support of this argument, Escort submitted the testimony of Dr. Grindon who confirmed that the interpretation offered by Escort was proper. *See Dr. Grindon Report (Dkt. No. 37-7)* at p. 23.

Judge Downes then held a *Markman* hearing and issued a decision interpreting only four of the phrases, not including the phrase "data received from the button." With regard to the other 22 phrases, Judge Downes rejected Escort's interpretations: "With regard to the other interpretations sought by [Escort], the Court rejects them as they add unnecessary complexity to terms that are used in their plain English sense." *See Memorandum Decision (Dkt. No. 56)* at p. 3. In other words, Judge Downes rejected the interpretation offered by Escort of the phrase "data received from the button" because it was a phrase that required no elaboration.

The Court agrees with Judge Downes' analysis. The phrase is written in plain English and requires no further interpretation. *Pagemelding*, 2009 WL at *10 (rejecting further

**Memorandum Decision - 5**

interpretation of claim that was in "plain English" with an "ordinary meaning" that "speaks for itself"). Accordingly, the Court finds no merit in Escort's argument here.

**Fleming's Motion for Escrow or Injunction**

Fleming asks the Court to order Escort to either place $750,000 in an escrow or, if an escrow is not ordered, to enjoin Escort from selling the infringing products. Escort responded by agreeing to place the money in escrow. The parties agreed to use the Huntington Bank as escrow agent but cannot agree to the terms of the escrow. Escort seeks to modify the Bank's standard form to allow it (Escort) to withdraw the funds at any time.

Escort's dispute over the escrow's terms raises a question whether it has agreed to an escrow at all. Regardless, the Court finds that Escort must place the $750,000 in escrow. The testimony at trial revealed Escort's precarious financial situation, and that fact justifies the escrow. *See Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp*., 443 F.2d 867, 884 (2nd Cir. 1971).

The Court approves the use of Huntington Bank as escrow agent. The Court further agrees with Fleming that the escrow release provisions should be limited to the following circumstances: (1) as jointly directed by Mr. Fleming and defendants (in the event of a settlement or otherwise), and (2) as ordered by the Court. The Court rejects the modifications sought by Escort.

The Court will consequently grant Fleming's motion for an escrow and deny the request for an injunction.

**Escort's Motion to Redact Transcript**

Escort seeks to seal from public view certain portions of the trial transcript where

**Memorandum Decision - 6**

Escort's  business and financial information were discussed.  The matters were discussed on the record during the public trial, and no attempt was made by Escort at that time to seal the proceedings or otherwise protect the information from disclosure.

In determining whether to seal part of the judicial record, the Court "must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture."  *Foltz v. State Farm*, 331 F.3d 1122, 1135 (9th Cir. 2003).  Escort has the burden of providing "compelling reasons" for sealing, and there is a "strong presumption in favor of access. *Id.* at 1135. This presumption applies even to documents that have been sealed pursuant to a protective order.  *Id.* "Unlike private materials unearthed during discovery, judicial records are public documents almost by definition, and the public is entitled to access by default."  *Kamakana v. City of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006).

In *Apple, Inc. v. Samsung Electronics Co. Ltd.,* 2012 WL 4936595 (N.D. Cal. Oct. 17, 2012), Apple sought to seal from the public the evidence of its sales, revenues, cost, and profit margins.  The court refused, finding that this information was produced at a public trial.  *Id.* at *3.  Once there has been public disclosure at trial, any interest in confidentiality lessens in light of the public's interest of understanding the judicial process.  *See TriQuint Semiconductor, Inc. v. Avago Technologies Ltd.*, 2012 WL 1432519 (D. Ariz. April 25, 2012) (refusing to redact sensitive business information produced at public trial).  Certainly, there are instances where sensitive information is "blurted out" at trial, or where similar circumstances requiring sealing. *Id.* at *4.  But that was not the case here – Escort purposely introduced the financial information as part of its trial strategy.

For all of these reasons, the Court will deny Escort's motion to redact.

**Memorandum Decision - 7**

**Conclusion**

     This matter has now been fully resolved.  The Court will enter a separate Judgment as required by Rule 58(a).

DATED:  **March 27, 2013**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision - 8**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | |
| Plaintiff, | Case No.  1:09-CV-105-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| ESCORT, INC., et al., | |
| Defendants. | |

## INTRODUCTION

The Court has before it nine post-trial motions.  The motions are fully briefed and at issue.  In summary, the Court will (1) uphold the jury verdict; (2) award Fleming attorney fees as the prevailing party; (3) award pre-judgment and post-judgment interest to Fleming; (4) award sanctions against Escort's counsel for violating a Court Order; and (5) deny Escort's motion to declare Fleming's patents invalid due to his inequitable conduct before the Patent and Trademark Office.  The Court's analysis is set forth below.

## ANALYSIS

In this action, plaintiff Fleming claimed that defendant Escort manufactured and sold radar detectors that infringed Fleming's '038 and '653 patents.  A jury found that Escort had infringed a number of Claims of both patents, and awarded Fleming $750,000. *See Special Verdict Form (Dkt. No. 304).*  Specifically the jury found that the following Escort products were infringing: GX65, Passport 9500, Passport 9500i, and Passport IQ.  The jury also found that other Claims of the two patents were invalid because they were

**Memorandum Decision & Order – page 1**

anticipated by the prior art.  The Court directed Escort to place the $750,000 sum in escrow, and Escort has now complied with that direction.

## Motion for Attorney Fees & Motion To Award Prevailing Party Status to Defendants

Plaintiff Fleming seeks an award of attorney fees under 35 U.S.C. § 285.  That statute states that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."

Escort responds that Fleming was not a prevailing party and hence cannot seek fees under § 285.  To be a "prevailing party,"  Fleming must obtain "at least some relief on the merits . . . [and] [t]hat relief must materially alter the legal relationship between the parties by modifying [Escort's] behavior in a way that "directly benefits" [Fleming]. *Shum v. Intel,* 629 F.3d 1360 (Fed.Cir. 2010) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–13 (1992)).

Fleming meets that test here.  The jury found that Escort infringed both patents at issue and awarded Fleming $750,000.  Escort points out that it prevailed on some issues and convinced the jury to award far less than Fleming demanded.  But *Farrar* held that "[a] judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay."  *Farrar,* 506 U.S. at 113.  Here, Escort must pay Fleming $750,000 for the right to make and sell the infringing products.  That is relief that materially alters Escort's behavior in a way that directly benefits Fleming. Hence Fleming is a prevailing party.

Memorandum Decision & Order – page 2

With that issue resolved, the remaining analysis under § 285 involves a two-step process. First, the Court must determine whether Fleming has proved by clear and convincing evidence that the case is "exceptional." Second, if the Court finds the case to be exceptional, it must then determine whether an award of attorney fees is appropriate. *Forest Laboratories v. Abbott Laboratories,* 339 F.3d 1323 (Fed.Cir. 2003).

Section 285 is an exception to the "American Rule" concerning attorney fees, and is limited to circumstances in which the award of fees is necessary "to prevent a gross injustice." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc*., 605 F.3d 1305 (Fed.Cir. 2010). In light of this high standard, recovery of attorney fees under § 285 "clearly was never contemplated to become an ordinary thing in patent suits." *Forest Labs.,* 339 F.3d at 1329. At the same time, "litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285." *Monolithic Power Systems, Inc. v. O2 Micro Intern*., 726 F.3d 1359, 1366-67 (Fed.Cir. 2013). "[T]he aim of § 285 is to compensate a [party] for attorneys' fees it should not have been forced to incur." *Kilopass Technology, Inc. v. Sidense Corp*., 738 F.3d 1302, 1313 (Fed.Cir. 2013).

In the present case, there is clear and convincing evidence that Escort's counsel pursued a strategy in this litigation that vexatiously increased the fees incurred by Fleming. There were numerous discovery disputes caused by Escort's meritless refusals to turn over discoverable information. Escort forced further litigation over its unsuccessful attempt to add 286 new patent invalidity contentions over 18 months after the deadline for those to be exchanged. On another occasion, Escort vehemently objected

**Memorandum Decision & Order – page 3**

to turning over sensitive trade secrets in discovery only to later allow those same "secrets" to be publically disclosed at trial.

This is just a small sample of Escort's vexatious conduct. While it is true that most of Escort's legal work was within the bounds of zealous advocacy, about 10% of the litigation costs incurred by Fleming were caused directly by this vexatious conduct by Escort's counsel. To that degree, the Court finds this an exceptional case under § 285.

An exceptional case finding based on litigation misconduct "usually does not support a full award of attorney's fees." *Monolithic Power Systems,* 726 F.3d at 1369. Instead, the fee award "must bear some relation to the extent of the misconduct, and compensate a party for the extra legal effort to counteract the misconduct." *Id.*

Fleming estimates that his total fees would be $1.2 million. This would result in a fee award of about $120,000 under the Court's calculation.

Fleming asks for an opportunity to submit a detailed statement of attorney fees and the Court will grant him that opportunity. The Court will grant this motion for an award of fees under 35 U.S.C. § 285. Assuming the final figure is about $1.2 million, the Court will award 10% of that figure as attorney fees to Fleming under § 285.

**<u>Motion for Pre-judgment & Post-judgment Interest</u>**

Fleming seeks an award of pre-judgment and post-judgment interest. In calculating pre-judgment interest, Fleming alleges that the infringement started on January 8, 2007, and that pre-judgment interest should run from that date at the rate of 12% (under Idaho law) until the date the Judgment was entered (March 27, 2013) in the

**Memorandum Decision & Order – page 4**

sum of $750,000.  The pre-judgment interest calculated in this manner comes to $559,479.45.

Escort does not dispute the dates or mathematical computations, but argues that Fleming is not entitled to an award because he could have accepted Escort's settlement offer of $1.3 million and received his money long ago.  This argument violates the Court's Order that anything related to the settlement process "may not be used in any way against any party."  *See Order (Dkt. No. 92)*.  Because of that Order, there is nothing in the record detailing the settlement offer and so the Court cannot evaluate the role it played in this litigation.  That was the entire point:  The Court-ordered confidentiality was intended to promote a full and frank discussion during the settlement conference.  Consequently, the Court rejects Escort's attempt to use its settlement offer to its advantage, and will take up this issue in more detail below in ruling on Fleming's motion for sanctions.

Escort also argues that Fleming delayed filing this suit and cannot benefit from that delay with an award of pre-judgment interest.  But Escort raised these same arguments earlier and they were rejected.  *See Memorandum Decisions (Dkt. Nos. 169 & 336)*.  The Court finds no reason to reconsider that ruling.

The award of pre-judgment interest is "the rule, not the exception."  *Sanofi–Aventis v. Apotex, Inc.*, 659 F.3d 1171, 1177 (Fed.Cir.2011).   An award of pre-judgment interest carries out Congress's "overriding purpose of affording patent owners complete compensation" since a patentee's damages also include the "forgone use of the money between the time of infringement and the date of judgment."  *Whitserve, LLC v.*

**Memorandum Decision & Order – page 5**

**37**

*Computer Packages, Inc.* 694 F.3d 10, 36 (Fed.Cir. 2012).  An award of pre-judgment

interest – starting from the date of infringement, which is when royalty payments should

have started – "merely serves to make the patent owner whole, since his damages consist

not only of the value of the royalty payments but also of the forgone use of the money

between the time of infringement and the date of judgment." *Sanofi-Aventis v. Apotex*

*Inc.,* 659 F.3d 1171, 1179 (Fed.Cir. 2011) (quoting *Gen. Motors Corp. v. Devex Corp.,*

461 U.S. 648, 655-56 (1983)).

   The Court shall therefore award pre-judgment interest calculated on the Judgment

sum of $750,000, starting on January 8, 2007, and running at the rate of 12% until the

date the Judgment was entered (March 27, 2013).  These figures and dates are not

disputed by Escort.  The pre-judgment interest calculated in this manner comes to

$559,479.45.

   Post-judgment interest is governed by 28 U.S.C. § 1961(a), which states that

"[i]nterest shall be allowed on any money judgment in a civil case recovered in a district

court."  The purpose of § 1961 is to "ensure[ ] that the plaintiff is further compensated for

being deprived of the monetary value of the loss from the date of ascertainment of

damages until payment by defendant." *American Tel. & Tel. Co. v. United Computer*

*Systems, Inc.,* 98 F.3d 1206, 1209 (9th Cir. 1996).  Given the compensatory purpose of

§ 1961, courts have computed post-judgment interest on the sum of the verdict plus the

amount of pre-judgment interest. *Fuchs v. Lifetime Doors, Inc.,* 939 F.2d 1275, 1280 (5th

Cir. 1991).  The Court will do likewise.  The Court finds that Fleming is entitled to post-

judgment interest at the rate set by § 1961, from March 27, 2013, the date of the

**Memorandum Decision & Order – page 6**

Judgment, on the sum of the Judgment plus the sum of pre-judgment interest, for a total

sum of $1,309,479.45.  Fleming has calculated post-judgment interest to be paid each

year as follows:

| Interest | Interest payment date |
|----------|----------------------|
| $1,501.42 | January 1, 2014 |
| $1,966.47 | January 1, 2015 |
| $1,969.42 | January 1, 2016 |
| $1,972.38 | January 1, 2017 |
| $1,975.33 | January 1, 2018 |
| $1,978.30 | January 1, 2019 |
| $1,981.26 | January 1, 2020 |
| $1,984.24 | January 1, 2021 |

Escort does not dispute this calculation, and the Court will order it.

**Motion for On-Going Royalty or an Injunction**

In this motion, Fleming seeks to (1) enjoin any further sales of Escort's infringing

devices or (2) receive an ongoing royalty for each device sold.  The issues raised in this

motion have been fully resolved in a later-filed case involving the same parties, *Fleming*

*v. Escort 1:12-CV-66-BLW*.  In that case, Fleming sought damages from Escort for

continuing to sell the radar detectors that infringed the '038 and '653 patents.  Escort

responded that Fleming was barred from such damages because the jury verdict in this

case represented a paid-up license covering both past and future use of the patented

technology.  After reviewing the jury instructions and verdict in this case, the Court

agreed with Escort and ruled as follows:

> In conclusion, the jury's verdict, when read together with the jury
> instructions, demonstrates that the jury's verdict was intended to
> require Escort to pay $750,000 for a paid-up license covering all past

**Memorandum Decision & Order – page 7**

and future use of the technology set forth in '038 and '653 patents.
Escort has paid that sum into an escrow account as requested by
Fleming until all appeals are completed. In essence, Escort has a
paid-up license. Fleming's attempt to receive further damages in this
lawsuit for selling devices infringing the '038 and '653 patents is
barred by the prohibition against a double recovery.

*Memorandum Decision (Dkt. No. 61) in Fleming v Escort 1:12-CV-66-BLW* at pg. 7.

Accordingly, the Court will deny this motion.

## Fleming's Motion for Judgment re Abandonment, Suppression or Concealment

Fleming seeks judgment on his claim that Escort failed to carry its burden of

proving that Orr did not suppress or conceal his invention.  The jury found otherwise on

the Special Verdict Form, answering that Escort had carried its burden of proof.

That verdict, however, was advisory because "[w]hether suppression or

concealment has occurred is a question of law".  *Apotex U.S.A., Inc. v. Merck & Co.*, 254

F.3d 1031, 1036 (Fed. Cir. 2001).  Thus, the Court must now determine if Escort has

carried its burden of proof on this issue.

At trial, Escort argued that Robert Orr had conceived of his invention in 1988 and

reduced it to practice in 1996, well-ahead of the time he filed for a patent in 1999.  The

issue at trial was whether Escort suppressed or concealed Orr's invention between 1996

and 1999, because the product was not placed on the market during that time and no

patent application – with its accompanying public record – was filed until 1999.

If Escort suppressed or concealed Orr's invention between 1996 and 1999, Escort would

not get the benefit of the 1996 reduction to practice in fixing the date for the invention.

**Memorandum Decision & Order – page 8**

**40**

An issued patent is presumed valid. 35 U.S.C. § 282. A patent may be invalidated if "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). Escort has the burden of proving by clear and convincing evidence that Orr did not suppress or conceal his invention. *Apotex,* 254 F.3d at 1037.

The concealment must be intentional. Concealment "refers to situations in which an inventor designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public." *Eolas Technologies, Inc. v. Microsoft Corp.,* 399 F.3d 1325, 1333 (Fed. Cir. 2005). Intentional concealment can be inferred "based upon the prior inventor's unreasonable delay in making the invention publicly known." *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001). On the other hand, there is no suppression or concealment where there is "slow (even fitful), but inexorable progress toward disclosure . . . ." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1568, 1567 (Fed. Cir. 1996). For example, the Federal Circuit found no suppression or concealment where the inventor delayed about 17 months from reducing the invention to practice and filing for a patent because he was "engaged in significant steps towards perfecting the invention," and because of the "complexity of the subject matter." *Id*. at 1568-69. On the other hand, evidence that the delay was simply due to the inventor's desire to retain the invention as a trade secret would be evidence of concealment. *Apotex,* 254 F.3d at 1039.

There is no doubt that Orr kept his invention from public view – he admitted as much from the stand during his testimony. If his intent was to retain a trade secret, he

**Memorandum Decision & Order – page 9**

would be guilty of concealment under § 102(g).  But if his intent was to diligently work to refine his invention with the goal of eventually filing a patent application, he is not guilty of concealment under § 102(g).

Under this standard, the Court finds, after an independent review, that it agrees with the jury verdict, which was only advisory.  There is clear and convincing evidence that Orr's delay in filing his patent application was due to his attempts to refine his invention.  The subject matter was complex, and Escort's predecessor (Orr's employer at the time) struggled financially, filing for bankruptcy in 1997.  All of this supported Orr's own testimony that he was diligently attempting to perfect his invention to support a patent filing, that was eventually made in 1999.

For all of these reasons, the Court will deny this motion.

**Motion for Judgment on Issue of Patent Validity**

The jury found that Claims 1, 18, 45, 47, and 48 of the '038 patent were invalid in light of prior art, that included Orr's Prior Invention and patents by Hoffberg, Ross, and Valentine.  Fleming seeks to overturn the jury's verdict under Rule 50(b), arguing that Escort failed to produce sufficient evidence of invalidity regarding these five Claims.

Before turning to the arguments of the parties, the Court must first consider the impact of the rejection of these Claims by the Patent and Trademark Office (PTO) in a reexamination proceeding.  On March 14, 2013, after the jury's verdict in this case, the PTO issued an "Office Action" that rejected Claims 1-8, 18, 25, 26, and 45-48 as obvious in light of the prior art represented by the Hoffberg and Ross patents.  *See Exhibit A (Dkt. No. 365-1).*

Memorandum Decision & Order – page 10

It is well-established that the cancellation of a patent's claims in a reexamination proceeding "cannot be used to reopen a final damages judgment ending a suit based on those claim." *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 721 F.3d 1330, 1346 (Fed.Cir. 2013). It is true that the PTO's reexamination decision was issued about two weeks before this Court entering Judgment. *See Judgment (Dkt. No. 337).* The PTO issued its reexamination decision on March 14, 2013, and about two weeks later on March 27, 2013, the Court filed its Judgment. But the reexamination process is not complete until the PTO issues a Certificate pursuant to 35 U.S.C. § 307 and 37 C.F.R. § 1.570. No such Certificate has yet issued, and the PTO's reexamination decision is presently on appeal before the Board of Patent Appeals and Interferences. *See Application No. 90/012,220.*[1] Because the validity of the Claims has not yet been finally adjudicated, *Fresenius* dictates that any subsequent issuance of a Certificate invalidating those Claims will have no impact on these proceedings because a Judgment has been entered.

The Court will now turn to the arguments of the parties. Fleming argues that the jury's verdict declaring those Claims invalid should be set aside because Escort failed to present the expert testimony required to explain in detail how each claim element is disclosed in the prior art references. Specifically, with regard to the impact of the prior art reference known as Orr's Prior Invention, Fleming argues the Court must ignore the testimony of Steven Orr (the purported inventor of Orr's Prior Invention) and consider only the testimony of Escort's expert Dr. Grindon.

_____

[1] The appeal is noted at http://portal.uspto.gov/pair/PublicPair.

**Memorandum Decision & Order – page 11**

Orr did testify that he had no expertise in interpreting patent claims. But Orr was qualified to describe in detail the structural and functional aspects of his invention, and he did so in detail. *See Trial Tr. (Dkt. No. 322)* at 120-27. His factual description of his invention aligned with the language of the Claims at issue here. *Id.* Following Orr's testimony, Dr. Grindon linked Orr's factual testimony to the Claim language and testified that Orr's Prior Invention anticipated each Claim element. *See Trial Tr. (Dkt. No. 324)* at 50-58. He also testified that there was motivation for one skilled in the art to combine the other prior art patents – Hoffberg, Ross, and Valentine – with Orr's Prior Invention to render the invention described in the '038 patent obvious. *Id.* at 58-70.

The issue raised by Fleming is whether the Court must ignore the non-expert testimony of Orr in resolving the issue whether the '038 patent was anticipated by the prior art. There is no rigid requirement of expert testimony in all cases where obviousness is an issue. *Wyers v. Master Lock Co*., 616 F.3d 1231, 1242 (Fed.Cir.2010). In so ruling, the Federal Circuit relied on the Supreme Court holding in *KSR International Co. v. Teleflex Inc.* 550 U.S. 398, 415 (2007), requiring an "expansive and flexible approach" in determining whether a patented invention was obvious at the time it was made. In particular, *KSR* emphasized the role of common sense: "Rigid preventative rules that deny factfinders recourse to common sense . . . are neither necessary under our case law nor consistent with it." *Id.* at 421. Following *KSR,* the Federal Circuit has held that the legal determination of obviousness, especially where the technology at issue is "easily understandable," "may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Wyers*, 616 F.3d at 1239, 1242. "Thus,

**Memorandum Decision & Order – page 12**

in appropriate cases, the ultimate inference as to the existence of a motivation to combine

references may boil down to a question of 'common sense." *Id.* at 1240.

Escort established its defense based on Orr's Prior Invention by using both the

factual account of Orr to establish the structural and functional aspects of his invention

and the testimony of an expert, Dr. Grindon, to tie these facts to an obviousness defense.

Given *KSR's* holding that the obviousness inquiry is to be "expansive and flexible," the

Court refuses to ignore the testimony of Orr in determining whether Escort established

the obviousness defense. *KSR,* 550 U.S. at 415.

Obviousness is a question of law based on underlying findings of fact. *In re

Enhanced Sec. Research, LLC,* 739 F.3d 1347, 1351 (Fed.Cir. 2014). The differences

between the claimed invention and the prior art as well as what a reference actually

teaches are questions of fact. *Id.* Orr and Dr. Grindon established the similarities

between Orr's Prior Invention and the Claims in Fleming's '038 patent. On a Rule 50(b)

motion, the Court cannot question the credibility of Orr's account concerning how he

invented the radar detector. *See Experience Hendrix LLC v Hendrixlicensing.com Ltd.,*

2014 WL 306600 (9th Cir. Jan. 29 2014). Dr. Grindon testified as to what was taught by

the Hoffberg, Ross, and Valentine patents and described the motivation of one skilled in

the art to combine those prior art patents with Orr's Prior Invention to render the

invention described in the '038 patent obvious. This is sufficient, and for that reason, the

Court will deny Fleming's motion for judgment as a matter of law on the obviousness

issue.

**<u>Fleming's Motion for Judgment for Lack of Corroboration</u>**

**Memorandum Decision & Order – page 13**

Fleming argues that Escort failed to present sufficient corroborating evidence to establish Orr's Prior Invention as prior art that anticipated Fleming's patents.  There is no dispute that Escort was required to submit more than Orr's testimony to establish that Orr's Prior Invention anticipated Fleming's patents.  An individual who claims to have reduced to practice the patented device prior to the patent must offer more than just his testimony to prove his claim.  *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157 (Fed.Cir. 2006).  This corroboration requirement "provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony."  *Id.* at 1170.

The sufficiency of the corroboration is evaluated under a "rule of reason" standard.  *Ohio Willow Wood Co. v. Alps South, LLC,* 735 F.3d 1333, 1346 (Fed.Cir. 2013).  In applying the "rule of reason" test, all pertinent evidence is examined in order to determine whether the testimony is credible.  *Id.*  This includes both documentary evidence and testimony from others.  *Id.*  In analyzing the sufficiency of corroborative evidence, the Court must keep in mind that "corroboration is fundamentally about credibility . . . ."  *Medichem,* 437 F.3d at 1171.

Fleming argues that the corroboration evidence must corroborate every element of every Claim that Escort seeks to invalidate.  Yet Fleming cites no case so holding.  Fleming's promotion of a rigid standard does not align with the rule of reason and ignores *KSR's* holding that obviousness is to be judged by an "expansive and flexible" standard.  *KSR,* 550 U.S. at 415.  Ultimately, the corroboration requirement is intended to determine credibility, and such evidence could establish the credibility of the purported

**Memorandum Decision & Order – page 14**

inventor without establishing every element of every Claim.  That is the case here.  Orr produced many documents that corroborated his testimony, and his allegations were supported by the testimony of John Kuhn and Tom Humphrey.  The jury reasonably concluded that the corroboration requirement was satisfied, and the Court will accordingly deny this motion.

**Motion for Sanctions**

Fleming seeks sanctions against defense counsel for willfully violating an Order of this Court. The Order at issue was entered by Magistrate Judge Bush prior to holding a settlement conference in this case.  That Order states in pertinent part as follows:

> All oral statements, written documents, or other materials considered during the settlement procedure shall be held in confidence and may not be used in any way against any party to this litigation.

*See Order (Dkt. No. 92)* at ¶ 10.  Despite this prohibition, Escort's counsel argues to this Court – in a number of post-trial motion briefs – that during the settlement conference, Fleming rejected Escort's offer of $1.3 million to settle and instead "held out for a lottery-type verdict . . . ."  *See Escort's Brief (Dkt. No. 351)* at pp. 2-3, 7.  For example, this was the principal argument advanced by Escort to show that it was the prevailing party in this litigation.

Escort violated the Order by revealing the settlement offer and Fleming's response, matters that – according to the Order – "shall be held in confidence and may not be used in any way against any party to this litigation."  In response, Escort argues that it revealed nothing to the jury.  But the Order's ban is not limited to the jury only. The Order states that settlement material "may not be used *in any way* against any party

Memorandum Decision & Order – page 15

to this litigation." This broad wording clearly prohibits revealing settlement offers in the briefing on post-trial motions to this Court.

Escort argues that "it merely recited to the Court what Fleming had already disclosed to it." *See Escort Brief (Dkt. No. 366)* at p. 3. In support, Escort cites Fleming's Motion for Entry of Judgment (Dkt. No. 130). If Escort is arguing that Fleming's Motion somehow opened the door to Escort's violation of the Court's Order, Escort is wrong. Fleming's Motion contains absolutely nothing regarding the settlement conference, and indeed was filed well-before the settlement conference even took place.

Escort cites numerous cases holding that settlement offers are relevant to the issues raised by the pending motions. But Escort cites no case holding that a party can willfully violate a court order to bring that settlement material to the Court's attention.

This Court has the inherent power to sanction a party or its lawyers if they act in willful disobedience of a court's order. *Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015, 1035 (9th Cir. 2012). A "willful" violation of a court order "does not require proof of mental intent such as bad faith or an improper motive, but rather it is enough that a party acted deliberately." *Id.*

There is no doubt that Escort's counsel acted deliberately here. They do not argue otherwise in their briefing – instead they argue that they were justified in violating the Order, an argument the Court has rejected above.

An appropriate sanction is an award of attorney fees levied against counsel, rather than the party, and measured by the fees incurred by opposing counsel in his attempts to block the improper use of the confidential information. *Id.* Here, Fleming had to respond

**Memorandum Decision & Order – page 16**

to Escort's use of settlement material in a number of briefs.  It would be very difficult to cull out the time Fleming's counsel spent responding to that issue as opposed to the time he spent responding to all other issues.  A more accurate method would be to award the amount of fees Fleming incurred in filing his motion for sanctions, and then increasing that sum by 20% representing the time Fleming's counsel had to spend responding in his various response briefs.  The Court will accordingly grant the motions for sanctions along these lines.

**<u>Motion to Vacate Judgment</u>**

Escort seeks to vacate the Court's Judgment on the ground that Fleming is guilty of inequitable conduct before the PTO.  Specifically, Escort argues that Fleming represented to the PTO that the Hoffberg and Murakami references only disclose a radar detector with a remote GPS unit (that is external to the radar detector).  Escort argues that Fleming's statements constitute misrepresentations and that they have now been rejected by four different patent examiners at the PTO.  Escort asks the Court to find that Fleming has committed inequitable conduct before the PTO, a finding that Escort argues would result in Fleming's patents being declared invalid.

To prove inequitable conduct, Escort must show by clear and convincing evidence that Fleming (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO.  *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed.Cir. 2011).  Because Fleming did provide the Hoffberg and Murakami references to the PTO, this is not a failure-to-disclose case.

**Memorandum Decision & Order – page 17**

Rather, the issue here turns on whether Fleming's interpretation of those prior art references constitutes inequitable conduct.

Patent applicants are required to prosecute patent applications with candor, good faith, and honesty. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed.Cir.2007). At the same time, an applicant "is free to advocate [his] interpretation of [his] claims and the teachings of prior art." *Innogenetics, N.V. v. Abbott Laboratories,* 512 F.3d 1363, 1379 (Fed.Cir. 2008). When the advocate has submitted the prior art to the PTO, the patent examiner "is free to accept or reject the [advocate's] arguments distinguishing its invention from the prior art." *Id.* "While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct." *Rothman v. Target Corp.*, 556 F.3d 1310, 1328–29 (Fed.Cir.2009). The balance between candor and advocacy are explored in two cases discussed below.

In *Semiconductor Energy Lab.Co., Ltd. v. Samsung Electronics,* 204 F.3d 1368 (Fed.Cir. 2000), counsel committed inequitable conduct in misrepresenting prior art. The prior art was a Japanese reference, and while counsel submitted a full translation of the reference, he also submitted a partial translation that omitted crucial passages detrimental to his case. The Federal Circuit found this deceptive, holding that by submitting the partial translation, the applicant "left the examiner with the impression that the examiner did not need to conduct any further translation or investigation." *Id.* at 1377.

In *Rothman,* counsel made legal arguments to the patent examiner about prior art that his opponent characterized as misleading and deceptive. The Federal Circuit

Memorandum Decision & Order – page 18

disagreed, finding that an attorney's "attempt to characterize . . . prior art in a manner favorable to the attorney's client" was "nothing more than attorney argument" and did not constitute inequitable conduct. *Id.* at 1329.

This case is far closer to *Rothman* than to *Samsung*. Fleming and his counsel were engaged in zealous advocacy in arguing for their interpretation of the Hoffberg and Murakami references. The Court can find no attempt to mislead or deceive; the patent examiners had access to the documents Fleming and his counsel were interpreting and the entire process was open and transparent. Consequently, the Court will deny Escort's motion to vacate the Judgment.

**ORDER**

In accordance with the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for attorney fees (docket no. 338) is GRANTED, and that Escort's motion to enter an order awarding prevailing status (docket no. 343) is DENIED. Fleming shall submit to the Court a petition detailing his fees and the Court will award a precise sum equal to a percentage of that total, pursuant to the discussion above.

IT IS FURTHER ORDERED, that the motion for pre-judgment and post-judgment interest (docket no. 340) is GRANTED. The Court shall enter an Amended Judgment with precise figures once the attorney fee sums are calculated.

IT IS FURTHER ORDERED, that the motion for ongoing royalty or injunction (docket no. 341) is DENIED.

**Memorandum Decision & Order – page 19**

IT IS FURTHER ORDERED, that Fleming's motions for judgment as a matter of law (docket nos. 345, 346 & 347) are DENIED.

IT IS FURTHER ORDERED, that Fleming's motion for sanctions (docket no. 353) is GRANTED and that Fleming shall submit to the Court a petition detailing the fees incurred in preparing the motion for sanctions.

IT IS FURTHER ORDERED, that Escort's motion to vacate judgment due to Fleming's inequitable conduct (docket no. 368) is DENIED.

DATED: February 21, 2014

B. Lynn Winmill
Chief Judge
United States District Court

**Memorandum Decision & Order – page 20**



US00RE39038E

(19) **United States**

(12) **Reissued Patent**
Fleming, III

(10) Patent Number: **US RE39,038 E**

(45) Date of Reissued Patent: *Mar. 28, 2006

(54) **METHOD AND APPARATUS FOR ALERTING AN OPERATOR OF A MOTOR VEHICLE TO AN INCOMING RADAR SIGNAL**

(76) Inventor: **Hoyt A. Fleming, III**, P.O. Box 140678, Boise, ID (US) 83703

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/352,679**

(22) Filed: **Jan. 28, 2003**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,204,798**
Issued: **Mar. 20, 2001**
Appl. No.: **09/292,089**
Filed: **Apr. 14, 1999**

(51) **Int. Cl.**
*G01S 7/40* (2006.01)

(52) **U.S. Cl.** ............................. 342/20; 342/52; 342/89; 342/195; 342/357.06; 342/357.1; 342/357.17

(58) **Field of Classification Search** .................. 342/20, 342/26, 27, 52, 73, 83, 90, 91, 92, 93, 104, 342/105, 103, 115, 118, 159, 165, 175, 195, 342/357.01, 357.06, 357.1, 357.13, 357.17; 370/901–905, 933, 936, 988, 989, 991

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,660,844 A | * | 5/1972 | Potter | 342/20 |
| 4,313,216 A | * | 1/1982 | Jaeger et al. | |
| 4,750,215 A | * | 6/1988 | Biggs | 342/20 X |
| 4,949,088 A | * | 8/1990 | Ryan et al. | 342/20 |
| 5,068,663 A | * | 11/1991 | Valentine et al. | 342/20 |
| 5,250,951 A | * | 10/1993 | Valentine et al. | 342/20 |
| 5,977,884 A | | 11/1999 | Ross | 340/936 |
| 6,118,403 A | | 9/2000 | Lang | |

OTHER PUBLICATIONS

Poteet, David C., *RadioSat*, <http://newcitymedia.com/radiosat/radiosat/radiosat/index.html>.*
Provisional U.S. Appl. No. 60/108,362, filed Nov. 13, 1988, which became U.S. Appl. No. 09/382,217, and then U.S. Pat. No. 6,118,403.

* cited by examiner

*Primary Examiner*—Bernarr E. Gregory

(57) **ABSTRACT**

A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver coupled to the microprocessor. Upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

**50 Claims, 2 Drawing Sheets**





**Fig. 1**



**Fig. 2**

Detect an incoming radar signal.

Determine at least one characteristic of the incoming radar signal.

Determine the position of the radar detector.

Generate an alert if the radar detector is not within a predetermined distance of a predetermined position and the at least one characteristic is not similar to a predetermined characteristic.

## Fig. 3

Detect an incoming radar signal.

Determine the velocity of the radar detector.

Generate an alert if the velocity of the radar detector is greater than a predetermined velocity.

## Fig. 4

US RE39,038 E

**1**

## METHOD AND APPARATUS FOR ALERTING AN OPERATOR OF A MOTOR VEHICLE TO AN INCOMING RADAR SIGNAL

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

### 1. BACKGROUND

The present invention relates generally to police radar detectors used in motor vehicles and, more particularly, to police radar detectors that utilize a motor vehicle's position, velocity and/or heading to minimize false alarms.

Many operators of motor vehicles utilize radar detectors to alert them to the fact that their speed is being monitored by law enforcement agencies. However, conventional radar detectors often generate "false alarms." These false alarms are annoying to the operators of motor vehicles. In fact, various automotive publications publish results of "false alarm" tests. Thus, anything that can be accomplished by the manufacturer to reduce the number of false alarms without reducing detection of police radar is commercially valuable.

In addition to police radar signals, there are many different sources of microwave signals in the frequency bands allocated to police radar by the U.S. Federal Communications Commission (FCC). For example, motion-detecting burglar alarms and automatic door openers also operate in the frequency bands allocated to police radar. Thus, a need exists for a radar detector that can distinguish between signals generated by a police radar transmitter and those generated by other devices which utilize microwave signals within the same frequency bands.

Still another source of annoying false alarms occurs when an operator of a motor vehicle is travelling at a speed that is below the legal speed limit, such as occurs when the operator is in traffic, and the radar detector alerts him to an incoming radar signal. Even if a police radar sensor is monitoring the speed of the operator's vehicle, because the velocity of the vehicle is below the legal speed limit, the operator of the vehicle may not need to be alerted to the presence of the police radar signal. Thus, a need exists for a radar detector that does not generate an alert if the velocity of the radar detector is below the legal speed limit.

Operators have become accustomed to radar detectors activating in certain locations along commonly traveled streets and highways. Police radar units may be deployed by the side of the roadway at these locations since the police also are aware of the local activation signals and the police are aware that the signals tend to mask their own speed monitoring radar units. Thus, a need exists for a radar detector that can avoid generating a false alarm due to such accustomed radar signals while still generating an alert for such police radar signals.

### 2. SUMMARY OF THE INVENTION

One embodiment is a radar detector for alerting an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver coupled to the microprocessor. The radar detector also includes a program storage device containing instructions for determining whether to generate an alert to an incoming radar signal based upon the radar detector's position, velocity, and/or heading.

**2**

Another embodiment of the invention is a method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the position of a radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

Still another embodiment of the invention is a second method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the velocity of the radar detector is determined. Then, an alert is generated if the velocity of a radar detector is greater than a predetermined velocity.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a radar detector including one embodiment of the present invention.

FIG. **2** is a flow diagram of a method of operating a radar detector.

FIG. **3** is a flow diagram of another method of operating a radar detector.

FIG. **4** is a flow diagram of yet another method of operating a radar detector.

### 3. DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

3.1 Description of a First Embodiment

One embodiment of the novel radar detector is shown in FIG. **1**. The radar detector includes an antenna that is coupled to a detector circuit. The detector circuit, which may be controlled by the microprocessor of FIG. **1**, collects the signals from the antenna, detects the incoming signals, and distinguishes valid radar signals from electrical noise. The detector circuit may be any appropriate radar detector circuit capable of generating an output signal which indicates the strength, the presence, and/or the frequency of incoming radar signals. While the detector circuit may operate autonomously, operation and control of the detector circuit may be performed by the microprocessor. For example, the microprocessor may control the detector as is known in the art so that radar signals in the different frequency bands allocated to police radar signals are detected. Such detector circuits can take a wide variety of forms and can include amplifiers, mixers, duplexes, and other circuitry commonly used in the radar detector field. Several examples of such circuits are shown in U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The output of the detector circuit is coupled to the input of one or more analog-to-digital converters. These converters convert the analog output of the detector circuit into digital signal that represent signal strength, signal presence, and/or signal frequency.

In addition to being coupled to the detector circuit and the analog-to-digital converter, the microprocessor is also coupled to an alert circuit. The alert circuit communicates information regarding detected radar signals to the operator of a motor vehicle using the radar detector by means of one or more alarm tones and/or visual indicators that are included within the alert circuit. Alert circuits are known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The microprocessor, which may be any conventional single or multiple chip microprocessor or digital signal processor, is coupled to a program storage device. The program storage device may be any conventional memory device such as a PROM, EPROM, EEPROM, ROM,

US RE39,038 E

**3**

SRAM, or even battery backed up DRAM. The program storage device contains machine readable instructions that command the microprocessor to perform certain functions. For example, the program storage device may be conventionally programmed to sweep a predetermined number of radar frequency bands, determine the frequency and/or signal strength of any detected radar signals in the swept frequency bands, and, if the signal strength of the detected radar signals exceed a predetermined value, then generate a signal that activates the alert circuit. Such programming is known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The microprocessor is also coupled to a positioning system such as a global positioning system ("GPS") receiver. As is well known, a GPS receiver receives signals from satellites and uses these signals to calculate the position of the GPS receiver. In addition, the GPS receiver may receive differential correction data and/or dead reckoning data, such as from a compass or a wheel sensor, to increase the accuracy of the receiver. By calculating the position of the GPS receiver at two different times, the velocity and heading of the GPS receiver can be easily determined using conventional algorithms. Thus, the GPS receiver can provide the microprocessor with data that includes the position, the velocity, and/or the heading of the radar detector.

The microprocessor may also be coupled to a user interface circuit (not shown). The user interface circuit may include a plurality of buttons that are intended to be depressed by an operator of a motor vehicle. Such buttons may include: a power button, a mute button, a city/highway button, and a dim button.

As will be discussed more fully below, the program storage device may also contain machine readable instructions that command the microprocessor to determine whether to generate an alert based upon data received from the GPS. Thus, upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

3.2 Description of a Second Embodiment

One method of operating the radar detector of FIG. **1** is shown in FIG. **2**. In this embodiment, the radar detector first detects an incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

By utilizing the above method, many false alarms may be eliminated. For example, if the position of a microwave automatic door opener is programmed into the radar detector and the radar detector detects an incoming signal when the radar detector's position is near the automatic door opener, then it is likely that the source of the incoming radar signal is the automatic door opener and not a police radar. Thus, using the method of FIG. **2**, an alert would not be generated for the detector radar signal.

The programming of predetermined positions may be accomplished by depressing one or more buttons that are coupled to the interface circuit discussed above. Thus, if an operator of a motor vehicle approaches a microwave automatic door opener, then the operator can depress an "ignore radar" button. Then, the radar detector would store the position of the radar detector and possibly the frequency and the signal strength of the incoming radar signal in the program storage device of FIG. **1** or another memory device (not shown) coupled to or integrated within the microprocessor. An alternative method of storing such data would be

**4**

to hold down a "mute" button for an extended length of time such as 3 to 5 seconds. It is also possible to experimentally generate a database containing position, frequency and/or signal strength for a specific geographical region. This database could be provided to operators of motor vehicles for a fee. Accessing the Internet via a cellular phone (not shown) coupled to the microprocessor of FIG. **1** would be one method of providing the above database to operators of motor vehicles.

In still another embodiment, when the operator instructs the radar detector to store a position of a incoming radar signal, the radar detection could attempt to locate the approximate position of the source of the incoming radar signal. For example, if an operator instructs the radar detector to store a position of an incoming radar signal as the operator is still approaching the source of the incoming radar signal, the signal strength of the incoming radar signal will be increasing. The radar detector could locate a position that is very near the position of the source of the incoming radar signal by determining the position of the radar detector when the strength of the incoming signal is at a maximum. In addition, radar detectors such as described in U.S. Pat. No. 5,250,951, may utilize multiple radar antennas and signal processing logic to more accurately determine the position of the source of the incoming radar signal. For example, the position of the source of many incoming radar signals may be closely approximated by the position of a radar detector when the radar detector identifies that the radar source is to the side of the vehicle.

The predetermined distance may also be programmed by the operator of the motor vehicle. If the GPS receiver is receiving differential correction data or is receiving dead reckoning data, then the predetermined distance may be set to a smaller value because the position of the radar detector may be more precisely determined. In addition, if the strength of the incoming signal is strong, the predetermined distance could be set (manually or automatically) to a higher value because the radar detector will detect the incoming radar signal at a greater distance from the source. For example, if a radar detector in a vehicle detected a radar signal while the vehicle traveled a **1** mile distance, then the predetermined distance for that particular radar signal may be calculated by dividing the 1 mile distance in half. In order to compensate for non-symmetrical detection of the radar signal and inaccuracies of the positioning of the radar detector, an additional ¼ or ½ mile might be added to the above predetermined distance.

3.3 Description of a Third Embodiment

The simple method of operating a radar detector shown in FIG. **2** can be improved as shown in FIG. **3**. In this embodiment, the after the radar detects an incoming radar signal it determines a characteristic of the radar signal. For example, the radar detector may determine the frequency and/or the signal strength of the incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the radar detector is not within a predetermined distance of a predetermined position and the characteristic is not similar to a predetermined characteristic.

By utilizing this method, many false alarms may be eliminated. For example, the location of a microwave automatic door opener and the frequency of the radar signal transmitted by the door opener are first programmed into a radar detector. Assume that a police radar is being transmitted near the location of the microwave automatic door opener. Because the police radar is near the automatic door opener, the method of FIG. **2** would not generate an alert.

**5**

Thus, the operator of a motor-vehicle would not be properly alerted to the police radar. However as shown below, the method of FIG. 3 would generate an alert.

If the automatic door opener signal is processed first according to the method of FIG. 3, then the frequency of the automatic door opener signal would be determined. Next, the position of the radar detector would be determined. Because the radar detector is near the previously programmed position of the automatic door opener and the frequency of the incoming radar signal is equal to the previously programmed frequency of the automatic door opener, the radar detector would not generate an alert.

Next, the police radar signal would be processed. Thus, the frequency of the police radar signal would be determined. However, even though the location of the radar detector is near the previously programmed location of the automatic door opener, because the frequency of the police radar is not equal to the previously programmed frequency of the radar signal transmitted by the door opener, an alert would be generated. Thus, the operator of the motor vehicle would be properly alerted to the presence of the police radar signal.

Due to inaccuracies in algorithms and slight variations in frequencies due to physical phenomena such as temperature of radar transmitters, it may not be practical to determine if a frequency of an incoming signal is exactly equal to a previously programmed frequency. Thus, is often sufficient to determined if the frequency of an incoming radar signal is similar to a previously programmed frequency. For example, if two frequencies are within ½, 1, 2, 3, 4, or 5 MHz of each other, then they may be considered to be similar.

In one embodiment of the invention, 256 frequency bins are defined for each frequency band of the radar detector. Thus, this one embodiment of the invention, each of the following frequency bands would have 256 bins: X band (10.475–10.575 GHz); Ku band (13.400–13.500 GHz); K band (24.025–24.275 GHz); and Ka band (34.150–35.250 GHz). In this embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same bin. In still another embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same or adjacent bins. In these two embodiments, the exact frequency of the incoming radar signal need not be determined. Only the frequency band and the appropriate frequency bin number need be determined. If higher resolution is required, then the number of bins for one or more frequency bands can be increased. On the other hand, if only very low resolution is required, then if two frequencies are in the same frequency band, they may be considered to be similar.

3.4 Description of a Fourth Embodiment

FIG. 4 shows still another method of operating the radar detector of FIG. 1. In this embodiment, the radar signal is first detected. Then, the velocity of the radar detector is determined. Next, an alert is generated if the velocity of the radar detector is greater than a predetermined velocity.

This embodiment is particularly useful if the predetermined velocity is set to a value that is less than the minimum speed time. For example, if an operator of a motor vehicle programs the predetermined velocity to 65 miles per hour, which may be the speed limit on a particular highway, then the operation will not be alerted to a radar signal unless he is speeding. Thus, the operator will not be alerted to radar signals when he is traveling at a slow rate of speed such as when the operator is in traffic. The operator could also program the predetermined velocity to the minimum speed

**6**

limit that the operator is likely to encounter in a specific geographical region. For example, if the city in which the operator lives has some streets with a 25 miles per hour speed limit, then the operator could program the predetermined speed to 25 miles per hour. If the operator performed such programming, such as by decreasing one or more buttons that are coupled to the interface circuit, the operator could be spared some, but not all false alarms.

A more sophisticated embodiment would not require the user to manually program the speed limit. This embodiment would obtain the speed limit from a database that contains speed limits for particular roads in a geographical region. By comparing the location and/or heading of a motor vehicle to the location and/or heading of a plurality of roads in the above database, the radar detector could determine the particular road upon which the vehicle is traveling. After such a determination, the speed limit for the particular road could be accessed from the database. Such algorithms are known by those skilled in the art. This database could be stored on the program storage device of FIG. 1 or could be stored on an external storage device such as a CD ROM or a hard disk drive. This database could also be provided to operators of motor vehicles for a fee.

3.5 Other Embodiments

In some cases, an operator of a motor vehicle may desire to be alerted to the presence of a radar signal even if the above methods would not "generate an alert." In such cases, a less intrusive alert such as a reduced volume tone, and/or a flashing LED could be generated. Thus, the phrase "generate an alert if" a condition occurs is intended to include generating a particular alert if the condition occurs. If another condition occurs, such as detection of an incoming radar signal while the radar detector is within a predetermined distance of a predetermined position as shown in FIG. 2, then another alert may be generated.

The above Description of the Preferred Embodiments includes words, such as "first," "then," and "next." These words indicate a sequence of acts. Many of the sequences can be modified within the scope of the invention. Thus, unless the results of a first act is required for a second act, then the language indicating a sequence should not be considered to be limitations to the invention.

Many of the above embodiments can be combined to produce a radar detector that generates very few false alarms. For example, the methods of FIG. 2 or FIG. 3 can be combined with the method of FIG. 4. Such combinations are intended to be within the scope of the invention.

I claim:

**1**. A method, executed by a device having a position, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

    (a) detecting the incoming radar signal;

    (b) determining the position of the device that detected the incoming radar signal; and

    (c) generating an alert if the position of the device is not within a predetermined distance of a predetermined position.

**2**. The method of claim **1** wherein the act of detecting the incoming radar signal includes determining at least one characteristic of the radar signal.

**3**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining the frequency of the radar signal.

**4**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining a frequency bin number.

US RE39,038 E

**7**

**5**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining whether the incoming radar signal is in the X frequency band, the Ku frequency band, the K frequency band, or the Ka frequency band.

**6**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining the signal strength of the incoming radar signal.

**7**. The method of claim **2** wherein the act of generating an alert includes generating an alert if the at least one characteristic is not similar to a predetermined characteristic.

**8**. The method of claim **1** wherein the act of determining the position of the device includes receiving signals from a plurality of satellites.

**9**. The method of claim **1** wherein the act of determining the position of the device includes receiving a differential global positioning signal.

**10**. The method of claim **1** wherein the act of determining the position of the device includes receiving dead reckoning data.

**11**. A method, executed by a device having a *position and a* velocity, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

(a) detecting the incoming radar signal;

(b) determining the velocity of the device that detected the incoming radar signal; [and]

(c) generating an alert if the velocity of the device is greater than a predetermined velocity*;*

*(d) determining the position of the device that detected the incoming radar signal; and*

*(e) comparing the position of the device that detected the incoming radar signal to a predetermined position.*

**12**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of satellites.

**13**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of global positioning satellites.

**14**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving differential global positioning data.

**15**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving dead reckoning data.

**16**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a velocity that has been previously programmed by an operator of a motor vehicle.

**17**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a legal speed limit that is retrieved from a database.

**18**. A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal comprising:

(a) a microprocessor;

(b) a circuit coupled to the microprocessor for detecting the incoming police radar signal; and

(c) a global positioning system receiver coupled to the microprocessor and operable to provide the microprocessor with data *that indicates the position of the radar detector.*

**19**. [The radar detector of claim **18**, further including] *A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal comprising:*

*(a) a microprocessor;*

*(b) a circuit coupled to the microprocessor for detecting the incoming police radar signal;*

**8**

*(c) a global positioning system receiver coupled to the microprocessor and operable to provide the microprocessor with data; and*

*(d)* a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

[(a)] *(i)*determining the position of a radar detector; and

[(b)] *(ii)*generating an alert if the position of the radar detector is not within a predetermined distance of a predetermined position.

**20**. The radar detector of claim **19**, wherein the program storage device includes machine readable instructions for determining at least one characteristic of the radar signal.

**21**. The radar detector of claim **18**, further including *a* program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

(a) determining the velocity of the device utilized to detect the incoming radar signal; and

(b) generating an alert if the velocity of a radar detector is greater than a predetermined velocity.

*22. The method of claim 1, further comprising:*

*(d) generating the alert if the device is within the predetermined distance of the predetermined position and if the signal strength of the incoming radar signal is greater than a predetermined radar signal strength.*

*23. The method of claim 1, further comprising:*

*(d) generating the alert if the device is within the predetermined distance of the predetermined position and if the signal strength of the incoming radar signal is not within a predetermined frequency range of a predetermined radar frequency.*

*24. The method of claim 1, further comprising:*

*(d) generating the alert if the device is within the predetermined distance of the predetermined position and if either the signal strength of the incoming radar signal is greater than a predetermined signal strength or if the frequency of the incoming radar signal is not within a predetermined frequency range of a predetermined radar frequency.*

*25. The method of claim 1, further comprising:*

*(d) generating the alert if the position of the device is within the predetermined distance of the predetermined position.*

*26. The method of claim 1, further comprising:*

*(d) storing the position of the device in a memory device.*

*27. The method of claim 1, further comprising:*

*(d) storing the frequency of the incoming radar signal in a memory device.*

*28. The method of claim 1, further comprising:*

*(d) storing the signal strength of the incoming signal in a memory device.*

*29. The radar detector of claim 18, wherein the global positioning system receiver is operable to provide the microprocessor with data that indicates the velocity of the radar detector.*

*30. The radar detector of claim 18, wherein the global positioning system receiver is operable to provide the microprocessor with data that indicates the heading of the radar detector.*

*31. The radar detector of claim 18, further comprising:*

*(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

*i) storing the position of the radar detector.*

US RE39,038 E

9

**32.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *determining the position of a source of a radar signal; and*

ii) *storing the position.*

**33.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *determining the distance between the position of the radar detector and another position.*

**34.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *determining the bearing between the position of the radar detector and another position.*

**35.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one position.*

**36.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one radar frequency.*

**37.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one radar signal strength.*

**38.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one position and at least one radar frequency.*

**39.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one position and at least one radar signal strength.*

**40.** *The radar detector of claim 18, further comprising:*

(d) *a memory device that is coupled to the microprocessor, the memory device containing at least one position, at least one radar frequency, and at least one radar signal strength.*

**41.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *comparing the frequency of an incoming radar signal with a previously stored radar frequency.*

10

**42.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *comparing the frequency of an incoming radar signal with a previously stored radar frequency; and*

ii) *generating an alert based at least in part upon the result of the comparison.*

**43.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *comparing the signal strength of an incoming radar signal with a previously stored radar signal strength.*

**44.** *The radar detector of claim 18, further comprising:*

(d) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

i) *comparing the signal strength of an incoming radar signal with a previously stored radar signal strength; and*

ii) *generating an alert based at least in part upon the result of the comparison.*

**45.** *A radar detector for alerting an operator of a motor vehicle to an incoming radar signal comprising:*

(a) *a circuit operable to detect an incoming radar signal; and*

(b) *a microprocessor operable to disable an alert to the incoming radar signal based at least in part upon the position of the radar detector.*

**46.** *The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the velocity of the radar detector.*

**47.** *The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the frequency of the incoming radar signal.*

**48.** *The radar detector of claim 45, wherein the microprocessor is operable to enable the alert based at least in part upon the frequency of the incoming radar signal.*

**49.** *The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the signal strength of the incoming radar signal.*

**50.** *The radar detector of claim 45, wherein the microprocessor is operable to enable the alert based at least in part upon the signal strength of the incoming radar signal.*

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : RE 39,038 E                                    Page 1 of 1
APPLICATION NO. : 10/352679
DATED                 : March 28, 2006
INVENTOR(S)      : Hoyt A. Fleming, III

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Insert in the first line of the specification the following:

  --Notice:  More than one reissue application has been filed for the reissue of patent

6,204,798.  The reissue applications are applications Nos. 11/196,841 and 10/352,679.

Reissue applicatin No. 11/196,841 is a continuation of reissue application No.

10/352,679.--

In Claim 23 (at column 8, line 31):
  Replace "signal strength" with --frequency--.

In Claim 25 (at column 8, line 43):
  Replace "the alert" with --a second alert--.

In Claim 28 (at column 8, line 53):
  Replace "incoming signal" with --incoming radar signal--.

Signed and Sealed this

Thirteenth Day of March, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*



US00RE40653E

(19) **United States**

(12) **Reissued Patent**
Fleming, III

(10) Patent Number:     **US RE40,653 E**
(45) Date of Reissued Patent:    *Mar. 10, 2009

(54) **RADAR DETECTOR FOR DETECTING POLICE RADAR THAT RECEIVES GPS DATA**

(76) Inventor:    **Hoyt A. Fleming, III**, 4134 W. Quail Ridge Dr., Boise, ID (US) 83703

( * )  Notice:    This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/196,841**

(22) Filed:    **Aug. 2, 2005**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.:    **6,204,798**
        Issued:    Mar. 20, 2001
        Appl. No.:    09/292,089
        Filed:    Apr. 14, 1999

U.S. Applications:
(63) Continuation of application No. 10/352,679, filed on Jan. 28, 2003, now Pat. No. Re. 39,038.

(51) **Int. Cl.**
        *G01S 7/40*        (2006.01)
        *G01S 13/00*        (2006.01)
(52) **U.S. Cl.** .............................. **342/20**; 342/52; 342/89; 342/195; 342/357.06; 342/357.1; 342/357.17
(58) **Field of Classification Search** ................... 342/20, 342/26 R–26 D, 27, 52, 83, 90–93, 104, 105, 342/109, 115, 118, 159, 165, 175, 195, 357.01, 342/357.06, 357.1, 357.13, 357.17, 146–158; 370/901–905, 933, 936, 988, 989, 991; 340/933–936
        See application file for complete search history.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,660,844 | A | * | 5/1972 | Potter | .......................... 342/20 |
| 4,313,216 | A | * | 1/1982 | Jaeger et al. | .................. 342/20 |
| 4,750,215 | A | * | 6/1988 | Biggs | ............................ 342/20 |
| 4,906,999 | A | * | 3/1990 | Harrah et al. | ................... 342/20 |
| 4,949,088 | A | * | 8/1990 | Ryan et al. | .................... 342/20 |

| | | | | | |
|---|---|---|---|---|---|
| 5,068,663 | A | * | 11/1991 | Valentine et al. | ............... 342/20 |
| 5,083,129 | A | * | 1/1992 | Valentine et al. | ............... 342/20 |
| 5,151,701 | A | * | 9/1992 | Valentine et al. | ............... 342/20 |
| 5,250,951 | A | * | 10/1993 | Valentine et al. | ............... 342/20 |
| 5,977,884 | A | * | 11/1999 | Ross | ........................... 340/936 |
| 6,040,301 | A | * | 4/2000 | Weagant | ....................... 342/20 |
| 6,118,403 | A | * | 9/2000 | Lang | ............................. 342/20 |
| 6,252,544 | B1 | | 6/2001 | Hoffberg | ................. 342/357.1 |
| 6,670,905 | B1 | | 12/2003 | Orr | |
| RE39,038 | E | * | 3/2006 | Fleming, III | ................. 342/20 |

OTHER PUBLICATIONS

"Buyers Guide: Radar Detectors"; no author listed; no date given; copyright 2002–206; on the Internet at radarbusters.com.*
Dr. Tom J. Chalko, "High accuracy speed measurement using GPS (Global Positioning System)"; Scientific Engineering Research P/L; Mount Best, Victoria, Australia; no date listed; copyright in the year 2007.
Poteet, David C., "RadioSat"; on the Internet at newcitymedia.com; no date given; copyright 1995–1997; last modified Oct. 6, 1998.*
U.S. Appl. Ser. No. 60/108,362, filed Nov. 13, 1988, never published.*
U.S. Appl. Ser. No. 60/139,097 filed Jun. 1999 Steven K. Orr.
U.S. Appl. Ser. No. 60/145,394 filed Jul. 1999 Steven K. Orr.

* cited by examiner

*Primary Examiner*—Bernarr E Gregory

(57)        **ABSTRACT**

A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver coupled to the microprocessor. Upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

**30 Claims, 2 Drawing Sheets**





## Fig. 1

Detect an incoming radar signal.

Determine the position of the radar detector.

Generate an alert if the position of the radar detector is not within a predetermined distance of a predetermined position.

## Fig. 2

Detect an incoming radar signal.

Determine at least one characteristic of the incoming radar signal.

Determine the position of the radar detector.

Generate an alert if the radar detector is not within a predetermined distance of a predetermined position and the at least one characteristic is not similar to a predetermined characteristic.

*Fig. 3*

Detect an incoming radar signal.

Determine the velocity of the radar detector.

Generate an alert if the velocity of the radar detector is greater than a predetermined velocity.

*Fig. 4*

64

US RE40,653 E

**1**

## RADAR DETECTOR FOR DETECTING POLICE RADAR THAT RECEIVES GPS DATA

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

*This application is a continuation of U.S. patent application Ser. No. 10/352,679, filed on Jan. 28, 2003 now Reissued U.S. Pat. No. Re. 39,038, which is a Reissue of U.S. Pat. No. 6,204,798, which issued from U.S. patent application Ser. No. 09/292,089, filed on Apr. 14, 1999.*

### 1. BACKGROUND

The present invention relates generally to police radar detectors used in motor vehicles and, more particularly, to police radar detectors that utilize a motor vehicle's position, velocity and/or heading to minimize false alarms.

Many operators of motor vehicles utilize radar detectors to alert them to he fact that their speed is being monitored by law enforcement agencies. However, conventional radar detectors often generate "false alarms." These false alarms are annoying to the operators of motor vehicles. In fact, various automotive publications publish results of "false alarm" tests. Thus, anything that can be accomplished by the manufacturer to reduce the number of false alarms without reducing detection of police radar is commercially valuable.

In addition to police radar signals, there are many different sources of microwave signals in the frequency bands allocated to police radar by the U.S. Federal Communications Commission (FCC). For example, motion-detecting burglar alarms and automatic door openers also operate in the frequency band allocated to police radar. Thus, a need exists for a radar detector that can distinguish between signals generated by a police radar transmitter and those generated by other devices which utilize microwave signals within the same frequency bands.

Still another source of annoying false alarms occurs when an operator of a motor vehicle is travelling at a speed that is below the legal speed limit, such as occurs when the operator is in traffic, and the radar detector alerts him to an incoming radar signal. Even if a police radar signal is monitoring the speed of the operator's vehicle, because the velocity of the vehicle is below the legal speed limit, the operator of the vehicle may not need to be alerted to the presence of the police radar signal. Thus, a need exists for a radar detector that does not generate an alert if the velocity of the radar detector is below the legal speed limit.

Operators have become accustomed to radar detectors activating in certain locations along commonly traveled streets and highways. Police radar units may be deployed by the side of the roadway at these locations since the police also are aware of the local activation signals and the police are aware that the signals tend to mask their own speed monitoring radar units. Thus, a need exits for a radar detector that can avoid generating a false alarm due to such accustomed radar signals while still generating an alert for such police radar signals.

### 2. SUMMARY OF THE INVENTION

One embodiment is a radar detector for altering an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver

**2**

coupled to the microprocessor. The radar detectors also includes a program storage device containing instructions for determining whether to generate an alert to an incoming radar signal based upon the radar detector's position, velocity and/or heading.

Another embodiment of the invention is a method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the position of a radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

Still another embodiment of the invention is a second method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the velocity of the radar detector is determined. Then, an alert is generated if the velocity of a radar detector is greater than a predetermined velocity.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a radar detector including one embodiment of the present invention.

FIG. **2** is a flow diagram of a method of operating a radar detector.

FIG. **3** is a flow diagram of another method of operating a radar detector.

FIG. **4** is a flow diagram of yet another method of operating a radar detector.

### 3. DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

3.1 Description of a First Embodiment

One embodiment of the novel radar detector is shown in FIG. **1**. The radar detector includes an antenna that is coupled to a detector circuit. The detector circuit, which may be controlled by the microprocessor of FIG. **1**, collects the signals from the antenna, detects the incoming signals, and distinguishes valid radar signals from electrical noise. The detector circuit may be any appropriate radar detector circuit capable of generating an output signal which indicates the strength, the presence, and/or the frequency of incoming radar signals. While the detector circuit may operate autonomously, operation and control of the detector circuit may be performed by the microprocessor. For example, the microprocessor may control the detector as is known in the art so that radar signals in the different frequency bands allocated to police radar signals are detected. Such detector circuits can take a wide variety of forms and can include amplifiers, mixers, diplexers, and other circuitry commonly used in the radar detector field. Several examples of such circuits are shown in U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The output of the detector circuit is coupled to the input of one or more analog-to-digital converters. These converters convert the analog output of the detector circuit into digital signals that represent signal strength, signal presence, and/or signal frequency.

In addition to being coupled to the detector circuit and the analog-to-digital converter, the microprocessor is also coupled to an alert circuit. The alert circuit communicates information regarding detected radar signals to the operator of a motor vehicle using the radar detector by means of one or more alarm tones and/or visual indicators that are included within the alert circuit. Alert circuits are known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

US RE40,653 E

3

The microprocessor, which may be any conventional single or multiple chip microprocessor or digital signal processor, is coupled to a program storage device. The program storage device may be any conventional memory device such as a PROM, EPROM, EEPROM, ROM, SRAM or even battery backed up DRAM. The program storage device contains machine readable instructions that command the microprocessor to perform certain functions. For example, the program storage device may be conventionally programmed to sweep a predetermined number of radar frequency bands, determine the frequency and/or signal strength of any detected radar signals in the swept frequency bands, and, if the signal strength of the detected radar signals exceed a predetermined value, then generate a signal that activates the alert circuit. Such programming is known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The microprocessor is also coupled to a positioning system such as a global positioning system ("GPS") receiver. As is well known, a GPS receiver receives signals from satellites and uses these signals to calculate the position of the GPS receiver. In addition, the GPS receiver may receive differential correction data and/or dead reckoning data, such as from a compass or a wheel sensor, to increase the accuracy of the receiver. By calculating the position of the GPS receiver at two different times, the velocity and heading of the GPS receiver can be easily determined using conventional algorithms. Thus, the GPS receiver can provide the microprocessor with data that indicates the position, the velocity, and/or the heading of the radar detector.

The microprocessor may also be coupled to a user interface circuit (not shown). The user interface circuit may include a plurality of buttons that are intended to be depressed by an operator of a motor vehicle. Such buttons may include: a power button, a mute button, a city/highway button, and a dim button.

As will be discussed more fully below, the program storage device may also contain machine readable instructions that command the microprocessor to determine whether to generate an alert based upon data received from the GPS. Thus, upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

3.2 Description of a Second Embodiment

One method of operating the radar detector of FIG. 1 is shown in FIG. 2. In this embodiment, the radar detector first detects an incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

By utilizing the above method, many false alarms may be eliminated. For example, if the position of a microwave automatic door opener is programmed into the radar detector and the radar detector detects an incoming radar signal when the radar detector's position is near the automatic door opener, then it is likely that the source of the incoming radar signal is the automatic door opener and not a police radar. Thus, using the method of FIG. 2, an alert would not be generated for the detected radar signal.

The programming of predetermined positions may be accomplished by depressing one or more buttons that are coupled to the user interface circuit discussed above. Thus, if an operator of a motor vehicle approaches a microwave automatic door opener, then the operator can depress an "ignore radar" button. Then, the radar detector would store the posi-

4

tion of the radar detector and possibly the frequency and the signal strength of the incoming radar signal in the program storage device of FIG. 1 or another memory device (not shown) coupled to or integrated within the microprocessor. An alternative method of storing such data would be to hold down a "mute" button for an extended length of time such as 3 to 5 seconds. It is also possible to experimentally generate a database containing position, frequency and/or signal strength for a specific geographical region. This database could be provided to operators of motor vehicles for a fee. Accessing the Internet via a cellular phone (not shown) coupled to the microprocessor of FIG. 1 would be one method of providing the above database to operators of motor vehicles.

In still another embodiment, when the operator instructs the radar detector to store a position of an incoming radar signal, the radar detector could attempt to locate the approximate position of the source of the incoming radar signal. For example, if an operator instructs the radar detector to store a position of an incoming radar signal as the operator is still approaching the source of the incoming radar signal, the signal strength of the incoming radar signal will be increasing. The radar detector could locate a position that is very near the position of the source of the incoming radar signal by determining the position of the radar detector when the strength of the incoming signal is at a maximum. In addition, radar detectors such as described in U.S. Pat. No. 5,250,951, may utilize multiple radar antennas and signal processing logic to more accurately determine the position of the source of the incoming radar signal. For example, the position of the source of many incoming radar signals may be closely approximated by the position of a radar detector when the radar detector identifies that the radar source is to the side of the vehicle.

The predetermined distance may also be programmed by the operator of the motor vehicle. If the GPS receiver is receiving differential correction data or is receiving dead reckoning data, then the predetermined distance may be set to a smaller value because the position of the radar detector may be more precisely determined. In addition, if the strength of the incoming radar is strong, the predetermined distance could be set (manually or automatically) to a higher value because the radar detector will detect the incoming radar signal at a greater distance from the source. For example, if a radar detector in a vehicle detected a radar signal while the vehicle traveled a 1 mile distance, then the predetermined distance for that particular radar signal may be calculated by dividing the 1 mile distance in half. In order to compensate for non-symmetrical detection of the radar signal ad inaccuracies of the positioning of the radar detector, an additional $\frac{1}{4}$ or $\frac{1}{2}$ mile may be added to the above predetermined distance.

3.3 Description of a Third Embodiment

The simple method of operating a radar detector shown in FIG. 2 can be improved as shown in FIG. 3. In this embodiment, the after the radar detects an incoming radar signal it determines a characteristic of the radar signal. For example, the radar detector may determine the frequency and/or the signal strength of the incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the radar detector is not within a predetermined distance of a predetermined position and the characteristic is not similar to a predetermined characteristic.

By utilizing this method, many false alarms may be eliminated. For example, the location of a microwave automatic door opener and the frequency of the radar signal transmitted by the door opener are first programmed into a radar detec-

US RE40,653 E

**5**

tor. Assume that a police radar is being transmitted near the location of the microwave automatic door opener. Because the police radar is near the automatic door opener, the method of FIG. **2** would not generate an alert. Thus, the operator of a motor vehicle would not be properly alerted to the police radar. However as shown below, the method of FIG. **3** would generate an alert.

If the automatic door opener signal is processed first according to the method of FIG. **3**, then the frequency of the automatic door opener signal would be determined. Next, the position of the radar detector would be determined. Because the radar detector is near the previously programmed position of the automatic door opener and the frequency of the incoming radar signal is equal to the previously programed frequency of the automatic door opener, the radar detector would not generate an alert.

Next, the police radar signal would be processed. Thus, the frequency of the police radar signal would be determined. However, even though the location of the radar detector is near the previously programmed location of the automatic door opener, because the frequency of the police radar is not equal to the previously programmed frequency of the radar signal transmitted by the door opener, an alert would be generated. Thus, the operator of the motor vehicle would be properly alerted to the presence of the police radar signal.

Due to inaccuracies in algorithms and slight variations in frequencies due to physical phenomena such as temperature of radar transmitters, it may not be practical to determine if a frequency of an incoming radar signal is exactly equal to a previously programmed frequency. Thus, is often sufficient to determine if the frequency of an incoming radar signal is similar to a previously programmed frequency. For example, if two frequencies are within ½, 1, 2, 3, 4, or 5 MHz of each other, then they may be considered to be similar.

In one embodiment of the invention, 256 frequency bins are defined for each frequency band of the radar detector. Thus, this one embodiment of the invention, each of the following frequency bands would have 256 bins: X band (10.475–10.575 GHz); Ku band (13.400–13.500 GHz); K band (24.025–24.275 GHz); and Ka band (34.150–35.250 GHz). In this embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same bin. In still another embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same or adjacent bins. In these two embodiments, the exact frequency of the incoming radar signal need not be determined. Only the frequency band and the appropriate frequency bin number need be determined. If higher resolution is required, then the number of bins for one or more frequency bands can be increased. On the other hand, if only very low resolution is required, then if two frequencies are in the same frequency band, they may be considered to be similar.

3.4 Description of a Fourth Embodiment

FIG. **4** shows still another method of operating the radar detector of FIG. **1**. In this embodiment, the radar signal is first detected. Then, the velocity of the radar detector is determined. Next, an alert is generated if the velocity of the radar detector is greater than a predetermined velocity.

This embodiment is particularly useful if the predetermined velocity is set to a value that is less than the minimum speed limit. For example, if an operator of a motor vehicle programs the predetermined velocity to 65 miles per hour, which may be the speed limit on a particular highway, then the operator will not be alerted to a radar signal unless he is speeding. Thus, the operator will not be alerted to radar signals when he is traveling at a slow rate of speed such as when

**6**

the operator is in traffic. The operator could also program the predetermined velocity to the minimum speed limit that the operator is likely to encounter in a specific geographical region. For example, if the city in which the operator lives has some streets with a 25 miles per hour speed limit, then the operator could program the predetermined speed to 25 miles per hour. If the operator performed such programming, such as by depressing one or more buttons that are coupled to the interface circuit, the operator could be spared some, but not all false alarms.

A more sophisticated embodiment would not require the user to manually program the speed limit. This embodiment would obtain the speed limit from a database that contains speed limits for particular roads in a geographic region. By comparing the location and/or the heading of a motor vehicle to the location and/or heading of a plurality of roads in the above database, the radar detector could determine the particular road upon which the vehicle is traveling. After such a determination, the speed limit for the particular road could be accessed from the database. Such algorithms are known by those skilled in the art. This database could be stored on the program storage device of FIG. **1** or could be stored on an external storage device such as a CD ROM or a hard disk drive. This database could also be provided to operators of motor vehicles for a fee.

3.5 Other Embodiments

In some cases, an operator of a motor vehicle may desire to be alerted to the presence of a radar signal even if the above methods would not "generate an alert." In such cases, a less intrusive alert such as a reduced volume tone, and/or a flashing LED could be generated. Thus, the phrase "generate an alert if" a condition occurs is intended to include generating a particular alert if the condition occurs. If another condition occurs, such as detection of an incoming radar signal while the radar detector is within a predetermined distance of a predetermined position as shown in FIG. **2**, then another alert may be generated.

The above Description of the Preferred Embodiments includes words, such as "first," "then," and "next." These words indicate a sequence of acts. Many of the sequences can be modified within the scope of the invention. Thus, unless the result of a first act is required for a second act, then the language indicating a sequence should not be considered to be limitations to the invention.

Many of the above embodiments can be combined to produce a radar detector that generates very few false alarms. For example, the methods of FIG. **2** or FIG. **3** can be combined with the method of FIG. **4**. Such combinations are intended to be within the scope of the invention.

I claim:

[**1**. A method, executed by a device having a position, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

(a) detecting the incoming radar signal;

(b) determining the position of the device that detected the incoming radar signal; and

(c) generating an alert if the position of the device is not within a predetermined distance of a predetermined position.]

[**2**. The method of claim **1** wherein the act of detecting the incoming radar signal includes determining at least one characteristic of the radar signal.]

[**3**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal in includes determining the frequency of the radar signal.]

[**4**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining a frequency bin number.]

US RE40,653 E

**7**

[**5**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining whether the incoming radar signal is in the X frequency band, the Ku frequency band, the K frequency band, or the Ka frequency band.]

[**6**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining the signal strength of the incoming radar signal.]

[**7**. The method of claim **2** wherein the act of generating an alert includes generating an alert if the at least one characteristic is not similar to a predetermined characteristic.]

[**8**. The method of claim **1** wherein the act of determining the position of the device includes receiving signals from a plurality of satellites.]

[**9**. The method of claim **1** wherein the act of determining the position of the device includes receiving a differential global positioning signal.]

[**10**. The method of claim **1** wherein the act of determining the position of the device includes receiving dead reckoning data.]

[**11**. A method, executed by a device having a velocity, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

(a) detecting the incoming radar signal;

(b) determining the velocity of the device that detected the incoming radar signal; and

(c) generating an alert if the velocity of the device is greater than a predetermined velocity.]

[**12**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of satellites.]

[**13**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of global positioning satellites.]

[**14**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving differential global positioning data.]

[**15**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving dead reckoning data.]

[**16**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a velocity that has been previously programmed by an operator of a motor vehicle.]

[**17**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a legal speed limit that is retrieved from a database.]

[**18**. A radar detector for altering an operator of a motor vehicle to an incoming police radar signal comprising:

(a) a microprocessor;

(b) a circuit coupled to the microprocessor for detecting the incoming police radar signal; and

(c) a global positioning system receiver coupled to the microprocessor and operable to provide the microprocessor with data.]

[**19**. The radar detector of claim **18**, further including a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

(a) determining the position of a radar detector; and

(b) generating an alert if the position of the radar detector is not within a predetermined distance of a predetermined position.]

**8**

[**20**. The radar detector of claim **19**, wherein the program storage device includes machine readable instructions for determining at least one characteristic of the radar signal.]

[**21**. The radar detector of claim **18**, further including a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

(a) determining the velocity of the device utilized to detect the incoming radar signal; and

(b) generating an alert if the velocity of a radar detector is greater than a predetermined velocity.]

22. A method, executed by a radar detector for alerting an operator of a motor vehicle to an incoming police radar signal, the radar detector having a GPS receiver and a processor, the method comprising:

receiving data based at least in part upon the incoming police radar signal;

alerting the operator of the motor vehicle to the incoming police radar signal;

determining a first position of the radar detector;

determining a second position of the radar detector; and

receiving data based at least in part upon the second position;

wherein the determining of the second position of the radar detector is performed by the radar detector's GPS receiver;

wherein the receiving the data based at least in part upon the second position and the receiving the data based at least in part upon the incoming police radar signal are both performed by the radar detector's processor.

23. The method of claim 22, further comprising determining the moving direction between the first position and the second position.

24. The method of claim 23, further comprising generating a visual indication based at least in part upon the moving direction.

25. The method of claim 22, wherein the radar detector includes a button, the method further comprising muting an audible alert based upon data received from the button.

26. The method of claim 25, wherein the radar detector includes non-volatile memory, the method further comprising storing data in the non-volatile memory based upon data received from the button.

27. The method of claim 25, wherein the radar detector includes non-volatile memory, the method further comprising storing the second position in the non-volatile memory based at least in part upon data received from the button.

28. The method of claim 25, wherein the radar detector includes non-volatile memory, the method further comprising storing the second position and the frequency of the incoming radar signal in the non-volatile memory based upon data received from the button.

29. The method of claim 25, wherein the radar detector includes non-volatile memory, the method further comprising storing the second position and data related to the frequency of the incoming radar signal in the non-volatile memory based upon data received from the button.

30. The method of claim 25, wherein the button is a mute button and the radar detector includes non-volatile memory, the method further comprising storing data in the non-volatile memory based upon data received from the mute button.

31. The method of claim 25, wherein the button is a mute button and the radar detector includes non-volatile memory, the method further comprising storing the second position in the non-volatile memory based upon data received from the mute button.

US RE40,653 E

9

32. The method of claim 25, wherein the button is a mute button and the radar detector includes non-volatile memory, the method further comprising storing the second position and the frequency of the incoming radar signal in the non-volatile memory based upon data received from the mute button.

33. The method of claim 25, wherein the button is a mute button and the radar detector includes non-volatile memory, the method further comprising storing the second position and data related to the frequency of the incoming radar signal in the non-volatile memory based upon data received from the mute button.

34. The method of claim 25, wherein the button is a mute button and the radar detector includes non-volatile memory, the method further comprising performing an act that is unrelated to muting an alert based upon data received from the mute button.

35. The method of claim 25, wherein the radar detector includes non-volatile memory, the method further comprising storing the second position in the non-volatile memory based upon first data received from the button and performing an act that is unrelated to storing a position in the non-volatile memory based upon second data received from the button.

36. The method of claim 22, wherein the radar detector has a velocity, the method further comprising generating an alert if the velocity of the radar detector is greater than a predetermined velocity.

37. The method of claim 22, wherein the radar detector has a velocity, the method further comprising muting an alert if the velocity of the radar detector is less than a predetermined velocity.

38. A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal, the radar detector comprising:

an alert circuit that alerts the operator of the motor vehicle to the incoming police radar signal;

a GPS receiver that determines a first position and a second position of the radar detector;

a processor, the processor receiving data based at least in part upon the second position, the processor also receiving data based at least in part upon the incoming police radar signal; and

a display that generates a visual indication based at least in part upon the second position of the radar detector.

39. The radar detector of claim 38, wherein the radar detector determines the moving direction between the first position and the second position.

40. The radar detector of claim 39, wherein the radar detector generates a visual indication based at least in part upon the moving direction.

41. The radar detector of claim 38, wherein the radar detector includes a button and the radar detector mutes an audible alert based upon data received from the button.

42. The radar detector of claim 38, wherein the radar detector includes a button and non-volatile memory and the radar detector stores data in the non-volatile memory based upon data received from the button.

10

43. The radar detector of claim 38, wherein the radar detector includes a button and non-volatile memory and the radar detector stores the second position and the frequency of the incoming radar signal in the non-volatile memory based upon data received from the button.

44. The radar detector of claim 38, wherein the radar detector includes a mute button and non-volatile memory and the radar detector stores data in the non-volatile memory based upon data received from the mute button.

45. The radar detector of claim 38, wherein the radar detector includes a mute button and non-volatile memory and the radar detector stores the second position in the non-volatile memory based upon data received from the mute button.

46. The radar detector of claim 38, wherein the radar detector includes a mute button and non-volatile memory and the radar detector stores at least two items in the non-volatile memory based upon data received from the mute button.

47. The radar detector of claim 38, wherein the radar detector includes a mute button and non-volatile memory and the radar detector performs an act that is unrelated to muting an alert based upon data received from the mute button.

48. The radar detector of claim 38, wherein the radar detector includes a button and non-volatile memory, and the radar detector stores data related to the second position in the non-volatile memory based upon first data received from the button and performing an act that is unrelated to storing a position in the non-volatile memory based upon second data received from the button.

49. The radar detector of claim 38, wherein the radar detector has a velocity and the radar detector generates an alert if the velocity of the radar detector is greater than a predetermined velocity.

50. The radar detector of claim 38, wherein the radar detector has a velocity and the radar detector mutes an alert if the velocity of the radar detector is less than a predetermined velocity.

51. A system, for use in an automobile, the system comprising:

a GPS receiver that outputs first data;

a plurality of antennas that receive radar signals;

signal processing logic coupled to the plurality of antennas, the signal processing logic using the received radar signals to determine positions of objects with respect to a side of the automobile;

a device, coupled to the GPS receiver and the signal processing logic, the device generating a first visual indication based at least in part upon the first data, the device generating a second visual indication based at least in part upon the positions of the objects with respect to the side of the automobile.

* * * * *

APPEAL,LC1,PAT/TRD/COPY,PROTO,TERMED
**U.S. District Court**
**District of Idaho (LIVE Database)Version 5.1.1 (Boise – Southern)**
**CIVIL DOCKET FOR CASE #: 1:09–cv–00105–BLW**

Fleming v. Escort Inc. et al                           Date Filed: 03/10/2009
Assigned to: Judge B. Lynn Winmill                     Date Terminated: 03/27/2013
 related Cases:   1:12–cv–00066–BLW                     Jury Demand: Both
                  1:12–cv–00064–BLW                     Nature of Suit: 830 Patent
 Case in other court:  United States Court of Appeals for the    Jurisdiction: Federal Question
                   Federal Cir, 14–01371
Cause: 15:1126 Patent Infringement

**Plaintiff**

**Hoyt A Fleming**                    represented by   **Kenneth H Bridges**
                                                       WONG CABELLO LUTSCH
                                                       RUTHERFORD AND BRUCCULERI
                                                       LLP
                                                       540 Cowper St Ste 100
                                                       Palo Alto, CA 94301
                                                       650–681–4475
                                                       Email: KBridges@BridgesMav.com
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*

                                                       **Michael T. Pieja**
                                                       WONG CABELLO LUTSCH
                                                       RUTHERFORD AND BRUCCULERI
                                                       LLP
                                                       540 Cowper St Ste 100
                                                       Palo Alto, CA 94301
                                                       650–681–4478
                                                       Fax: (650) 473–9832
                                                       Email: MPieja@BridgesMav.com
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*

                                                       **Peter M. Midgley**
                                                       Parsons Behle &Latimer
                                                       960 Broadway, Ste. 250
                                                       Boise, ID 83706
                                                       (208) 562–4900
                                                       Fax: (208) 562–4901
                                                       Email: PMidgley@parsonsbehle.com
                                                       *TERMINATED: 11/02/2011*
                                                       *LEAD ATTORNEY*

                                                       **Thomas C Mavrakakis**
                                                       WONG CABELLO LUTSCH
                                                       RUTHERFORD AND BRUCCULERI
                                                       LLP
                                                       540 Cowper St Ste 100
                                                       Palo Alto, CA 94301
                                                       650–681–4475
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brian Kwok**

WONG CABELLO LUTSCH
RUTHERFORD AND BRUCCULERI
LLP
540 Cowper St Ste 100
Palo Alto, CA 94301
650–681–4479
*TERMINATED: 08/30/2010*
*PRO HAC VICE*

**Dana M Herberholz**
Parsons Behle &Latimer
800 W. Main Street
Suite 1300
Boise, ID 83702
208–562–4900
Fax: 208–562–4901
Email: dherberholz@parsonsbehle.com
*TERMINATED: 11/02/2011*

**Michael S Dowler**
Park, Vaughan, Fleming &Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
713–821–1540
Email: mike@parklegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven F Schossberger**
HAWLEY TROXELL ENNIS
&HAWLEY
PO Box 1617
Boise, ID 83701
(208) 344–6000
Email: sfs@hteh.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Escort Inc.**                    represented by    **Alexander P. McLaughlin**
Givens Pursley LLP
P O Box 2720
Boise, ID 83701
208–388–1200
Email: mclaughlin@davisoncopple.com
*TERMINATED: 05/27/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**
Andersen Banducci PLLC
101 S. Capitol Blvd., Suite 1600
Boise, ID 83702
(208) 342–4411
Fax: 1–208–342–4455
Email: sba@andersenbanducci.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry C Copple**
DAVISON COPPLE COPPLE &COPPLE
PO Box 1583
Boise, ID 83701

(208) 342–3658
Fax: 1–208–386–9428
Email: tc@davisoncopple.com
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A Schatz**
Wood, Herron &Evans, L.L.P.
441 Vine Street
Cincinnati, OH 45202
513–241–2324
Email: bschatz@whe–law.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
Wood, Herron &Evans, L.L.P.
441 Vine Street
2700 Carew Tower
Cincinnati, OH 45202
513–241–2324
Fax: 513–241–6234
Email: gahrens@whepatent.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Beltronics USA, Inc.**                    represented by   **Alexander P. McLaughlin**
(See above for address)
*TERMINATED: 05/27/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry C Copple**
(See above for address)
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A Schatz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tracy Jack Crane**
Anderson Julian and Hull
POB 7426
Boise, ID 83707
208–344–5800
Email: tcrane@ajhlaw.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Escort Inc.**

represented by **Alexander P. McLaughlin**
(See above for address)
*TERMINATED: 05/27/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry C Copple**
(See above for address)
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A Schatz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Beltronics USA, Inc.**

represented by **Alexander P. McLaughlin**
(See above for address)
*TERMINATED: 05/27/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry C Copple**
(See above for address)
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A Schatz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Hoyt A Fleming**

represented by **Kenneth H Bridges**
(See above for address)
*TERMINATED: 08/30/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Michael T. Pieja**

**73**

(See above for address)
*TERMINATED: 08/30/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Peter M. Midgley**
(See above for address)
*TERMINATED: 11/02/2011*
*LEAD ATTORNEY*

**Thomas C Mavrakakis**
(See above for address)
*TERMINATED: 08/30/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Brian Kwok**
(See above for address)
*TERMINATED: 08/30/2010*
*PRO HAC VICE*

**Dana M Herberholz**
(See above for address)
*TERMINATED: 11/02/2011*

**Michael S Dowler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven F Schossberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Escort Inc.**                          represented by **Brett A Schatz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Beltronics USA, Inc.**                 represented by **Brett A Schatz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory F Ahrens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven B Andersen**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Hoyt A Fleming**                    represented by   **Kenneth H Bridges**
                                                       (See above for address)
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*

                                                       **Michael T. Pieja**
                                                       (See above for address)
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*

                                                       **Peter M. Midgley**
                                                       (See above for address)
                                                       *TERMINATED: 11/02/2011*
                                                       *LEAD ATTORNEY*

                                                       **Thomas C Mavrakakis**
                                                       (See above for address)
                                                       *TERMINATED: 08/30/2010*
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*

                                                       **Brian Kwok**
                                                       (See above for address)
                                                       *TERMINATED: 08/30/2010*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Dana M Herberholz**
                                                       (See above for address)
                                                       *TERMINATED: 11/02/2011*

                                                       **Michael S Dowler**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2009 | 1 | COMPLAINT against Escort Inc., Beltronics USA, Inc. ( Filing fee $ 350 receipt number 09760000000000451097.), filed by Hoyt A Fleming. (Attachments: # 1 Exhibit 1 to the Complaint, # 2 Exhibit 2 to the Complaint, # 3 Exhibit 3 to the Complaint, # 4 Cover Sheet, # 5 Summons for Escort Inc., # 6 Summons for Beltronics USA, Inc.)(Midgley, Peter) |
| 03/11/2009 |  | Summons Issued as to Escort Inc., Beltronics USA, Inc.. (dks) |
| 03/11/2009 | 2 | REPORT on the filing of an action regarding patent number(s)6,204,798, RE39,038 RE40,653 &(Notice sent to USPTO) (dks) |
| 03/17/2009 | 4 | MOTION FOR PRO HAC VICE APPEARANCE of Thomas C. Mavrakakis for Hoyt A Fleming ( Filing fee $ 200 receipt number 09760000000000454293.)Peter M. Midgley, Thomas C Mavrakakis appearing for Plaintiffs Hoyt A Fleming, Hoyt A Fleming. Responses due by 4/10/2009 (Midgley, Peter) |

**75**

| | | |
|---|---|---|
| 03/18/2009 | 5 | DOCKET ENTRY ORDER granting 3 and 4 Applications for Pro Hac Vice Appearance of attorneys Kenneth H Bridges and Thomas C. Mavrakakis for Hoyt A Fleming; Per General Order 206, out–of–state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk); (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 03/31/2009 | 6 | STIPULATION *For Extension Of Time To Answer Or Otherwise Respond To Complaint* by Escort Inc., Beltronics USA, Inc.. (Copple, Terry) |
| 03/31/2009 | 7 | NOTICE of Availability of Magistrate Judge and Requirement for Consent sent to counsel for Hoyt A Fleming, Escort Inc., Beltronics USA, Inc. Consent/Objection to Magistrate due by 6/2/2009. (dks) |
| 03/31/2009 | | NOTICE: Pursuant to FRCP 7.1 you are required to file a Corporate Disclosure Statement with the Clerk's Office. You can do this by choosing the category Other Documents, then select Corporate Disclosure Statement. (dks) |
| 04/02/2009 | 8 | Corporate Disclosure Statement by Escort Inc., Beltronics USA, Inc.. (Copple, Terry) |
| 04/02/2009 | 9 | MOTION FOR PRO HAC VICE APPEARANCE for Escort Inc., Beltronics USA, Inc. ( Filing fee $ 200 receipt number 0976000000000460813.)Terry C Copple appearing for Defendants Escort Inc., Beltronics USA, Inc., Escort Inc., Beltronics USA, Inc.. Responses due by 4/27/2009 (Copple, Terry) |
| 04/02/2009 | 10 | MOTION FOR PRO HAC VICE APPEARANCE for Escort Inc., Beltronics USA, Inc. ( Filing fee $ 200 receipt number 0976000000000460824.)Terry C Copple appearing for Defendants Escort Inc., Beltronics USA, Inc., Escort Inc., Beltronics USA, Inc.. Responses due by 4/27/2009 (Copple, Terry) |
| 04/03/2009 | 11 | DOCKET TEXT ORDER granting 9 , 10 Motion for Pro Hac Vice Appearance for attorneys Gregory F. Ahrens and Brett A Schatz. Per General Order 206, out–of–state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by wm) |
| 04/08/2009 | 12 | DOCKET ENTRY NOTICE of Hearing: Telephonic Scheduling Conference set for 5/12/2009 04:45 PM in Boise Chambers before Judge B. Lynn Winmill. (Attachments: Only use the Patent Litigation Plan if it applies to this case. # 1 Litigation Plan Letter, # 2 Patent Litigation Plan, # 3 Litigation Plan)(lg) |
| 04/14/2009 | 13 | MOTION to Transfer Case Brett A. Schatz appearing for Defendants Escort Inc., Beltronics USA, Inc.. Responses due by 5/8/2009 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Declaration of John Larson, # 3 Exhibit B–Declaration of John Kuhn, # 4 Exhibit C–Declaration of Mark Carr, # 5 Exhibit D–Webpage parklegal.com, # 6 Exhibit E–Case–International Securities Exchange, LLC v. Chicago Board Options Exchange Incorporated, # 7 Exhibit F–Case–Greater Yellowstone Coalition, et al. v. Larry Timchak, et al., # 8 Exhibit G–Case–John M. Neil v. Onecap Real Estate Fund I, LLC et al., # 9 Exhibit H–Case–Lighting World, Inc. v. Birchwood Lighting, Inc., # 10 Exhibit I–Case–Robert Leach v. Idaho Nephrology Associates, PLLC, et al.)(Schatz, Brett) |
| 04/14/2009 | 14 | MOTION to Dismiss Brett A. Schatz appearing for Defendants Escort Inc., Beltronics USA, Inc.. Responses due by 5/8/2009 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Document No. 29 in Case 08–355 in SDCA, # 3 Exhibit B–Document No. 47 in Case 08–355 in SDCA, # 4 Exhibit C–Document No. 50–3 in Case 08–355 in SDCA)(Schatz, Brett) |
| 04/29/2009 | 15 | RESPONSE to Motion re 14 MOTION to Dismiss filed by Hoyt A Fleming. Replies due by 5/18/2009. (Attachments: # 1 Request for Judicial Notice, # 2 Notice of Lodgement, # 3 Exhibit Exhibit A)(Midgley, Peter) |
| 04/29/2009 | 16 | RESPONSE to Motion re 13 MOTION to Transfer Case filed by Hoyt A Fleming. Replies due by 5/18/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit A, Attachment 1, # 3 Exhibit A Attachment 2, # 4 Exhibit A, Attachment 3, # 5 Exhibit A, Attachment 4, # 6 Exhibit A, Attachment 5, # 7 Exhibit A, Attachment 6, # 8 Exhibit B)(Midgley, Peter) |

| 05/07/2009 | 17 | SCHEDULING CONFERENCE FORM – LITIGATION PLAN by Hoyt A Fleming. (Midgley, Peter) |
|---|---|---|
| 05/13/2009 | 18 | DOCKET ENTRY ORDER – IT IS HEREBY ORDERED THAT a hearing on the Motion to Dismiss 14 shall be held on Thursday, June 4, 2009 at 2:30 p.m. Additionally, if the motion to dismiss is denied, the Court shall also hear the Motion to Transfer 13 . The hearing shall be conducted at the James A. McClure Federal Building and U.S. Courthouse in Boise, Idaho, by The Honorable A. Wallace Tashima, United States Court of Appeals for the Ninth Circuit, sitting by special designation. Signed by Judge B. Lynn Winmill. (sbh) |
| 05/13/2009 | | Set/Reset Deadlines as to 14 MOTION to Dismiss. Motion Hearing set for 6/4/2009 02:30 PM in Boise, ID before Judge A. Wallace Tashima. (dks) |
| 05/13/2009 | 19 | CASE MANAGEMENT ORDER–Standard–Markman hearing set for 11/23/09 at 9:00 a.m. in Boise before Judge B. Lynn Winmill. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 05/13/2009 | | Set/Reset Hearings: Markman Hearing set for 11/23/2009 09:00 AM in Boise, ID before Judge B. Lynn Winmill. (dks) |
| 05/14/2009 | 20 | APPLICATION FOR PRO HAC VICE APPEARANCE for Hoyt A Fleming ( Filing fee $ 200 receipt number 0976000000000476344.) Michael T. Pieja appearing for Pla Hoyt A Fleming. Responses due by 6/8/2009 (Midgley, Peter) |
| 05/15/2009 | 21 | DOCKET ENTRY ORDER granting 20 Application for Pro Hac Vice Appearance of attorney Michael T. Pieja for Hoyt A Fleming Per General Order 206, out–of–state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 05/18/2009 | 22 | REPLY to Response to Motion re 13 MOTION to Transfer Case filed by Escort Inc., Beltronics USA, Inc.. (Attachments: # 1 Exhibit A–Fleming Invention Disclosure Document, # 2 Exhibit B–Case–Timothy Foret v. Aries Marine Corp, et al., # 3 Exhibit C–Case–Kwik Goal, Ltd. v. Youth Sports Publishing et al., # 4 Exhibit D–Case No. 08–081–Notice of Dismissal, # 5 Exhibit E–SDCA–Case No. 08–355–First Amended Complaint)(Schatz, Brett) |
| 05/18/2009 | 23 | REPLY to Response to Motion re 14 MOTION to Dismiss filed by Escort Inc., Beltronics USA, Inc.. (Attachments: # 1 Exhibit A–SDCA–Case No. 08–355–First Amended Complaint, # 2 Exhibit B–SDCA–Case No. 08–355–Second Amended Complaint)(Schatz, Brett) |
| 06/03/2009 | | The 60 day deadline has expired. Case will remain with District Judge. No more notice of availability will be sent out. (dks) |
| 06/04/2009 | 24 | Minute Entry for proceedings held before Judge A. Wallace Tashima: Motion Hearing held on 6/4/2009 re 14 MOTION to Dismiss filed by Beltronics USA, Inc., Escort Inc.. 13 MOTION to Transfer Case filed by Beltronics USA, Inc., Escort Inc. Motions taken UNDER ADVISEMENT. (Court Reporter/ESR Robin Lee.) (so) |
| 06/08/2009 | 25 | Letter from Mr. Michael T. Pieja to Judge Tashima(dks) (Entered: 06/10/2009) |
| 06/11/2009 | 26 | ORDER denying 13 Motion to Transfer Case; denying 14 Motion to Dismiss. Signed by Judge A. Wallace Tashima. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 06/19/2009 | 27 | MOTION FOR PRO HAC VICE APPEARANCE for Hoyt A Fleming ( Filing fee $ 200 receipt number 0976000000000488765.)Peter M. Midgley, Brian Kwok appearing for Plaintiffs Hoyt A Fleming, Hoyt A Fleming. Responses due by 7/13/2009 (Midgley, Peter) |
| 06/22/2009 | 28 | *DEFENDANTS*' ANSWER to Complaint, COUNTERCLAIM against Hoyt A Fleming by Escort Inc., Beltronics USA, Inc..(Schatz, Brett) |
| 06/22/2009 | 29 | DOCKET ENTRY ORDER granting attorney Brian Kwok 27 Motion for Pro Hac Vice Appearance Per General Order 206, out–of–state counsel shall immediately |

| | | |
|---|---|---|
| | | register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by wm) |
| 06/29/2009 | 30 | AMENDED ANSWER to 1 Complaint,, COUNTERCLAIM against Hoyt A Fleming by Escort Inc., Beltronics USA, Inc.. (Schatz, Brett) |
| 07/02/2009 | 31 | Transcript of Proceedings (Pending Motions hearing) held on 6/4/09 before Judge A. Wallace Tashima. Court Reporter/Transcriber Tucker &Assoc., Telephone number (208) 345–3704. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 7/27/2009. Redacted Transcript Deadline set for 8/5/2009. Release of Transcript Restriction set for 10/5/2009.(dks) (Entered: 07/06/2009) |
| 07/06/2009 | 32 | Notice of Filing of Official Transcript (dks) |
| 07/20/2009 | 33 | Joint MOTION for Protective Order *(Stipulated)* Michael T. Pieja appearing for Counter Defendant Hoyt A Fleming, Plaintiff Hoyt A Fleming. Responses due by 8/13/2009 (Attachments: # 1 Exhibit 1)(Pieja, Michael) |
| 07/22/2009 | 34 | *Plaintiff's* ANSWER to 30 Amended Answer to Complaint, Counterclaim by Hoyt A Fleming.(Pieja, Michael) |
| 08/05/2009 | 35 | STIPULATED PROTECTIVE ORDER granting 33 Motion for Protective Order. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 08/17/2009 | 36 | MEMORANDUM/BRIEF filed by Hoyt A Fleming *Joint Claim Construction and Prehearing Statement*. (Attachments: # 1 Exhibit A)(Pieja, Michael) |
| 10/07/2009 | 37 | OPENING CLAIM CONSTRUCTION BRIEF filed by Beltronics USA, Inc., Escort Inc. *(Defendants' Opening Claim Construction Brief)*. (Attachments: # 1 Exhibit US Patent 5668554, # 2 Exhibit US Patent 6252544, # 3 Exhibit JP Patent H9–27096, # 4 Exhibit US Patent RE39038, # 5 Exhibit Proposed Constructions for Disputed Terms–Exhibit A, # 6 Exhibit ESC001035–001040, # 7 Exhibit Expert Opinion–Dr. John Grindon, # 8 Exhibit ESC001047, # 9 Exhibit Deposition Transcript–Part 1, # 10 Exhibit Deposition Transcript–Part 2, # 11 Exhibit Deposition Transcript–Part 3, # 12 Exhibit ESC001059, # 13 Exhibit ESC001043–001046, # 14 Exhibit ESC001066, # 15 Exhibit FLEMING 012195, # 16 Exhibit ESC001063–001065, # 17 Exhibit ESC001072, # 18 Exhibit ESC001073–001074, # 19 Exhibit ESC001077–001079)(Schatz, Brett) |
| 10/07/2009 | 38 | CONSTRUCTION BRIEF pursuant to Patent Local Rule 4–5(a) filed by Hoyt A Fleming *Plaintiff Hoyt A. Fleming's Opening Claim Construction Brief Pursuant to Patent Local Rule 4–5(a)*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Kwok, Brian) |
| 10/21/2009 | 39 | RESPONSE re 38 Memorandum/Brief (generic), filed by Beltronics USA, Inc., Escort Inc. *Defendants' Response to Plaintiff's Opening Claim Construction Brief*. (Schatz, Brett) |
| 10/21/2009 | 40 | MEMORANDUM/BRIEF re 37 Memorandum/Brief (generic),,, filed by Hoyt A Fleming *Plaintiff Hoyt A. Fleming's Responsive Claim Construction Brief Pursuant to Patent Local Rule 4–5(b)*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Kwok, Brian) |
| 10/22/2009 | 41 | DOCKET ENTRY ORDER – IT IS HEREBY ORDERED THAT the Markman hearing in this matter shall be referred to The Honorable William F. Downes, United States District Judge for the District of Wyoming, sitting by special designation. Additionally, a hearing on the Markman hearing currently scheduled on November 23, 2009 at 9:00 a.m. shall be moved to Wednesday, November 18, 2009 at 9:00 a.m. at the James A. McClure Federal Building and U.S. Courthouse in Boise, Idaho. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by sbh) |

| 10/22/2009 | | Set Deadlines/Hearings: Markman Hearing reset for 11/18/2009 09:00 AM in Boise, ID before Judge William F Downes. (dks) |
|---|---|---|
| 10/28/2009 | 42 | DOCKET ENTRY ORDER – The Court's staff held a discovery conference with all counsel on October 28, 2009. The parties attempted to reach agreement on plaintiffs' demand for (1) sales and profit information on non–GPS radar units, (2) defendants' plans to introduce GPS units in 2010, and (3) defendants' contentions with regard to the effect of the claim constructions they urge. No agreement was reached, although counsel agreed to continue discussing the issues. Counsel may file appropriate motions if they cannot reach agreement on these three issues. Signed by Judge B. Lynn Winmill. (sbh) |
| 10/30/2009 | 43 | MOTION to Compel *Defendants' Response to Plaintiff's Interrogatory No. 10* Brian Kwok appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 11/23/2009 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Kwok, Brian) |
| 10/30/2009 | 44 | MOTION to Expedite *Plaintiff's Motion to Shorten Time for Defendants to Respond to Plaintiff's Motion to Compel A Response to Plaintiff's Interrogatory No. 10* Brian Kwok appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 11/23/2009 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kwok, Brian) |
| 11/04/2009 | 45 | REPLY re 40 Memorandum/Brief (generic), filed by Beltronics USA, Inc., Escort Inc. *(Defendants' Reply to Plaintiff's Responsive Claim Construction Brief)*. (Schatz, Brett) |
| 11/04/2009 | 46 | REPLY re 39 Response(generic) filed by Hoyt A Fleming *Plaintiff Hoyt A. Fleming's Reply Claim Construction Brief Pursuant to Patent Local Rule 4–5(c)*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Kwok, Brian) |
| 11/10/2009 | 47 | DOCKET ENTRY ORDER – Finding good cause therefore, NOW THEREFORE IT IS HEREBY ORDERED THAT the Motion to Shorten Time 44 is GRANTED and defense shall file a response on or before November 11, 2009. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by sbh) |
| 11/11/2009 | 48 | MEMORANDUM in Opposition re 43 MOTION to Compel *Defendants' Response to Plaintiff's Interrogatory No. 10* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 11/30/2009.(Schatz, Brett) |
| 11/12/2009 | 49 | DOCKET ENTRY ORDER – Finding good cause therefore, NOW THEREFORE IT IS HEREBY ORDERED, that the Motion to Compel 43 is DENIED. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by sbh) |
| 11/18/2009 | 50 | Minute Entry for proceedings held before Judge William F Downes: Markman Hearing held on 11/18/2009 – taken UNDER ADVISEMENT. (Court Reporter/ESR Brooke Bohr.) (so) (Entered: 11/19/2009) |
| 11/23/2009 | 51 | MEMORANDUM/BRIEF re 37 Memorandum/Brief (generic),,, filed by Beltronics USA, Inc., Escort Inc. *Defendants' Supplemental Claim Construction Brief*. (Attachments: # 1 Exhibit A–Office Action Summary–Final, # 2 Exhibit B–Office Action Summary–Mailed 5–10–2007)(Schatz, Brett) |
| 12/02/2009 | 52 | Transcript of Proceedings (Partial Markman Hearing) held on 11/18/09 before Judge Judge William F. Downes. Court Reporter/Transcriber David Cromwell, Telephone number (208) 345–3704. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 12/28/2009. Redacted Transcript Deadline set for 1/5/2010. Release of Transcript Restriction set for 3/5/2010.(dks) |
| 12/02/2009 | 53 | Notice of Filing of Official Transcript (dks) |

| 06/10/2010 | 54 | MOTION for Leave to File *Motion for Leave of Court to Amend Defendants' Patent Invalidity Contentions* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/6/2010 (Attachments: # 1 Exhibit A–Vaughn–038 Patent, # 2 Exhibit A–Vaughn–653 Patent, # 3 Exhibit B–Rayner–038 Patent, # 4 Exhibit B–Rayner–653 Patent, # 5 Exhibit C–Escort First Supplemental Patent Invalidity Contentions, # 6 Exhibit D–Escort Counsel–May 28, 2010 Letter, # 7 Exhibit E–Fleming Counsel–June 9, 2010 Email, # 8 Exhibit F–Escort Counsel–June 10, 2010 Letter)(Schatz, Brett) |
| --- | --- | --- |
| 06/29/2010 | 56 | ORDER re Claim Construction. Signed by Judge William F Downes. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) (Entered: 07/07/2010) |
| 07/06/2010 | 55 | RESPONSE to Motion re 54 MOTION for Leave to File *Motion for Leave of Court to Amend Defendants' Patent Invalidity Contentions* filed by Hoyt A Fleming. Replies due by 7/23/2010.(Midgley, Peter) |
| 07/08/2010 | 57 | MOTION FOR PRO HAC VICE APPEARANCE by Michael S. Dowler. ( Filing fee $ 200 receipt number 0976–627991.)Dana Herberholz appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 8/2/2010 (Herberholz, Dana) |
| 07/09/2010 | 58 | NOTICE of Hearing: Telephonic Scheduling Conference set for 8/2/2010 at 11:00 AM before Judge B. Lynn Winmill. (Attachments: # 1 Litigation Plan Letter, # 2 Litigation Plan)(jlg) |
| 07/13/2010 | 59 | MOTION for Leave to File *to Amend Plaintiff's Patent Infringement Contentions* Peter M. Midgley appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 8/6/2010 (Attachments: # 1 Exhibit A, # 2 Appendix A, # 3 Appendix B, # 4 Appendix C)(Midgley, Peter) |
| 07/20/2010 | 60 | DOCKET ENTRY ORDER: Finding good cause therefore, NOW THEREFORE IT IS HEREBY ORDERED that the motion for leave to amend infringment contentions 59 is GRANTED, and counsel shall submit to the Clerk for filing a clean copy of the amended document with attachments, and the Clerk shall file the same. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 07/26/2010 | 61 | FIRST AMENDED DISCLOSURE of Asserted Claims and Infringement Contentions by Hoyt A Fleming. *Plaintiff's First Amended Disclosure of Asserted Claims and Infringement Contentions*. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C, # 4 Appendix D, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D)(Midgley, Peter) Modified on 7/27/2010 to edit text (jm). |
| 07/28/2010 | 62 | DOCKET ENTRY ORDER: Finding good cause therefore, NOW THEREFORE IT IS HEREBY ORDERED that the motion for leave to amend defendants' patent invalidity contentions 54 is GRANTED, and counsel shall submit to the Clerk for filing a clean copy of the amended document with attachments, and the Clerk shall file the same. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 07/29/2010 | 63 | SCHEDULING CONFERENCE FORM – LITIGATION PLAN by Hoyt A Fleming. (Midgley, Peter) |
| 08/02/2010 | 64 | CASE MANAGEMENT ORDER–Track (Patent) ADR Plan to be filed by 11/2/2010. Amended Pleadings due by 9/2/2010. Discovery due by 1/31/2011. Joinder of Parties due by 9/2/2010. Motions due by 2/28/2011.. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) (Entered: 08/03/2010) |
| 08/05/2010 | 65 | FIRST SUPPLEMENTAL PATENT INVALIDITY CONTENTIONS filed by Beltronics USA, Inc., Escort Inc. <. (Attachments: # 1 Exhibit 1–Claim Chart–US Patent 2003/0218562, # 2 Exhibit 2–Claim Chart–Orr Prior Invention, # 3 Exhibit 3–Claim Chart–JP Patent H9–27096, # 4 Exhibit 4–Claim Chart–US Patent 4,841,302, # 5 Exhibit 5–Claim Chart–US Patent 6,384,776, # 6 Exhibit 6–Claim Chart–US Patent 6,201,493, # 7 Exhibit 7–Claim Chart–US Patent 6,246,948, # 8 |

| | | |
|---|---|---|
| | | Exhibit 8–Claim Chart–PCT Patent WO 00/77539, # 9 Exhibit 9–Claim Chart–US Patent 2003/0218562, # 10 Exhibit 10–Claim Chart–Orr Prior Invention, # 11 Exhibit 11–Claim Chart–JP H9–27096, # 12 Exhibit 12–Claim Chart–US Patent 6,384,776, # 13 Exhibit 13–Claim Chart–US Patent 6,201,493, # 14 Exhibit 14–Claim Chart–US Patent 6,246,948, # 15 Exhibit 15–Claim Chart–PCT Patent WO 00/77539, # 16 Exhibit 16–Claim Chart–US Patent 4,949,088, # 17 Exhibit 17–Claim Chart–US Patent 5,530,447, # 18 Exhibit 18–Claim Chart–US Patent 6,252,544, # 19 Exhibit 19–Claim Chart–US Patent 6,118,403, # 20 Exhibit 20–Claim Chart–US Patent 5,977,884, # 21 Exhibit 21–Claim Chart–US Patent 5,668,554, # 22 Exhibit 22–Claim Chart–US Patent 5,305,007, # 23 Exhibit 23–Claim Chart–US Patent 5,907,293, # 24 Exhibit 24–Claim Chart–US Patent 5,146,226, # 25 Exhibit 25–Claim Chart–US Patent 4,581,769, # 26 Exhibit 26–Claim Chart–US Patent 4,949,088, # 27 Exhibit 27–Claim Chart–US Patent 5,530,447, # 28 Exhibit 28–Claim Chart–US Patent 6,252,544, # 29 Exhibit 29–Claim Chart–US Patent 6,118,403, # 30 Exhibit 30–Claim Chart–US Patent 5,977,884, # 31 Exhibit 31–Claim Chart–US Patent 5,146,226, # 32 Exhibit 32–Claim Chart–US Patent 6,449,540, # 33 Exhibit 33–Claim Chart–US Patent 6,449,540, # 34 Exhibit 34–Claim Chart–US Patent 5,485,161, # 35 Exhibit 35–Claim Chart–US Patent 5,485,161)(Schatz, Brett) |
| 08/09/2010 | 66 | DOCKET ENTRY ORDER granting 57 Application for Pro Hac Vice Appearance of attorney Michael S Dowler for Hoyt A Fleming Per General Order 206, out–of–state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) |
| 08/12/2010 | 67 | MOTION to Strike *PORTIONS OF DEFENDANTS INVALIDITY CONTENTIONS* Peter M. Midgley appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 9/7/2010 (Attachments: # 1 Exhibit 1 Part 1 of 2, # 2 Exhibit 1 Part 2 of 2)(Midgley, Peter) Modified on 8/13/2010 to link to dkts 65, 67, 68, and 69 (jm). |
| 08/12/2010 | 68 | SUPPLEMENT (Doc #67) MOTION to Strike *PORTIONS OF DEFENDANTS INVALIDITY CONTENTIONS* Peter M. Midgley appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 9/7/2010 (Attachments: # 1 Exhibit 2 Part 1 of 2, # 2 Exhibit 2 Part 2 of 2)(Midgley, Peter) Modified on 8/16/2010 to amend text and create a relationship to Doc #67 (dks). |
| 08/12/2010 | 69 | SUPPLEMENT TO (Doc #67) MOTION to Strike *PORTIONS OF DEFENDANTS INVALIDITY CONTENTIONS* Peter M. Midgley appearing for Plaintiff Hoyt A Fleming, Counter Defendants Hoyt A Fleming, Hoyt A Fleming. Responses due by 9/7/2010 (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 5, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10)(Midgley, Peter) Modified on 8/16/2010 to amend text and create a relationship to Doc #67 (dks). |
| 08/13/2010 | | CORRECTIVE ENTRY – The entry docket number 68 MOTION to Strike filed by Hoyt A Fleming and 69 MOTION to Strike filed by Hoyt A Fleming were filed using the incorrect docket event. The docket clerk will term dkt 68 &69 as they are not pending motions. The motion is correctly filed at dkt 67. For future reference, the event that should have been used is "Supplement" located under Other Documents.(jm) |
| 08/23/2010 | 70 | MOTION to Amend/Correct 35 Order on Motion for Protective Order Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 9/16/2010 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Dowler, Michael) |
| 08/23/2010 | 71 | MOTION to Expedite *Defendants' Response to Plaintiff's Motion to Amend the Protective Order* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 9/16/2010 (Dowler, Michael) |
| 08/30/2010 | 72 | NOTICE of Substitution – Attorney Michael S Dowler for Hoyt A Fleming,Michael S Dowler for Hoyt A Fleming added. Attorney Thomas C Mavrakakis; Michael T. Pieja; Kenneth H Bridges and Brian Kwok terminated. (Kwok, Brian) |

| | | |
|---|---|---|
| 09/07/2010 | 73 | MEMORANDUM in Opposition re 67 MOTION to Strike *PORTIONS OF DEFENDANTS INVALIDITY CONTENTIONS* filed by Escort Inc.. Replies due by 9/24/2010. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Schatz, Brett) |
| 09/08/2010 | 74 | SEALED RESPONSE to Motion re 70 MOTION to Amend/Correct 35 Order on Motion for Protective Order filed by Beltronics USA, Inc., Escort Inc.. Replies due by 9/27/2010. (Attachments: # 1 Exhibit A–Email dated 7/22/2010 between counsel, # 2 Exhibit B–Letters dated 8/20/2010 and 8/23/2010 between counsel, # 3 Exhibit C–Declaration of Timothy A. Coomer, # 4 Exhibit D–Deposition Transcript–Fleming, # 5 Exhibit E–Patent License Agreement)(Schatz, Brett) |
| 09/10/2010 | 75 | SEALED REPLY to Response to Motion re 70 MOTION to Amend/Correct 35 Order on Motion for Protective Order filed by Hoyt A Fleming. (Attachments: # 1 Declaration of Peggy Finley)(Dowler, Michael) Modified on 9/10/2010 to seal pleading at request by attny (dks). |
| 09/15/2010 | 76 | REPLY to Response to Motion re 67 MOTION to Strike *PORTIONS OF DEFENDANTS INVALIDITY CONTENTIONS* filed by Hoyt A Fleming.(Dowler, Michael) |
| 09/21/2010 | 77 | CERTIFICATE OF SERVICE by Hoyt A Fleming re 75 Reply to Response to Motion, Reply to Response to Motion *To Amend the Protective Order* (Dowler, Michael) |
| 09/24/2010 | 78 | MEMORANDUM DECISION AND ORDER. Escort shall immediately (1) answer Fleming's Interrogatory 3; and (2) provide to Fleming, pursuant to Protective Order protections, the source code without redactions. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 09/29/2010 | 79 | SEALED MOTION *For Leave of Court To File a Sur–Reply to Plaintiff's Reply in Support of His Motion to Amend the Protective Order (Dkt. No. 75)* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 10/25/2010 (Attachments: # 1 Sealed Sur–Reply to Motion to Amend, # 2 Sealed Exhibit A–Defendants First Set Interrogatories, # 3 Sealed Exhibit B–Subpoena and Stipulated Protective Order, # 4 Sealed Exhibit C–Documents Third Party)(Schatz, Brett) |
| 10/04/2010 | 80 | SEALED RESPONSE to Motion re 79 SEALED MOTION *For Leave of Court To File a Sur–Reply to Plaintiff's Reply in Support of His Motion to Amend the Protective Order (Dkt. No. 75)*, 70 MOTION to Amend/Correct 35 Order on Motion for Protective Order, 71 MOTION to Expedite *Defendants' Response to Plaintiff's Motion to Amend the Protective Order* filed by Hoyt A Fleming. Replies due by 10/21/2010. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Dowler, Michael) |
| 10/19/2010 | 81 | DOCKET ENTRY ORDER Finding good cause therefore, NOW THEREFORE IT IS HEREBY ORDERED, that the sealed motion to allow sur–reply brief 79 is GRANTED. IT IS FURTHER ORDERED, that the Court shall also examine the sealed sur–reply brief filed by plaintiff 80 . Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 10/19/2010 | 82 | SEALED ORDER granting 70 Motion to Amend/Correct. The Protective Order 35 is modified to allow Plaintiff Hoyt Fleming to view information the defendants have designated "attorneys eyes only" regarding infringement and prior art. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) Modified on 10/20/2010 to SEAL per instruction of LC1 (cjm). (Entered: 10/20/2010) |
| 11/02/2010 | 83 | ADR Plan by Plaintiff Hoyt A Fleming(Dowler, Michael) |
| 11/03/2010 | 84 | DOCKET ENTRY ORDER – Pending before the Court is the ADR Plan 83 filed by the parties on November 2, 2010. The Court having considered the pleadings shall approve of the Plan. IT IS HEREBY ORDERED THAT this matter shall be referred to United States Magistrate Judge Ronald E. Bush for the purpose of |

| | | |
|---|---|---|
| | | conducting a settlement conference. The parties shall contact Lynette Case, Judge Bush's In Court Deputy at (208) 334–9023 no later than November 26, 2010, to schedule the Settlement Conference, which shall be held after February 28, 2011. Signed by Judge B. Lynn Winmill. (sbh) |
| 11/09/2010 | 85 | MEMORANDUM DECISION AND ORDER. It is ordered that Fleming's counsel shall contact the Court's law clerk Dave Metcalf by email on or before 11/12/2010, as to whether he is willing to agree that adding the Passport iQ to this case will not result in any new infringement contentions. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) (Entered: 11/10/2010) |
| 11/12/2010 | 86 | ORDER re 85 Memorandum Decision and Order. It is hereby ordered that the Passport iQ is added to this case on the understanding that it will raise no new infringement contentions. The parties are directed to conduct discovery assuming that the Passport iQ is part of this case. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 12/07/2010 | 87 | MEMORANDUM DECISION AND ORDER granting 67 Motion to Strike. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) (Entered: 12/08/2010) |
| 12/09/2010 | 88 | MOTION for Leave to File *Motion for Leave of Court to Clarify/Amend Defendants' Patent Invalidity Contentions* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 1/3/2011 (Attachments: # 1 Exhibit A–Defendants' Patent Invalidity Contentions, # 2 Exhibit B–Excerpts John Grindon Expert Report, # 3 Exhibit C–US Patent 6,449,540)(Schatz, Brett) |
| 12/10/2010 | 89 | DOCKET TEXT NOTICE of Hearing: Settlement Conference set for 4/7/2011 09:30 AM (MTN. TIME) in Boise,IDAHO, 5th Floor, – Courtroom 7 before Judge Ronald E Bush. Order setting forth instructions shall be entered in due course prior to the Conference.(lc) |
| 12/17/2010 | 90 | MEMORANDUM DECISION. With these rulings, the Court will direct the parties to agree to combine the three depositions in Ohio, along with the inspection/demonstration, so that plaintiff's counsel is not required to make more than one trip there. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 12/23/2010 | 91 | MEMORANDUM in Opposition re 88 MOTION for Leave to File *Motion for Leave of Court to Clarify/Amend Defendants' Patent Invalidity Contentions and Cross Motion to Strike* filed by Hoyt A Fleming. Replies due by 1/10/2011. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Dowler, Michael) |
| 12/27/2010 | 92 | ORDER, ( Settlement Conference set for 4/7/2011 09:30 AM in Boise – Courtroom 7 before Judge Ronald E Bush.). Signed by Judge Ronald E Bush. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dks) (Entered: 12/28/2010) |
| 01/10/2011 | 93 | REPLY to Response to Motion re 88 MOTION for Leave to File *Motion for Leave of Court to Clarify/Amend Defendants' Patent Invalidity Contentions* filed by Escort Inc..(Schatz, Brett) |
| 01/18/2011 | 94 | REPLY to Response to Motion re 88 MOTION for Leave to File *Motion for Leave of Court to Clarify/Amend Defendants' Patent Invalidity Contentions* filed by Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D – Response &Suppl. Response to First Set of Requests for Entry Upon Land, # 5 Exhibit E, # 6 Exhibit F – filed under seal, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Schatz, Brett) |

| 01/18/2011 | 95 | Sealed Document Re: 94 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Exhibit F*. (Schatz, Brett) |
|---|---|---|
| 01/24/2011 | | CORRECTIVE ENTRY – The entry docket number 91 Memorandum in Opposition to Motion, filed by Hoyt A Fleming was filed incorrectly in this case as it is two documents in one. It should be filed as a Response and then as a Motion. No action is needed by the filing party at this time as the motion has already been responded to in docket #94.(cjm) |
| 01/24/2011 | | CORRECTIVE ENTRY – The entry docket number 94 Reply to Response to Motion,, filed by Escort Inc. was filed incorrectly in this case as it is two documents in one. It is correctly filed as a Reply to Response to Motion docket #88. Please note that it is also a Response to the incorrectly filed motion docket #91. The filing party shall re–submit their filing as a motion to amend also to appropriately set the response deadline.(cjm) |
| 01/24/2011 | 96 | MOTION to Amend/Correct *Alternative Cross Motion to Amend* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 2/17/2011 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F–filed under seal, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Schatz, Brett) |
| 01/24/2011 | 97 | Sealed Document Re: 96 MOTION to Amend/Correct *Alternative Cross Motion to Amend (Exhibit F)*. (Schatz, Brett) |
| 01/27/2011 | 98 | REPLY re 94 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion, 91 Memorandum in Opposition to Motion, Memorandum in Opposition to Motion filed by Hoyt A Fleming. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B (sealed), # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E, # 6 Exhibit Ex. F)(Dowler, Michael) Modified on 1/27/2011 to reflect Exhibit F disk placed on shelf in Clerk's office (cjm). |
| 01/27/2011 | 99 | Sealed Document Re: 98 Reply (generic), Reply (generic) *Exhibit B to Dkt. No. 98*. (Dowler, Michael) |
| 01/28/2011 | 100 | MOTION to Seal Document 98 Reply (generic), Reply (generic) *Exhibit F* Peter M. Midgley appearing for Plaintiff Hoyt A Fleming. Responses due by 2/22/2011 (Midgley, Peter) |
| 02/11/2011 | 101 | MOTION to Strike *Defendants' Motion to Strike Appendix Q of Plaintiff's Rebuttal Report of Bartone and All of Plaintiff's Rebuttal Report of O'Brien* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 3/7/2011 (Attachments: # 1 Exhibit A–Filed Under Seal, # 2 Exhibit B–Filed Under Seal)(Schatz, Brett) |
| 02/11/2011 | 102 | Sealed Document Re: 101 MOTION to Strike *Defendants' Motion to Strike Appendix Q of Plaintiff's Rebuttal Report of Bartone and All of Plaintiff's Rebuttal Report of O'Brien Exhibit A*. (Schatz, Brett) |
| 02/11/2011 | 103 | Sealed Document Re: 101 MOTION to Strike *Defendants' Motion to Strike Appendix Q of Plaintiff's Rebuttal Report of Bartone and All of Plaintiff's Rebuttal Report of O'Brien Exhibit B*. (Schatz, Brett) |
| 02/13/2011 | 104 | MEMORANDUM DECISION AND ORDER. Now therefore it is hereby ordered, that Escort fully answer interrogatories 21 and 22. It is further ordered, that Escort answer the 75 RFAs pertaining solely to Kuhn and Blair. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) (Entered: 02/14/2011) |
| 02/21/2011 | 105 | RESPONSE to Motion re 101 MOTION to Strike *Defendants' Motion to Strike Appendix Q of Plaintiff's Rebuttal Report of Bartone and All of Plaintiff's Rebuttal Report of O'Brien and Cross Motion to Strike Counterclaim Plaintiffs' Experts* filed by Hoyt A Fleming. Replies due by 3/10/2011. (Attachments: # 1 Exhibit 1 (Sealed), # 2 Exhibit 2 (Sealed), # 3 Exhibit 3 (Sealed))(Dowler, Michael) |

| 02/21/2011 | 106 | Sealed Document Re: 105 Response to Motion, Response to Motion *to Strike 101 and Plaintiff's Cross Motion to Strike Counterclaim Plaintiffs' Experts*. (Attachments: # 1 Exhibit 1, Part 2 (Sealed), # 2 Exhibit 1, Part 3 (Sealed), # 3 Exhibit 2 (Sealed), # 4 Exhibit 3 (Sealed))(Dowler, Michael) |
|---|---|---|
| 02/21/2011 | 107 | Cross MOTION to Strike *Counterclaim Plaintiffs' Experts* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 3/17/2011 (Attachments: # 1 Exhibit 1 (Sealed), # 2 Exhibit 2 (Sealed), # 3 Exhibit 3 (Sealed))(Dowler, Michael) |
| 02/21/2011 | 108 | Sealed Document Re: 107 Cross MOTION to Strike *Counterclaim Plaintiffs' Experts*. (Attachments: # 1 Exhibit 1, Part 2 (Sealed), # 2 Exhibit 1, Part 3 (Sealed), # 3 Exhibit 2 (Sealed), # 4 Exhibit 3 (Sealed))(Dowler, Michael) |
| 02/23/2011 | 109 | DOCKET ENTRY ORDER –– To give the Court more time to rule on pending motions that must be decided prior to the filing of dispositive motions, the Court will extend the time for filing dispositive motions. NOW THEREFORE IT IS HEREBY ORDERED, that all dispositive motions be filed on or before March 28, 2011. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 03/10/2011 | 110 | REPLY to Response to Motion re 101 MOTION to Strike *Defendants' Motion to Strike Appendix Q of Plaintiff's Rebuttal Report of Bartone and All of Plaintiff's Rebuttal Report of O'Brien* filed by Beltronics USA, Inc.. (Attachments: # 1 Exhibit A filed separately under seal, # 2 Exhibit B)(Schatz, Brett) |
| 03/10/2011 | 111 | Sealed Document Re: 110 Reply to Response to Motion, Reply to Response to Motion *Exhibit A*. (Schatz, Brett) |
| 03/10/2011 | 112 | MEMORANDUM in Opposition re 107 Cross MOTION to Strike *Counterclaim Plaintiffs' Experts* filed by Beltronics USA, Inc.. Replies due by 3/28/2011. (Attachments: # 1 Exhibit A filed under seal separately, # 2 Exhibit B)(Schatz, Brett) |
| 03/10/2011 | 113 | Sealed Document Re: 112 Memorandum in Opposition to Motion *Exhibit A*. (Schatz, Brett) |
| 03/21/2011 | 114 | REPLY to Response to Motion re 107 Cross MOTION to Strike *Counterclaim Plaintiffs' Experts* filed by Hoyt A Fleming. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Dowler, Michael) |
| 03/23/2011 | 115 | DOCKET ENTRY ORDER To give the Court more time to rule on pending motions that must be decided prior to the filing of dispositive motions, the Court will extend the time for filing dispositive motions. NOW THEREFORE IT IS HEREBY ORDERED, that all dispositive motions be filed on or before April 29, 2011. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 03/28/2011 | 116 | DOCKET TEXT NOTICE: The Settlement Conference set for APRIL 7, 2011 (DOC. 89/92) before Judge Ronald E. Bush is VACATED. (lc) |
| 04/21/2011 | 117 | MEMORANDUM DECISION AND ORDER denying 88 Motion for Leave to File; granting in part and denying in part 91 Motion to Strike; denying Escort's motion to amend, made not by separate motion but by a request set forth in a brief. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 04/29/2011 | 118 | MOTION for Leave to File Excess Pages *In Support Of Plaintiff's Motions For Summary Judgment* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/23/2011 (Dowler, Michael) |
| 04/29/2011 | 119 | MOTION for Leave to File Excess Pages *In Support Of Defendants' Motion for Summary Judgment* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/23/2011 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |

| 04/29/2011 | 120 | SEALED MOTION *For Summary Judgment* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/23/2011 (Attachments: #_1 Sealed Statement Of Facts, #_2 Declaration Of Hoyt A. Fleming, #_3 Exhibit 1, #_4 Exhibit 2, #_5 Exhibit 3, #_6 Sealed Exhibit 4, part 1, #_7 Sealed Exhibit 4, part 2, #_8 Sealed Exhibit 4, part 3, #_9 Sealed Exhibit 4, part 4, #_10 Sealed Exhibit 4, part 5, #_11 Sealed Exhibit 4, part 6, #_12 Exhibit 5, #_13 Exhibit 6, #_14 Exhibit 7, #_15 Exhibit 8, #_17 Exhibit 9, #_18 Exhibit 11, #_19 Sealed Exhibit 12, part 1, #_20 Sealed Exhibit 12, part 2, #_21 Sealed Exhibit 12, part 3, #_22 Exhibit 13, #_23 Exhibit 14, #_24 Exhibit 15, #_25 Exhibit 16, #_26 Exhibit 17, #_27 Exhibit 18, #_28 Exhibit 19, #_29 Exhibit 20, #_30 Exhibit 21, #_31 Exhibit 22)(Dowler, Michael) |
|---|---|---|
| 04/29/2011 | 121 | MOTION for Leave to File Excess Pages *for Defendants' Statement Of Material Facts In Support Of Motion For Summary Judgment* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/23/2011 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |
| 04/29/2011 | 122 | SEALED MOTION *Defendants' Motion for Summary Judgment* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/23/2011 (Attachments: #_1 Memorandum in Support, #_2 Exhibit A, #_3 Exhibit B, #_4 Exhibit C, #_5 Exhibit D, #_6 Exhibit E, #_7 Exhibit F, #_8 Exhibit G, #_9 Exhibit H, #_10 Exhibit I, #_11 Exhibit J, #_12 Exhibit K, #_13 Exhibit L, #_14 Exhibit M, #_15 Exhibit N, #_16 Exhibit O, #_17 Exhibit P, #_18 Exhibit Q, #_19 Exhibit R, #_20 Exhibit S, #_21 Exhibit T, #_22 Exhibit U, #_23 Exhibit V, #_24 Exhibit W, #_25 Exhibit X, #_26 Defendants Statement of Undisputed Material Facts)(Schatz, Brett) |
| 05/02/2011 | 123 | DOCKET ENTRY ORDER granting _118 Motion for Leave to File Excess Pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 05/02/2011 | 124 | DOCKET ENTRY ORDER granting _119 Motion for Leave to File Excess Pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 05/02/2011 | 125 | DOCKET ENTRY ORDER granting _121 Motion for Leave to File Excess Pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 05/02/2011 | 126 | MOTION for Reconsideration re _117 Order on Motion for Leave to File, Order on Motion for Leave to File Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/26/2011 (Attachments: #_1 Memorandum in Support, #_2 Exhibit A, #_3 Exhibit B, #_4 Exhibit C, #_5 Exhibit C1)(Schatz, Brett) |
| 05/02/2011 | 127 | DOCKET ENTRY NOTICE OF HEARING regarding _122 Sealed Motion for Summary Judgment, and _120 Sealed Motion For Summary Judgment: A Motion Hearing is set for 7/15/2011 at 3:00 PM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (jlg) |
| 05/03/2011 | 128 | MOTION to Strike *Defendants' Motion to Strike Plaintiff's New Infringement Contentions and Expert Opinions* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/27/2011 (Attachments: #_1 Memorandum in Support, #_2 Exhibit A–1, #_3 Exhibit A–2, #_4 Exhibit A–3, #_5 Exhibit A–4, #_6 Exhibit B–1, #_7 Exhibit B–2, #_8 Exhibit B–3, #_9 Exhibit C, #_10 Exhibit D, #_11 Exhibit E–Filed Under Seal, #_12 Exhibit F–Filed Under Seal, #_13 Exhibit G–Filed Under Seal)(Schatz, Brett) |
| 05/03/2011 | 129 | Sealed Document Re: _128 MOTION to Strike *Defendants' Motion to Strike Plaintiff's New Infringement Contentions and Expert Opinions (Exhibits E, F and G Filed Under Seal)*. (Attachments: #_1 Exhibit E–Filed Under Seal, #_2 Exhibit F–Filed Under Seal, #_3 Exhibit G–Filed Under Seal)(Schatz, Brett) |

| 05/03/2011 | 130 | SEALED MOTION *For Entry Of Judgment And Injunction* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/27/2011 (Attachments: #_1 Declaration of Michael Dowler, #_2 Declaration Of Hoyt A. Fleming, #_3 Exh. 1, #_4 Exh. 2, #_5 Exh. 3, #_6 Exh. 4, #_7 Exh. 5, #_8 Exh. 6, #_9 Exh. 7, #_10 Exh. 8, #_11 Exh. 9, #_12 Exh. 10, #_13 Exh. 11, #_14 Exh. 12, #_15 Exh. 13, #_16 Exh. 14, #_17 Exh. 15, #_18 Exh. 16, #_19 Exh. 17, #_20 Exh. 18, #_21 Exh. 19, #_22 Exh. 20)(Dowler, Michael) |
| --- | --- | --- |
| 05/09/2011 | 131 | RESPONSE to Motion re_126 MOTION for Reconsideration re_117 Order on Motion for Leave to File, Order on Motion for Leave to File *And Request For An Order To Show Cause* filed by Hoyt A Fleming. Replies due by 5/26/2011. (Attachments: #_1 Exhibit 1, #_2 Exhibit 1 continued, #_3 Exhibit 2, #_4 Exhibit 3)(Dowler, Michael) (Attachment 1 replaced on 5/10/2011) (cjm). (Attachment 2 replaced on 5/10/2011) (cjm). (Attachment 3 replaced on 5/10/2011) (cjm). (Attachment 4 replaced on 5/10/2011) (cjm). (Additional attachment(s) added on 5/10/2011: #_5 Exhibit 4) (cjm). Modified on 5/10/2011 to correct unreadable attachments. Regenerated NEF (cjm). |
| 05/17/2011 | 132 | AMENDED DOCKET ENTRY NOTICE of Hearing regarding_122 Defendants' Sealed Motion for Summary Judgment and_120 Sealed Motion For Summary Judgment: At the request of counsel, the Motion Hearing set for 7/15/2011 at 3:00 p.m. has been RESCHEDULED for 7/28/2011 at 3:00 p.m. in Boise − Courtroom 3 before Judge B. Lynn Winmill. (jlg) |
| 05/23/2011 | 133 | MOTION for Leave to File Excess Pages *Defendants' Motion to Enlarge Page Limit for Defendants' Response to Plaintiff's Motions for Summary Judgment* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/16/2011 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |
| 05/23/2011 | 134 | MOTION for Leave to File Excess Pages *Defendants' Motion to Enlarge Page Limit for Defendants' Response to Plaintiff's Statement of Material Facts Supporting Motions for Summary Judgment* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/16/2011 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |
| 05/23/2011 | 135 | MOTION to Strike_120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Portions of Plaintiff's Statement of Material Facts* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/16/2011 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |
| 05/23/2011 | 136 | MOTION to Strike_120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Plaintiff's New Infringement Contentions Regarding Willful Infringement* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/16/2011 (Attachments: #_1 Memorandum in Support, #_2 Exhibit A−1, #_3 Exhibit A−2, #_4 Exhibit A−3, #_5 Exhibit A−4, #_6 Exhibit A−5, #_7 Exhibit A−6, #_8 Exhibit A−7, #_9 Exhibit B−1, #_10 Exhibit B−2, #_11 Exhibit B−3, #_12 Exhibit B−4, #_13 Exhibit B−5, #_14 Exhibit C−1, #_15 Exhibit C−2, #_16 Exhibit C−3)(Schatz, Brett) |
| 05/23/2011 | 137 | SEALED RESPONSE to Motion re_120 SEALED MOTION *For Summary Judgment Defendants' Reply to Plaintiff's Statement of Material Facts Supporting of His Motions for Summary Judgment* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/9/2011.(Schatz, Brett) |
| 05/23/2011 | 138 | SEALED RESPONSE to Motion re_120 SEALED MOTION *For Summary Judgment Defendants' Response to Plaintiff's Motions for Summary Judgment* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/9/2011. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C, #_4 Exhibit D, #_5 Exhibit E, #_6 Exhibit F, #_7 Exhibit G, #_8 Exhibit H, #_9 Exhibit I, #_10 Exhibit J, #_11 Exhibit K, #_12 Exhibit L, #_13 Exhibit M−1, #_14 Exhibit M−2, #_15 Exhibit M−3, #_16 Exhibit M−4, #_17 Exhibit M−5, #_18 Exhibit N, #_19 Exhibit O, #_20 Exhibit P, #_21 Exhibit Q, #_22 Exhibit R, #_23 Exhibit S)(Schatz, Brett) |

| 05/23/2011 | 139 | SEALED RESPONSE to Motion re 122 SEALED MOTION *Defendants' Motion for Summary Judgment* filed by Hoyt A Fleming. Replies due by 6/9/2011. (Attachments: # 1 Response To Defendants' Statement Of Facts, # 2 Declaration Of Hoyt A. Fleming, # 3 Declaration Of Dr. Bartone, # 4 Exh. 1, # 5 Exh. 2, # 6 Exh. 3, # 7 Exh. 4, # 8 Exh. 5, # 9 Exh. 6, # 10 Exh. 7, # 11 Exh. 8, part 1, # 12 Exh. 8, part 2, # 13 Exh. 8, part 3, # 14 Exh. 8, part 4, # 15 Exh. 8, part 5, # 16 Exh. 8, part 6, # 17 Exh. 8, part 7, # 18 Exh. 8, part 8, # 19 Exh. 9, part 1, # 20 Exh. 9, part 2, # 21 Exh. 9, part 3, # 22 Exh. 10, # 23 Exh. 11, # 24 Exh. 12, # 25 Exh. 13, # 26 Exh. 14, # 27 Exh. 15, # 28 Exh. 16, # 29 Exh. 17, # 30 Exh. 18, # 31 Exh. 19, # 32 Exh. 20, # 33 Exh. 21, # 34 Exh. 22, # 35 Exh. 23, # 36 Exh. 24, # 37 Exh. 25, # 38 Exh. 26, # 39 Exh. 27, # 40 Exh. 28, # 41 Exh. 29, # 42 Exh. 30, # 43 Exh. 31, # 44 Exh. 32, # 45 Exh. 33, # 46 Exh. 34, # 47 Exh. 35, # 48 Exh. 36, # 49 Exh. 37, # 50 Exh. 38)(Dowler, Michael) |
| 05/24/2011 | 140 | DOCKET ENTRY ORDER granting 133 Motion for Leave to File Excess Pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 05/24/2011 | 141 | DOCKET ENTRY ORDER granting 134 Motion for Leave to File Excess Pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 05/26/2011 | 142 | REPLY to Response to Motion re 126 MOTION for Reconsideration re 117 Order on Motion for Leave to File, Order on Motion for Leave to File filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I–Filed Under Seal, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S–Filed Under Seal)(Schatz, Brett) |
| 05/26/2011 | 143 | Sealed Document Re: 142 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Exhibit I–Filed Under Seal*. (Schatz, Brett) |
| 05/26/2011 | 144 | Sealed Document Re: 142 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Exhibit S–Parts 1 and 2–Filed Under Seal*. (Attachments: # 1 Exhibit S–Seal Exhibit)(Schatz, Brett) |
| 05/27/2011 | 145 | NOTICE by Escort Inc. *Withdrawal of Attorney* (Copple, Terry) |
| 05/27/2011 | 146 | RESPONSE to Motion re 130 SEALED MOTION *For Entry Of Judgment And Injunction* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/13/2011.(Ahrens, Gregory) |
| 05/27/2011 | 147 | RESPONSE to Motion re 128 MOTION to Strike *Defendants' Motion to Strike Plaintiff's New Infringement Contentions and Expert Opinions* filed by Hoyt A Fleming. Replies due by 6/13/2011. (Attachments: # 1 Declaration of Michael Dowler, # 2 Exh. 1, part 1, # 3 Exh. 1, part 2, # 4 Exh. 1, part 3, # 5 Exh. 2 (Sealed))(Dowler, Michael) |
| 05/27/2011 | 148 | Sealed Document Re: 147 Response to Motion, Response to Motion *to Strike Infringement Contentions and Expert Report 128* . (Attachments: # 1 Exh. 2 part 2, # 2 Exh. 2, part 3, # 3 Exh. 2, part 4, # 4 Exh. 2, part 5, # 5 Exh. 2, part 6, # 6 Exh. 2, part 7, # 7 Exh. 2, part 8)(Dowler, Michael) |
| 06/01/2011 | 149 | SEALED REPLY to Response to Motion re 130 SEALED MOTION *For Entry Of Judgment And Injunction* filed by Hoyt A Fleming. (Attachments: # 1 Dowler Declaration, # 2 Arnold Declaration, # 3 Klein Declaration, # 4 Mr. Fleming Declaration, # 5 Mrs. Fleming Declaration, # 6 Ochoa Declaration, # 7 Exh. 1, part 1, # 8 Exh. 1, part 2, # 9 Exh. 1, part 3, # 10 Exh. 1, part 4, # 11 Exh. 1, part 5, # 12 Exh. 1, part 6, # 13 Exh. 2, # 14 Exh. 3)(Dowler, Michael) |
| 06/02/2011 | 150 | MEMORANDUM DECISION AND ORDER granting in part and denying in part 126 Motion for Reconsideration. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 06/08/2011 | 151 | REPLY to Response to Motion re 120 SEALED MOTION *For Summary Judgment* filed by Hoyt A Fleming. (Attachments: # 1 Dowler Declaration, # 2 |

| | | |
|---|---|---|
| | | Arnold Declaration, # 3 Klein Declaration, # 4 Mr. Fleming Declaration, # 5 Mrs. Fleming Declaration, # 6 Ochoa Declaration, # 7 Exhibit 23, # 8 Exhibit 24, # 9 Exhibit 25 (sealed), # 10 Exhibit 26, # 11 Exhibit 27, # 12 Exhibit 28, # 13 Exhibit 29, # 14 Exhibit 30, # 15 Exhibit 31, # 16 Exhibit 32, # 17 Exhibit 33, # 18 Exhibit 34, # 19 Exhibit 35, # 20 Exhibit 36, # 21 Exhibit 37, # 22 Exhibit 38)(Dowler, Michael) |
| 06/08/2011 | 152 | Sealed Document Re: 151 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *(Sealed Exhibit 25)*. (Dowler, Michael) |
| 06/09/2011 | 153 | MOTION for Leave to File Excess Pages *For Defendants' Reply In Support of Motion for Summary Judgment (Dkt. No. 122)* Brett A. Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/5/2011 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 06/09/2011 | 154 | REPLY to Response to Motion re 128 MOTION to Strike *Defendants' Motion to Strike Plaintiff's New Infringement Contentions and Expert Opinions* filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schatz, Brett) |
| 06/09/2011 | 155 | SEALED REPLY to Response to Motion re 122 SEALED MOTION *Defendants' Motion for Summary Judgment* filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schatz, Brett) |
| 06/11/2011 | 156 | DOCKET ENTRYORDER granting 153 Motion for Leave to File Excess Pages. Defendant's reply brief shall not exceed 20 pages. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 06/16/2011 | 157 | RESPONSE to Motion re 135 MOTION to Strike 120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Portions of Plaintiff's Statement of Material Facts* filed by Hoyt A Fleming. Replies due by 7/5/2011.(Dowler, Michael) |
| 06/16/2011 | 158 | RESPONSE to Motion re 136 MOTION to Strike 120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Plaintiff's New Infringement Contentions Regarding Willful Infringement* filed by Hoyt A Fleming. Replies due by 7/5/2011. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Dowler, Michael) |
| 06/16/2011 | 159 | MOTION to Strike 149 Sealed Reply to Response to Motion, Sealed Reply to Response to Motion, 151 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Defendants' Motion to Strike Certain Portions of Plaintiff's Reply to His Motion for Judgment and Injunction (Dkt. No. 149) and Plaintiff's Reply to His Motion for Summary Judgment (Dkt. 151), Or In The Alternative, Motion for Leave to File a Sur−Reply* Gregory F Ahrens appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/11/2011 (Attachments: # 1 Memorandum in Support)(Ahrens, Gregory) |
| 06/22/2011 | 160 | RESPONSE to Motion re 159 MOTION to Strike 149 Sealed Reply to Response to Motion, Sealed Reply to Response to Motion, 151 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Defendants' Motion to Strike Certain Portions of Plainti* filed by Hoyt A Fleming. *Replies due by 7/11/2011. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Dowler, Michael)* |
| 06/24/2011 | 161 | SEALED REPLY to Response to Motion re 122 SEALED MOTION *Defendants' Motion for Summary Judgment Substitute Reply* filed by Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schatz, Brett) |
| 07/05/2011 | 162 | REPLY to Response to Motion re 135 MOTION to Strike 120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Portions of Plaintiff's Statement of Material Facts* filed by Escort Inc..(Schatz, Brett) |
| 07/05/2011 | 163 | REPLY to Response to Motion re 136 MOTION to Strike 120 SEALED MOTION *For Summary Judgment Defendants' Motion to Strike Plaintiff's New Infringement Contentions Regarding Willful Infringement* filed by Escort Inc..(Schatz, Brett) |

| 07/11/2011 | 164 | REPLY to Response to Motion re 159 MOTION to Strike 149 Sealed Reply to Response to Motion, Sealed Reply to Response to Motion. 151 Reply to Response to Motion, Reply to Response to Motion, Reply to Response to Motion *Defendants' Motion to Strike Certain Portions of Plaintiff's Reply Briefs filed by Beltronics USA, Inc., Escort Inc..(Ahrens, Gregory)* |
|---|---|---|
| 07/22/2011 | 165 | MEMORANDUM DECISION AND ORDER denying 101 Motion to Strike ; denying 107 Motion to Strike. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 07/28/2011 | 166 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Motion Hearing held on 7/28/2011 re 122 SEALED MOTION *Defendants' Motion for Summary Judgment* filed by Beltronics USA, Inc., Escort Inc.. 120 SEALED MOTION *For Summary Judgment* filed by Hoyt A Fleming. Motions taken under advisement. (Court Reporter/ESR Tammy Hohenleitner.) (al) (Entered: 07/29/2011) |
| 08/29/2011 | 167 | DOCKET ENTRY ORDER granting 100 Motion to Seal Exhibit F (two CDs stored with Clerk). Exhibit F is an exhibit to Reply (docket no. 98). Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |
| 11/02/2011 | 168 | NOTICE of Substitution – Attorney Steven F Schossberger for Hoyt A Fleming,Steven F Schossberger for Hoyt A Fleming added. Attorney Peter M. Midgley terminated. (Schossberger, Steven) |
| 12/15/2011 | 170 | NOTICE OF HEARING – A Telephonic Status Conference is set for 1/9/2012 at 10:00 AM before Judge B. Lynn Winmill for the purpose of setting a trial date. Plaintiff is directed to initiate the conference call. The Court can be reached at (208)334–9145. (jlg) |
| 12/22/2011 | 171 | DOCKET TEXT NOTICE of Hearing: Settlement Conference set for 2/2/2012 09:30 AM (MOUNTAIN TIME) in Boise – Courtroom 7/5th Floor before Judge Ronald E Bush, at Boise, Idaho. *Counsel shall review the Settlement Conference ORDER previously entered by the Court (DOC. #92) which provides Instructions for this Conference. * However, the Settlement Conference Brochures are now due to Judge Bush's January 23, 2012. (lc) |
| 01/19/2012 | 172 | ORDER. Motions in Limine due by 5/7/2012. Jury Trial set for 6/18/2012 01:30 PM in Boise – Courtroom 3 before Judge B. Lynn Winmill. Telephonic Pretrial Conference set for 5/21/2012 04:00 PM in Boise Chambers before Judge B. Lynn Winmill. In cases involving serious Daubert issues (rule 702 Motions), the parties shall contact Law Clerk Dave Metcalf on or before February 1, 2012, to determine whether a hearing is necessary. The parties agree that they shall notify the Court by 4/23/2012, that the case has either settled or will definitely go to trial. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) (Entered: 01/20/2012) |
| 01/23/2012 | 173 | Sealed MOTION *Plaintiff's Unopposed Motion to Unseal Dkt. No. 169* . (Attachments: # 1 Exhibit 1)(Dowler, Michael) Modified on 1/24/2012 to edit text to reflect filing is a motion per Corrective Entry and to create link (cjm). |
| 01/24/2012 | | CORRECTIVE ENTRY – The entry docket number 173 Sealed Document was filed incorrectly in this case as the wrong event was used. This is a Sealed Motion. No action is required by the filing party as the Clerk's office will correct to reflect this is a motion. When filing a sealed motion in future, please use event of "Sealed Motion" located under Motions. (cjm) |
| 01/25/2012 | 174 | MOTION to Exclude *Defendants' Use Of The '721 Patent At Trial* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 2/21/2012 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Dowler, Michael) |
| 01/30/2012 | 175 | DOCKET ENTRY ORDER granting 173 Sealed Motion. The Clerk shall file the redacted decision attached as Exhibit 1 to docket no. 173. That filing shall not be sealed but shall be available to the public. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by dm) |

| 01/31/2012 | 176 | REDACTION of Memorandum Decision and Order filed at 169 Sealed Order re: 173 Sealed Motion. Clerk filed redaction per 175 Order.(cjm) |
| 02/02/2012 | 177 | Minute Entry for proceedings held before Judge Ronald E Bush: Settlement Conference held on 2/2/2012 case not settled. (Court Reporter/ESR n/a.) (lc) |
| 02/10/2012 | 178 | DOCKET ENTRY ORDER: The undersigned is in receipt of correspondence, dated February 8, 2012, related to the February 2, 2012 settlement conference. The Court will not hold a telephone conference. If relief is sought as it may be alleged to pertain to the settlement conference, then it must be sought by motion. If any such motion is filed, the undersigned will consider the issue(s). The motion, if any, shall be specifically addressed to the undersigned, as the settlement conference judge, and not U.S. District Judge B. Lynn Winmill, the presiding judge. Signed by Judge Ronald E Bush. (dg) |
| 02/17/2012 | 179 | ORDER. Each party shall file its list of issues by 3/5/2012. The deadline for informing the Court if any Daubert hearings are needed is extended to 3/19/2012. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by cjm) |
| 02/21/2012 | 180 | SEALED RESPONSE to Motion re 174 MOTION to Exclude *Defendants' Use Of The '721 Patent At Trial* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 3/9/2012. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Schatz, Brett) |
| 03/05/2012 | 181 | RESPONSE re 179 Order, Order filed by Beltronics USA, Inc., Escort Inc. *Defendants' List of Issues Upon Which They Bear the Burden of Proof*. (Schatz, Brett) |
| 03/05/2012 | 182 | RESPONSE re 179 Order, Order filed by Hoyt A Fleming. (Dowler, Michael) |
| 03/08/2012 | 183 | REPLY to Response to Motion re 174 MOTION to Exclude *Defendants' Use Of The '721 Patent At Trial* filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3, # 2 Exh. 4)(Dowler, Michael) |
| 03/14/2012 | 184 | MOTION for Leave to File *Sur–Reply in Opposition to Plaintiff's Motion to Exclude* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 4/9/2012 (Attachments: # 1 Sur–Reply)(Ahrens, Gregory) |
| 03/19/2012 | 185 | NOTICE by Hoyt A Fleming *Notice of Daubert Issues* (Dowler, Michael) |
| 03/20/2012 | 186 | RESPONSE to Motion re 184 MOTION for Leave to File *Sur–Reply in Opposition to Plaintiff's Motion to Exclude*, 174 MOTION to Exclude *Defendants' Use Of The '721 Patent At Trial* filed by Hoyt A Fleming. Replies due by 4/6/2012. (Attachments: # 1 Declaration of Michael S. Dowler, # 2 Exh. 5, # 3 Exh. 6)(Dowler, Michael) |
| 03/30/2012 | 187 | Third MOTION to Strike *Defendants' Invalidity Contentions* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/23/2012 (Attachments: # 1 Declaration of Michael S. Dowler, # 2 Exh. 1, # 3 Exh. 2, # 4 Exh. 3, # 5 Exh. 4, # 6 Exh. 5, # 7 Exh. 6, # 8 Exh. 7, # 9 Exh. 8, # 10 Exh. 9, # 11 Exh. 10, # 12 Exh. 11, # 13 Exh. 12, # 14 Exh. 13, # 15 Exh. 14, # 16 Exh. 15, # 17 Exh. 16)(Dowler, Michael) |
| 04/02/2012 | 188 | MOTION Plaintiff's First Daubert Motion Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/26/2012 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/04/2012 | 189 | NOTICE of Substitution – Attorney Steven B Andersen for Beltronics USA, Inc.,Steven B Andersen for Beltronics USA, Inc.,Steven B Andersen for Beltronics USA, Inc.,Steven B Andersen for Escort Inc.,Steven B Andersen for Escort Inc.,Steven B Andersen for Escort Inc. added. Attorney Terry C Copple terminated. (Andersen, Steven) |
| 04/23/2012 | 190 | NOTICE by Hoyt A Fleming *Plaintiff's Trial Notice* (Dowler, Michael) |
| 04/23/2012 | 191 | NOTICE by Beltronics USA, Inc., Escort Inc. *Defendants' Notice Regarding Status of Settlement* (Schatz, Brett) |

| | | |
|---|---|---|
| 04/23/2012 | 192 | RESPONSE to Motion re 187 Third MOTION to Strike *Defendants' Invalidity Contentions* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 5/10/2012. (Attachments: # 1 Exhibit 1–Defendant Invalidity Contentions, # 2 Exhibit 2–Defendant 8–20–2009 Letter, # 3 Exhibit 3–Defendant Interrogatory Responses, # 4 Exhibit 4–Defendant 9–23–2010 Letter, # 5 Exhibit 5–Plaintiff Notice of Deposition, # 6 Exhibit 6–Filed Under Seal, # 7 Exhibit 7–Defendant 8–26–2010 Letter, # 8 Exhibit 8–Defendant Interrogatory Responses, # 9 Exhibit 9–Defendant Supplemental Responses, # 10 Exhibit 10–Defendant Supplemental Responses, # 11 Exhibit 11–Plaintiff Notice of Deposition, # 12 Exhibit 12–Filed Under Seal, # 13 Exhibit 13–Filed Under Seal, # 14 Exhibit 14–Grindon Expert Report)(Schatz, Brett) |
| 04/23/2012 | 193 | Sealed Document Re: 192 Response to Motion,,, Exhibits 6, 12 and 13 Filed Under Seal. (Attachments: # 1 Exhibit 6.2–Filed Under Seal, # 2 Exhibit 6.3 Filed Under Seal, # 3 Exhibit 6.4 Filed Under Seal, # 4 Exhibit 6.5 Filed Under Seal, # 5 Exhibit 6.6 Filed Under Seal, # 6 Exhibit 12–Filed Under Seal, # 7 Exhibit 13–Filed Under Seal)(Schatz, Brett) |
| 04/25/2012 | 194 | ORDER RE TRIAL SCHEDULE. Briefing due 5/7/2012. Jury Selection set for 6/14/2012 09:00 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. Jury Trial reset for 6/15/2012 08:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 04/26/2012 | 195 | RESPONSE to Motion re 188 MOTION Plaintiff's First Daubert Motion filed by Beltronics USA, Inc., Escort Inc.. Replies due by 5/14/2012. (Attachments: # 1 Exhibit A–Escort Supplemental Responses)(Schatz, Brett) |
| 04/30/2012 | 196 | REPLY to Response to Motion re 188 MOTION Plaintiff's First Daubert Motion filed by Hoyt A Fleming.(Dowler, Michael) |
| 04/30/2012 | 197 | REPLY to Response to Motion re 187 Third MOTION to Strike *Defendants' Invalidity Contentions* filed by Hoyt A Fleming.(Dowler, Michael) |
| 05/07/2012 | 198 | MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Pre–Complaint Conduct* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Plaintiff Interrogatory Responses)(Schatz, Brett) |
| 05/07/2012 | 199 | MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Purported Notice Of Alleged Infringement* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Plaintiff Interrogatory Responses)(Schatz, Brett) |
| 05/07/2012 | 200 | MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Post–Complaint Conduct* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 05/07/2012 | 201 | MOTION in Limine *To Preclude Plaintiff From Presenting New Infringement Contentions Under The Doctrine Of Equivalents* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 05/07/2012 | 202 | MOTION in Limine *To Preclude Plaintiff From Telling The Jury About A Presumption Of Validity* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |

| 05/07/2012 | 203 | MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Technical Expert Reports* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
|---|---|---|
| 05/07/2012 | 204 | Exhibit List *of Defendants* by Beltronics USA, Inc., Escort Inc... (Ahrens, Gregory) |
| 05/07/2012 | 205 | MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Financial Expert Reports* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 05/07/2012 | 206 | Proposed Voir Dire by Beltronics USA, Inc., Escort Inc.. (Ahrens, Gregory) |
| 05/07/2012 | 207 | Proposed Jury Instructions by Beltronics USA, Inc., Escort Inc.. (Ahrens, Gregory) |
| 05/07/2012 | 208 | Special Verdict (Proposed) by Defendants Beltronics USA, Inc., Escort Inc.. (Ahrens, Gregory) |
| 05/07/2012 | 209 | MOTION in Limine *To Preclude Plaintiff From Presenting Arguments That Defendant Copied Plaintiff's Alleged Invention* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Plaintiff Interrogatory Responses)(Schatz, Brett) |
| 05/07/2012 | 210 | Exhibit List *for Plaintiff* by Hoyt A Fleming.. (Dowler, Michael) |
| 05/07/2012 | 211 | Proposed Voir Dire by Hoyt A Fleming. (Dowler, Michael) |
| 05/07/2012 | 212 | Proposed Jury Instructions by Hoyt A Fleming. (Dowler, Michael) |
| 05/07/2012 | 213 | TRIAL BRIEF *for Plaintiff* by Hoyt A Fleming. (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 05/07/2012 | 214 | MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Infringement Of Claims 18, 45 and 47–48 of the '038 Patent* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 05/07/2012 | 215 | First MOTION in Limine *by Plaintiff* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 6/1/2012 (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3, # 4 Exh. 4, # 5 Exh. 5)(Dowler, Michael) |
| 05/07/2012 | 216 | NOTICE by Hoyt A Fleming *Regarding Division of Trial Time Among Parties* (Dowler, Michael) |
| 05/07/2012 | 217 | MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Willful Conduct Beyond Discovery Responses and Infringement Contentions* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Plaintiff Interrogatory Responses)(Schatz, Brett) |
| 05/07/2012 | 218 | MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Opinions Of Counsel* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Attachments: # 1 Memorandum in Support)(Schatz, Brett) |
| 05/07/2012 | 219 | Witness List (sealed) by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 05/07/2012 | 220 | TRIAL BRIEF by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 05/07/2012 | 221 | SEALED MOTION *Defendants' Daubert Motion* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 |

| | | |
|---|---|---|
| | | (Attachments: #_1 Exhibit A–Sealed Expert Report, #_2 Exhibit B–Sealed Supplemental Expert Report)(Schatz, Brett) |
| 05/07/2012 | 222 | MOTION Allocation of Trial Time Steven B Andersen appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/1/2012 (Andersen, Steven) |
| 05/08/2012 | 223 | Second MOTION in Limine *By Plaintiff* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 6/1/2012 (Attachments: #_1 Exh. 1, #_2 Exh. 2, #_3 Exh. 3, #_4 Exh. 4, #_5 Exh. 5, #_6 Exh. 6)(Dowler, Michael) |
| 05/11/2012 | 224 | SEALED RESPONSE to Motion re_221 SEALED MOTION *Defendants' Daubert Motion* filed by Hoyt A Fleming. Replies due by 5/29/2012.(Dowler, Michael) |
| 05/15/2012 | 225 | Third MOTION in Limine Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 6/8/2012 (Dowler, Michael) |
| 05/16/2012 | 226 | MOTION for Leave to File Excess Pages *(Defendants' Response to Plaintiff's First Motion In Limine, Dkt. 215)* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/11/2012 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |
| 05/16/2012 | 227 | RESPONSE to Motion re_215 First MOTION in Limine *by Plaintiff* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/4/2012. (Attachments: #_1 Exhibit A–Defendants Interrogatory Responses, #_2 Exhibit B–Defendants Initial Disclosures, #_3 Exhibit C–Plaintiff Document Production, #_4 Exhibit D–Plaintiff Document Production, #_5 Exhibit E–Plaintiff Document Production, #_6 Exhibit F–Plaintiff Document Production)(Schatz, Brett) |
| 05/16/2012 | 228 | RESPONSE to Motion re_202 MOTION in Limine *To Preclude Plaintiff From Telling The Jury About A Presumption Of Validity*, _205 MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Financial Expert Reports*, _214 MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Infringement Of Claims 18, 45 and 47–48 of the '038 Patent*, _217 MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Willful Conduct Beyond Discovery Responses and Infringement Contentions*, _199 MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Purported Notice Of Alleged Infringement*, _218 MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Opinions Of Counsel*, _198 MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Pre–Complaint Conduct*, _209 MOTION in Limine *To Preclude Plaintiff From Presenting Arguments That Defendant Copied Plaintiff's Alleged Invention*, _203 MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Technical Expert Reports*, _200 MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Post–Complaint Conduct*, _201 MOTION in Limine *To Preclude Plaintiff From Presenting New Infringement Contentions Under The Doctrine Of Equivalents* filed by Hoyt A Fleming. Replies due by 6/4/2012. (Attachments: #_1 Exh. 1, #_2 Exh. 2, #_3 Exh. 3, #_4 Exh. 4, #_5 Exh. 5, #_6 Exh. 6)(Dowler, Michael) |
| 05/16/2012 | 229 | RESPONSE to Motion re_223 Second MOTION in Limine *By Plaintiff* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/4/2012. (Attachments: #_1 Exhibit A–Orr Declaration)(Schatz, Brett) |
| 05/18/2012 | 230 | DOCKET ENTRY ORDER granting _226 Motion for Leave to File Excess Pages. Defendant may have an additional 5 pages for its brief _227 . Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (dm) |
| 05/18/2012 | 231 | MOTION to Strike_223 Second MOTION in Limine *By Plaintiff*, _225 Third MOTION in Limine *Defendants' Motion to Strike Plaintiff's Untimely Motions in Limine (Dkt. 223 and 225)* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/11/2012 (Attachments: #_1 Memorandum in Support)(Schatz, Brett) |

| | | |
|---|---|---|
| 05/18/2012 | <u>232</u> | MEMORANDUM DECISION AND ORDER granting <u>174</u> Motion to Exclude; granting <u>184</u> Motion for Leave to File. Plaintiff's request for attorney fees is denied. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 05/21/2012 | <u>233</u> | REPLY to Response to Motion re <u>215</u> First MOTION in Limine *by Plaintiff* filed by Hoyt A Fleming. (Attachments: # <u>1</u> Exh. 6, # <u>2</u> Exh. 7)(Dowler, Michael) |
| 05/21/2012 | <u>234</u> | REPLY to Response to Motion re <u>223</u> Second MOTION in Limine *By Plaintiff* filed by Hoyt A Fleming.(Dowler, Michael) |
| 05/21/2012 | <u>235</u> | RESPONSE to Motion re <u>231</u> MOTION to Strike <u>223</u> Second MOTION in Limine *By Plaintiff*, <u>225</u> Third MOTION in Limine *Defendants' Motion to Strike Plaintiff's Untimely Motions in Limine (Dkt. 223 and 225)* filed by Hoyt A Fleming. Replies due by 6/7/2012. (Attachments: # <u>1</u> Exh. 1, # <u>2</u> Exh. 2, # <u>3</u> Exh. 3, # <u>4</u> Exh. 4, # <u>5</u> Exh. 5)(Dowler, Michael) |
| 05/21/2012 | <u>236</u> | REPLY to Response to Motion re <u>202</u> MOTION in Limine *To Preclude Plaintiff From Telling The Jury About a Presumption Of Validity*, <u>218</u> MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Opinions Of Counsel*, <u>205</u> MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Financial Expert Reports*, <u>198</u> MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Pre–Complaint Conduct*, <u>209</u> MOTION in Limine *To Preclude Plaintiff From Presenting Arguments That Defendant Copied Plaintiff's Alleged Invention*, <u>214</u> MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Infringement Of Claims 18, 45 and 47–48 of the '038 Patent*, <u>203</u> MOTION in Limine *To Preclude Expert Testimony Regarding Matters Not Included In Plaintiff's Technical Expert Reports*, <u>200</u> MOTION in Limine *To Preclude Plaintiff From Confusing The Jury About Post–Complaint Conduct*, <u>217</u> MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Willful Conduct Beyond Discovery Responses and Infringement Contentions*, <u>199</u> MOTION in Limine *To Preclude Plaintiff From Telling The Jury About Purported Notice Of Alleged Infringement*, <u>201</u> MOTION in Limine *To Preclude Plaintiff From Presenting New Infringement Contentions Under The Doctrine Of Equivalents* filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # <u>1</u> Exhibit A–Plaintiff Discovery Responses, # <u>2</u> Exhibit B–Plaintiff Second Amended Disclosure of Asserted Claims and Infringement Contentions)(Schatz, Brett) Modified on 5/21/2012 to edit text to reflect correct document per Corrective Entry (cjm). |
| 05/21/2012 | | CORRECTIVE ENTRY – The entry docket number <u>236</u> Memorandum in Support of Motion, filed by Beltronics USA, Inc., Escort Inc. was filed incorrectly in this case as the wrong event was used. This is not a Memorandum in Support but a "Reply to Response to Motion". The Clerks office will edit the docket text accordingly and term the reply deadline. No action is required by the filing party.(cjm) |
| 05/22/2012 | <u>237</u> | PRE–TRIAL ORDER. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) (Entered: 05/23/2012) |
| 05/23/2012 | <u>238</u> | MEMORANDUM DECISION AND ORDER granting <u>188</u> Plaintiff's First Daubert Motion. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 05/23/2012 | <u>239</u> | MEMORANDUM DECISION AND ORDER granting in part and denying in part <u>187</u> Flemings' Motion to Strike. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) (Entered: 05/24/2012) |
| 05/24/2012 | <u>240</u> | Expedited MOTION to Alter Judgment re 169 Sealed Order Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 6/18/2012 (Dowler, Michael) Modified on 5/25/2012 to edit text to reflect correct motion type (cjm). Modified on 5/25/2012 to edit text and create link per second Corrective Entry (cjm). |

| 05/24/2012 | 241 | Proposed Voir Dire by Beltronics USA, Inc., Escort Inc.. (Andersen, Steven) |
|---|---|---|
| 05/25/2012 | 242 | REPLY re 241 Proposed Voir Dire filed by Hoyt A Fleming . (Attachments: # 1 Exh. 1)(Dowler, Michael) |
| 05/25/2012 | | CORRECTIVE ENTRY – The entry docket number 240 Expedited MOTION to Alter Judgment filed by Hoyt A Fleming was filed incorrectly in this case as the wrong motion event was used. This is a Motion for Entry of Judgment and thus the motion event to use is "Entry of Judgment". No action is required by the filing party as the Clerk's office will edit text to reflect correct motion type.(cjm) Modified on 5/25/2012 to correct text toreflect correct motion type and NEF regenerated (cjm). |
| 05/25/2012 | | CORRECTIVE ENTRY – The entry docket number 240 Expedited MOTION to Alter Judgment filed by Hoyt A Fleming was filed incorrectly in this case. Per conversation with the filing party, it is meant to be a Motion to Alter Judgment. The Clerk's office will edit text to reflect that and link to Order.(cjm) |
| 05/29/2012 | 243 | Proposed Jury Instructions by Hoyt A Fleming. (Dowler, Michael) |
| 05/29/2012 | 244 | SEALED REPLY to Response to Motion re 221 SEALED MOTION *Defendants' Daubert Motion Defendants' Reply in Support of Motion to Exclude Opinions from Plaintiff's Financial Expert Based on Irrelevant Evidence* filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A–Expert Report–11/30/2010, # 2 Exhibit B–Supplemental Expert Report–4/10/2010, # 3 Exhibit C–Second Supplemental Expert Report–5/7/2012, # 4 Exhibit D–Rebuttal Expert Report–12/14/2010)(Schatz, Brett) |
| 05/29/2012 | 245 | Sealed MOTION Re: 244 Sealed Reply to Response to Motion,, *(Sur–Reply to Dkt. No. 244)*. (Attachments: # 1 Exh. 1)(Dowler, Michael) Modified on 6/1/2012 to reflect as a motion per LC1/dm (cjm). |
| 05/31/2012 | 246 | Sealed Document Re: 245 Sealed Document *Defendants' Opposition to Plaintiff's Motion to File Sur–Reply in Response to Defendants' Daubert Motion (Dkt. No. 245)*. (Schatz, Brett) |
| 05/31/2012 | 247 | Expedited SEALED MOTION *to Exclude Mr. Orr Pursuant to Fed. R. Evid. 615* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 6/25/2012 (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3, # 4 Exh. 4)(Dowler, Michael) |
| 06/04/2012 | 248 | MEMORANDUM DECISION AND ORDER amending 237 Pre–Trial Order. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 06/04/2012 | 249 | MEMORANDUM DECISION AND ORDER denying 198 Motion in Limine; denying 199 Motion in Limine; denying 200 Motion in Limine; denying 201 Motion in Limine; denying 202 Motion in Limine; denying 203 Motion in Limine; denying 205 Motion in Limine; denying 209 Motion in Limine; denying 214 Motion in Limine; denying 217 Motion in Limine; denying 218 Motion in Limine. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 06/05/2012 | 250 | SEALED RESPONSE to Motion re 247 Expedited SEALED MOTION *to Exclude Mr. Orr Pursuant to Fed. R. Evid. 615* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/22/2012. (Attachments: # 1 Exhibit A–Excerpts Deposition Transcript, # 2 Exhibit B–Excerpts Deposition Transcript, # 3 Exhibit C–Declaration)(Schatz, Brett) |
| 06/05/2012 | 251 | REPLY to Response to Motion re 247 Expedited SEALED MOTION *to Exclude Mr. Orr Pursuant to Fed. R. Evid. 615* filed by Hoyt A Fleming. (Attachments: # 1 Exh. 5)(Dowler, Michael) |
| 06/08/2012 | 252 | Witness List (sealed) by Hoyt A Fleming. (Dowler, Michael) |

| 06/08/2012 | 253 | SEALED RESPONSE to Motion re 225 Third MOTION in Limine filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/25/2012.(Schatz, Brett) |
| 06/08/2012 | 254 | Exhibit List *Joint with Stipulations and Objections* by Beltronics USA, Inc., Escort Inc., Hoyt A Fleming.. (Ahrens, Gregory) |
| 06/08/2012 | 255 | REPLY to Response to Motion re 225 Third MOTION in Limine filed by Hoyt A Fleming.(Dowler, Michael) |
| 06/12/2012 | | Reset Hearings pursuant to Pre–Trial Order #237: Jury Trial set for 6/14/2012 at 9:00 AM in Boise – Courtroom #1 before Judge B. Lynn Winmill. Beginning 6/15/2012 the Jury Trial will take place in Courtroom #3 before Judge B. Lynn Winmill. (jlg) |
| 06/12/2012 | 256 | Defendant's Objections to Court's Proposed Jury Instructions by Beltronics USA, Inc., Escort Inc.. (Ahrens, Gregory) Modified on 6/13/2012 to edit text to match document filed (cjm). |
| 06/12/2012 | 257 | TRIAL BRIEF in Support of Admissibility of Corroborating Evidence by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G PART 1, # 8 Exhibit G PART 2, # 9 Exhibit G PART 3, # 10 Exhibit G PART 4, # 11 Exhibit G PART 5, # 12 Exhibit G PART 6, # 13 Exhibit G PART 7, # 14 Exhibit G PART 8, # 15 Exhibit G PART 9, # 16 Exhibit G PART 10, # 17 Exhibit H, # 18 Exhibit I, # 19 Exhibit J)(Ahrens, Gregory) Modified on 6/13/2012 to edit text per Corrective Entry (cjm). |
| 06/12/2012 | 258 | RESPONSE re 256 Objections to Court's Proposed Jury Instructions, filed by Hoyt A Fleming . (Dowler, Michael) Modified on 6/13/2012 to edit text for link (cjm). |
| 06/12/2012 | 259 | Expedited MOTION in Limine *(Plaintiff's Fourth Motion in Limine)* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 7/6/2012 (Dowler, Michael) |
| 06/12/2012 | 260 | Expedited MOTION in Limine *(Plaintiff's Fifth Motion in Limine)* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 7/6/2012 (Attachments: # 1 Exh. 1)(Dowler, Michael) |
| 06/13/2012 | | CORRECTIVE ENTRY – The entry docket number 257 Proposed Jury Instructions,, filed by Beltronics USA, Inc., Escort Inc. was filed incorrectly in this case as the wrong event was used. The correct event is "Trial Brief" located under Trial Documents. No action is required by the filing party as the Clerk's office will edit the text.(cjm) |
| 06/13/2012 | | CORRECTIVE ENTRY – The entry docket number 256 Proposed Jury Instructions filed by Beltronics USA, Inc., Escort Inc. was filed incorrectly in this case as the worng event was used. The correct event is "Objection" located under Trial Documents. No action is required by the filing party as the Clerk's office will edit the text.(cjm) |
| 06/13/2012 | 261 | RESPONSE re 257 Trial Brief, filed by Hoyt A Fleming *(Brief Regarding Admissibility of Corroborating Evidence not Disclosed in Invalidity Contentions*. (Dowler, Michael) Modified on 6/15/2012 to edit text for link (cjm). |
| 06/14/2012 | 262 | RESPONSE to Motion re 259 Expedited MOTION in Limine *(Plaintiff's Fourth Motion in Limine)* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 7/2/2012.(Andersen, Steven) |
| 06/14/2012 | 263 | RESPONSE to Motion re 260 Expedited MOTION in Limine *(Plaintiff's Fifth Motion in Limine) With Exhibits A–F* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 7/2/2012.(Andersen, Steven) |
| 06/14/2012 | 264 | Sealed Minute Entry for proceedings held before Judge B. Lynn Winmill: SEALED Jury Selection held on 6/14/2012. Jury Trial to resume on 6/15/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/14/2012 | 265 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 1) and Motion Hearing held on 6/14/2012. Trial to resume on 6/15/2012 at 8:30 |

| | | |
|---|---|---|
| | | a.m. Counsel shall be present at 8:15 a.m. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/14/2012 | 266 | STIPULATION *To Admit Exhibits (Joint)* by Hoyt A Fleming. (Dowler, Michael) |
| 06/15/2012 | 267 | MEMORANDUM DECISION AND ORDER denying 221 Sealed Motion to Exclude. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 06/15/2012 | 268 | DOCKET ENTRY ORDER – The Stipulation 266 is APPROVED. The following exhibits are deemed ADMITTED: 1001–1003; 1036; 1040–1081; 1087–1116; 1151–1198; 2025–2027; 2029; 2031; 2033; 2034; 2053; 2108; 2116–2119; 2144–2149; 2257–2259; 2278; 2295–2297; 2302–2310; 2312; 2314–2317; 2328–2329; 2331–2333; 2343; 2347; and 2359. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (dm) |
| 06/15/2012 | | NOTICE TO COURT that counsel Peter M. Midgley wishes to no longer be noticed electronically on this case as of the date of this notice. (Midgley, Peter) |
| 06/15/2012 | 269 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 2) held on 6/15/2012. Jury Trial to resume on 6/18/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. Counsel shall be present at 8:15 AM.(Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/18/2012 | 270 | MEMORANDUM DECISION AND ORDER granting in part and denying in part and reserving in part 215 First MOTION in Limine *by Plaintiff* filed by Hoyt A Fleming. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 06/18/2012 | 271 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 3) held on 6/18/2012. Jury Trial to resume on 6/19/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. Counsel shall be present at 8:10 a.m. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/19/2012 | 272 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 4) held on 6/19/2012. Jury Trial to resume on 6/20/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/19/2012 | 273 | MOTION to Exclude *Expert Rebuttal Opinion Testimony During Plaintiff's Case in Chief* Tracy Jack Crane appearing for Defendant Beltronics USA, Inc.. Responses due by 7/13/2012 (Attachments: # 1 Memorandum in Support of Motion to Exclude)(Crane, Tracy) |
| 06/20/2012 | 274 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 5) held on 6/20/2012. Jury Trial to resume on 6/21/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/20/2012 | 275 | MOTION to Strike *Trial Testimony* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |
| 06/21/2012 | 276 | RESPONSE to Motion re 275 MOTION to Strike *Trial Testimony* filed by Hoyt A Fleming. Replies due by 7/9/2012.(Dowler, Michael) |
| 06/21/2012 | 277 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 6) held on 6/21/2012. Jury Trial to resume on 6/22/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/21/2012 | 278 | MOTION for Judgment as a Matter of Law *on the Issue of Infringement Under the Doctrine of Equivalents* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |

| 06/21/2012 | 279 | MOTION for Judgment as a Matter of Law *on the Issue of Plaintiff's Expert Testimony on Reasonable Royalty Calculation* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |
| --- | --- | --- |
| 06/21/2012 | 280 | MOTION for Judgment as a Matter of Law *on the Issue of Willful Infringement due to Post−Complaint Conduct* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |
| 06/21/2012 | 281 | MOTION for Judgment as a Matter of Law *on the Issue of Willful Infringement due to Pre−Complaint Conduct* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |
| 06/21/2012 | 282 | MOTION for Judgment as a Matter of Law *on the Issue of Inducement* Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/16/2012 (Ahrens, Gregory) |
| 06/22/2012 | 283 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 7) held on 6/22/2012. Jury Trial to resume on 6/27/2012 at 8:30 AM in Boise − Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/25/2012 | 284 | MOTION to Admit Corroborating Documents that Plaintiff Improperly Suggested to the Jury Do Not Exist Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/19/2012 (Attachments: # 1 Declaration and Exhibits)(Ahrens, Gregory) |
| 06/25/2012 | 285 | MOTION to Admit into Evidence a Translation of Japanese Patent H9−27096 Under FRE 104 and 901 Gregory F Ahrens appearing for Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 7/19/2012 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Ahrens, Gregory) |
| 06/26/2012 | 286 | Transcript of Proceedings held on 6/22/2012 before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara I. Hohenleitner, Telephone number 208−334−1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 7/20/2012. Redacted Transcript Deadline set for 7/30/2012. Release of Transcript Restriction set for 9/27/2012.(krb) |
| 06/26/2012 | 287 | Notice of Filing of Official Transcript (krb) |
| 06/26/2012 | 288 | Transcript of Proceedings held on 6/21/2012 before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara I. Hohenleitner, Telephone number 208−334−1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 7/20/2012. Redacted Transcript Deadline set for 7/30/2012. Release of Transcript Restriction set for 9/27/2012.(krb) |
| 06/26/2012 | 289 | Notice of Filing of Official Transcript (krb) |
| 06/26/2012 | 290 | RESPONSE to Motion re 285 MOTION to Admit into Evidence a Translation of Japanese Patent H9−27096 Under FRE 104 and 901 filed by Hoyt A Fleming. Replies due by 7/13/2012. (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 06/26/2012 | 291 | RESPONSE to Motion re 284 MOTION to Admit Corroborating Documents that Plaintiff Improperly Suggested to the Jury Do Not Exist filed by Hoyt A Fleming. Replies due by 7/13/2012.(Dowler, Michael) |
| 06/27/2012 | 292 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 8) held on 6/27/2012. Jury Trial to resume 6/28/2012 08:30 AM in Boise − Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (so) . |

| | | |
|---|---|---|
| 06/28/2012 | 293 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 9) held on 6/28/2012. Jury Trial to resume on 6/29/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg). |
| 06/29/2012 | 294 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 10) held on 6/29/2012. Jury Trial to resume on 7/2/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 06/30/2012 | 295 | MOTION for Judgment as a Matter of Law *Regarding Invalidity Under 35 U.S.C. §§ 102–103* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 7/26/2012 (Dowler, Michael) |
| 07/02/2012 | 296 | RESPONSE to Motion re 295 MOTION for Judgment as a Matter of Law *Regarding Invalidity Under 35 U.S.C. §§ 102–103* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 7/19/2012.(Schatz, Brett) |
| 07/02/2012 | 297 | Minute Entry for proceedings held before Judge B. Lynn Winmill: Jury Trial (Day 11) held on 7/2/2012. Jury Trial to resume on 7/3/2012 at 8:30 AM in Boise – Courtroom 3 before Judge B. Lynn Winmill. (Court Reporter Tammy Hohenleitner.) (jlg) |
| 07/02/2012 | 298 | MEMORANDUM DECISION RE JURY QUESTION. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) (Entered: 07/03/2012) |
| 07/03/2012 | 299 | ORDER re exhibit list sent to jury room. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (cjm) |
| 07/03/2012 | 300 | Minute Entry for proceedings held before Judge Larry M. Boyle: Jury Trial (Day 12) completed on 7/3/2012. Jury verdict read and recorded. (Court Reporter Lisa Yant.) (jlg) |
| 07/03/2012 | 301 | Joint Exhibit List With Objections by Beltronics USA, Inc., Escort Inc., Hoyt A Fleming. (Attachments: # 1 Exhibit continued pages 33–63)(cjm) (Entered: 07/05/2012) |
| 07/03/2012 | 302 | Jury Questions for Witnesses. (cjm) (Entered: 07/05/2012) |
| 07/03/2012 | 303 | Sealed Jury Questions from Deliberations. (cjm) (Entered: 07/05/2012) |
| 07/03/2012 | 304 | SPECIAL VERDICT FORM. (Attachments: # 1 Sealed Unredacted form with signature)(cjm) (Entered: 07/05/2012) |
| 07/03/2012 | 305 | Jury Instructions. (Attachments: # 1 Continued Attachment for Special Verdict Form)(cjm) (Entered: 07/10/2012) |
| 07/12/2012 | 306 | DOCKET ENTRY NOTICE OF HEARING – A Telephonic Status Conference is set for 7/20/2012 at 10:00 AM before Judge B. Lynn Winmill to discuss the resolution of post–trial issues, including issues of indefiniteness and reissue validity. The call in information is as follows: Dial in number 877–336–1828; Access Code 4685496; Security Code 9466.(jlg) |
| 07/20/2012 | 307 | DOCKET ENTRY ORDER –– Pursuant to a status conference held with the Courts law clerk and counsel, it was agreed that defendant shall file an opening brief on August 6, 2012, concerning the three remaining issues in the case: (1) reissue validity; (2) intervening rights; and (3) indefiniteness. The remainder of the briefing and page limits will follow the Courts Local Rules. When all briefing is complete, the Court will examine the briefs and determine whether it can rule without a hearing or needs either oral argument or an evidentiary hearing. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (dm) |
| 08/03/2012 | 308 | Transcript of Proceedings held on 6/15/2012 (Jury Trial Day 2 – partial) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline |

|  |  |  |
|---|---|---|
|  |  | for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 8/27/2012. Redacted Transcript Deadline set for 9/7/2012. Release of Transcript Restriction set for 11/5/2012.(cjm) |
| 08/03/2012 | 309 | Notice of Filing of Official Transcript (cjm) |
| 08/06/2012 | 310 | Transcript of Proceedings held on 6/18/12 (Jury Trial–Day 3) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 8/30/2012. Redacted Transcript Deadline set for 9/10/2012. Release of Transcript Restriction set for 11/8/2012.(dks) |
| 08/06/2012 | 311 | Transcript of Proceedings held on 6/19/12 (Partial) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 8/30/2012. Redacted Transcript Deadline set for 9/10/2012. Release of Transcript Restriction set for 11/8/2012.(dks) |
| 08/06/2012 | 312 | Transcript of Proceedings held on 6/29/12 (Partial) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 8/30/2012. Redacted Transcript Deadline set for 9/10/2012. Release of Transcript Restriction set for 11/8/2012.(dks) |
| 08/06/2012 | 313 | Notice of Filing of Official Transcript (dks) |
| 08/06/2012 | 314 | *Defendants' Post–Trial Opening Brief Regarding Reissue Invalidity, Intervening Rights and Indefiniteness.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Schatz, Brett) Modified on 9/10/2012 to unseal &regenerate NEF per filing attorney's request (ja). |
| 08/14/2012 | 315 | Transcript of Proceedings held on 6/15/2012 (Jury Trial Day 2) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/7/2012. Redacted Transcript Deadline set for 9/17/2012. Release of Transcript Restriction set for 11/16/2012.(cjm) |
| 08/14/2012 | 316 | Notice of Filing of Official Transcript (cjm) |
| 08/14/2012 | 317 | Transcript of Proceedings held on 6/19/2012 (Jury Trial Day 4) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/7/2012. Redacted Transcript Deadline set for 9/17/2012. Release of Transcript Restriction set for 11/16/2012.(cjm) |
| 08/14/2012 | 318 | Notice of Filing of Official Transcript (cjm) |
| 08/20/2012 | 319 | Transcript of Proceedings held on 6/20/2012 (Jury Trial Day 5) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release |

| | | |
|---|---|---|
| | | of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/13/2012. Redacted Transcript Deadline set for 9/24/2012. Release of Transcript Restriction set for 11/23/2012.(cjm) (Main Document 319 replaced on 8/20/2012 with corrected version from Court Reporter) (cjm) |
| 08/20/2012 | 320 | Transcript of Proceedings held on 6/21/2012 (Jury Trial Day 6) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/13/2012. Redacted Transcript Deadline set for 9/24/2012. Release of Transcript Restriction set for 11/23/2012.(cjm) (Main Document 320 replaced on 8/20/2012 with corrected version from Court Reporter) (cjm). |
| 08/20/2012 | 321 | Notice of Filing of Official Transcript |
| 08/20/2012 | 322 | Transcript of Proceedings held on 6/27/2012 (Jury Trial Day 8) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/13/2012. Redacted Transcript Deadline set for 9/24/2012. Release of Transcript Restriction set for 11/23/2012.(cjm) |
| 08/20/2012 | 323 | Transcript of Proceedings held on 6/28/2012 (Jury Trial Day 9) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/13/2012. Redacted Transcript Deadline set for 9/24/2012. Release of Transcript Restriction set for 11/23/2012.(cjm) |
| 08/20/2012 | 324 | Transcript of Proceedings held on 6/29/2012 (Jury Trial Day 10) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 9/13/2012. Redacted Transcript Deadline set for 9/24/2012. Release of Transcript Restriction set for 11/23/2012.(cjm) |
| 08/20/2012 | 325 | Notice of Filing of Official Transcript (cjm) |
| 08/22/2012 | 326 | RESPONSE re 314 Sealed Document, filed by Hoyt A Fleming . (Attachments: # 1 Exh. A, # 2 Exh. B, # 3 Exh. C, # 4 Exh. D, # 5 Exh. E)(Dowler, Michael) |
| 08/23/2012 | 327 | SEALED MOTION *For Escrow and Injunction* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 9/17/2012 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 09/04/2012 | 328 | *Defendants' Post–Trial Reply Brief Regarding Reissue Invalidity, Intervening Rights, And Indefiniteness*. Re: 314 Sealed Document, (Attachments: # 1 Exhibit A–USPTO–Ex Parte Reexamination Communication)(Schatz, Brett) Modified on 9/10/2012 to unseal and regenerate NEF per filing attorney's request (ja). |
| 09/13/2012 | 329 | Transcript Redaction Request by attorney Brett A Schatz. (Schatz, Brett) |
| 09/13/2012 | | CORRECTIVE ENTRY – The entry docket number 329 Transcript Redaction Request was filed incorrectly in this case in regards to the Certificate of Service. Per the Transcript Redaction Procedures, the requesting party shall serve the Redaction Request on the court report/transcriber. This procedure is located on our website located under the Attorney Resources tab, Court Reporters and Transcripts. This requirement is referenced on page 3, paragraph 5. Please file a new Certificate |

| | | |
|---|---|---|
| | | of Service using the event "Certificate of Service" located under Service of Process and link to docket 329.(cjm) |
| 09/13/2012 | 330 | CERTIFICATE OF SERVICE by Beltronics USA, Inc., Escort Inc. re 329 Transcript Redaction Request (Schatz, Brett) |
| 09/17/2012 | 331 | RESPONSE to Motion re 327 SEALED MOTION *For Escrow and Injunction* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 10/4/2012. (Attachments: # 1 Exhibit A–Dowler Email dated July 31, 2012, # 2 Exhibit B–Schatz Email dated August 2, 2012, # 3 Exhibit C–Dowler Email dated August 2, 2012, # 4 Exhibit D–Escrow Agreement)(Schatz, Brett) |
| 09/25/2012 | 332 | MOTION to Redact 323 Transcript,, Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 10/19/2012 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Declaration of John Larson)(Schatz, Brett) |
| 10/02/2012 | 333 | REPLY to Response to Motion re 327 SEALED MOTION *For Escrow and Injunction* filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3, # 2 Exh. 4, # 3 Exh. 5, # 4 Exh. 6)(Dowler, Michael) |
| 10/17/2012 | 334 | RESPONSE to Motion re 332 MOTION to Redact 323 Transcript,, filed by Hoyt A Fleming. Replies due by 11/5/2012. (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3, # 4 Exh. 4)(Dowler, Michael) |
| 10/31/2012 | 335 | REPLY to Response to Motion re 332 MOTION to Redact 323 Transcript,, filed by Beltronics USA, Inc., Escort Inc..(Schatz, Brett) |
| 03/27/2013 | 336 | MEMORANDUM DECISION. This matter has now been fully resolved. The Court will enter a separate Judgment as required by Rule 58(a).. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (krb) |
| 03/27/2013 | 337 | JUDGMENT in favor of Hoyt Fleming against Escort Inc. The defendants pay to plaintiff the sum of $750,000.. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (krb) |
| 04/02/2013 | 338 | MOTION for Attorney Fees Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/26/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/02/2013 | 339 | BILL OF COSTS by Hoyt A Fleming. Taxation of Costs due by 5/3/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/02/2013 | 340 | MOTION Pre– and Post–Judgment Interest Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/26/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/02/2013 | 341 | MOTION On–going Royalty or Injunction Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/26/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/03/2013 | 342 | SUPPLEMENT by Plaintiff Hoyt A Fleming re 339 Bill of Costs . (Dowler, Michael) |
| 04/16/2013 | 343 | MOTION Court Enter Order Awarding Prevailing Party Status to Defendants Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 5/10/2013 (Attachments: # 1 Memorandum in Support, # 2 Exhibit A–Plaintiff Disclosure of Asserted Claims and Infringement Contentions, # 3 Exhibit B–Plaintiff Letter dated February 6, 2012, # 4 Exhibit C–USPTO Ex Parte Reexamination Communication Mailed 3/14/2013)(Schatz, Brett) |
| 04/16/2013 | 344 | OBJECTION TO BILL OF COSTS by Beltronics USA, Inc., Escort Inc. re 339 Bill of Costs filed by Hoyt A Fleming. (Schatz, Brett) |

| | | |
|---|---|---|
| 04/22/2013 | 345 | MOTION for Judgment as a Matter of Law *on the Issue of Abandonment, Suppression or Concealment* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/16/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3)(Dowler, Michael) |
| 04/22/2013 | 346 | MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Evidence)* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/16/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 04/22/2013 | 347 | MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Corroboration)* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/16/2013 (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3, # 4 Exh. 4)(Dowler, Michael) |
| 04/22/2013 | 348 | Transcript of Proceedings held on 7/2/2012 (Jury Trial Day 11) before Judge B. Lynn Winmill. Court Reporter/Transcriber Tammy Hohenleitner, Telephone number 208–334–1500. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed. Redaction Request due 5/16/2013. Redacted Transcript Deadline set for 5/28/2013. Release of Transcript Restriction set for 7/25/2013.(cjm) (Entered: 04/23/2013) |
| 04/23/2013 | 349 | Notice of Filing of Official Transcript (cjm) |
| 04/26/2013 | 350 | RESPONSE to Motion re 338 MOTION for Attorney Fees filed by Beltronics USA, Inc., Escort Inc.. Replies due by 5/13/2013. (Attachments: # 1 Exhibit A–Plaintiff Disclosure of Asserted Claims and Infringement Contentions, # 2 Exhibit B–Plaintiff February 6, 2012 Letter, # 3 Exhibit C–Defendants February 8, 2012 Letter, # 4 Exhibit D–Documents Regarding Discovery Dispute, # 5 Exhibit E–Defendants September 30, 2010 Letter, # 6 Exhibit F–Email Correspondence September 30, 2010, # 7 Exhibit G–Correspondence November 2, 2010, # 8 Exhibit H–Defendants December 2, 2010 Letter, # 9 Exhibit I–Correspondence August–October 2010, # 10 Exhibit J–Correspondence November 22, 2010, # 11 Exhibit K–Defendants February 3, 2011 Letter, # 12 Exhibit L–Correspondence September 2012)(Schatz, Brett) |
| 04/26/2013 | 351 | RESPONSE to Motion re 340 MOTION Pre– and Post–Judgment Interest filed by Beltronics USA, Inc., Escort Inc.. Replies due by 5/13/2013. (Attachments: # 1 Exhibit A–Defendants February 8, 2012 Letter, # 2 Exhibit B–U.S. Patent No. 6,204,798, # 3 Exhibit C–U.S. Patent No. RE39,038, # 4 Exhibit D–U.S. Patent No. RE40,653)(Schatz, Brett) |
| 04/26/2013 | 352 | RESPONSE to Motion re 341 MOTION On–going Royalty or Injunction filed by Beltronics USA, Inc., Escort Inc.. Replies due by 5/13/2013. (Attachments: # 1 Exhibit A–Pleading–Fractus S.A. v. Samsung Electronics–Charge of the Court, # 2 Exhibit B–Pleading–Fractus S.A. v. Samsung Electronics–Verdict Form, # 3 Exhibit C–Proceedings–July 2, 2012, # 4 Exhibit D–Proceedings–June 29, 2012, # 5 Exhibit E–Proceedings–June 15, 2012, # 6 Exhibit F–Proceedings–June 19, 2012)(Schatz, Brett) |
| 04/29/2013 | 353 | First MOTION for Sanctions *Against Defendants and Defendants' Counsel* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/23/2013 (Dowler, Michael) |
| 04/29/2013 | 354 | RESPONSE to Motion re 343 MOTION Court Enter Order Awarding Prevailing Party Status to Defendants filed by Hoyt A Fleming. Replies due by 5/16/2013. (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3)(Dowler, Michael) |
| 04/29/2013 | 355 | REPLY re 339 Bill of Costs, 342 Supplement filed by Hoyt A Fleming . (Attachments: # 1 Exh. 3, # 2 Exh. 4, # 3 Exh. 5)(Dowler, Michael) |
| 04/30/2013 | 356 | REPLY to Response to Motion re 340 MOTION Pre– and Post–Judgment Interest filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3, # 2 Exh. 4)(Dowler, Michael) |
| 05/06/2013 | 357 | REPLY to Response to Motion re 341 MOTION On–going Royalty or Injunction filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3, # 2 Exh. 4, # 3 Exh. 5, # 4 Exh. |

| | | 6)(Dowler, Michael) |
|---|---|---|
| 05/06/2013 | 358 | MOTION for Leave to File Excess Pages Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 5/31/2013 (Dowler, Michael) |
| 05/07/2013 | 359 | DOCKET ENTRY ORDER denying 358 Motion for Leave to File Excess Pages. Plaintiff shall refile its reply brief 357 to comply with the 10–page limit. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (dm) |
| 05/07/2013 | 360 | REPLY to Response to Motion re 341 MOTION On–going Royalty or Injunction *(Refiled per Order at Dkt. No. 359)* filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3, # 2 Exh. 4, # 3 Exh. 5, # 4 Exh. 6)(Dowler, Michael) |
| 05/13/2013 | 361 | REPLY to Response to Motion re 338 MOTION for Attorney Fees filed by Hoyt A Fleming. (Attachments: # 1 Exh. 3)(Dowler, Michael) |
| 05/16/2013 | 362 | REPLY to Response to Motion re 343 MOTION Court Enter Order Awarding Prevailing Party Status to Defendants filed by Beltronics USA, Inc., Escort Inc..(Schatz, Brett) |
| 05/16/2013 | 363 | RESPONSE to Motion re 345 MOTION for Judgment as a Matter of Law *on the Issue of Abandonment, Suppression or Concealment* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/3/2013.(Schatz, Brett) |
| 05/16/2013 | 364 | RESPONSE to Motion re 347 MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Corroboration)* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/3/2013.(Schatz, Brett) |
| 05/16/2013 | 365 | RESPONSE to Motion re 346 MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Evidence)* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/3/2013. (Attachments: # 1 Exhibit A–Office Communication from USPTO dated 3/14/2013, # 2 Exhibit B–US Patent No. RE39038)(Schatz, Brett) |
| 05/23/2013 | 366 | RESPONSE to Motion re 353 First MOTION for Sanctions *Against Defendants and Defendants' Counsel* filed by Beltronics USA, Inc., Escort Inc.. Replies due by 6/10/2013. (Attachments: # 1 Exhibit A–Letter to the Court dated 2/8/2012)(Schatz, Brett) |
| 05/24/2013 | 367 | REPLY to Response to Motion re 346 MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Evidence)* filed by Hoyt A Fleming.(Dowler, Michael) |
| 05/24/2013 | 368 | MOTION to Vacate *Judgment* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 6/17/2013 (Attachments: # 1 Exhibit A–Plaintiff Disclosure of Asserted Claims and Infringement Contentions, # 2 Exhibit B–USPTO Request for Ex Parte Reexamination Transmittal, # 3 Exhibit C–USPTO–Request for Reexamination, # 4 Exhibit D–USPTO–Office Communication Dated 04/25/2012, # 5 Exhibit E–USPTO–Response to Office Action Dated 04/03/2012, # 6 Exhibit F–USPTO–Office Communication Dated 11/08/2012, # 7 Exhibit G–US Patent 6252544, # 8 Exhibit H–Japanese Patent H9–27096, # 9 Exhibit I–Humphrey Letter Dated 11/16/2012, # 10 Exhibit J–Humphrey Email Dated 11/21/2012, # 11 Exhibit K–USPTO PAIR Printout, # 12 Exhibit L–USPTO Office Communication Dated 03/14/2013, # 13 Exhibit M–USPTO Office Communication Dated 03/28/2013, # 14 Exhibit N–Declaration of Richard A. Killworth, # 15 Exhibit O–Declaration of Dr. John R. Grindon, # 16 Exhibit P–Pgs. 1–5–Excerpts Bartone Expert Rpts., # 17 Exhibit P–Pgs. 6–11–Excerpts Bartone Expert Rpts.)(Schatz, Brett) |
| 05/29/2013 | 369 | REPLY to Response to Motion re 347 MOTION for Judgment as a Matter of Law *on the Issue of Patent Invalidity Under 35 U.S.C. 102–103 (No Corroboration)* filed by Hoyt A Fleming.(Dowler, Michael) |
| 05/30/2013 | 370 | REPLY to Response to Motion re 345 MOTION for Judgment as a Matter of Law *on the Issue of Abandonment, Suppression or Concealment* filed by Hoyt A Fleming. (Attachments: # 1 Exh. 4, # 2 Exh. 5)(Dowler, Michael) |

| 06/06/2013 | 371 | REPLY to Response to Motion re 353 First MOTION for Sanctions *Against Defendants and Defendants' Counsel* filed by Hoyt A Fleming.(Dowler, Michael) |
| 06/17/2013 | 372 | RESPONSE to Motion re 368 MOTION to Vacate *Judgment* filed by Hoyt A Fleming. Replies due by 7/5/2013. (Attachments: # 1 Exh. 1, # 2 Exh. 2, # 3 Exh. 3, # 4 Exh. 4, # 5 Exh. 5)(Dowler, Michael) |
| 07/05/2013 | 373 | REPLY to Response to Motion re 368 MOTION to Vacate *Judgment* filed by Beltronics USA, Inc., Escort Inc.. (Attachments: # 1 Exhibit A–Reexam 90/012,220–Response to 3–14–2013 Office Action, # 2 Exhibit B–Reexam 90/012,220–Declaration of Chris Bartone, P.E., # 3 Exhibit C–Memorandum–Dkt. 607–Kimberly–Clark Worldwide, Inc. v. First Quality, # 4 Exhibit D–Reexam 90/012,234–Response to Office Action, # 5 Exhibit E–Reexam 90/012,692–Response to Office Action, # 6 Exhibit F–Reexam 90/012,234–Response to 11/8/12 Office Action)(Schatz, Brett) |
| 08/16/2013 | 374 | REPORT on the filing or determination of an action regarding patent and/or trademark number(s)6,204,789, RE39,038 and RE40,653 (Notice sent to USPTO)(krb) |
| 08/16/2013 | 375 | REPORT on the filing or determination of an action 6,204,798, RE39,038 and RE40,653 (Notice sent to USPTO) (krb) |
| 02/21/2014 | 376 | MEMORANDUM DECISION AND ORDER The motion for attorney fees (docket no. 338 ) is GRANTED, and that Escort's motion to enter an order awarding prevailing status (docket no. 343 ) is DENIED. The motion for pre–judgment and post–judgment interest (docket no. 340 ) is GRANTED. The motion for ongoing royalty or injunction (docket no. 341 ) is DENIED. Fleming's motions for judgment as a matter of law (docket nos. 345 , 346 &347 ) are DENIED. Fleming's motion for sanctions (docket no. 353 ) is GRANTED. Escort's motion to vacate judgment due to Fleming's inequitable conduct (docket no. 368 ) is DENIED. Signed by Judge B. Lynn Winmill. (jp) (Entered: 02/24/2014) |
| 02/25/2014 | 377 | NOTICE OF APPEAL *to the U.S. Court of Appeals for the Federal Circuit* by Hoyt A Fleming. Filing fee $ 505, receipt number 0976–1125176. (Notice sent to Court Reporter &9th Cir) (Dowler, Michael) Modified on 2/28/2014 to edit text to reflect appeal to the Federal Circuit (cjm). |
| 02/28/2014 | 378 | CERTIFICATE OF SERVICE by Clerk of Court of emailing 377 Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit, certified copy of 376 Memorandum Decision and Order, and certified copy of Docket Sheet. (cjm) (cjm). Modified on 2/28/2014 to include additional documents emailed (cjm). |
| 02/28/2014 | 379 | MEMORANDUM/BRIEF re 376 Memorandum Decision, Terminate Motions,,,, filed by Hoyt A Fleming *(Plaintiff's Petition Regarding the Court's Entry of Sanctions Against Defense Counsel)*. (Attachments: # 1 Exh. A)(Dowler, Michael) |
| 02/28/2014 | 380 | MEMORANDUM/BRIEF re 376 Memorandum Decision, Terminate Motions,,,, filed by Hoyt A Fleming *(Plaintiff's Petition Regarding the Court's Award of Attorney Fees Against Defendants)*. (Attachments: # 1 Exh. A)(Dowler, Michael) |
| 03/03/2014 | 381 | MOTION to Seal *Defendants' Unopposed Motion to Place Documents Under Seal* Brett A Schatz appearing for Counter Claimants Beltronics USA, Inc., Beltronics USA, Inc., Escort Inc., Escort Inc., Defendants Beltronics USA, Inc., Escort Inc.. Responses due by 3/27/2014 (Attachments: # 1 Exhibit A–Email Correspondence, # 2 Exhibit B–Redacted Document 343–1, # 3 Exhibit C–Redacted Document 344, # 4 Exhibit D–Redacted Document 350, # 5 Exhibit E–Redacted Document 351, # 6 Exhibit F–Redacted Document 352, # 7 Exhibit G–Redacted Document 376)(Schatz, Brett) |
| 03/05/2014 | 382 | MOTION for Entry of Judgment Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 3/31/2014 (Attachments: # 1 Exh. A)(Dowler, Michael) |
| 03/05/2014 | 383 | MOTION to Expedite *Defendants' Response to Plaintiff's Motion for Entry of Judgment* Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 3/31/2014 (Dowler, Michael) |

| 03/06/2014 | 384 | Sealed Document Re: 380 Memorandum/Brief (generic) *Plaintiff's Submission of Exhibits 1–2 In Support Of His Petition Regarding The Court's Award Of Attorney Fees Against Defendants (For In Camera Review Only)*. (Attachments: # 1 Exh. 1 (for in camera review only), # 2 Exh. 2 (for in camera review only))(Dowler, Michael) |
|---|---|---|
| 03/10/2014 | 385 | NOTICE OF CROSS APPEAL as to 376 Memorandum Decision, Terminate Motions,,,, 336 Order, 56 Order by Beltronics USA, Inc., Escort Inc.. Filing fee $ 505, receipt number 0976–1130586. (Notice sent to Court Reporter &9th Cir) (Schatz, Brett) |
| 03/11/2014 | 386 | ORDER granting 381 Motion to Seal. The Clerk is directed to seal the material at the following docket nos.: 343–1, 344, 350, 351, 352, and 376. Escort shall file redacted versions of each document. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jp) |
| 03/11/2014 | 387 | TRANSCRIPT REQUEST by Hoyt A Fleming for proceedings held on None (Notice sent by e–mail to Court Reporter) (Dowler, Michael) |
| 03/12/2014 | 388 | REDACTION *to Document 343–1* by Beltronics USA, Inc., Escort Inc. (Schatz, Brett) Modified on 3/18/2014 to link to dkt 343 (jp). |
| 03/12/2014 | 389 | REDACTION to 344 Objection to Bill of Costs by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 03/12/2014 | 390 | REDACTION to 350 Response to Motion,,, by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 03/12/2014 | 391 | REDACTION to 351 Response to Motion, by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 03/12/2014 | 392 | REDACTION to 352 Response to Motion,, by Beltronics USA, Inc., Escort Inc.. (Schatz, Brett) |
| 03/12/2014 | 393 | REDACTION to 376 Memorandum Decision, Terminate Motions,,,, by Beltronics USA, Inc., Escort Inc. (Schatz, Brett) |
| 03/19/2014 | 394 | The Notice of Cross Appeal to the Court of Appeals for the Federal Circuit (dkt 385), the Memorandum Decision (dkt 336), the Memorandum Decision &Order (dkt 376) and the Order (dkt 56) plus copy of the docket sheet were emailed to the Court of Appeals for the Federal Circuit. (jp) (jp). |
| 03/21/2014 | 395 | REPLY re 379 Memorandum/Brief (generic), filed by Beltronics USA, Inc., Escort Inc. *Defendants' Non–Opposition to Petition (Dkt. 379)*. (Schatz, Brett) |
| 03/21/2014 | 396 | REPLY re 380 Memorandum/Brief (generic) filed by Beltronics USA, Inc., Escort Inc. *Defendants' Response to Petition (Dkt. 380)*. (Attachments: # 1 Exhibit A–Email Correspondence Dated 3/18/2014)(Schatz, Brett) |
| 03/25/2014 | 397 | TRANSCRIPT REQUEST *(Notice Sent by E–Mail to Court Reporter)* by Beltronics USA, Inc., Escort Inc. for proceedings held on None. (Schatz, Brett) |
| 03/26/2014 | 398 | DOCKET ENTRY ORDER denying 383 Motion to Expedite. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (dm) |
| 03/27/2014 | 399 | NOTICE of Docketing by the United States Court of Appeals for the Federal Circuit (their case number 14–1371), re 377 Notice of Appeal, 385 Notice of Cross Appeal, (jp) |
| 03/28/2014 | 400 | REPLY re 380 Memorandum/Brief (generic) filed by Hoyt A Fleming *(Plaintiff's Reply In Support Of His Petition Regarding The Court's Award Of Attorney Fees Against Defendants)*. (Dowler, Michael) |
| 03/31/2014 | 401 | RESPONSE to Motion re 382 MOTION for Entry of Judgment filed by Beltronics USA, Inc., Escort Inc.. Replies due by 4/17/2014. (Attachments: # 1 Exhibit A–Email Correspondence Dated 2/28/2014, # 2 Exhibit B–Email Correspondence Dated 3/4/2014)(Schatz, Brett) |

| 03/31/2014 | 402 | REPLY to Response to Motion re 382 MOTION for Entry of Judgment *and Escrow* filed by Hoyt A Fleming.(Dowler, Michael) |
| 03/31/2014 | 403 | MOTION to Strike 385 Notice of Cross Appeal, Michael S Dowler appearing for Plaintiff Hoyt A Fleming. Responses due by 4/24/2014 (Attachments: # 1 Exh. 1, # 2 Exh. 2)(Dowler, Michael) |
| 03/31/2014 | 404 | PRAECIPE by Plaintiff Hoyt A Fleming. Plaintiff's Request for the Clerk's Entry of Judgment Pursuant to Fed. R. Civ. P. 54 and 58(Dowler, Michael) Modified on 4/1/2014 to edit text (jp). |

1   PETER M. MIDGLEY
    midgley@zarianmidgley.com
2   Idaho Bar Number 6913
    Zarian Midgley & Johnson, PLLC
3   960 Broadway Avenue
    Suite 250
4   Boise, ID 83706
    (208) 562-4900
5   (208) 562-4901 (facsimile)

6   Attorneys for Plaintiff

7

8                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF IDAHO
9

10  HOYT A. FLEMING,                    )
                                        )  Case No. _____
11              Plaintiff,              )
    vs.                                 )  COMPLAINT FOR PATENT
12                                      )  INFRINGEMENT
    ESCORT INC.                         )
13                                      )
    and                                 )  DEMAND FOR JURY TRIAL
14                                      )
    BELTRONICS USA, INC.                )
15                                      )
                Defendants.             )
16

17          Plaintiff Hoyt A. Fleming ("Fleming") brings this action for infringement of U.S. Patent

18  Numbers RE39,038 ("the '038 patent") and RE40,653 ("the '653 patent") in violation of 35

19  U.S.C. § 271.  Plaintiff alleges the following facts upon actual knowledge with respect to

20  himself and upon information and belief as to all other matters.

21                              **THE PARTIES**

22  1.      Plaintiff Fleming is an individual and is a resident of the State of Idaho.

23

                           COMPLAINT FOR PATENT INFRINGEMENT - 1

2.      Defendant Escort Inc. is an Illinois corporation with its principal place of business located at 5440 West Chester Road, West Chester, Ohio 45069.

3.      Defendant Beltronics USA, Inc. is a wholly owned subsidiary of Defendant Escort Inc. Beltronics USA, Inc. has a place of business located at 5440 West Chester Road, West Chester, Ohio 45069.  Escort Inc. and Beltronics USA, Inc. will be referred to collectively as "Escort".

4.      Defendant Escort is a provider of, among other things, aftermarket vehicle electronics including radar detectors.

5.      Defendant Escort transacts business in this District and elsewhere by making, using, selling, and/or offering for sale radar detectors (including radar detectors that are the subject of this action) in this District.

## JURISDICTION AND VENUE

6.      This is an action for patent infringement arising under the Patent Laws of the United States, particularly 35 U.S.C. §§ 271 and 281 – 285.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

## BACKGROUND

8.      On March 20, 2001, the United States Patent and Trademark Office issued U.S. Patent No. 6,204,798 ("the '798 patent").  A true copy of the '798 patent is attached as Exhibit 1.

9.      The United States Patent and Trademark Office issued U.S. Patent No. 6,204,798 with 21 claims.

10.      On March 28, 2006, the United States Patent and Trademark Office issued the '038 patent.  A true copy of the '038 patent is attached as Exhibit 2.  The '038 patent issued with 50 claims.

COMPLAINT FOR PATENT INFRINGEMENT - 2

11.     The '038 patent is a reissue of the '798 patent.

12.     On March 10, 2009, the United States Patent and Trademark Office issued the '653 patent.  A true copy of the '653 patent is attached as Exhibit 3.  The '653 patent issued with 30 claims.

13.     The '653 patent is a reissue of the '798 patent.

## COUNT ONE – INFRINGEMENT OF THE '038 PATENT

14.     Plaintiff Fleming re-alleges and incorporates by reference paragraphs 1 – 13 above.

15.     Plaintiff Fleming is the owner of all right, title, and interest in the '038 patent.

16.     Defendant Escort has infringed and continues to infringe the '038 patent under 35 U.S.C. § 271 by making, using, offering to sell, or selling in the United States, and/or by importing into the United States, without authorization, GPS enabled radar detectors, such as the Passport 9500i, the Passport 9500ix, and the Beltronics Professional Series GX65.   Further, Defendant Escort has infringed and continues to infringe the '038 patent under 35 U.S.C. § 271 by contributing to infringement of that patent by others, and/or inducing others to infringe that patent.

17.     As a result of Defendant Escort's infringement of the '038 patent, Plaintiff Fleming has been damaged and will continue to be damaged unless such infringement is enjoined by this Court.

18.     Pursuant to 35 U.S.C. § 284, Plaintiff Fleming is entitled to damages adequate to compensate for infringement, including, *inter alia*, a reasonable royalty.

19.      Defendant Escort had knowledge of and was on notice of the '798 patent and the '038 patent before the date that Defendant Escort sold its first GPS enabled radar detector.

COMPLAINT FOR PATENT INFRINGEMENT - 3

20.     Defendant Escort's infringement of the '038 patent has been and is willful, and renders this case exceptional.

## COUNT TWO – INFRINGEMENT OF THE '653 PATENT

21.     Plaintiff Fleming re-alleges and incorporates by reference paragraphs 1 – 20 above.

22.     Plaintiff Fleming is the owner of all right, title, and interest in the '653 patent.

23.     Defendant Escort has infringed and continues to infringe the '653 patent under 35 U.S.C. § 271 by making, using, offering to sell, or selling in the United States, and/or by importing into the United States, without authorization, GPS enabled radar detectors, such as the Passport 9500i, the Passport 9500ix, and the Beltronics Professional Series GX65.   Further, Defendant Escort has infringed and continues to infringe the '653 patent under 35 U.S.C. § 271 by contributing to infringement of that patent by others, and/or inducing others to infringe that patent.

24.     As a result of Defendant Escort's infringement of the '653 patent, Plaintiff Fleming has been damaged and will continue to be damaged unless such infringement is enjoined by this Court.

25.     Pursuant to 35 U.S.C. § 284, Plaintiff Fleming is entitled to damages adequate to compensate for infringement, including, *inter alia*, a reasonable royalty.

26.      Defendant Escort had knowledge of and was on notice of the '653 patent on or about the date that the '653 patent issued.

27.     Defendant Escort's infringement of the '653 patent has been and is willful, and renders this case exceptional.

COMPLAINT FOR PATENT INFRINGEMENT - 4

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Fleming prays that the Court enter a judgment against Defendant Escort as follows:

A.     A decree that Defendant Escort has infringed the '038 patent and the '653 patent;

B.     A permanent injunction restraining Defendant Escort, its officers, directors, agents, employees, representatives, distributors, servants, attorneys and all persons in active concert or participation with them from further acts of infringement of the '038 patent and the '653 patent, pursuant to 35 U.S.C. § 283;

C.     An award of damages against Defendant Escort sufficient to compensate Plaintiff Fleming for Defendant Escort's infringement of the '038 patent and the '653 patent in an amount not less than a reasonable royalty, pursuant to 35 U.S.C § 284;

D.     An award of treble the damages, pursuant to 35 U.S.C § 284;

E.     An award of prejudgment interest, pursuant to 35 U.S.C § 284, from the date of each act of infringement of the '038 patent and the '653 patent by Defendant Escort to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid;

F.     An award of reasonable attorneys' fees against Defendant Escort, pursuant to 35 U.S.C. § 285, and Plaintiff Fleming's costs of suit against Defendant Escort, pursuant to 35 U.S.C. § 284, based upon Defendant Escort's willful infringement of the '038 patent and the '653 patent; and

G.     Such other and further relief as this Court deems just and appropriate.

COMPLAINT FOR PATENT INFRINGEMENT - 5

1

2    **JURY TRIAL DEMAND**

3    Plaintiff Fleming demands a jury trial as against Defendant Escort on all triable issues.

4

5    DATED this 10th day of March, 2009

6
                              Respectfully submitted:
7

8
                              ___/s/_____
9                             Peter M. Midgley,
                              Of the Firm,
10                            Zarian Midgley & Johnson, PLLC
                              Attorneys for Plaintiff Hoyt A. Fleming
11

12                            *Of Counsel*
                              (Application for *pro hac vice* admission to be submitted)
13                            Kenneth H. Bridges
                              Tom Mavrakakis
14                            Wong, Cabello, Lutsch, Rutherford & Brucculeri, L.L.P.
                              540 Cowper Street
15                            Palo Alto, CA 94301
                              (650) 681-4475
16                            (650) 473-9832 (facsimile)

17                            Attorneys for Plaintiff Hoyt A. Fleming

18

19

20

21

22

23

                              COMPLAINT FOR PATENT INFRINGEMENT - 6

**114**

Exhibit 2

U.S. Patent No. RE39,038

US00RE39038E

(19) **United States**

(12) **Reissued Patent**

Fleming, III

(10) Patent Number: **US RE39,038 E**

(45) Date of Reissued Patent: *Mar. 28, 2006

(54) **METHOD AND APPARATUS FOR ALERTING AN OPERATOR OF A MOTOR VEHICLE TO AN INCOMING RADAR SIGNAL**

(76) Inventor: **Hoyt A. Fleming, III**, P.O. Box 140678, Boise, ID (US) 83703

( * ) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/352,679**

(22) Filed: **Jan. 28, 2003**

**Related U.S. Patent Documents**

Reissue of:

(64) Patent No.: **6,204,798**
    Issued: **Mar. 20, 2001**
    Appl. No.: **09/292,089**
    Filed: **Apr. 14, 1999**

(51) **Int. Cl.**
    *G01S 7/40* (2006.01)

(52) **U.S. Cl.** ............................. 342/20; 342/52; 342/89; 342/195; 342/357.06; 342/357.1; 342/357.17

(58) **Field of Classification Search** ................... 342/20, 342/26, 27, 52, 73, 83, 90, 91, 92, 93, 104, 342/105, 103, 115, 118, 159, 165, 175, 195, 342/357.01, 357.06, 357.1, 357.13, 357.17; 370/901–905, 933, 936, 988, 989, 991

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,660,844 A * 5/1972 Potter ........................... 342/20
4,313,216 A   1/1982 Jaeger et al.
4,750,215 A * 6/1988 Biggs ....................... 342/20 X
4,949,088 A * 8/1990 Ryan et al. ................... 342/20
5,068,663 A * 11/1991 Valentine et al. ............. 342/20
5,250,951 A * 10/1993 Valentine et al. ............. 342/20
5,977,884 A   11/1999 Ross .......................... 340/936
6,118,403 A   9/2000 Lang

OTHER PUBLICATIONS

Poteet, David C., *RadioSat*, <http://newcitymedia.com/radiosat/radiosat/radiosat/index.html>.*
Provisional U.S. Appl. No. 60/108,362, filed Nov. 13, 1988, which became U.S. Appl. No. 09/382,217, and then U.S. Pat. No. 6,118,403.

* cited by examiner

*Primary Examiner*—Bernarr E. Gregory

(57) **ABSTRACT**

A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver coupled to the microprocessor. Upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

**50 Claims, 2 Drawing Sheets**





# Fig. 1



# Fig. 2

U.S. Patent        Mar. 28, 2006        Sheet 2 of 2        US RE39,038 E

┌─────────────────────────────────────────┐
│ Detect an incoming radar signal.         │
└─────────────────────────────────────────┘
┌─────────────────────────────────────────┐
│ Determine at least one characteristic of the │
│         incoming radar signal.            │
└─────────────────────────────────────────┘
┌─────────────────────────────────────────┐
│ Determine the position of the radar detector. │
└─────────────────────────────────────────┘
┌─────────────────────────────────────────┐
│ Generate an alert if the radar detector is not │
│     within a predetermined distance of a  │
│   predetermined position and the at least one │
│  characteristic is not similar to a predetermined │
│            characteristic.                │
└─────────────────────────────────────────┘

**Fig. 3**

┌─────────────────────────────────────────┐
│ Detect an incoming radar signal.         │
└─────────────────────────────────────────┘
┌─────────────────────────────────────────┐
│ Determine the velocity of the radar detector. │
└─────────────────────────────────────────┘
┌─────────────────────────────────────────┐
│ Generate an alert if the velocity of the radar │
│ detector is greater than a predetermined velocity. │
└─────────────────────────────────────────┘

**Fig. 4**

US RE39,038 E

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**METHOD AND APPARATUS FOR ALERTING AN OPERATOR OF A MOTOR VEHICLE TO AN INCOMING RADAR SIGNAL**

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

### 1. BACKGROUND

The present invention relates generally to police radar detectors used in motor vehicles and, more particularly, to police radar detectors that utilize a motor vehicle's position, velocity and/or heading to minimize false alarms.

Many operators of motor vehicles utilize radar detectors to alert them to the fact that their speed is being monitored by law enforcement agencies. However, conventional radar detectors often generate "false alarms." These false alarms are annoying to the operators of motor vehicles. In fact, various automotive publications publish results of "false alarm" tests. Thus, anything that can be accomplished by the manufacturer to reduce the number of false alarms without reducing detection of police radar is commercially valuable.

In addition to police radar signals, there are many different sources of microwave signals in the frequency bands allocated to police radar by the U.S. Federal Communications Commission (FCC). For example, motion-detecting burglar alarms and automatic door openers also operate in the frequency bands allocated to police radar. Thus, a need exists for a radar detector that can distinguish between signals generated by a police radar transmitter and those generated by other devices which utilize microwave signals within the same frequency bands.

Still another source of annoying false alarms occurs when an operator of a motor vehicle is travelling at a speed that is below the legal speed limit, such as occurs when the operator is in traffic, and the radar detector alerts him to an incoming radar signal. Even if a police radar signal is monitoring the speed of the operator's vehicle, because the velocity of the vehicle is below the legal speed limit, the operator of the vehicle may not need to be alerted to the presence of the police radar signal. Thus, a need exists for a radar detector that does not generate an alert if the velocity of the radar detector is below the legal speed limit.

Operators have become accustomed to radar detectors activating in certain locations along commonly traveled streets and highways. Police radar units may be deployed by the side of the roadway at these locations since the police also are aware of the local activation signals and the police are aware that the signals tend to mask their own speed monitoring radar units. Thus, a need exists for a radar detector that can avoid generating a false alarm due to such accustomed radar signals while still generating an alert for such police radar signals.

### 2. SUMMARY OF THE INVENTION

One embodiment is a radar detector for alerting an operator of a motor vehicle to an incoming police radar signal. This radar detector includes a microprocessor; a circuit coupled to the microprocessor for detecting the incoming police radar signal; and a global positioning system receiver coupled to the microprocessor. The radar detector also includes a program storage device containing instructions for determining whether to generate an alert to an incoming radar signal based upon the radar detector's position, velocity, and/or heading.

Another embodiment of the invention is a method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the position of a radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

Still another embodiment of the invention is a second method of generating an alert to an incoming radar signal. This method includes first detecting the incoming radar signal. Next, the velocity of the radar detector is determined. Then, an alert is generated if the velocity of a radar detector is greater than a predetermined velocity.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a radar detector including one embodiment of the present invention.

FIG. **2** is a flow diagram of a method of operating a radar detector.

FIG. **3** is a flow diagram of another method of operating a radar detector.

FIG. **4** is a flow diagram of yet another method of operating a radar detector.

### 3. DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

3.1 Description of a First Embodiment

One embodiment of the novel radar detector is shown in FIG. **1**. The radar detector includes an antenna that is coupled to a detector circuit. The detector circuit, which may be controlled by the microprocessor of FIG. **1**, collects the signals from the antenna, detects the incoming signals, and distinguishes valid radar signals from electrical noise. The detector circuit may be any appropriate radar detector circuit capable of generating an output signal which indicates the strength, the presence, and/or the frequency of incoming radar signals. While the detector circuit may operate autonomously, operation and control of the detector circuit may be performed by the microprocessor. For example, the microprocessor may control the detector as is known in the art so that radar signals in the different frequency bands allocated to police radar signals are detected. Such detector circuits can take a wide variety of forms and can include amplifiers, mixers, duplexes, and other circuitry commonly used in the radar detector field. Several examples of such circuits are shown in U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The output of the detector circuit is coupled to the input of one or more analog-to-digital converters. These converters convert the analog output of the detector circuit into digital signal that represent signal strength, signal presence, and/or signal frequency.

In addition to being coupled to the detector circuit and the analog-to-digital converter, the microprocessor is also coupled to an alert circuit. The alert circuit communicates information regarding detected radar signals to the operator of a motor vehicle using the radar detector by means of one or more alarm tones and/or visual indicators that are included within the alert circuit. Alert circuits are known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The microprocessor, which may be any conventional single or multiple chip microprocessor or digital signal processor, is coupled to a program storage device. The program storage device may be any conventional memory device such as a PROM, EPROM, EEPROM, ROM,

US RE39,038 E

3

SRAM, or even battery backed up DRAM. The program storage device contains machine readable instructions that command the microprocessor to perform certain functions. For example, the program storage device may be conventionally programmed to sweep a predetermined number of radar frequency bands, determine the frequency and/or signal strength of any detected radar signals in the swept frequency bands, and, if the signal strength of the detected radar signals exceed a predetermined value, then generate a signal that activates the alert circuit. Such programming is known by those skilled in the art. For example, see U.S. Pat. Nos. 4,313,216, 5,068,663, and 5,250,951, which are incorporated herein by reference.

The microprocessor is also coupled to a positioning system such as a global positioning system ("GPS") receiver. As is well known, a GPS receiver receives signals from satellites and uses these signals to calculate the position of the GPS receiver. In addition, the GPS receiver may receive differential correction data and/or dead reckoning data, such as from a compass or a wheel sensor, to increase the accuracy of the receiver. By calculating the position of the GPS receiver at two different times, the velocity and heading of the GPS receiver can be easily determined using conventional algorithms. Thus, the GPS receiver can provide the microprocessor with data that includes the position, the velocity, and/or the heading of the radar detector.

The microprocessor may also be coupled to a user interface circuit (not shown). The user interface circuit may include a plurality of buttons that are intended to be depressed by an operator of a motor vehicle. Such buttons may include: a power button, a mute button, a city/highway button, and a dim button.

As will be discussed more fully below, the program storage device may also contain machine readable instructions that command the microprocessor to determine whether to generate an alert based upon data received from the GPS. Thus, upon detection of an incoming radar signal, the radar detector can utilize the position, velocity, and/or heading data from the global positioning system receiver to determine whether to generate an alert.

3.2 Description of a Second Embodiment

One method of operating the radar detector of FIG. 1 is shown in FIG. 2. In this embodiment, the radar detector first detects an incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the position of the radar detector is not within a predetermined distance of a predetermined position.

By utilizing the above method, many false alarms may be eliminated. For example, if the position of a microwave automatic door opener is programmed into the radar detector and the radar detector detects an incoming signal when the radar detector's position is near the automatic door opener, then it is likely that the source of the incoming radar signal is the automatic door opener and not a police radar. Thus, using the method of FIG. 2, an alert would not be generated for the detector radar signal.

The programming of predetermined positions may be accomplished by depressing one or more buttons that are coupled to the interface circuit discussed above. Thus, if an operator of a motor vehicle approaches a microwave automatic door opener, then the operator can depress an "ignore radar" button. Then, the radar detector would store the position of the radar detector and possibly the frequency and the signal strength of the incoming radar signal in the program storage device of FIG. 1 or another memory device (not shown) coupled to or integrated within the microprocessor. An alternative method of storing such data would be

4

to hold down a "mute" button for an extended length of time such as 3 to 5 seconds. It is also possible to experimentally generate a database containing position, frequency and/or signal strength for a specific geographical region. This database could be provided to operators of motor vehicles for a fee. Accessing the Internet via a cellular phone (not shown) coupled to the microprocessor of FIG. 1 would be one method of providing the above database to operators of motor vehicles.

In still another embodiment, when the operator instructs the radar detector to store a position of a incoming radar signal, the radar detection could attempt to locate the approximate position of the source of the incoming radar signal. For example, if an operator instructs the radar detector to store a position of an incoming radar signal as the operator is still approaching the source of the incoming radar signal, the signal strength of the incoming radar signal will be increasing. The radar detector could locate a position that is very near the position of the source of the incoming radar signal by determining the position of the radar detector when the strength of the incoming signal is at a maximum. In addition, radar detectors such as described in U.S. Pat. No. 5,250,951, may utilize multiple radar antennas and signal processing logic to more accurately determine the position of the source of the incoming radar signal. For example, the position of the source of many incoming radar signals may be closely approximated by the position of a radar detector when the radar detector identifies that the radar source is to the side of the vehicle.

The predetermined distance may also be programmed by the operator of the motor vehicle. If the GPS receiver is receiving differential correction data or is receiving dead reckoning data, then the predetermined distance may be set to a smaller value because the position of the radar detector may be more precisely determined. In addition, if the strength of the incoming radar is strong, the predetermined distance could be set (manually or automatically) to a higher value because the radar detector will detect the incoming radar signal at a greater distance from the source. For example, if a radar detector in a vehicle detected a radar signal while the vehicle traveled a 1 mile distance, then the predetermined distance for that particular radar signal may be calculated by dividing the 1 mile distance in half. In order to compensate for non-symmetrical detection of the radar signal and inaccuracies of the positioning of the radar detector, an additional $\frac{1}{4}$ or $\frac{1}{2}$ mile might be added to the above predetermined distance.

3.3 Description of a Third Embodiment

The simple method of operating a radar detector shown in FIG. 2 can be improved as shown in FIG. 3. In this embodiment, the after the radar detects an incoming radar signal it determines a characteristic of the radar signal. For example, the radar detector may determine the frequency and/or the signal strength of the incoming radar signal. Next, the position of the radar detector is determined. Then, an alert is generated if the radar detector is not within a predetermined distance of a predetermined position and the characteristic is not similar to a predetermined characteristic.

By utilizing this method, many false alarms may be eliminated. For example, the location of a microwave automatic door opener and the frequency of the radar signal transmitted by the door opener are first programmed into a radar detector. Assume that a police radar is being transmitted near the location of the microwave automatic door opener. Because the police radar is near the automatic door opener, the method of FIG. 2 would not generate an alert.

US RE39,038 E

5

Thus, the operator of a motor-vehicle would not be properly alerted to the police radar. However as shown below, the method of FIG. 3 would generate an alert.

If the automatic door opener signal is processed first according to the method of FIG. 3, then the frequency of the automatic door opener signal would be determined. Next, the position of the radar detector would be determined. Because the radar detector is near the previously programmed position of the automatic door opener and the frequency of the incoming radar signal is equal to the previously programmed frequency of the automatic door opener, the radar detector would not generate an alert.

Next, the police radar signal would be processed. Thus, the frequency of the police radar signal would be determined. However, even though the location of the radar detector is near the previously programmed location of the automatic door opener, because the frequency of the police radar is not equal to the previously programmed frequency of the radar signal transmitted by the door opener, an alert would be generated. Thus, the operator of the motor vehicle would be properly alerted to the presence of the police radar signal.

Due to inaccuracies in algorithms and slight variations in frequencies due to physical phenomena such as temperature of radar transmitters, it may not be practical to determine if a frequency of an incoming signal is exactly equal to a previously programmed frequency. Thus, is often sufficient to determined if the frequency of an incoming radar signal is similar to a previously programmed frequency. For example, if two frequencies are within ½, 1, 2, 3, 4, or 5 MHz of each other, then they may be considered to be similar.

In one embodiment of the invention, 256 frequency bins are defined for each frequency band of the radar detector. Thus, this one embodiment of the invention, each of the following frequency bands would have 256 bins: X band (10.475–10.575 GHz); Ku band (13.400–13.500 GHz); K band (24.025–24.275 GHz); and Ka band (34.150–35.250 GHz). In this embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same bin. In still another embodiment, frequencies are considered to be similar if they are in the same frequency band and are in the same or adjacent bins. In these two embodiments, the exact frequency of the incoming radar signal need not be determined. Only the frequency band and the appropriate frequency bin number need be determined. If higher resolution is required, then the number of bins for one or more frequency bands can be increased. On the other hand, if only very low resolution is required, then if two frequencies are in the same frequency band, they may be considered to be similar.

3.4 Description of a Fourth Embodiment

FIG. 4 shows still another method of operating the radar detector of FIG. 1. In this embodiment, the radar signal is first detected. Then, the velocity of the radar detector is determined. Next, an alert is generated if the velocity of the radar detector is greater than a predetermined velocity.

This embodiment is particularly useful if the predetermined velocity is set to a value that is less than the minimum speed time. For example, if an operator of a motor vehicle programs the predetermined velocity to 65 miles per hour, which may be the speed limit on a particular highway, then the operation will not be alerted to a radar signal unless he is speeding. Thus, the operator will not be alerted to radar signals when he is traveling at a slow rate of speed such as when the operator is in traffic. The operator could also program the predetermined velocity to the minimum speed

6

limit that the operator is likely to encounter in a specific geographical region. For example, if the city in which the operator lives has some streets with a 25 miles per hour speed limit, then the operator could program the predetermined speed to 25 miles per hour. If the operator performed such programming, such as by decreasing one or more buttons that are coupled to the interface circuit, the operator could be spared some, but not all false alarms.

A more sophisticated embodiment would not require the user to manually program the speed limit. This embodiment would obtain the speed limit from a database that contains speed limits for particular roads in a geographical region. By comparing the location and/or the heading of a motor vehicle to the location and/or heading of a plurality of roads in the above database, the radar detector could determine the particular road upon which the vehicle is traveling. After such a determination, the speed limit for the particular road could be accessed from the database. Such algorithms are known by those skilled in the art. This database could be stored on the program storage device of FIG. 1 or could be stored on an external storage device such as a CD ROM or a hard disk drive. This database could also be provided to operators of motor vehicles for a fee.

3.5 Other Embodiments

In some cases, an operator of a motor vehicle may desire to be alerted to the presence of a radar signal even if the above methods would not "generate an alert." In such cases, a less intrusive alert such as a reduced volume tone, and/or a flashing LED could be generated. Thus, the phrase "generate an alert if" a condition occurs is intended to include generating a particular alert if the condition occurs. If another condition occurs, such as detection of an incoming radar signal while the radar detector is within a predetermined distance of a predetermined position as shown in FIG. 2, then another alert may be generated.

The above Description of the Preferred Embodiments includes words, such as "first," "then," and "next." These words indicate a sequence of acts. Many of the sequences can be modified within the scope of the invention. Thus, unless the results of a first act is required for a second act, then the language indicating a sequence should not be considered to be limitations to the invention.

Many of the above embodiments can be combined to produce a radar detector that generates very few false alarms. For example, the methods of FIG. 2 or FIG. 3 can be combined with the method of FIG. 4. Such combinations are intended to be within the scope of the invention.

I claim:

**1**. A method, executed by a device having a position, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

(a) detecting the incoming radar signal;

(b) determining the position of the device that detected the incoming radar signal; and

(c) generating an alert if the position of the device is not within a predetermined distance of a predetermined position.

**2**. The method of claim **1** wherein the act of detecting the incoming radar signal includes determining at least one characteristic of the radar signal.

**3**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining the frequency of the radar signal.

**4**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining a frequency bin number.

US RE39,038 E

7

**5**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining whether the incoming radar signal is in the X frequency band, the Ku frequency band, the K frequency band, or the Ka frequency band.

**6**. The method of claim **2** wherein the act of determining at least one characteristic of the radar signal includes determining the signal strength of the incoming radar signal.

**7**. The method of claim **2** wherein the act of generating an alert includes generating an alert if the at least one characteristic is not similar to a predetermined characteristic.

**8**. The method of claim **1** wherein the act of determining the position of the device includes receiving signals from a plurality of satellites.

**9**. The method of claim **1** wherein the act of determining the position of the device includes receiving a differential global positioning signal.

**10**. The method of claim **1** wherein the act of determining the position of the device includes receiving dead reckoning data.

**11**. A method, executed by a device having a *position and a velocity*, of generating an alert to an incoming radar signal having a frequency and a signal strength, the method comprising the acts of:

(a) detecting the incoming radar signal;

(b) determining the velocity of the device that detected the incoming radar signal; **[and]**

(c) generating an alert if the velocity of the device is greater than a predetermined velocity*;*

(*d*) *determining the position of the device that detected the incoming radar signal; and*

(*e*) *comparing the position of the device that detected the incoming radar signal to a predetermined position.*

**12**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of satellites.

**13**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving data from a plurality of global positioning satellites.

**14**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving differential global positioning data.

**15**. The method of claim **11** wherein the act of determining the velocity of the device includes receiving dead reckoning data.

**16**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a velocity that has been previously programmed by an operator of a motor vehicle.

**17**. The method of claim **11** wherein the act of generating an alert if the velocity of the device is greater than a predetermined velocity includes generating an alert if the velocity of the device is greater than a legal speed limit that is retrieved from a database.

**18**. A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal comprising:

(a) a microprocessor;

(b) a circuit coupled to the microprocessor for detecting the incoming police radar signal;

(c) a global positioning system receiver coupled to the microprocessor and operable to provide the microprocessor with data *that indicates the position of the radar detector.*

**19**. **[**The radar detector of claim **18**, further including**]** *A radar detector for alerting an operator of a motor vehicle to an incoming police radar signal comprising:*

(*a*) *a microprocessor;*

(*b*) *a circuit coupled to the microprocessor for detecting the incoming police radar signal;*

8

(*c*) *a global positioning system receiver coupled to the microprocessor and operable to provide the microprocessor with data; and*

(*d*)a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

**[**(a)**]** (*i*)determining the position of a radar detector; and

**[**(b)**]** (*ii*)generating an alert if the position of the radar detector is not within a predetermined distance of a predetermined position.

**20**. The radar detector of claim **19**, wherein the program storage device includes machine readable instructions for determining at least one characteristic of the radar signal.

**21**. The radar detector of claim **18**, further including a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

(a) determining the velocity of the device utilized to detect the incoming radar signal; and

(b) generating an alert if the velocity of a radar detector is greater than a predetermined velocity.

*22. The method of claim 1, further comprising:*

(*d*) *generating the alert if the device is within the predetermined distance of the predetermined position and if the signal strength of the incoming radar signal is greater than a predetermined radar signal strength.*

*23. The method of claim 1, further comprising:*

(*d*) *generating the alert if the device is within the predetermined distance of the predetermined position and if the signal strength of the incoming radar signal is not within a predetermined frequency range of a predetermined radar frequency.*

*24. The method of claim 1, further comprising:*

(*d*) *generating the alert if the device is within the predetermined distance of the predetermined position and if either the signal strength of the incoming radar signal is greater than a predetermined signal strength or if the frequency of the incoming radar signal is not within a predetermined frequency range of a predetermined radar frequency.*

*25. The method of claim 1, further comprising:*

(*d*) *generating the alert if the position of the device is within the predetermined distance of the predetermined position.*

*26. The method of claim 1, further comprising:*

(*d*) *storing the position of the device in a memory device.*

*27. The method of claim 1, further comprising:*

(*d*) *storing the frequency of the incoming radar signal in a memory device.*

*28. The method of claim 1, further comprising:*

(*d*) *storing the signal strength of the incoming signal in a memory device.*

*29. The radar detector of claim 18, wherein the global positioning system receiver is operable to provide the microprocessor with data that indicates the velocity of the radar detector.*

*30. The radar detector of claim 18, wherein the global positioning system receiver is operable to provide the microprocessor with data that indicates the heading of the radar detector.*

*31. The radar detector of claim 18, further comprising:*

(*d*) *a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:*

*i) storing the position of the radar detector.*

130

US RE39,038 E

**9**

32. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) determining the position of a source of a radar signal; and

   ii) storing the position.

33. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) determining the distance between the position of the radar detector and another position.

34. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) determining the bearing between the position of the radar detector and another position.

35. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one position.

36. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one radar frequency.

37. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one radar signal strength.

38. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one position and at least one radar frequency.

39. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one position and at least one radar signal strength.

40. The radar detector of claim 18, further comprising:

(d) a memory device that is coupled to the microprocessor, the memory device containing at least one position, at least one radar frequency, and at least one radar signal strength.

41. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) comparing the frequency of an incoming radar signal with a previously stored radar frequency.

**10**

42. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) comparing the frequency of an incoming radar signal with a previously stored radar frequency; and

   ii) generating an alert based at least in part upon the result of the comparison.

43. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) comparing the signal strength of an incoming radar signal with a previously stored radar signal strength.

44. The radar detector of claim 18, further comprising:

(d) a program storage device that is coupled to the microprocessor, the program storage device containing machine readable instructions for:

   i) comparing the signal strength of an incoming radar signal with a previously stored radar signal strength; and

   ii) generating an alert based at least in part upon the result of the comparison.

45. A radar detector for alerting an operator of a motor vehicle to an incoming radar signal comprising:

(a) a circuit operable to detect an incoming radar signal; and

(b) a microprocessor operable to disable an alert to the incoming radar signal based at least in part upon the position of the radar detector.

46. The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the velocity of the radar detector.

47. The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the frequency of the incoming radar signal.

48. The radar detector of claim 45, wherein the microprocessor is operable to enable the alert based at least in part upon the frequency of the incoming radar signal.

49. The radar detector of claim 45, wherein the microprocessor is operable to disable the alert based at least in part upon the signal strength of the incoming radar signal.

50. The radar detector of claim 45, wherein the microprocessor is operable to enable the alert based at least in part upon the signal strength of the incoming radar signal.

\* \* \* \* \*

GREGORY F. AHRENS
BRETT A. SCHATZ
WOOD, HERRON & EVANS, L.L.P.
Attorneys at Law
441 Vine Street, 2700 Carew Tower
Cincinnati, Ohio 45202-2917
Telephone: (513) 241-2324
Facsimile: (513) 421-7269
gahrens@whepatent.com
bschatz@whepatent.com

Attorneys for Defendants
       Escort Inc.
       Beltronics USA, Inc.

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HOYT A. FLEMING, | ) | Case No. 1:09-cv-00105-BLW |
| | ) | |
| Plaintiff | ) | **DEFENDANTS' BRIEF IN SUPPORT OF** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| ESCORT INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BELTRONICS USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.    INTRODUCTION

Defendants, Escort, Inc. and Beltronics USA, Inc. (collectively, "Defendants"), have moved the Court for entry of summary judgment on Plaintiff Hoyt A. Fleming III's ("Fleming") claims of patent infringement.  Specifically, Defendants have moved the Court for entry of summary judgment that (1) U.S. Patent Nos. RE39,038 ("the '038 patent") and RE40,653 ("the '653 patent") violate the Reissue Statute, 35 U.S.C. § 251, and are therefore invalid, (2) Claims 1, 18, and 45 of the '038 patent and Claims 22 and 38 of the '653 patent are anticipated by prior art, and are therefore invalid, (3) the '038 patent and the '653 patent are not infringed under the Doctrine of Equivalents, (4) Fleming engaged in inequitable conduct and the '653 patent is therefore unenforceable, (5) Fleming cannot prove that the alleged infringement is willful, and (6) Fleming cannot establish a priority date for his inventions earlier than April 14, 1999.

## II.    Standard For Entry of Summary Judgment

Summary judgment is equally appropriate in a patent case as in any other type of case. *Spectra Corp. v. Lutz*, 839 F.2d 1579, 1581, n.6 (Fed. Cir. 1988).  Therefore, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In addition, "the nonmoving party may not rest upon mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.    The '038 and '653 Patents Violate The Reissue Statute And Are Invalid

Both the '038 and '653 patents are "reissue" patents of original patent, U.S. Patent No. 6,204,798 ("the '798 patent").  As reissue patents, the '038 and '653 patents are governed by

special requirements not applicable to typical patents.  Pertinent here is the reissue statute, 35

U.S.C. § 251:

> Whenever any patent is, <u>through error</u> without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall…reissue the patent for the invention disclosed in the original patent…No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251 (emphasis added).  Absent legally proper "error," a reissue patent is invalid.  *In re Weiler*, 790 F.2d 1576, 1582-83 (Fed. Cir. 1986).

The scope of legally proper error is strictly limited.  That is because "Section[ ] 251…evince[s] the clear intent of Congress to protect the public against the unanticipated broadening of a claim after the grant of the patent by the PTO."  *Superior Fireplace Co. v. The Majestic Prods. Co.*, 270 F.3d 1358, 1371 (Fed. Cir. 2001).  Further, "[t]he reissue statute was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute *de novo* his original application."  *In re Weiler*, 790 F.2d at 1582.  Therefore, but for "inadvertence, accident, or mistake" at the time of the original patent, the claims of the reissue patent had to have been claimed when the original patent was filed.  *Id.* at 1582.  Otherwise, there is no legally proper error at the time of the original patent, and the reissue is invalid.  *Id.*

That means that merely disclosing subject matter in the original patent without claiming that subject matter in the original patent, and only subsequently claiming it in a reissue patent, is not sufficient to demonstrate legally proper "error":

> It is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification.

*U.S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp.*, 315 U.S. 668, 676, 62 S.Ct. 839 (1942).  It is also not sufficient that the patentee had within his knowledge the subject matter only subsequently claimed in the reissue patent.  *Id.* at 676.

Rather, "inadvertence, accident, or mistake" at the time of the original patent has to be the cause of why the subject matter only subsequently claimed in a reissue patent was not claimed when the original patent was filed.  *In re Weiler*, 790 F.2d at 1582.  It follows that if the patentee did not intend to claim subject matter in connection with and at the time of the original patent, that conveys that the patentee's failure to claim that subject matter was not the result of legally proper "error."  *Id.* at 1583.

As noted below, Fleming testified that there was no "inadvertence, accident, or mistake" at the time of the original patent that caused him not to claim subject matter in the original patent, and only later in his reissue patents.  In fact, he swore under oath directly to the contrary.

A.    **The '038 Patent**

The '038 patent issued from a patent application filed nearly four years after the application that issued as the '798 patent was filed on April 14, 1999.  Nearly four years later, Fleming decided that he wanted to seek a reissue patent, and filed the patent application that ultimately issued as the '038 patent on January 28, 2003.  (*See* Dkt. 1, Exs. 1, 2).

During his deposition, Fleming explained the basis for his decision to seek his first reissue patent, *i.e.*, the '038 patent, and when that decision was made.  When asked if there was "anything specific that [he] looked at or reviewed that caused [him] to seek reissue," Fleming identified the GPSRD Radar Detector from Uniden.  (*See* Exhibit A; Fleming Dep. at 51).  He went on to testify as follows:

Q:    Okay.  When did you first become aware of this Uniden product that
      prompted you to seek reissue of the '798 patent?
A:    Very shortly before this (Indicating).
Q:    And when you say 'very shortly before this,' you are referring to Exhibit 4?
A:    Yes…

(*See* Exhibit A; Fleming Dep. at 52).  Exhibit 4 is a declaration signed by Fleming in January

2003, nearly four years after the application that issued as the '798 patent.  (*See* Exhibit B).

    Fleming also testified that there was no "inadvertence, accident, or mistake" at the time

of the original patent that caused him not to claim particular subject matter, and to only

subsequently do so in connection with the '038 patent.  Rather, he concluded years after the

original patent that he believed he had the right to claim more than he originally had:

Q:  And so I take it that shortly before Exhibit 4 was filed, you saw or first had an
    understanding of this Uniden product and came to the conclusion that the market in
    this area, and the products in this area, were moving in a particular direction?
A:  Mr. Schatz, you know, approximately a month before this was filed, Exhibit 4, a
    docket indicator on my docket system threw something up on my screen that said,
    you know, Two-year reissue filing date approaches in so many months…When that
    came up, I read the patent again, my patent, the '798 patent, I read the claims, and
    then I spent some time surfing the web to see what was going on in the field.  I did
    find the Uniden GPSRD….But when I saw that, I said, you know, I need to review
    the spec and make sure that I claim what I need to claim, or what I can claim, what I
    have a right to claim…

(*See* Exhibit A; Fleming Dep. at 53-54).

    Fleming's sworn testimony makes it clear that he did not make an accident or mistake at

the time of the original patent, and that the original patent was free from inadvertence.  Rather,

Fleming made a calculated decision, years later, to seek claims that issued as the '038 patent.

    The source of the problem with Fleming's reissue, *i.e.*, lack of legally proper "error," is

easy to track.  Fleming testified that he believed that "[t]he reissue rules allow you to claim

anything you have a right to claim, which is in the specification that meets 112 requirements, if

you file the first reissue application within two years…" (*See* Exhibit A; Fleming Dep. at 54-55).

Fleming's belief is wrong, and has been the identical source of confusion for others:

> Weiler argues, on the basis of loose language which, taken out of context, would appear to say that one looks only to see whether the subject matter of a reissue claim appears in the disclosure, and, if it does, a reissue applicant must be granted allowance of that claim. But the question of support in the disclosure is a § 112 inquiry. If there be no such support, the inquiry ends there, and reissue cannot be obtained. Thus, all consideration of § 251 must await that threshold § 112 determination.
>
> \*      \*      \*
>
> References to 'intent to claim' in our cases, though occasionally including § 112 considerations, resolve ultimately in the question of error…It is true that absence of compliance with § 112 will foreclose a finding of 'intent' and preclude grant of the reissue, but, as indicated above, that absence dooms the application in any event. The converse is not true. Compliance with § 112 does not alone establish 'intent to claim' and does not alone establish error in a failure to claim.

*In re Weiler*, 790 F.2d at 1581-82 (Federal Circuit finds the reissue patent invalid for lack of

legally proper error, despite finding that it satisfied § 112).

### B.    The '653 Patent

The '653 patent issued from a patent application filed on August 2, 2005, nearly six and

one-half years after the application that issued as the '798 patent was filed.  (*See* Dkt. 1, Ex. 3).

Under oath, Fleming explained the basis for his decision to seek a second reissue patent so long

after the original patent application was filed.  As with the '038 patent, Fleming testified that he

decided to seek a second reissue patent, not due to any error, but to cover a third party's product:

> Q: Okay.  How did the Cobra detector come up?
> A: I was drafting claims and had claims pending that I believed would cover a number of Cobra products.
> Q: And did you tell Mr. Coverstone that?
> A: Yes, I did.
> Q: Okay.  And the claims that you were drafting, did you believe that they related to any other products other than Cobra and Escort?
> A: The claims I were [sic] drafting were tailored specifically to Cobra.  There may have been some overlap with Escort, but that was not the target.
>
> \*      \*      \*
>
> Q: Okay.  And what did you discuss with reference to your claims?

  A: We discussed that the then pending claims were intended to be – to cover various Cobra products.

(*See* Exhibit C; Fleming Dep. at 43, 49).

  What is undeniably clear is that Fleming decided, after nearly six and one-half years, to seek claims that were intended to cover Cobra products.  That is, he tried to draft claims to support an infringement argument against products that had been recently introduced to the market.  It follows that Fleming's awareness of Cobra products that had been recently introduced to the market, and his decision to pursue patent claims that would cover those products, were the reasons he filed the application that ultimately issued as the '653 patent.  It also follows that six and one-half years before that time, when the original patent application was filed, there was no "inadvertence, accident, or mistake" for not including in the original application the claims that ultimately issued in connection with the '653 patent.  Indeed, there could be none because the circumstance that prompted Fleming's decision to seek a second reissue, *i.e.*, his awareness of Cobra products, did not occur until nearly six and one-half years later.

## IV. Claims 1, 18, And 45 Of The '038 Patent And Claims 22 and 38 Of The '653 Patent Are Anticipated

  The patent statute provides that "a person shall be entitled to a patent unless…the invention was patented or described in a printed publication…more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).  In addition, "a person shall be entitled to a patent unless…before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."  35 U.S.C. § 102(g)(2).  If a prior art reference discloses every limitation of the claimed invention, either explicitly or inherently, the claim is anticipated.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007).

Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)
mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| HOYT A. FLEMING, | Case No. 1:09-cv-00105-BLW |
| Plaintiff, |  |
| v. | PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT AND INJUNCTION |
| ESCORT INC. and BELTRONICS USA, INC. |  |
| Defendants. | FILED UNDER SEAL |

## I.    SUMMARY

Plaintiff, Mr. Hoyt Fleming, respectfully requests that the Court enter judgment of infringement against defendants, enjoin defendants' sale of their infringing products, and require defendants to deposit Mr. Fleming's infringement damages into an interest bearing escrow account. Defendants admit they infringe one of Mr. Fleming's asserted patents, and they have no credible invalidity defense to that patent. Despite this, defendants refuse to cease their infringing activity, thereby necessitating a preliminary injunction. Moreover, defendants' admittedly poor financial condition necessitates an escrow of Mr. Fleming's infringement damages to assure collection of his inevitable money remedy.

Plaintiff's Motion For Entry Of Judgment And Injunction                                  1

and GX65, which are police radar detectors that help drivers avoid receiving speeding violations.    (*See* www.escortradar.com and www.beltronics.com.)    According to defendants' documents, the last time defendants realized a net profit selling these accused products was in 2007, where they netted only $1,236,161.  In 2008, defendants had a net loss of $349,794.  In 2009, they had a net loss of $358,217.  In 2010, they had a net loss of $256,450.  And, through February 2011 (which is the extent to which defendants have produced data), they had a net loss of $309,078.  (Exh. 8, defendants' sales history.)

Mr. Fleming's financial expert has opined and will testify at trial that damages resulting from defendants' infringement are $25 for each accused unit sold.  (Exh. 9, Expert Report.)    Not coincidentally, that is the same royalty rate at which one of defendants' primary competitors has licensed Mr. Fleming's patents.  (Exh. 10, License Agreement.)    Testimony at trial will also show that defendants' infringement has been willful, thereby entitling Mr. Fleming to $75 per unit.  35 U.S.C. § 284 ("the court may increase the damages up to three times the amount found or assessed").    Based on defendants' sales records through January 2011, the damages for defendants' admitted/willful infringement is approximately $18M, and they are accruing at approximately $500,000 per month.  (Exh. 8.)  Thus, as of the time this motion is filed on May 3, 2011, damages are approximately $19.5M.  This says nothing of prejudgment interest, costs, and attorneys fees, which will add another approximately $5M.

Aside from defendants' persistent net loss on sales of the accused products over the last three years, defendants' records also show that at the end of 2010 they had $1,049,00 in cash and $100,933,000 in liabilities.  (Exh. 11, Consolidated Balance Sheet at ESC015926.)  With the staggering disproportionate nature of these figures in mind,

and relating them to defendants' current (and ever increasing) $24.5M damage liability, it appears defendants will likely default on any damage assessment in the range of what is owed. Accordingly, the prospect that Mr. Fleming will not get paid what he is owed is—by definition—irreparable injury in the context of the second *Erico* factor, and proof that the balance of hardships favors Mr. Fleming in the context of the third *Erico* factor. *Erico,* 516 F3d at 1353-54.

Finally, in the context of the fourth *Erico* factor, the fact that the public interest would not be disserved by a preliminary injunction goes almost without saying. There is no public interest in allowing defendants to infringe in circumstances where they cannot pay damages for that infringement. To allow that would undermine not only the constitutional guarantee of "securing… Inventors the exclusive Right to their respective Writings and Discoveries", but it would also ignore nearly unanimous judicial precedent that gives respect and credence to the rights this country affords inventors. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988). Accordingly, Mr. Fleming respectfully requests that the Court issue a preliminary injunction barring defendants from forthwith selling the Passport 9500i, Passport 9500ix, Passport iQ, and GX65 products that defendants admit infringe claim 45 in the '038 patent.

## V.    AN ESCROW IS NECESSARY

Irrespective of the Court's ruling on a preliminary injunction, a mandatory injunction requiring defendants to escrow Mr. Fleming's damages is both customary and necessary in these circumstances.

As explained above, defendants' financial condition puts Mr. Fleming in jeopardy of not being paid for defendants' admitted/defenseless infringement. This is not a unique

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | Case No. 1:09-cv-00105-BLW |
| Plaintiff, | DECLARATION OF HOYT A. FLEMING |
| v. | IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' |
| ESCORT INC. and BELTRONICS USA, INC. | MOTION FOR SUMMARY JUDGMENT (DKT.NO 122) |
| Defendants. | |

I, HOYT A. FLEMING, declare under penalty of perjury that the following statements are true and correct:

1.    I make this declaration based upon my own personal knowledge and can testify to the truth of these matters if called to testify as a witness at the trial of this action.

2.    On September 7, 1998 at 10:41 PM, I saved a first draft of my radar detector patent application. A true and correct draft of that application is attached as Exhibit 24.

3.    On March 14, 1999 at 5:41 PM, I saved a second draft of my radar detector patent application. A true and correct draft of that application is attached as Exhibit 25.

4.    On April 10, 1999 at 10:24 PM, I saved a file containing the figures for my radar detector application. A true and correct copy of those figures is attached as Exhibit 26.

5.    On April 12, 1999 at 7:04 PM, I saved a third draft of my radar detector patent application. A true and correct draft of that application is attached as Exhibit 27.

6.    Between April 12, 1999 at 7:04 PM and April 14, 1999, when I filed my radar detector patent application with the U.S. Patent Office, I drafted a coversheet for my patent application, a Declaration, a Statement Claiming Small Entity Status, a Fee Transmittal, a Utility Patent Application Transmittal, and an Information Disclosure Statement.

7.    On April 14, 1999, I filed my patent application, which included the figures, the coversheet and the Declaration with the U.S. Patent Office. On that date, I also filed the Statement Claiming Small Entity Status, the Fee Transmittal, the Utility Patent Application Transmittal, and

- 1 -

the Information Disclosure Statement with the U.S. Patent Office. A true and accurate copy of the materials filed with the U.S. Patent Office on April 14, 1999 is attached as Exhibit 28.

8. Other than the coversheet, the addition of which changed the page numbering on the bottom of each page, the disclosure of the application that I filed with the U.S. Patent Office on April 14, 1999 is word-for-word-identical to the third draft of my radar detector patent application that I saved on April 12, 1999 at 7:04 PM.

9. I prosecuted that patent application until the U.S. Patent Office issued that patent application as United States Patent No. 6,204,798 ("the '798 patent") on March 20, 2001. A true and correct copy of the '798 patent is attached as Exhibit 1.

10. Shortly after the issuance of the '798 patent, the date of the issuance of that patent, March 20, 2001, was input into my law firm's docketing system.

11. My law firm's docketing system was programmed to provide me with notice three months before the second anniversary of the issuance date of patents for which I am responsible. The purpose of this notice is to notify me that the two-year broadening reissue deadline will occur three months after the notice.

12. On or about January 20, 2003, my law firm's docketing system provided me with notice that the two-year broadening reissue deadline for the '798 patent would occur in three months.

13. After I received that notice from my law firm's docket system, I reviewed the 21 patent claims of the '798 patent and performed a prior art search in order to locate any prior art that may be relevant to the claims of the '798 patent. During that prior art search, I became aware, for the first time, of U.S. Provisional Patent Application No, 60/108,362 to Lang ("Lang") and U.S. Patent No. 5,977,884 to Ross ("Ross").

14. I then compared the 21 claims of the '798 patent to Lang and Ross.

15. As a result of my comparison, I determined that during the prosecution of the application that resulted in the '798 patent, I had inadvertently claimed more than I was entitled to claim. Specifically, I determined that two of the 21 claims, namely, claims 11 and 18 of the '798 patent, claimed more than I was entitled to claim in light of Ross.

- 2 -

16.     During my prior art search, I also became aware of a Uniden GPRS radar detector manual.  While this manual was not prior art to the '798 patent, the manual indicated to me that modern radar detectors were just beginning to use GPS functionality to increase their intelligence.

17.     Based upon my determination that claims 11 and 18 inadvertently claimed more than I had a right to claim in light of Ross, I decided to seek reissue of the '798 patent.

18.     In preparation of my filing a reissue patent application, I performed a detailed review of the subject matter disclosed in the specification of the '798 patent.  Based upon that review, I began drafting a preliminary amendment that amended claims 11 and 18 to include additional limitations, thereby narrowing those claims.  The additional limitations that were added to claims 11 and 18 were located during my review of the subject matter disclosed in the specification of the '798 patent.  As a result of my amendment of claim 18, I determined that I needed to amend claim 19, which depended from claim 18.

19.     As a result of my detailed review of the subject matter disclosed in the specification of the '798 patent, I determined that during the prosecution of the application that issued as the '798 patent, I had failed to appreciate the full scope of my invention and had inadvertently claimed less than I had a right to claim.  Based upon that determination, I decided to add broadening claims to the reissue application.  Thus, I continued to draft the preliminary amendment so that it would include new claims 22 – 54.

20.     On January 28, 2003, I filed a reissue patent application with the United States Patent and Trademark Office.  A true and correct copy of that reissue application is attached as Exhibit 29.  One of the documents contained in the reissue application is a *Statement of Inoperativeness or Invalidity of Original Patent*.  This Statement stated, among other things:

> "I, Hoyt A. Fleming III, believe the original patent, which is the subject of this reissue application, to be partly invalid because of errors without any deceptive intent on the part of myself, by reason of claiming less than I had a right to claim in the original patent and by reasons of claiming more than I had a right to claim in the original patent.
>
> As an example, the issued patent does not include a claim directed to a database

- 3 -

within a radar detector having a plurality of positions and a plurality of radar frequencies and/or radar signal strengths.  In addition, the issued patent does not include a claim directed to a radar detector containing a circuit for detecting an incoming radar signal and a microprocessor operable to disable an alert to an incoming radar signal based in part upon the position of the radar detector.  In addition, U.S. Patent No. 5,977,884 entitled "Radar Detector Responsive to Vehicle Speed" may invalidate original claims 11 and 18.

I hereby declare that all statements made herein of my own knowledge are true ..."

I believed those statements were true then and I believe them to be true now.

21.     In addition to the reissue application that I filed on January 28, 2008, I also filed a preliminary amendment.  A true and correct copy of the preliminary amendment is attached as Exhibit 30.  The preliminary amendment amended claims 11 and 18 to added additional limitations, amended claim 19, and added new claims 22 – 54.

22.     In addition to the reissue application that I filed on January 28, 2008, I also filed an Information Disclosure Statement that notified the United States Patent and Trademark Office of both Lang and Ross.  A true and correct copy of the Information Disclosure Statement is attached as Exhibit 31.

23.     As I prosecuted the reissue application, I submitted an additional reissue declaration on December 21, 2004.  A true and correct copy of that declaration is attached as Exhibit 32.  That declaration stated, among other things:

"I, Hoyt A. Fleming III, believe that the original patent, which is the subject of this reissue application, to be partly invalid because of errors without any deceptive intent on the part of my self, by reason of claiming less than I had a right to claim in the original patent.

All errors that are being corrected in the present reissue application up to the time of filing of the declaration arose without any deceptive intention of the part of applicant.

One error is the omission of a claim directed to a radar detector containing a circuit for detecting an incoming radar signal and a microprocessor operable to disable an alert to an incoming radar signal based in art upon the position of the radar detector.  This error has been corrected by the addition of new claim 49, the text of which follows:

- 4 -

49.     A radar detector for alerting an operator of a motor vehicle to an incoming radar signal comprising:

(a)     a circuit operable to detect an incoming radar signal; and

(b)     a microprocessor operable to disable an alert to the incoming radar signal based at least in part upon the position of the radar detector.

I hereby declare that all statements made herein of my own knowledge are true . . .."

I believed those statements were true then and I believe them to be true now.

24.     After receiving my December 21, 2004 declaration, the United States Patent and Trademark Office issued United States Patent No. RE39,038.

25.     During the prosecution of the reissue application that eventually issued as United States Patent No. RE39,038, I again performed a detailed review of the specification of the '798 patent.  During that review, I determined that during the prosecution of the application that issued as the '798 patent, I had failed to appreciate the full scope of my invention and had inadvertently claimed less than I had a right to claim.  In particular, I determined that I had not claimed a method, which is performed by a radar detector, that included detecting an incoming police radar signal and determining the heading of the radar detector.  Based upon that determination, I decided to seek a second reissue patent.

26.     On August 2, 2005, I filed a second reissue application.  A true and correct copy of that reissue application is attached as Exhibit 33.  One of the documents contained in the reissue application is a *Reissue Declaration*.  This Declaration stated, among other things:

"I, Hoyt A. Fleming III, believe that the original patent, which is the subject of this reissue application, to be partly invalid because of errors without any deceptive intent on the part of my self, by reason of claiming less than I had a right to claim in the original patent.

All errors that are being corrected in the present reissue application up to the time of filing of the declaration arose without any deceptive intention of the part of applicant.

One error is the omission of a claim directed to a method performed by a radar detector for alerting an operator of a motor vehicle to an incoming radar signal. The method includes detecting the incoming police radar signal and determining the heading of the radar detector.  This error has been corrected by the addition of new claim 22.

- 5 -

1

          I hereby declare that all statements made herein of my own knowledge
are true . . ..”

2

I believed those statements were true then and I believe them to be true now.

3

          27.     In addition to the reissue application that I filed on August 2, 2005, I also filed a

4

preliminary amendment.  A true and correct copy of the preliminary amendment is attached as

5

Exhibit 34.  The preliminary amendment canceled original claims 1 – 21 and added new claims 22 –

6

43.

7

          28.     As I prosecuted the reissue application, I submitted an additional reissue declaration

8

on August 19, 2008.  A true and correct copy of that declaration is attached as Exhibit 35.  That

9

declaration stated, among other things:

10

11

          “I, Hoyt A. Fleming III, believe that the original patent, which is the subject of
          this reissue application, to be partly invalid because of errors without any
          deceptive intent on the part of my self, by reason of claiming less than I had a
          right to claim in the original patent.

12

13

          All errors that are being corrected in the present reissue application up to the time
          of filing of the declaration arose without any deceptive intention of the part of
          applicant.

14

15

          One error is the omission of a claim directed to a system, for use in an
          automobile.   The system includes a GPS receiver that outputs first data, a
          plurality of antennas, signal processing logic that determines positions of objects
          with respect to a side of the automobile, and a device that generates a first visual
          indication based upon the first data and generates a second visual indication bases
          upon the positions of the objects with respect to the side of the automobile.  This
          error has been corrected by the addition of new claim 81.
                  I hereby declare that all statements made herein of my own knowledge
          are true . . ..”

16

17

18

19

20

21

I believed those statements were true then and I believe them to be true now.

22

          29.     After receiving my August 19, 2008 declaration, the Unites States Patent and

23

Trademark Office issued United States RE40,653.

24

          30.     At no time during the prosecution of my original ‘798 patent did I appreciate that I

25

had erred in claiming more or less than I had a right to.  If I had, I would have corrected the over-

26

/under-claiming then and there.

27

28

- 6 -

31.     At no time during the prosecution of my original '798 patent, or prior to or during any of the subsequent reissue proceedings, did I ever err with deceptive intent with respect to any patent application, patent, or claim.

32.     On May 21, 2009, I filed an Information Disclosure Statement ("IDS") with the U.S. Patent Office along with a large number of documents.  A true and correct copy of the IDS is attached as Exhibit 23.    When I filed the IDS and the documents, I did not believe that many of the documents were material to the patentability of any of my radar detector patent applications.  For example, I did not believe that Escort's '881 patent application, a true an correct copy of which is attached as Exhibit 11, was material because the disclosure of the '881 application is word-for-word identical with the disclosure of Escort's 6,670,905 patent, which I had previously submitted to the U.S. Patent Office.  The '881 application was filed with the U.S. Patent Office solely because defendants had alleged that I should have filed the '881 application with the U.S. Patent Office.  In addition, I did not believe that the numerous documents relating to the *Fleming v. Coverstone* litigation were material to the patentability of any of my radar detector patent applications.  The *Fleming v. Coverstone* documents were filed with the U.S. Patent Office solely because defendants had alleged that I should have filed such documents with the U.S. Patent Office.   I have never had the intent to mislead or deceive the U.S. Patent Office.  To the contrary, I have always conducted my dealings with the U.S. Patent Office with the utmost candor and professionalism.

33.     A true and correct copy of U.S. Patent No. RE39,038 (the '038 patent) is attached as Exhibit 2.  Claims 1 through 10 of the '038 are identical to claims 1 through 10 of the '798 patent as those claims were carried over from the '798 patent.

34.     A true and correct copy of U.S. Patent No. RE40,653 is attached as Exhibit 3.

35.     A true and correct copy of *In Re Yasuhito Tanaka* is attached as Exhibit 4.

36.     A true and correct copy of the Substitute Reissue Declaration for reissue application serial number 10/201,948 is attached as Exhibit 5.

37.     A true and correct copy of selected pages of Mr. Orr's November 20, 2009 deposition transcript is attached as Exhibit 6.

- 7 -

38.    A true and correct copy of selected pages of defendant's 2nd supplemental response to Interrogatory No. 3 is attached as Exhibit 7.

39.    A true and correct copy the Supplemental Opening Report of Chris Gregory Bartone is attached as Exhibit 8.

40.    A true and correct copy of selected pages of the Supplemental Rebuttal Report of Chris Gregory Bartone is attached as Exhibit 9.

41.    A true and correct copy of the Expert Report of Richard A. Killworth is attached as Exhibit 10.

42.    A true and correct copy of U.S. Patent Application Serial Number 10/396,881 is attached as Exhibit 11.

43.    A true and correct copy of the Supplemental Rebuttal Expert Report of John Grindon is attached as Exhibit 12.

44.    A true and correct copy of defendants' second supplemental response to Interrogatory number 8 is attached as Exhibit 13.

45.    A true and correct copy of Escort's March 13, 2002 preliminary amendment for U.S. Patent Application Serial Number 09/889,656 is attached as Exhibit 14.

46.    A true and correct copy of Escort's March 25, 2003 preliminary amendment for U.S. Patent Application Serial Number 10/396,881 is attached as Exhibit 15.

47.    A true and correct copy of the May 30, 2006 Office Action for U.S. Patent Application Serial Number 10/396,881 is attached as Exhibit 16.

48.    A true and correct copy of the August 19, 2005 declaration of Mr. Stephen K. Orr is attached as Exhibit 17.

49.    A true and correct copy of Defendants' Responses to Fleming's Requests For Admission is attached as Exhibit 18.

50.    A true and correct copy of  Defendants' Supp. Resp. to Fleming Interrog. No. 13 is attached as Exhibit 19.

- 8 -

51.     A true and correct copy of an October 22, 2010 letter from Mr. Michael Dowler to Mr. Brett Schatz is attached as Exhibit 20.

52.     A true and correct copy of a November 1, 2010 email from Mr. Michael Dowler to Mr. Brett Schatz is attached as Exhibit 21.

53.     A true and correct copy of a letter from Mr. Brett Schatz to Mr. Michael Dowler is attached as Exhibit 22.

54.     A true and correct copy of an Information Disclosure Statement that I filed with the U.S. Patent Office on May 21, 2009 is attached as Exhibit 23.

55.     A true and correct copy of an Escort press release dated June 23, 2008 is attached as Exhibit 36.

56.     A true and correct copy of an Escort press release dated October 27, 2010 is attached as Exhibit 37.

57.     A true and correct copy of a Beltronics press release dated September 1, 2008 is attached as Exhibit 38.

58.     I would testify to all the factual statements set forth above if I was called as a witness at trial.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of May, 2011.


Hoyt A. Fleming

- 9 -

DECLARATION OF HOYT A. FLEMING IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**707**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | ) Case No. 1:09-cv-00105-BLW |
| Plaintiff, | ) |
| v. | ) DECLARATION OF CHRIS GREGORY |
| | ) BARTONE, PH.D., P.E. |
| ESCORT INC. and BELTRONICS USA, INC. | ) |
| Defendants. | ) |

I, Chris Gregory Bartone, declare under penalty of perjury that I would testify as to the truth of the factual statements below and, to the extent my opinions are expressed below, that I would testify to them if called as a witness at trial.

1.      Exhibit 8 is a true and correct copy of the Supplemental Opening Expert Report of Chris Gregory Bartone, Ph.D., P.E.

2.      Exhibit 9 is a true and correct copy of selected pages of the Supplemental Rebuttal Expert Report of Chris Gregory Bartone, Ph.D., P.E.

3.      My qualifications for providing the opinions that I expressed in that report are also set forth in the report, as well as my curriculum vitae attached thereto.

4.       Attached hereto as Exhibit A are additional factual statements and opinions that I have formulated as part of this case.

5.      As indicated above, I would testify to all the factual statements and opinions set forth in Exhibit A if I was called as a witness at trial.

1        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

2   correct.

3        Executed on this 23 day of May, 2011.

4

5                                                    _____
                                                     Chris Gregory Bartone

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)
mike@parklegal.com

Attorneys for Plaintiff


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| HOYT A. FLEMING, | Case No. 1:09-cv-00105-BLW |
| Plaintiff, | |
| v. | PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT (DKT. NO. 120) |
| ESCORT INC. and BELTRONICS USA, INC. | |
| Defendants. | |

# TABLE OF CONTENTS

I.   DEFENDANTS FAIL THE SUMMARY JUDGMENT STANDARD ........................ 1

II.  SUMMARY JUDGMENT ON PATENT CLAIMS DEFENDANTS
     ADMIT THEY INFRINGE ...................................................................... 2

III. SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE
     DEFENSES ............................................................................................ 4

     A.  There Is No Evidence Supporting Defendants' Eighth Affirmative
         Defense—That Mr. Fleming Does Not Own His Patents .................................... 4

     B.  There Is No Evidence Supporting Defendants' Fifth Affirmative
         Defense—Laches ............................................................................ 7

         1.  Defendants' opposition errs as a matter of law ........................... 7

         2.  Defendants' opposition errs as a matter of fact ......................... 8

         3.  Defendants identify no evidence of delay or prejudice ........................ 9

     C.  There Is No Evidence Supporting Defendants' Fourth
         Affirmative Defense—Estoppel .......................................................... 14

     D.  Defendants' Third Affirmative Defense Under 35 U.S.C. § 251
         (Reissue Of Defective Patents) Errs As A Matter Of Law .............................. 16

     E.  Defendants Admit Their Third Affirmative Defense Under
         35 U.S.C. § 252 Is Not A Recognized Patent Invalidity Defense ................... 17

     F.  There Is No Evidence Supporting Defendants' Tenth Affirmative
         Defense—Intervening Rights ............................................................ 18

         1.  Defendants admit there are no absolute or equitable intervening
             rights for claims 1, 3, and 5-8 in the '038 patent ..................... 18

         2.  Defendants admit there are no absolute intervening rights
             for other patent claims ............................................................ 18

         3.  Defendants have not advanced any evidence supporting equitable
             intervening rights for any of the asserted patent claims ......................... 19

IV.  SUMMARY JUDGMENT OF INFRINGEMENT OF OTHER
     CLAIMS IN THE '038 PATENT ................................................................ 24

A.   ‘038 Patent, Claim 1 ....................................................... 24

B.   ‘038 Patent, Claims 3, 5, 6, 8, 26, and 27 ....................... 28

C.   ‘038 Patent, Claim 25 ..................................................... 29

D.   ‘038 Patent, Claim 28 ..................................................... 30

V.   SUMMARY JUDGMENT OF INFRINGEMENT OF THE ‘653 PATENT ............. 31

A.   ‘653 Patent, Claim 22 ..................................................... 31

B.   ‘653 Patent, Claim 26 ..................................................... 31

C.   ‘653 Patent, Claim 30 ..................................................... 32

D.   ‘653 Patent, Claim 31 ..................................................... 32

E.   ‘653 Patent, Claims 32-33 .............................................. 33

F.   ‘653 Patent, Claim 38 ..................................................... 34

G.   ‘653 Patent, Claims 41-42, and 45-46 ............................ 34

VI.   SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT ......................... 35

A.   The ‘881 Orr Patent Application....................................... 36

1.   Defendants fail to advance any evidence of materiality ......................... 36

2.   Defendants fail to advance any evidence of intent ................................. 38

B.   The Orr Declarations......................................................... 40

C.   The Coverstone Litigation ................................................ 41

1.   Coverstone’s Arguments Concerning the Prior Art Status of the ‘881 Application .................................................. 41

2.   The Existence of the Coverstone Litigation............................................ 42

3.   Coverstone’s Fraud Allegations............................................................. 43

D.   The Reissue Declarations.................................................. 44

VII.   SUMMARY JUDGMENT THAT MURAKAMI DOES NOT ANTICIPATE ‘038 PATENT CLAIMS 1, 3, or 5-8 UNDER 35 U.S.C. § 102 ................................ 45

VIII.  SUMMARY JUDGMENT THAT DEFENDANTS' INFRINGEMENT
       IS WILLFUL ....................................................................................... 48

       A.   Defendants' Opposition Fails To Advance Any Admissible Evidence ............. 48

       B.   Defendants' Arguments Show They Willfully Infringed ................... 49

            1.   Defendants admit they infringe ................................................ 49

            2.   Defendants copied and tried to steal Mr. Fleming's invention
                 through fraudulent activity before the U.S. Patent Office ..................... 50

            3.   Defendants' "continuous development" theory is frivolous ................... 53

            4.   Defendants' remaining arguments are irrelevant ..................... 56

       C.   Defendants' Post-Complaint Willful Infringement ........................... 57

IX.    CONCLUSION.......................................................................................... 59

## TABLE OF AUTHORITIES

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992).................................................................. 9, 11

*ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*,
  592 F.Supp.2d 1208 (N.D. Cal. 2008) .......................................................... 59

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*,
  2000 WL 34334583 (N.D. Cal. March 31, 2000)........................................... 56

*Affinity* Labs *of Texas, LLC v. Alpine Elecs. of Am., Inc.*,
  No. 9:08-CV-171, slip op. at 2 (E.D. Tex. Sept. 2, 2009) ........................... 59

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................. passim

*Avia Group Int'l., Inc. v. L.A. Gear California, Inc.*,
  853 F.2d 1557 (Fed. Cir. 1988)..................................................................... 54

*Avocent Huntsville Corp. v. Clearcube Tech. Inc.*,
  443 F. Supp. 1284 (N.D. Ala. 2006)............................................................. 45

*Board Of Trustees Of The Leland Stanford Junior University v. Roche Molecular*
  *Systems, Inc.*, No. 09-1159, 563 U.S. ___ (June 6, 2011) ............................ 4

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008)....................................................................... 55

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)..................................................................... 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................. passim

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ................................................................ 15, 44

*Exergen Corp. v. Wal-mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009)..................................................................... 44

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
  122 S.Ct. 1831 (2002).................................................................................. 15

*Finisar Corp. v. DirecTV Group, Inc.,*
523 F.3d 1323 (Fed. Cir. 2008)................................................................ 55

*Finjan, Inc. v. Secure Computing Corp.,*
626 F.3d 1197 (Fed Cir. 2010).......................................................... 26, 33

*Halliburton Co. v. Western Co. of North America,*
10 U.S.P.Q.2d. 1973 (W.D. Okla. 1989) ................................................ 21

*Haskell Plumbing and Heating Co. v. Weeks,*
237 F.2d 263 (9th Cir. 1956) .................................................................. 49

*Henrob Ltd v. Böllhoff Systentechnick GMBH & Co.,*
2009 WL 3188572 (E.D. Mich 2009)...................................................... 21

*Hester Indus., Inc. v. Stein, Inc.,*
142 F.3d 1472 (Fed. Cir. 1998)............................................................... 16

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,*
488 F.3d 982 (Fed. Cir. 2007)................................................................. 28

*In Re Amos,*
953 F.2d 613 (Fed. Cir. 1991)................................................................. 16

*In re Bennett,*
766 F.2d 524 (Fed. Cir. 1985).................................................................. 8

*In re Fotland,*
779 F.2d 31 (Fed. Cir. 1985).................................................................... 8

*In re Seagate Tech.,*
497 F.3d 1360 (Fed. Cir. 2007)..................................................... 49, 57, 58

*In Re Yasuhito Tanaka,*
No. 2010-1262 (Fed. Cir. April 15, 2011) ............................................... 17

*Ives v. Sargent,*
119 U.S. 652 (1887)................................................................................. 7

*Krippelz v. Ford Motor Co.,*
636 F.Supp.2d 669 (N.D. Ill. Mar. 25, 2009) ......................................... 59

*Matsushita Elec. Indus. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)........................................................................ passim

*Medtronic, Inc. v. Guidant Corp.*,
  465 F.3d 1360 (Fed. Cir. 2006) ................................................................. 16

*Meyers v. Brooks Shoe Inc.*,
  912 F.2d 1459 (Fed. Cir. 1990) ........................................................ passim

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
  138 F.3d 1437 (Fed. Cir. 1998) ................................................................. 56

*Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*,
  2009 WL 483865 (D. N.J. Feb. 25, 2009) ................................................. 59

*Quad Envtl. Technologies v. Union Sanitary Dist.*,
  17 U.S.P.Q.2d 1667, 1990 WL 288712 (N.D. Cal. 1990),
  *rev'd on other grounds*, 946 F.2d 870 (Fed. Cir. 1991) ............................. 21

*Radar Industries, Inc. v. Cleveland Die & Mfg. Co.*,
  No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 ....... passim

*Sanchez v. Vild*,
  891 F.2d 240 (9th Cir. 1989) ............................................................ passim

*Seattle Box Co. v. Industrial Crating & Packing, Inc.*,
  756 F. 2d 1574 (Fed. Cir. 1985) ............................................................... 19

*Shockley v. Arcan, Inc.*,
  248 F.3d 1349 (Fed. Cir. 2001) ............................................................... 18

*SIRF Tech., Inc. v. Int'l Trade Comm'n*,
  601 F.3d 1319 (Fed. Cir. 2010) ................................................................. 4

*Slimfold Mfg. Co. v. Kinkead Industries, Inc.*,
  810 F.2d 1113 (Fed. Cir. 1987) ............................................................... 21

*Sontag Chain Stores Co. v. National Nut Co.*,
  310 U.S. 281 (1940) .................................................................................. 7

*SSIH Equip. S.A. v. United States Int'l Trade Comm'n*,
  718 F.2d 365 (Fed. Cir. 1983) ................................................................. 47

*St. Clair Intellectual Prop. Consultants, Inc. v. Palm, Inc.*,
  2009 WL 1649751 (D. Del. Jun.10, 2009) ................................................. 59

*State Contracting & Engineering Corp v. Condotte America, Inc.*,
  346 F.3d 1057 (Fed. Cir. 2003) ........................................................ 11, 13

*Therasense, Inc. v. Becton, Dicksinson and Co.*,
   No. 2008-1511 (Fed. Cir. May 25, 2011) ......................................... passim

*Thorpe v. Jones & Co.,*
   1990 WL 102763 (9th Cir. 1990) ...................................................... 49

*Trintec Indus., Inc. v. Top-U.S.A. Corp.,*
   295 F.3d 1292 (Fed. Cir. 2002) ........................................................ 47

*Visto Corp. v. Sproqit Tech., Inc.,*
   413 F. Supp. 2d 1073 (N.D. Cal. 2006) ............................................ 19

*Walton v. United Consumers Club, Inc.,*
   786 F.2d 303 (7th Cir. 1986) ........................................................... 49

*Webmap Tech v. Google,*
   2010 WL 3768097 (E.D. Tex 2010) .................................................. 58

*Wollensak v. Reiher,*
   115 U.S. 96 (1885) ............................................................................. 7

## Statutes

35 U.S.C. § 111 ....................................................................................... 37

35 U.S.C. § 135(b)(1) ............................................................................. 39

35 U.S.C. § 251 ................................................................................. 8, 16

35 U.S.C. § 252 .............................................................. 17, 18, 20, 21

35 U.S.C. § 102 ............................................................................... passim

35 U.S.C. § 103 ............................................................................... passim

## Regulations

37 C.F.R. § 1.178(b) ........................................................................ 42, 43

37 C.F.R. § 1.56 ...................................................................................... 38

Mr. Fleming's motions show there are a host of issues still in this case that cannot reasonably be disputed, and yet defendants simply will not drop them. Indeed, defendants' opposition brief shows there is little they will not argue in an effort to maintain even the most unmeritorious defenses. Mr. Fleming respectfully requests that the Court grant his motions for summary judgment in order to pare this case to only those issues that warrant the Court's and the jury's effort.

## I. DEFENDANTS FAIL THE SUMMARY JUDGMENT STANDARD

The Court is well aware of the standard for summary judgment, but defendants' opposition so fails that standard that it is worth emphasizing since this alone necessitates granting Mr. Fleming's motions.

Mr. Fleming sought summary judgment on issues for which he bears the burden of proof and on issues for which defendants bear the burden of proof. In the former case, Mr. Fleming demonstrated there are no genuine issues of material fact regarding his affirmative claims. In the latter case, Mr. Fleming demonstrated there is a absence of evidence supporting defendants' affirmative claims. In both instances, defendants have failed to come forward with any admissible evidence. This is fatal to defendants' opposition. As the U.S. Supreme Court held:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'.

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis original; citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment mandated "against a party who fails to make a showing sufficient to

Plaintiff's Reply In Support Of His
Motion For Summary Judgment (Dkt. No. 120)                                                          1

establish the existence of an element essential to that party's case"); *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989) (opposing party must present "significant probative evidence tending to support its claim that material, triable issues of fact remain").

Defendants' opposition brief advances no admissible evidence. It presents only attorney argument, innuendo, and conclusory statements, none of which is evidence and, consequently, none of which suffices to avoid summary judgment.

## II.   SUMMARY JUDGMENT ON PATENT CLAIMS DEFENDANTS ADMIT THEY INFRINGE

Defendants' opposition to Mr. Fleming's request for summary judgment of infringement on those patent claims defendants admit they infringe shows there is nothing defendants will not argue to needlessly increase the burden and expense of this case. (Dkt. No. 138, Defendants' Opp. Br., pp. 7-9.) Mr. Fleming's motion should be granted because defendants' arguments present excuses and obfuscation, not evidence or disputed facts.

Defendants' opposition admits they have "elected not to raise a non-infringement defense for these claims", *i.e.,* claims 18, 45, 47, and 48 in the '038 patent. (*Id*. at p. 7.) Accordingly, defendants would have the Court and jury endure: (1) Mr. Fleming marshalling the same evidence his expert presents in his expert report regarding defendants' infringement of claims 18, 45, 47, and 48; (2) listening to defendants announce at trial that they have "elected not to raise a non-infringement defense for those claims";[1] and (3) forcing the jury to answer separate verdict questions for each of those claims. (Exh. 23, Model Patent Jury Instructions for N.D. Cal., Sample Verdict Form

---

[1] The Court's Case Management Order precludes defendants from offering any evidence of non-infringement at trial. (Dkt. No. 64, p 5 ("expert witnesses will not be allowed to offer any opinion not disclosed in the mandatory Rule 26 disclosures…").)

(showing that infringement and validity issues are answered separately).)  This is the type of waste summary judgment is intended to eliminate.

Defendants' argument that they cannot locate Mr. Fleming's infringement contentions for claims 18, 45, 47, and 48 in Mr. Fleming's expert report is disingenuous. Mr. Fleming's expert report explains that:

> The basis and reasons for the opinions I have formed regarding infringement by defendants' products are explained in detail in Appendix A (infringement of the '038 patent by the GX65), Appendix B (infringement of the '653 patent by the GX65), Appendix C (infringement of the '038 patent by the Passport 9500i and Passport 9500ix), Appendix D (infringement of the '653 patent by the Passport 9500i and Passport 9500ix), Appendix G (infringement of the '038 patent by the Passport iQ) and Appendix H (infringement of the '653 patent by the Passport iQ).

(Dkt. No. 120, Fleming Br. at Exh. 4, ¶ 13.)  Each of the identified appendices is a claim chart that lists the asserted patent claims in numerical order.  (*Id*.)  Defendants' claim that this is a "needle in a haystack" is an attempt to dodge the substantive issue.  Defendants' expert obviously had no problem finding Mr. Fleming's contentions when he responded (in his responsive report) that he had no non-infringement defense to those claims.  (*Id*. at Exh. 6, pp. 9-13.)

Defendants' argument that Mr. Fleming's expert report contains impermissible infringement contentions is similarly meritless.[2]  The so-called "new" contentions and evidence defendants complain about is the exact same as that to which defendants' expert conceded he had no non-infringement defense.  (*Id*.)  Thus, defendants' final argument is just another obfuscating dodge of the real issue.  Accordingly, Mr. Fleming requests entry of judgment that the Passport 9500i, Passport 9500ix, Passport iQ, and GX65 products infringe claims 18, 45, 47, and 48 in the '038 patent.

---

[2] That issue is presently before the Court in different motion papers.  (Dkt. Nos. 128, 147, [reply not yet filed].)

## III.  SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES

### A.  There Is No Evidence Supporting Defendants' Eighth Affirmative Defense—That Mr. Fleming Does Not Own His Patents

Defendants' argument regarding Mr. Fleming's ownership of his patents misapplies the law, misrepresents the facts, and ignores all the other evidence.  (Dkt. No. 138, Defendants' Br., pp. 9-11.)  Mr. Fleming's request for summary judgment that he owns his patents should be granted because defendants have raised no issue of law or any genuine issue of material fact that would enable defendants to prove by clear and convincing evidence that Mr. Fleming does not own his patents.  *Matsushita,* 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254-55 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

Defendants' opposition begins by erring as a matter of law.  It is not Mr. Fleming's burden to prove that he owns his patents.  The law presumes that.  Mr. Fleming's opening brief cited *SIRF Tech., Inc. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1327, n. 5 (Fed. Cir. 2010) for this unassailable proposition, which defendants conspicuously do not mention, much less challenge.  This presumption was confirmed just this week by the U.S. Supreme Court, which held "[o]ur precedents confirm the general rule that rights in an invention belong to the inventor... In accordance with these principles, we have recognized that unless there is an agreement to the contrary, an employer does not have rights in an invention 'which is the original conception of the employee alone.'"  *Board Of Trustees Of The Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, No. 09-1159 at *7, 563 U.S. ___ (June 6, 2011).  This presumption eliminates defendants' argument regarding standing, unless defendants can

prove otherwise by clear and convincing evidence.

Instead of coming forward with an agreement that Mr. Fleming assigned rights in his invention to Micron Electronics, Inc. ("MEI") as the Supreme Court requires, defendants' argue that MEI owns Mr. Fleming's patents based solely on their misrepresentation of Mr. Ochoa's deposition testimony. Mr. Ochoa's testimony shows that he did not testify that MEI—Mr. Fleming's former employer—"would have rights to any inventions prepared or created by Mr. Fleming" as defendants would have the Court believe. Mr. Ochoa's attached declaration avers that defendants' use of his testimony is out-of-context, incorrect, and completely inaccurate. (Ochoa Decl.)

Mr. Ochoa has no knowledge of MEI's patent ownership policies, and the "Micron" entity whose patent ownership policy he testified about was Micron Technology, Inc., not MEI. (*Id.*) In particular, Mr. Ochoa avers that he does not know "if MEI had rights of any particular inventions of Mr. Fleming". (*Id.* at ¶ 11.) Mr. Ochoa also avers that he does not know if MEI's patent policy "required Mr. Fleming to assign an invention to MEI if the invention did not relate to the business of MEI" or if MEI's "policies would have required any permission through separate paperwork or writing to authorize Mr. Fleming to seek a patent on his own behalf." (*Id.*)

While the above defeats defendants' ownership defense by eliminating defendants' only evidence, also attached are declarations from Mr. Steven Arnold (then VP and General Counsel for MEI), Mr. Dean Klein (then VP and Chief Technical Officer for MEI), Mrs. Teresa Fleming (Mr. Fleming's wife), and Mr. Fleming, all unequivocally showing that Mr. Fleming owns his patents.

Specifically, Mr. Arnold (MEI's General Counsel) describes in detail MEI's

pertinent corporate polices regarding ownership of employee inventions during the timeframe that Mr. Fleming made his invention, and he avers that:

> An intelligent radar detector was not the type of invention that would have been assigned to MEI under the policies in effect from 1998 to 2001. Thus, the policies of MEI in effect in 1998 through 2001 would not have obligated Mr. Fleming to assign any right, title, or interest to an intelligent radar detector to MEI.

(Arnold Decl., ¶ 12.)  MEI's Chief Technical Officer (Mr. Klein) and Mr. Fleming both declare the same thing.[3]  (Klein Decl.; Mr. Fleming Decl.)  Thus, the then General Counsel of MEI, the then Chief Technical Officer of MEI, and Mr. Fleming (MEI's then Senior Intellectual Property Attorney), all declare that the MEI policies in effect when Mr. Fleming invented his intelligent radar detector did not require Mr. Fleming to assign Mr. Fleming's invention to MEI.  Mr. Fleming also unequivocally declares that he has never assigned any ownership interest in his intelligent radar detector patents to MEI. (Mr. Fleming Decl., ¶ 23.)

Defendants' final argument, that Mrs. Fleming is a co-owner and necessary party to this case, is also demonstrably wrong and unsupported by any evidence.  As Mrs. Fleming avers, since well before this case was filed and continuously thereafter, she had no ownership interest in Mr. Fleming's patents.  (Mrs. Fleming Decl., ¶¶ 1-5; *see also* Mr. Fleming Decl., ¶¶ 23-27.)  Both Mr. and Mrs. Fleming aver that Mr. Fleming has owned his patents as his separate property since well before this case was filed.  (*Id*.)

As shown, the *only* evidence defendants cite in support of their ownership defense is the deposition testimony of Mr. Ochoa, who declares that he has no knowledge of MEI's patent ownership policies.  This leaves defendants with no evidence supporting a

---

[3] Mr. Fleming identified Mr. Arnold and Mr. Klein in his Rule 26 Initial Disclosure as having information pertinent to ownership, yet defendants chose not to depose either of them.

defense on which they bear the burden of proof by clear and convincing evidence. While that alone warrants entry of summary judgment, all of the other evidence from MEI's officers, Mr. Fleming, and Mrs. Fleming irrefutably establish the same thing—that Mr. Fleming is the undisputed sole owner of his patents. No jury could conclude otherwise on this record. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986). Accordingly, Mr. Fleming respectfully requests entry of summary judgment to that effect.

### B. There Is No Evidence Supporting Defendants' Fifth Affirmative Defense—Laches

The Court is well aware that a laches defense requires unreasonable and inexcusable delay in filing suit and material prejudice attributable to that delay. Given that Mr. Fleming filed suit on the same day the Patent Office issued his '653 patent, there was zero delay in his filing. Unfazed by the facts and loathe to concede anything, defendants embark on a "laches" argument that errs as a matter of law and identifies no evidence of unreasonable and inexcusable delay or prejudice. As such, defendants cannot avoid summary judgment on an issue for which they bear the burden of proof. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

### 1. Defendants' opposition errs as a matter of law

Defendants' citation to "laches" cases from the 1800s entirely misses the point. (Dkt. No. 138, Defendants' Opp. Br., pp. 11-12.) Those cases concern whether a patentee delayed too long under then-existing law to seek a reissue patent. (*Id*. at 12, citing *Ives v. Sargent*, 119 U.S. 652 (1887); *Wollensak v. Reiher*, 115 U.S. 96 (1885); *Sontag Chain Stores Co. v. National Nut Co.,* 310 U.S. 281 (1940).) The Patent Statute

under which we now operate was enacted in 1952, and unlike the law in the 1800s, it expressly provides a two-year window for patentees to seek a broadening reissue patent. 35 U.S.C. § 251; *see also In re Fotland*, 779 F.2d 31, 33 (Fed. Cir. 1985) ("Prior to the 1952 Patent Act there was no fixed time limit for the filing of a broadening reissue and courts generally applied the principles of laches, frequently adopting a two-year limitation. It was codified in the fourth paragraph of 35 U.S.C. § 251…"); *In re Bennett*, 766 F.2d 524, 529 (Fed. Cir. 1985). Thus, while the "delay" alleged in defendants' opposition brief may have been relevant in 1885, it is irrelevant today and, consequently, provides no basis on which to deny Mr. Fleming summary judgment of no laches.[4]

## 2. Defendants' opposition errs as a matter of fact

Defendants argue Mr. Fleming could have asserted claims 1, 3, and 5-8 in the '038 patent earlier because those same claims existed in Mr. Fleming's original '798 patent. (Dkt. No. 138, Defendants' Opp. Br., p. 13.) In other words, defendants argue Mr. Fleming should have sued earlier using his '798 patent. That respectfully makes no sense. As part of the process of seeking a reissue patent, Mr. Fleming was required to surrender his '798 patent to the Patent Office. 35 U.S.C. § 251. Mr. Fleming did that on January 5, 2004 and, consequently, Mr. Fleming had no patent as of that date. (Exh. 24, January 5, 2004 Office Action Response, p. 11.) Because defendants did not announce their first accused product (the Passport 9500i) until three years later on January 8, 2007, it obviously was impossible for Mr. Fleming to assert his then non-existent '798 patent against defendants. (Dkt. No. 120, Fleming Br. at Exh. 7.)

---

[4] There is no dispute that Mr. Fleming timely applied for his reissue patents since he did so well within the two-year statutory window.

### 3. Defendants identify no evidence of delay or prejudice

The Federal Circuit, in its seminal patent laches case, defined the two elements required to prove a laches defense:

> Two elements underlie the defense of laches: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay.

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). Defendants have come forward with no evidence supporting either of these elements, as they must in order to avoid summary judgment on a defense for which they bear the burden of proof. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

#### a) The '653 patent

Mr. Fleming filed this case on the same day the Patent Office issued his '653 patent. Thus, there is zero delay associated with the '653 patent. *Meyers v. Brooks Shoe Inc.,* 912 F.2d 1459, 1462 (Fed. Cir. 1990) ("[L]ike infringement, laches does not begin until the patent issues."). That ends the laches inquiry with respect to the '653 patent, and Mr. Fleming requests summary judgment in that respect. *Id.* ("[W]here the plaintiff alleges infringement of more than one patent, laches must be determined separately for each.")

#### b) The '038 patent

The '038 patent issued on March 28, 2006. Because defendants did not sell their first accused product until January 8, 2007, that is the earliest suit could have been filed on the '038 patent. (Dkt. No. 120, Fleming Br. at Exh. 7.) <u>Put differently, to the extent there is a "delay" or "laches" period, it is between January 8, 2007 and March 10, 2009</u>

when suit was filed.[5]  Notably, defendants have failed to cite a single case where laches was found over such a short timeframe.  Indeed, far from citing any case concerning delay, defendants ignore Mr. Fleming's citation to *Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1462 (Fed. Cir. 1990), where the Federal Circuit found no laches on facts identical to those here.  The *Meyers* case held it was "reasonable" in a laches context for a patentee like Mr. Fleming to await filing suit until his second related patent issues from the Patent Office:

> It strikes us as reasonable for Meyers to have waited to sue on his first patent (the '797 patent) at least until he could sue on both the first and second patents at the same time.  As the district court recognized, the '797 and '283 patents are related.  The '283 is a divisional of the '797, and, even though the claims are different in scope, Meyers alleges that the same nine models of Brooks' shoes infringe both patents.  When Meyers learned of Brooks' alleged infringement in late 1982, his second patent application was already pending, and by autumn 1983 he knew it would soon issue.  Awaiting issuance of the second patent to sue on both at once conserved both the parties' and the courts' resources.

*Id*.

There is no dispute that the '038 and '653 patents are related—the '653 patent is a continuation of the '038 patent.   (Dkt. No. 120, Fleming Br. at Exh. 2.)  Just as in *Meyers*, Mr. Fleming alleges the same four products infringe both of his patents.  (*Id*. at Exh. 4, ¶ 13.)  Again just as in *Meyers*, when Mr. Fleming learned of defendants' infringement of the '038 patent, the '653 patent application was already pending and it was not long thereafter that he knew it would soon issue.  (Fleming Decl., ¶¶ 28-32.)  And again just as in *Meyers*, Mr. Fleming's accused delay indisputably conserved both

---

[5] The "delay" period is even shorter for two of the other four accused products, and non-existent for the fourth.  The Passport 9500ix was first announced in June 2008.  (Dkt. No. 120, Fleming Br. at Exh. 8.)  The Beltronics GX65 was first announced in September 2008.  (*Id*. at Exh. 9.)  The Passport iQ was first announced in October 2010.  (*Id*. at Exh. 10.)  Defendants lose under any scenario.

the parties' and the court's resources since he did not bring separate cases on his two asserted patents, instead he filed suit on the day the '653 patent issued. Thus, any alleged "delay" was both reasonable and excusable under *Myers*. Defendants' refusal to even acknowledge *Myers* only highlights that it defeats their laches defense.

With no evidence of unreasonable and inexcusable delay, defendants' opposition fails as a matter of law since both unreasonable/inexcusable delay and prejudice are required elements of a laches defense. *A.C. Aukerman*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). Nevertheless, if the Court is inclined to review defendants' prejudice argument, it suffers a similar fate because it is both threadbare and erroneous as a matter of law.

The *only* thing defendants say about alleged prejudice is:

> During that interim period, Escort undertook a significant amount of work, including investments, labor, and capital expenditures in furtherance of the Passport 9500i, Passport 9500ix, GX 65, and Passport iQ radar detectors.

(Dkt. No. 138, Defendants' Opp. Br., p. 13.) Ignoring for the moment the veracity of that statement, it is conclusory and, therefore, insufficient to show prejudice. *Meyers,* 912 F.2d at 1463 ("conclusory averments are not sufficient to show prejudice" in a laches context). The statement also is irrelevant since it does nothing to tie defendants' alleged prejudice to Mr. Fleming's alleged delay in filing suit. *State Contracting & Engineering Corp v. Condotte America, Inc*., 346 F.3d 1057, 1066–67 (Fed. Cir. 2003) ("[Defendants] have failed to establish a nexus between the delay in filing suit and their asserted economic injury.") In other words, while the statement says defendants did something, it says nothing about what they would have done differently had Mr. Fleming filed suit earlier. *Meyers,* 912 F.2d at 1463 (Fed. Cir. 1990) ("Brooks has not shown any connection between its activities during the laches period and Meyers' silence.").

Defendants' failure to identify the requisite nexus is fatal to their opposition, but it

also is not surprising because there is no nexus.  Mr. Fleming filed suit in March 2009 and defendants have not changed their behavior one bit.  They are continuing to sell each of the three accused products they were selling prior to Mr. Fleming's lawsuit.  (Exh. 25, defendants' sales records.)  Even more telling, defendants went straight ahead and developed their fourth accused product *during the lawsuit*—the accused Passport iQ was first announced in October 2010 and was only allowed to be added to this case because it infringes for the *same* reasons as the other three accused products.  (Dkt. No. 86, Order.) Thus, while defendants fail to allege the requisite nexus, the undisputed facts show defendants' actions have been totally unaffected by the timing of Mr. Fleming's lawsuit, and defendants do not contend otherwise.  This is independently fatal to defendants' opposition.  *Meyers,* 912 F.2d at 1463 (Fed. Cir. 1990) (defendant's continued sales after suit defeats prejudice argument).

Similarly fatal to defendants' opposition is the fact that defendants' alleged prejudice is not even applicable in a laches context.  Defendants state that during the interim period, *i.e.,* between January 8, 2007 and March 10, 2009, they worked on and invested in the Passport 9500i, Passport 9500ix, GX 65, and Passport iQ radar detectors. That statement is demonstrably false.  The Passport 9500i was first sold on January 8, 2007, so it obviously was not developed during the relevant laches period.  (Dkt. No. 120, Fleming Br. at Exh. 7.)  Similarly, the Passport iQ was first sold in October 2010, so it also obviously was not developed during the laches period.  (*Id*. at Exh. 10.)

Defendants' citation to a single paragraph in an attached declaration by Mr. Kuhn further confirms the inapplicability of their alleged prejudice.  Paragraph 14 of Mr. Kuhn's declaration states:

14.     The products that are accused of infringement are a continuous development of the work undertaken in 1991 and 1992, during which I was involved in the design of radar detectors that would suppress false alerts.  The products that are accused of infringement are also a continuous development of the work that Mr. Orr had undertaken as early as April or May 1996, and in addition to the work associated with the 5000 Model radar detector.  This same technology was continuously developed and incorporated into the 9500i, 9500ix, GX 65, and Passport iQ products.  Some of the identical source code which appears in each of the products accused of infringement was first developed by Mr. Orr as early as April or May 1996.

Thus, defendants argue that the activities giving rise to their alleged prejudice date back continuously to 1991.  The fallacy of that argument is that the only activities that matter in a laches context are those that took place during the laches period, *i.e.*, between January 8, 2007 and March 10, 2009.  *Meyers,* 912 F.2d at 1463 ("there is no support for [defendant's] claim that it expanded sales during the laches period"); *State Contracting*, 346 F.3d at 1066–67 (Fed. Cir. 2003) ("the contractors have failed to show that they changed their economic position during the period of delay…Mr. McGonagill's testimony…is irrelevant to a finding of laches, which applies only to the period after patent issuance when suit could have been brought.").  This makes sense because the prejudice issue concerns whether defendants would have done something different had Mr. Fleming filed suit sometime closer to (but after) the beginning of the laches period on January 8, 2007.  *State Contracting*, 346 F.3d at 1066–67 ("[defendants] have not directed us to evidence that an earlier filing would have led them to alter their behavior or avoid incurring certain expenditures.")  Accordingly, what defendants did sixteen years earlier in 1991 (or continuously thereafter) is entirely irrelevant and wholly insufficient— as a matter of law—to support a finding of material prejudice attributable to Mr. Fleming's delay in filing suit.

Accordingly, Mr. Fleming respectfully requests summary judgment of no laches since there is no evidence of delay or prejudice supporting this defense on which defendants bear the burden of proof. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

### C.     There Is No Evidence Supporting Defendants' Fourth Affirmative Defense—Estoppel

Defendants' opposition concerning their estoppel defense fails to present any evidence regarding certain of Mr. Fleming's asserted patent claims. Accordingly, Mr. Fleming's motion should be granted.

Mr. Fleming's opening brief indicated that defendants had identified no evidence that Mr. Fleming made a narrowing amendment to his asserted patent claims that would bar his assertion of the doctrine of equivalents. (Dkt. No. 120, Fleming Br., pp. 6-7.) Defendants responded with a "data dump" of documents that concludes, without any analysis of those documents, that "Fleming made narrowing amendments in order to secure allowance of both the '038 and the '653 patent." (Dkt. No. 138, Defendants' Opp. Br., p. 14.) Defendants' attempt to obscure the issue through a mass of unexplained documents fails because a review of those documents shows that Mr. Fleming made no amendment at least to claims 1, 3, and 5-8 during the prosecution of the '038 patent.[6] Accordingly, Mr. Fleming is entitled to summary judgment as to those claims since defendants have identified no evidence that could possibly bar Mr. Fleming's application of the doctrine of equivalents to those claims. *Celotex,* 477 U.S. at 322-323.

Defendants' argument concerning whose burden of proof it is to prove

---

[6] The only citations concerning the '038 patent are in defendants' Exh. M at: 8255-8266; 8272-8284; 8301-8312; 8336-8347; 8354-8366; 8389-8399; 8429-8437. None of these documents shows any amendment to claims 1, 3, and 5-8 in the '038 patent. Defendants' other citations concern the '653 patent.

foreseeability is irrelevant because, absent evidence of a narrowing amendment, the foreseeability portion of the test for the doctrine of equivalents does not arise. Defendants' brief concedes that point. (Dkt. No. 138, Defendants' Br., p. 14 ("The patentee may rebut that presumption [that a narrowing amendment precludes application of the doctrine of equivalents] by showing….that the equivalent was not foreseeable… .") *See also, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 122 S.Ct. 1831, 1840-41 (2002); *Celotex,* 477 U.S. at 322-323.

Finally, defendants' one-sentence argument, which is devoid of any evidence, attempting to raise the defense of equitable estoppel is without merit because defendants never pled an equitable estoppel defense. Specifically, defendants' opposition brief alleges for the first time in this case that there was some sort of "misleading conduct that leads the accused infringer to believe that the patentee will not bring an infringement action against it." (Dkt. No. 138, Defendants' Br., p. 14.) That allegation has nothing to do with the estoppel defense defendants' pled, which stated:

> Fleming is estopped and/or otherwise barred from asserting that Escort is liable for infringement of '038 patent and the '653 patent by reasons of prior art and/or statements made to the Patent Office during the prosecution of the application that issued as the '038 patent and the '653 patent.

(Dkt. No. 30, Defendants' Amended Answer, ¶ 31.) As shown, defendants' estoppel defense concerns "prior art and/or statements made to the Patent Office during the prosecution of the application that issued as the '038 patent and the '653 patent", *i.e.,* prosecution history estoppel (which only relates to the doctrine of equivalents), not equitable estoppel raised by Fleming's alleged "misleading conduct" that allegedly led defendants to "believe that [Mr. Fleming] would not bring an infringement action against [defendants]." Defenses that are not pled cannot be raised in response to a summary

**3424**

judgment motion.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294-95 (9th Cir. 2000).

Accordingly, Mr. Fleming respectfully also requests summary judgment on defendants'

new theory of equitable estoppel.

### D.    Defendants' Third Affirmative Defense Under 35 U.S.C. § 251 (Reissue Of Defective Patents) Errs As A Matter Of Law

The sum total of defendants' argument with respect to 35 U.S.C. § 251 is that the

errors in Mr. Fleming's original '798 patent—contrary to the U.S. Patent Office's express

finding—do not qualify as errors under § 251 solely because Mr. Fleming did not know

about the errors early enough, *i.e.* defendants argue Mr. Fleming did not know about them

"at the time of the original ['798] patent" and only discovered and sought to correct them

thereafter.  (Dkt. No. 138, Defendants' Opp. Br., p. 15.)  Defendants have the facts right

but the law exactly backwards.

Nowhere in § 251 is there a requirement that the patentee discover his error during

prosecution of the original patent.  To the contrary, § 251 only applies if the patentee

discovers his error *after* prosecution of the original patent.  *See e.g. C.R. Bard, Inc. v. M3*

*Systems, Inc.,* 157 F.3d 1340, 1354 (Fed. Cir. 1998) ("An inadvertent failure to appreciate

the scope of an invention at the time of the original patent grant, and thus an initial intent

not to claim the omitted subject matter, is a remedial error.") *citing In Re Amos,* 953 F.2d

613, 619 (Fed. Cir. 1991); *Hester Indus., Inc. v. Stein, Inc.,* 142 F.3d 1472, 1476-77 (Fed.

Cir. 1998) (approving reissue to correct/improve patent for infringement litigation, but not

to recapture subject matter intentionally surrendered during original prosecution);

*Medtronic, Inc. v. Guidant Corp.,* 465 F.3d 1360, 1372-76 (Fed. Cir. 2006).

The facts the Federal Circuit has relied on when authorizing a patent applicant's

actions under § 251 are precisely the undisputed facts of this case.  Mr. Fleming did not

appreciate the error in his original '798 patent until *after* it issued from the Patent Office. (Fleming Declaration, ¶¶ 10-31.)  In other words, only *after* the '798 patent issued and *after* Mr. Fleming discovered the errors did he seek to correct them pursuant to § 251. (*Id.*)

Defendants agree those are the facts.  In fact, likely because they have the law backwards, their entire argument is based on the undisputed fact that Mr. Fleming did not know about the errors "at the time of the original ['798] patent".  (Dkt. No. 138, Defendants' Opp. Br., p. 15.)  Nowhere do defendants even suggest, much less advance any evidence, that Mr. Fleming knew about the errors in his original patent during the original prosecution and consciously/deliberately decided not to fix them at that time.  As the Federal Circuit held several weeks ago in *In Re Yasuhito Tanaka*, the facts of this case fit perfectly with the purpose of § 251, which allows the correction of later-realized errors.  No. 2010-1262 (Fed. Cir. April 15, 2011).  Thus, Mr. Fleming is entitled to summary judgment of no invalidity under 35 U.S.C. § 251 because the undisputed facts as correctly applied to the law eliminate—as a matter of law—defendants' invalidity defense under § 251.

> **E.    Defendants Admit Their Third Affirmative Defense Under 35 U.S.C. § 252 Is Not A Recognized Patent Invalidity Defense**

Once again refusing to concede what cannot be disputed, defendants' argue that 35 U.S.C. § 252 is a "recognized invalidity defense".  (Dkt. No. 138, Defendants' Opp. Br., p. 15.)  That is all defendants say—no case cite, argument, analysis, or attempt to distinguish the express language of § 252 or the case law Mr. Fleming cited. Accordingly, this portion of defendants' third affirmative defense should be dismissed on summary judgment because it does not allege a recognized patent invalidity defense.

F.    **There Is No Evidence Supporting Defendants' Tenth Affirmative Defense—Intervening Rights**

"The second paragraph of 35 U.S.C. § 252 (1994) provides for two separate and distinct defenses to patent infringement under the doctrine of intervening rights: 'absolute' intervening rights and 'equitable' intervening rights." *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1359 (Fed. Cir. 2001). As defendants had not alleged they were entitled to equitable intervening rights until saying so in their opposition brief, Mr. Fleming's motion focused on absolute intervening rights. This reply addresses both absolute and equitable intervening rights.

1.    **Defendants admit there are no absolute or equitable intervening rights for claims 1, 3, and 5-8 in the '038 patent**

Defendants admit there can be no absolute or equitable intervening rights for claims 1, 3, and 5-8 in the '038 patent. (Dkt. No. 138, Defendants' Opp. Br., p. 15.) Accordingly, Mr. Fleming requests an order to that effect for each of the accused products.

2.    **Defendants admit there are no absolute intervening rights for other patent claims**

a)    **'038 patent, claims 18, 23, 25-28, and 45-48**

Defendants admit there can be no absolute intervening rights for claims 18, 23, 25-28 and 45-48 in the '038 patent. (Dkt. No. 138, Defendants' Opp. Br., p. 15.) Accordingly, Mr. Fleming requests an order to that effect for each of the accused products.

b)    **'653 Patent, claims 22, 24, 26, 30-33, 38, 41, 42, 45, 46, and 48-50**

Defendants admit there can be no absolute intervening rights for claims 22, 24, 26, 30-33, 38, 41, 42, 45, and 48-50 in the '653 patent with respect to the Passport iQ

product. (Dkt. No. 138, Defendants' Opp. Br., p. 17.) Accordingly, Mr. Fleming requests an order to that effect for the Passport iQ product.

### 3. Defendants have not advanced any evidence supporting equitable intervening rights for any of the asserted patent claims

Defendants bear the burden of proving their intervening rights defense. Accordingly, to avoid summary judgment defendants must advance enough admissible evidence that a reasonable jury could find in defendants' favor on that defense. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986). Defendants fail to do that.

The applicability of equitable intervening rights is based upon six factors: (1) whether "substantial preparation" was made by the infringer before the reissue; (2) whether the infringer continued manufacturing before reissue on advice of its patent counsel; (3) whether there were existing orders or contracts; (4) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) whether there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) whether the infringer has made profits sufficient to recoup its investment. *Visto Corp. v. Sproqit Tech., Inc.*, 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006); *see also Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 756 F. 2d 1574, 1579 (Fed. Cir. 1985).

Defendants' purported evidence on the first factor is irrelevant as a matter of law, and they do not advance any evidence whatsoever on the other five factors. Accordingly, defendants' opposition fails and Mr. Fleming's motion must be granted.

## a) Defendants have not advanced any evidence that substantial preparation was made before reissue of the '038 and '653 patents

The totality of defendants' argument regarding "substantial preparation" is that the accused products have been in continuous development, at considerable effort and expense, since 1991. (Dkt. No. 138, Defendants' Opp. Br., p. 16, citing Kuhn Declaration at ¶¶ 13-14.) The Court need not even assess the credibility or weight of that argument because it is totally irrelevant.

The theory behind equitable intervening rights is that businesses should not be enticed into action (designing products, investing in manufacturing, hiring labor, etc.) in reliance on a competitor's patent, only to have their actions undermined by a later reissue of that patent. For example, in enacting 35 U.S.C. § 252, Congress decided that those who invest in making widgets in reliance on their belief that their widgets do not infringe Patent X should not be punished if Patent X later reissues in a form in which those widgets then infringe. The accused infringer's rights that arise between the time of the original patent and the reissue patent are, therefore, referred to as "equitable intervening rights".

In order to acquire equitable intervening rights the accused infringer must show that he relied in some manner on his belief that his actions would not infringe the original patent, otherwise he has not been injured or unfairly surprised by a reissue of that patent that suddenly (in its reissued form) covers what he is doing. As the Northern District of California reasoned:

> Quad argues alternatively that… in order to establish intervening rights, USD must also show that USD relied on 'some perceived infirmity in the original patent.'

The cases cited by Quad clearly indicate that some degree of reliance on the original patent is required to establish intervening rights. *See Slimfold*, 810 F.2d at 1117 (alleged infringer must 'demonstrate that it relied to its detriment on any aspect of the original claims that was changed by reissue'); *Halliburton Co. v. Western Co. of North America*, 10 U.S.P.Q.2d, 1973, 1983 (W.D. Okla. 1989) ('The purpose of the statute is to protect investments which have been made in good faith reliance on some perceived infirmity in the original patent.')

USD does not attempt to distinguish these cases, and presents no persuasive argument for its own position, which appears to be that mere purchase of the equipment demonstrates adequate reliance.

Because USD has failed to come forward with any evidence of actual reliance on the 'perceived infirmities' of the original patent, there is further, independent reason for granting Quad's motion for summary adjudication.

*Quad Envtl. Technologies v. Union Sanitary Dist.*, 17 U.S.P.Q.2d 1667, 1990 WL 288712 at *4-5 (N.D. Cal. 1990), *rev'd on other grounds*, 946 F.2d 870 (Fed. Cir. 1991);

*Henrob Ltd v. Böllhoff Systentechnick GMBH & Co.*, 2009 WL 3188572 at *17 (E.D. Mich. 2009) ("While there is no dispute that the BMW Defendants have made a substantial investment in the purchase of Böllhoff SPR machines, the court is not persuaded that this fact alone entitles them to equitable intervening rights."); *Halliburton Co. v. Western Co. of North America*, 1989 WL 1677414 at * 14 (W.D. OK 1989) ("The purpose of the statute is to protect investments which have been made in good faith reliance on some perceived infirmity in the original patent. Thus, investments made prior to the issuance of the original patent are generally not relevant to the issue of 'equitable intervening rights'."); *Slimfold Mfg. Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117 (Fed. Cir. 1987) ("35 U.S.C. § 252 protects third persons who rely on the scope of a claim as originally granted, as against subsequent changes in scope by reissue.")

Defendants' *only* opposition argument is that the accused products were continuously developed since 1991. As indicated, that is totally irrelevant. Defendants say nothing, much less advance any evidence, of their knowledge of Mr. Fleming's original patent, whether they perceived any infirmity in it, whether they relied on that perceived infirmity, or whether that perceived infirmity was remedied by Mr. Fleming's reissue patents. This complete failure of evidence on an issue for which defendants bear the burden of proof requires issuance of summary judgment to Mr. Fleming. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

### b) Defendants have advanced no evidence that they continued manufacturing being done before reissue on advice of its patent counsel

Defendants have not come forward with any evidence that they continued any pre-reissue manufacturing of the accused products on advice of their patent counsel. In fact, the evidence is directly to the contrary. According to defendants:

> [N]one of the 'conclusions' and/or 'determinations' regarding the alleged non-infringement and/or invalidity of the asserted Fleming patents mentioned in that supplemental [interrogatory] response were in any way made, based, or premised on the conclusions of a lawyer or with the assistance or input of a lawyer.

(Dkt. No. 139, Fleming Opp. Br. at Exhs. 18-22.) Thus, not only do defendants advance no evidence, the evidence of record compels a finding against them.

### c) Defendants have not advanced any evidence that, during the relevant period, there were existing orders or contracts

Defendants have not come forward with any evidence that, during the relevant time period, there were any existing orders or contracts. Thus, this factor also indicates that defendants are not entitled to equitable intervening rights.

Plaintiff's Reply In Support Of His
Motion For Summary Judgment (Dkt. No. 120)

22

    **d)**  **Defendants have not advanced any evidence that non-infringing goods cannot be manufactured from the inventory used to manufacture the infringing products and the cost of conversion**

   Defendants have not come forward with any evidence that non-infringing goods could not be manufactured from the inventory used to manufacture the accused products or the costs of converting the accused products into non-infringing products. In fact, the evidence is to the contrary since defendants need only remove the GPS unit from their accused products in order to create non-infringing products, which defendants already are doing in some of their products, such as the Passport 8500. *See* http://www.escortradar.com/passport8500x50-details.php. Thus, this factor also indicates that defendants are not entitled to equitable intervening rights.

    **e)**  **Defendants have not advanced any evidence that there was a long period of sales and operations before the patent reissued from which no damages can be assessed**

   Defendants have not come forward with any evidence that there was a long period of sales and operations before the patents reissued from which no damages can be assessed. The evidence is directly to the contrary. First, defendants did not sell any of their accused products prior to issuance of the '038 patent since all of those products were first announced after the '038 patent issued. (*Supra* at p. 9.) Second, defendants have produced sales information that identifies the sales of all accused products, and damages can easily be assessed using that information. (Exh. 25.) Thus, this factor also indicates that defendants are not entitled to equitable intervening rights.

        **f)**     **Defendants have not advanced any evidence of whether they have made profits sufficient to recoup their investment**

Defendants have not come forward with any evidence that indicates the monetary value of their alleged "substantial investment" or of their profits. Accordingly, this factor also indicates that defendants are not entitled to equitable intervening rights.

In summary, defendants have advanced no evidence on any of the 6 factors utilized for determining the availability of equitable intervening rights. This complete absence of evidence necessitates entry of summary judgment for Mr. Fleming. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

## IV. SUMMARY JUDGMENT OF INFRINGEMENT OF OTHER CLAIMS IN THE '038 PATENT

Throughout the entirety of this case, defendants have dodged, obstructed, and generally refused to deal with the issues in a straightforward manner. The Court's docket shows that defendants have lost every dispute brought to the Court's attention, and there have been many. This infringement issue is no different. Defendants' opposition brief is a textbook example of intentional vagueness designed to obscure issues that defendants cannot defend on their merits. Not lost in their obscurity, however, is the fact that defendants have advanced no evidence in support of their opposition, thereby warranting the granting of Mr. Fleming's motion. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986).

### A.     '038 Patent, Claim 1

Mr. Fleming's expert witness has opined that defendants infringe claim 1 in the '038 patent, and defendants' expert has responded that there is only one limitation in that

claim that defendants' accused products allegedly do not meet. (Dkt. No. 120, Fleming Br. at Exh. 4, Supp. Opening Expert Report of Dr. Bartone at ¶ 13; Exh. 12, Rebuttal Expert Report of Dr. Bartone at Appx. Q; Exh. 5, Defendants' Second Supp. Response to Fleming Interrogatory No. 3; Exh. 6, Defendant's Rule 26 Supp. Rebuttal Expert Report of Dr. Grindon, pp. 8-9.) Thus, the infringement issue is limited to that one claim element.

Using defendants' product manuals and product source code, Mr. Fleming's opening brief demonstrated that there are no disputed facts concerning whether that one claim element is present in the accused products. (Dkt. No. 120, Fleming Br., pp. 11-17.) Defendants' opposition is conclusory, void of explanation, and generally incomprehensible. Defendants apparently believe they can avoid summary judgment if no one can understand their position.

The claim limitation in dispute calls for:

generating an alert if the position of the device is not within a predetermined distance of a predetermined position.

The diagram below illustrates the scenario described by this limitation.



As indicated, Mr. Fleming's opening brief shows that defendants' product manuals and source code irrefutably prove that the accused products generate an alert if they are more than .50 miles from the location of a known false alert. Defendants do not challenge any of Mr. Fleming's citations to those product manuals or source code. Those facts,

therefore, are undisputed. Instead, defendants raise four "arguments" in opposition. None of them are availing.

First, defendants argue they do not meet this claim limitation because their expert, Mr. Grindon, says so. That is it. That is all defendants say. No explanation, no nothing. Just Dr. Grindon's apparent conclusion. That, respectfully, tells us nothing and, as such, does not defeat summary judgment. *Radar Industries, Inc. v. Cleveland Die & Mfg. Co.,* No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989) (the party opposing summary judgment must present "significant probative evidence tending to support its claim that material, triable issues of fact remain").

Second, defendants argue that the accused products "have the capability of generating an alert if the radar detector is within a region that has been locked out." That is irrelevant because it has nothing to do with the disputed claim limitation. The issue is whether the accused products generate an alert based upon the product being outside of a region that has been locked out. (Claim 1 calling for: "generating an alert if the position of the device is *not* within a predetermined distance of a predetermined position".) *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1204 (Fed Cir. 2010) ("an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation").

Third, defendants argue the accused products "do not generate an alert based on a predetermined distance" because "the distance from the lockout varies". This is

nonsensical, irrelevant, conclusory, and lacks evidentiary support. The fact that a car is traveling down the road and that, therefore, its distance from the known false alarm is varying is not noteworthy. Of course that is the case. The issue, however, is whether the detector determines its distance from the false alarm and generates an alert if it is more than a predetermined distance from that false alarm. Defendants' suggestion that the car has to be stopped (so that "the distance from the lockout does not vary") has nothing to do with the disputed claim element. Defendants string cite to alleged support for this irrelevant proposition tells us nothing other than Dr. Grindon thinks "the distance to the lockout varies". Defendants never explain how that variance could possibly be relevant or how Dr. Grindon believes the variance affects his non-infringement contention. As indicated above, defendants can only avoid summary judgment by coming forward with and evidentiary conflict. Conclusions, especially irrelevant ones, do not suffice. *Radar Industries,* No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5; *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

Defendants' final argument concerns only the Passport 9500ix and Passport iQ products (not the Passport 9500i or the GX 65). For these products, defendants argue "the user need not request a lockout of a detected signal if a detected signal is re-detected at a location." Defendants do not explain this so Mr. Fleming will. This refers to a "smart" feature in the two accused products, whereby the radar detector determines for itself that a detected signal is a source of false alarms if the detector encounters that signal several times in the same area. In other words, if the detector encounters the same signal at the corner of Main Street and First Street several different times, it will conclude (without input from the user) that the signal is a source of false alarms and, consequently,

store that location in its memory for later use. This obviously has nothing to do with the disputed claim limitation of "generating an alert if the position of the device is not within a predetermined distance of a predetermined position". Defendants do not even contend otherwise, but rather blindly "throw it out there" in apparent hopes that the issue will be sufficiently confusing that they might avoid summary judgment.

In summary, Mr. Fleming is entitled to summary judgment because defendants do not dispute the germane facts identified in Mr. Fleming's motion, and the only arguments defendants have made in opposition are either vague, conclusory, irrelevant, or lack evidentiary value.

### B. '038 Patent, Claims 3, 5, 6, 8, 26, and 27

Defendants argue that "Fleming has failed to show that the accused products meet each limitation of Claims 3, 5, 6, 8, 26, and 27 of the '038 patent", but once again defendants do not explain why. (Dkt. No. 138, Defendants' Opp. Br., p. 20.) Nor could they. Defendants' complaint that Dr. Bartone's expert report is long is irrelevant, especially since their own expert reviewed that report and concluded that he had no opposing non-infringement defense other than the one he raised for independent claim 1. (Dkt. No. 120, Fleming Br. at Exh. 4, pp. 9, 11; Exh. 6 Defendants' Rule 26 Supp. Rebuttal Expert report of Dr. Grindon, pp. 9, 12.) Defendants also admitted in response to Mr. Fleming's requests for admission that they infringed these dependent claims if they were found to infringe independent claim 1. (*Id*. at Exh. 11 at Nos. 13-18.) Thus, as is the law, if the Court finds that defendants infringe claim 1, it must also find that they infringe claims 3, 5, 6, 8, 26, and 27. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982, 995 (Fed. Cir. 2007); *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986).

## C. '038 Patent, Claim 25

Mr. Fleming's opening brief demonstrated using defendants' own documents that the "second alert" called for by claim 25 is "the GPS indicator spinning clockwise on the display" on the Passport 9500i, Passport 9500ix, and GX65 and by "a gray bar" on the Passport iQ. (Dkt. No. 120, Fleming Br., pp. 17-19.) Defendants do not challenge any of Mr. Fleming's citations to those product manuals. Those facts, therefore, are undisputed. Defendants obfuscate instead.

Defendants first argue they do not meet this limitation because their expert, Mr. Grindon, says so. That is it. No explanation, no nothing; just Dr. Grindon's apparent conclusion. That, respectfully, tells us nothing and, as such, does not defeat summary judgment. *Radar Industries,* No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

The reason for defendants' obfuscation materializes upon review of Dr. Grindon's report. He opines that claim 25 is not infringed for the same reason independent claim 1 is not infringed. (Dkt. No. 120, Fleming Br. at Exh. 6, p. 11, ¶¶ 36-41.) That issue was addressed above. (*Supra* at pp. 24-27.) Next, Dr. Grindon argues that the "9500ix incorporates a feature that the user need not request a lockout of a detected signal if a detected signal is redetected at a location." (Dkt. No. 120, Fleming Br. at Exh. 6, p. 11, ¶ 37.) This is another reference to the above-describe "smart" product feature, whereby the radar detector identifies sources of false alarms by itself, *i.e.,* without the user making the decision. (*Supra* at p. 27.) This obviously has nothing to do with the disputed claim limitation of "generating a second alert if the position of the device is within the

predetermined distance of the predetermined position". Defendants do not even contend otherwise. Thus, defendants haven not challenged Mr. Fleming's evidence, nor have they have advanced a germane non-infringement defense. Accordingly, Mr. Fleming's motion should be granted.

### D.  '038 Patent, Claim 28

Mr. Fleming's opening brief demonstrated using defendants' own documents, source code, and an actual picture of their product in use that they "stor[e] the signal strength of the incoming radar signal in a memory device" as required by claim 28. (Dkt. No. 120, Fleming Br., pp. 19-21.) Defendants do not challenge any of Mr. Fleming's evidence. That evidence, therefore, is undisputed. Instead, the only thing defendants do is summarily conclude that the accused products "do not store signal strength". Defendants cite to Dr. Grindon's expert report as alleged support for their conclusion, but the sum total of his non-infringement contention is "[t]he 9500i, 9500ix, GX65, and Passport iQ products do not store signal strength." (Dkt. No. 120, Fleming Br. at Exh. 6, p. 12, ¶ 45.) Mr. Fleming's motion must be granted because conclusory allegations do not suffice to avoid summary judgment. *Radar Industries,* No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

## V.   SUMMARY JUDGMENT OF INFRINGEMENT OF THE '653 PATENT

### A.   '653 Patent, Claim 22

Mr. Fleming's opening brief demonstrated using defendants' own documents and source code that the accused products contain a processor that receives data based on the position of the product and on an incoming police radar signal.  (Dkt. No. 120, Fleming Br., pp. 21-24.)   Defendants do not challenge any of Mr. Fleming's evidence.   That evidence, therefore, is undisputed.   Instead, defendants summarily conclude otherwise. Defendants cite to Dr. Grindon's expert report, but he summarily concludes the same thing in a single sentence with no evidentiary citation whatsoever.   (Dkt. No. 120, Fleming Br. at Exh. 6, pp. 13-14, ¶ 54.)[7]  Mr. Fleming's motion must be granted because defendants cannot avoid summary judgment by simply saying "our expert disagrees". *Radar Industries,* No.   2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

### B.   '653 Patent, Claim 26

Mr. Fleming's opening brief demonstrated using defendants' own documents and source code that the accused products "stor[e] data in the non-volatile memory based upon data received from the button".   (Dkt. No. 120, Fleming Br., pp. 25-26.) Defendants do not challenge any of Mr. Fleming's evidence.   That evidence, therefore, is undisputed.   Instead, defendants summarily conclude otherwise, *i.e.,* all defendants say is that the accused products "do not receive any data from a button".   (Dkt. No. 138,

---

[7] Defendants' citation to raw source code lines, unaccompanied by any explanation, fares no better.

Defendants' Opp. Br., p. 24.)   Defendants cite to Dr. Grindon's expert report, but he summarily concludes the same thing in a single sentence with no evidentiary citation whatsoever, *i.e.,* he says the accused products "do not receive any data from a button" (Dkt. No. 120, Fleming Br. at Exh. 6, p. 14, ¶ 60.)[8]   Once again, Mr. Fleming's motion must be granted because defendants cannot avoid summary judgment by merely saying "our expert disagrees".   *Radar Industries,* No.  2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

### C.      '653 Patent, Claim 30

Defendants advance no opposition argument for claim 30 that they have not already advanced for claims 22 and 26.  (Dkt. No. 138, Defendants' Opp. Br., p. 24.) Defendants' argument that Mr. Fleming has shown no proof of infringement of claim 25 (from which claim 30 depends) is meritless.  A detailed explanation, complete with evidentiary citations, is provided in Dr. Bartone's expert report.  (Dkt. No. 120, Fleming Br. at Exh. 4, ¶ 13.)  Accordingly, if the Court finds that claims 22 and 26 are infringed, it must also find that claim 30 is infringed.

### D.      '653 Patent, Claim 31

The only difference between claims 30 and 31 is that claim 31 requires storing "the second position" instead of storing "data" as required by claim 30.  (Exh. 2 at col. 8, lns. 63-67.)  Since it has been demonstrated that the accused products infringe claim 30 and since defendants have not disputed that the claimed "second position" is just a

---

[8] Defendants' citation to raw source code lines, unaccompanied by any explanation, fares no better.

specific type of data that is stored, each of the accused products infringes claim 31 as well.

Defendants' new argument that the accused products "do not store the position of the unit at the time the button is pressed" is irrelevant. (Dkt. No. 138, Defendants' Opp. Br., p. 25.) Nothing in this claim has anything to do with timing, as is clear from the claim language itself. Defendants' reference to the "auto-learn" feature of the Passport 9500ix and Passport iQ is also irrelevant. The "auto-learn" feature is the above-described "smart" product feature where the devices automatically store locations of false alerts, *i.e.,* without any pressing of a button by the user. (*Supra* at p. 27.) The fact that the devices are capable of doing that says nothing about the fact that they also indisputably store false alert locations in response to the user pushing the mute button three times. (Dkt. No. 120, Fleming Br., pp. 25 -26, citing defendants' product manuals.) *Finjan,* 626 F.3d at 1204 (Fed Cir. 2010) ("an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation").

**E.      '653 Patent, Claims 32-33**

Defendants present no non-infringement argument, much less any evidence, for claims 32-33 other than those they identify for claim 31. (Dkt. No. 138, Defendants' Opp. Br., p. 25.) Indeed, defendants do nothing to challenge the evidence Mr. Fleming advanced in support of his motion for summary judgment on claims 32-33. Thus, if the Court enters summary judgment on claim 31, it also must enter summary judgment for claims 32-33.

### F. '653 Patent, Claim 38

Mr. Fleming's opening brief demonstrated using defendants' own documents and source code that the accused products infringe claim 38. (Dkt. No. 120, Fleming Br., pp. 28-30.) Defendants do not challenge any of Mr. Fleming's evidence. That evidence, therefore, is undisputed. Instead, defendants summarily conclude otherwise in a single sentence. (Dkt. No. 138, Defendants' Opp. Br., p. 26.) Defendants cite to Dr. Grindon's expert report, but he summarily concludes the same thing, also in a single sentence with no evidentiary citation whatsoever. (Dkt. No. 120, Fleming Br. at Exh. 6, pp. 16-17, ¶¶ 76-79.)[9] Mr. Fleming's motion must be granted because defendants cannot avoid summary judgment by simply saying "our expert disagrees". *Radar Industries,* No. 2010-1335 (Fed. Cir. March 30, 2011) slip copy at 2011 WL 1150534 * 5 ("It is well-settled law that a party opposing summary judgment 'must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient.'"); *Sanchez* 891 F.2d at 242 (9th Cir. 1989).

### G. '653 Patent, Claims 41-42, and 45-46

Defendants have not raised any non-infringement arguments for claims 41-42 and 45-46 that they have not raised above, nor have they disputed, much less advanced any evidence, in opposition to Mr. Fleming's motion on these claims. (Dkt. No. 138, Defendants' Opp. Br., pp. 26-27.) Accordingly, the Court should reject defendants' arguments on these claims for the same reasons identified above.

---

[9] Defendants' citation to raw source code lines, unaccompanied by any explanation, fares no better.

## VI. SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

On May 25, 2011, the Federal Circuit issued its long-awaited *en banc* decision in *Therasense, Inc. v. Becton, Dicksinson and Co.*, No. 2008-1511 (Fed. Cir. May 25, 2011) (attached as Exh. 26). After reiterating the "scourge" that inequitable conduct has become in patent cases (as also discussed in Mr. Fleming's opening brief), the Federal Circuit strictly limited the defense only to situations involving the most egregious efforts to defraud the Patent Office. In doing so, the court tightened "the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id*. at 24.

> To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO. A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement. 'In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference.' In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it.

*Id*. (citations omitted; emphasis original).

> Intent and materiality are separate requirements. A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality.

*Id*. at 25 (citations omitted).

> [T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in light of all the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.

*Id*. at 25-26 (citations omitted; emphasis original).

> This court holds that, as a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

*Id*. at 27-28.

The *Therasense* decision overrules the entirety of defendants' inequitable conduct theories, arguments, and case law citations, leaving defendants with no inequitable conduct defense.

### A.     The '881 Orr Patent Application

Defendants accuse Mr. Fleming of committing inequitable conduct during prosecution of his '653 patent by not disclosing the '881 Orr patent application to the Patent Office. (Dkt. No. 138, Defendants' Opp. Br., pp. 28-33.) However, because defendants fail to come forward with any evidence of intent or materiality under *Therasense* on these issues that they bear the burden of proof on by clear and convincing evidence, Mr. Fleming's motion must be granted. *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. 242, 254-55 (1986).

### 1.     Defendants fail to advance any evidence of materiality

Information is material only if the Patent Office would not have issued the patent had it known about that information. *Therasense*, Exh. 26 at pp. 27-28 (adopting a new "but-for" test for materiality).

As an initial matter, there is no dispute that the '881 Orr Patent Application is not prior art since it was filed in March 2003, nearly four years after Mr. Fleming filed his

original patent application in April 1999. Because the Patent Office only makes prior art invalidity rejections based on prior art, there can be no dispute that the non-prior art '881 Orr Patent Application is by definition not "but-for" material. *See* 35 U.S.C. §§ 102-103. That ends the inquiry, as confirmed by defendants' unsurprising failure to cite a single case in the history of patent jurisprudence where a patent was invalidated by a court (or rejected by the Patent Office) in view of a reference dated nearly four years thereafter.

Defendants' response to the fact that the '905 patent—which Mr. Fleming disclosed to the Patent Office—is an exact duplicate of the '881 Orr Patent Application is likewise meritless. The Court can see for itself that those two references are identical. Because the Patent Office allowed Mr. Fleming's '653 patent claims over the '905 patent (and therefore effectively over the '881 Orr Patent Application), the '881 Orr Application—once again—obviously is not "but-for" material.[10] *Therasense*, Exh. 26 at pp. 27-28.

Defendants' only counter-argument is that documents *other than* the '881 Orr Application should have been disclosed. (Dkt. No. 138, Defendants' Opp. Br., pp. 29-32 ("Escort filed a series of responses demonstrating that it had conceived and reduced to practice the same alleged inventions prior to Fleming…[citing the Orr declarations, etc.].").) That "series of responses" consists of parts of the '881 prosecution history— they are not part of the '881 Application, an indisputable fact defendants do reconcile. *See* 35 U.S.C. § 111, defining the contents of a patent application to include: a

---

[10] The fact that Mr. Fleming disclosed U.S. Patent 6,670,905 to the U.S. Patent Office during prosecution of the '653 patent is evidenced by the listing of that patent on the face of the '653 patent. (*See* Exh. 2, '653 patent.)

specification; a drawing; and an oath.[11]  Thus, this "series of responses" is irrelevant to whether the '881 Orr Application is but-for material under *Therasense*.

Finally, the only evidence defendants cite for the proposition that the '881 Orr Application is material is from their "patent law expert", Mr. Killworth.  (Dkt. No. 138, Defendants' Opp. Br., p. 32.)  However, aside from the fact that Mr. Killworth is not a person of ordinary skill in the art qualified to assess materiality, he opined using the "materiality" standard set forth in 37 C.F.R. § 1.56, which the Federal Circuit expressly rejected in *Therasense*.  (Exh. 26 at pp. 32-36 ("This court does not adopt the definition of materiality in PTO Rule 56.").)[12]

Accordingly, because defendants have advanced no evidence of but-for materiality under *Therasense*, Mr. Fleming's motion must be granted as to the '881 Orr Application.

## 2.    **Defendants fail to advance any evidence of intent**

Defendants "must prove by clear and convincing evidence that [Mr. Fleming] knew of the ['881 Orr Application], knew that it was material, and made a deliberate decision to withhold it."  *Therasense*, Exh. 26 at pp. 27-28.  The only evidence of intent defendants raise is the allegation that "Fleming acknowledged that an interference between the '881 Application and the claims of the '798 patent may ensue."  (Dkt. No.

---

[11] Defendants' "patent law expert" agrees.  (Exh. 13, Killworth Report, p. 3 ("A patent application consists of at least a written description of the invention, one or more claims that define the scope of the protection sought for the invention, and a declaration signed by each inventor… .").)

[12] Defendants argue that Mr. Fleming admitted to the materiality of the '881 Application when he disclosed it in a later-filed patent application (not part of this case).  (Dkt. No. 138, Defendants' Opp. Br., p. 33.)  In fact, Mr. Fleming declared just the opposite when he disclosed that application to the Patent Office.  (Exh. 27 ("This [disclosure] statement is not intended to represent that….the information cited in the statement is, or is considered to be, material to patentability as defined in [37 C.F.R.] § 1.56.").)

138, Defendants' Opp. Br., pp. 31-32.) Defendants' argument is legally and factually baseless, as well as irrelevant.

First, the relevance between the '881 Application and the '798 patent, if any, is entirely irrelevant to the issue of inequitable conduct regarding the '653 patent. The claims of the '653 patent are different from the claims of the '798 patent, and defendants have not argued, much less explained, how Mr. Fleming's alleged thoughts about the '881 Application vis-à-vis the '798 patent has anything to do with prosecution of the '653 patent.

Second, the '798 patent issued on March 20, 2001, and the '881 Application was filed on March 25, 2005. The Patent Statute requires that interferences be initiated within one year of a patent issuing. 35 U.S.C. § 135(b)(1). Thus, the idea that Mr. Fleming thought that "an interference between the '881 Application and the claims of the '798 patent may ensue" does not make sense because it was legally impossible for there to be any interference in these circumstances. Mr. Fleming confirms he knew that. (Fleming Decl. at ¶¶ 32-33.) The fact that defendants' argument fails to make sense is further revealed by defendants' distortion of what Mr. Fleming actually said, which is:

> Escort attempted to create an interference with my ['798] patent. However, Escort could not show diligence. Thus Examiner Gregory rejected Escort's claims based upon my patent.

(Dkt. No. 138, Defendants' Opp. Br., p. 3, citing Exhibit P, Fleming 2124.) Obviously, Mr. Fleming hardly "acknowledged that an interference…may ensue" as defendants twist his words.

In light of the Federal Circuit's new standard for intent, these circumstances clearly do not permit a finding of it. *Therasense*, Exh. 26 at pp. 26-27 ("[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single

most reasonable inference able to be drawn from the evidence.'  Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in light of all the circumstances.'  Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.") (citations omitted; emphasis original).

Accordingly, because defendants have advanced no evidence of intent under *Therasense*, Mr. Fleming's motion must be granted as to the '881 Orr Application.

### B.      The Orr Declarations

Defendants' opposition brief fails to challenge the substance of Mr. Fleming's motion regarding the Orr declarations, thereby conceding that it must be granted.  (Dkt. No. 120, Fleming's Br., pp. 34-36.)

Defendants first fail to challenge the fact that the Orr declarations (dated 2004 and 2005) are not prior art to Mr. Fleming's patents filed in 1999.  (Dkt. No. 138, Defendants' Opp. Br., pp. 33-35.)  Because the Patent Office only makes prior art invalidity rejections based on prior art, there can be no dispute that the non-prior art Orr declarations by definition are not "but-for" material.  *See* 35 U.S.C. §§ 102-103; *Therasense*, Exh. 26 at pp. 27-28 (adopting a new "but-for" test for materiality).  That ends the inquiry, as confirmed by defendants' unsurprising failure to cite a single case in the history of patent jurisprudence where a patent was invalidated by a court (or rejected by the Patent Office) in view of a reference dated four and five years thereafter.

Defendants also do not challenge the fact that the Orr Declarations are hearsay and, as such, are not admissible as prior art.

Defendants' final argument—that the Orr declarations are not cumulative to the '905 patent and two other patent applications (the '097 and '394 applications) that Mr.

Fleming disclosed to the Patent Office—raises the same issues discussed above with respect to Mr. Fleming's alleged failure to cite the '881 Orr Application because the Orr declarations are part of the "series of responses" defendants accuse Mr. Fleming of not disclosing in connection with his alleged failure to disclose the '881 Orr Application. Accordingly, for the same reasons discussed above (*supra* at pp. 36-40), defendants have failed to come forward with any evidence of "but-for" materiality or intent under *Therasense* sufficient to defeat Mr. Fleming's summary judgment motion.

### C. The Coverstone Litigation

#### 1. Coverstone's Arguments Concerning the Prior Art Status of the '881 Application

The Federal Circuit held that "the materiality required to establish inequitable conduct is but-for materiality." *Therasense*, Exh. 26 at pp. 27-28 (adopting a new "but-for" test for materiality). Thus, the failure to disclose a non-prior art reference cannot be material because the U.S. Patent Office cannot reject a claim based upon a reference that is not prior art. *See* 35 U.S.C. §§ 102-103. Defendants do not dispute that Mr. Coverstone's arguments are not prior art. Thus, Mr. Coverstone's argument regarding the '881 Orr application is *per se* not material, and defendants' inequitable conduct defense with respect to Mr. Coverstone's arguments fails for this reason alone.

Defendants' opposition also independently fails because defendants have never alleged, much less demonstrated, that Mr. Coverstone's arguments were "but-for" material. To the contrary, defendants have only argued that Mr. Coverstone's arguments were "close enough" to material that they should have been disclosed. (Dkt. No. 138, Defendants' Opp. Br., p. 36 ("The question of materiality of the Coverstone Litigation, including the arguments made by Coverstone therein, was clearly close enough that its

relevancy should have been left to the examiner.").)  Defendants' "close enough" argument is not a replacement for *Therasense's* requisite showing of but-for materiality by clear and convincing evidence.

Defendants also fail to allege intent as required by *Therasense*.  Defendants argue that Mr. Fleming's alleged failure to disclose the Coverstone litigation and arguments made by Coverstone therein "necessarily demonstrates an intent to deceive".  (Dkt. No. 138, Defendants' Opp. Br., p. 36.)  *Therasense* expressly rejects that approach/argument. As the Federal Circuit held:

> Intent and materiality are separate requirements.  A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality.

*Therasense*, Exh. 26 at p. 25.  Aside from defendants' argument that Mr. Coverstone's arguments during the Coverstone litigation were so material that Mr. Fleming's intent to withhold them should simply be inferred, defendants advance no evidence of intent.  As such, there is no legally sufficient allegation or evidence of intent, and Mr. Fleming's motion should be granted on this basis as well.

## 2.    The Existence of the Coverstone Litigation

Defendants' arguments regarding the Coverstone litigation do not differ from their arguments regarding Mr. Coverstone's arguments during that litigation. Accordingly, Mr. Fleming's motion should be granted for the same reasons discussed above.  (*Supra* at pp. 40-42.)

Mr. Fleming's motion should also be granted because defendants fail to explain how Mr. Fleming could have violated 37 C.F.R. § 1.178(b) (requiring disclosure of

litigation involving Mr. Fleming's '798 patent) when Mr. Fleming's '798 patent had not existed for more than four years prior to the Coverstone litigation. (Dkt. No. 120, Fleming Br., pp. 37-38.) Defendants tell the Court that "the Coverstone litigation involved the '798 patent", but they never explain how that could possibly be the case. (Dkt. No. 138, Defendants' Opp. Br., pp. 36-37.) Simply saying it does not make it so. Defendants could just as well tell the Court that the sun sets in the east and rises in the west, but that does not make it true or material for summary judgment purposes. The facts are undisputed and the Court can take judicial notice of them from publicly available records, which show the Coverstone litigation was initiated in 2008 and the '798 patent was surrendered to the Patent Office more than four years earlier in January 2004. (Exh. 24, January 5, 2004 surrender of '798 patent.) As such, because the express language of 37 C.F.R. § 1.178(b) does not require Mr. Fleming to disclose the Coverstone litigation during prosecution of the '653 patent, there can be no issue of inequitable conduct as a matter of law.

### 3.    Coverstone's Fraud Allegations

The Federal Circuit held that "the materiality required to establish inequitable conduct is but-for materiality." *Therasense*, Exh. 26 at pp. 27-28 (adopting a new "but-for" test for materiality). Thus, the failure to disclose a non-prior art reference cannot be material because the U.S. Patent Office cannot reject a claim based upon a reference that is not prior art. *See* 35 U.S.C. §§ 102-103. Defendants do not dispute that Mr. Coverstone's fraud allegations are not prior art. Thus, Mr. Coverstone's litigation-inspired arguments in a separate lawsuit are *per se* not material, and defendants' inequitable conduct defense with respect to those allegations fails for this reason alone.

Defendants also fail to allege intent as required by *Therasense*. The sum total of defendants' allegation of intent consists of defendants' conclusory argument that Mr. Fleming's alleged failure to disclose Mr. Coverstone's fraud allegations "is a violation of the duty of candor, which includes intent to deceive." (Dkt. No. 138, Defendants' Opp. Br., p. 40.) *Therasense* obviously requires far more than that. *Therasense*, Exh. 26 at pp. 26-27 ("[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in light of all the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.") (citations omitted; emphasis original). Because defendants' argument advances no evidence on an issue for which they bear the burden of proof, Mr. Fleming's motion must be granted. *Matsushita*, 475 U.S. 574, 586-87 (1986); *Celotex*, 477 U.S. 317, 322 (1986); *Anderson*, 477 U.S. 242, 254-55 (1986).

### D. The Reissue Declarations

Defendants' opposition to Mr. Fleming's motion concedes that defendants never alleged in their pleadings that Mr. Fleming committed inequitable conduct in connection with his reissue declarations. (Dkt. No. 138, Defendants' Opp. Br., p. 40 n. 7.) By failing to acknowledge, much less distinguish, Mr. Fleming's cases showing that defendants are barred from now raising inequitable conduct allegations that were not pled, defendants also concede that Mr. Fleming's motion should be granted for that reason alone. *Exergen Corp. v. Wal-mart Stores, Inc.,* 575 F.3d 1312, 1318, 1325-31 (Fed. Cir. 2009) (allegations of inequitable conduct must be specifically pled); *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294-95 (9th Cir. 2000) (defenses that are not pled

cannot be raised in response to a summary judgment motion); *Avocent Huntsville Corp. v. Clearcube Tech. Inc.,* 443 F. Supp. 1284, 1365-66 (N.D. Ala. 2006) (limiting inequitable conduct allegations to those contained within the pleadings).

Defendants also do not come forward with any evidence that Mr. Fleming's reissue declarations are "but-for" material under *Therasense*. All defendants allege is that "Fleming's reissue declarations are not accurate or consistent with [his deposition testimony]". (Dkt. No. 138, Defendants' Opp. Br., p. 40) Obviously, this vague, conclusory allegation fails to present clear and convincing evidence of but-for materiality, much less intent, as required by *Therasense*. Thus, Mr. Fleming's motion must be granted on this issue.

## VII. SUMMARY JUDGMENT THAT MURAKAMI DOES NOT ANTICIPATE '038 PATENT CLAIMS 1, 3, OR 5-8 UNDER 35 U.S.C. § 102

The only issue here is whether there is a genuine issue of material fact regarding whether Murakami discloses the following element of claims 1, 3, and 5-8 in the '038 patent: "generating an alert if the position of the device is not within a predetermined distance of a predetermined position". The diagram below illustrates this claim language, where the generation of an alert depends on whether the car is outside the .50 mile predetermined distance.



The parties do not dispute that the following paragraph from Murakami contains the operative language for determining whether or not Murakami discloses this claim element. If not, Murakami does not anticipate claims 1, 3, or 5-8.

> While the user is driving, the speed limit of the particular road is searched for (step 1). The current driving speed is measured by the GPS apparatus 1 (step 2), and a determination is made as to whether or not the user is driving within the speed limit (step 3). If the driver is driving faster than the speed limit, a warning sound or the like (warning A) is given to the driver (step 4). Next, a search is made regarding whether or not the current driving location belongs to areas of excess speed enforcement stored in memory 5 (step 5), and if so, a warning is given using a warning sound (warning B (step 6). At the same time, if enforcement waves are received by the speed limit enforcement radar detector 4, a warning sound or the like (warning C) is given (steps 7, 8). The warnings A-C are here different warning methods (e.g., by varying the warning sound). The driver is thus warned and excess speed violations are prevented.

(Exh. 21, Murakami at ¶ [0013].)

Defendants' opposition brief is so unintelligible on this issue that it appears to have been drafted to be intentionally convoluted in hopes of obscuring the issue enough that the Court will throw up its hands and conclude "there must be a fact issue somewhere". But reading this passage from Murakami is not rocket science, and whatever defendants' argument is, it cannot be genuinely disputed that none of Murakami's three disclosed warnings comports with the disputed language in claim 1, *i.e.*, "generating an alert if the position of the device is not within a predetermined distance of a predetermined position".

Murakami's "Warning A" is generated if a user is driving faster than the speed limit for a given road. Thus, Warning A has nothing to do with generating an alert based on whether "the position of the device is not within a predetermined distance of a predetermined position".

Murakami's "Warning B" is generated if it is determined that the car is *within* a previously identified speed trap area. Thus, Warning B has nothing to do with generating an alert based on whether "the position of the device is *not within* a predetermined distance of a predetermined position".

Murakami's "Warning C" is generated if the radar detector detects a police radar signal. Thus, Warning C has nothing to do with generating an alert based on whether "the position of the device is not within a predetermined distance of a predetermined position".

While comparing Murakami's disclosure to the disputed claim language is by itself straightforward, the nature of the analysis also simplifies the Court's decision-making process. The issue here is whether Murakami "anticipates" the disputed language in claim 1 under 35 U.S.C. § 102. Anticipation only exists of the reference identically discloses every element of the claim. *Trintec Indus., Inc. v. Top-U.S.A. Corp.,* 295 F.3d 1292, 1297 (Fed. Cir. 2002); *SSIH Equip. S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 384 (Fed. Cir. 1983).

Defendants have criticized Mr. Fleming's opening brief on this issue, but they do so only by misreading what Mr. Fleming said. Mr. Fleming did not contend that an anticipation analysis requires a prior art reference to contain "identical language" to the patent claim. He stated only that the prior art reference must "identically disclose" the patent claim. *See e.g., Trintec Indus., Inc.,* 295 F.3d at 1297 ("Cases involving novelty, with its strict identity requirement, are quite rare.") Put differently, this is not a question of whether the claim language is "obvious" in view of Murakami, as would be the case under 35 U.S.C. § 103 where there invariably are varying shades of gray affecting the

analysis. Rather, this is an issue of anticipation/novelty where the only issue is whether Murakami *identically* discloses the disputed claim language.

Nor is this an issue the Court is incapable of deciding solely because Mr. Fleming has not advanced any expert testimony on the issue and defendants have. The Court performed its claim construction analysis without Mr. Fleming advancing expert opinions, and it rejected all of Dr. Grindon's contrary advice on each claim term the Court previously construed. For example, the Court held:

> Defendants allege that the word "velocity" should be defined to include both speed and direction. They cite the testimony of their expert, Dr. Grindon, that one skilled in the art defines velocity as a vector measurement of the rate and direction of motion. Yet that definition makes no sense when applied to the patents at issue here.

(Dkt. No. 56, Order, p. 3.) Accordingly, Dr. Grindon's opinions do not trump the Court's ability to decide for itself whether the above-quoted passage from Murakami identically discloses the disputed claim language.

## VIII. SUMMARY JUDGMENT THAT DEFENDANTS' INFRINGEMENT IS WILLFUL

Defendants' opposition fails because it misrepresents the facts, the law, and fails to cite any admissible evidence regarding their pre- and post-complaint willful infringement.

### A. Defendants' Opposition Fails To Advance Any Admissible Evidence

Mr. Fleming's motion should be granted because defendants' opposition is not supported by any admissible evidence. The only thing defendants offer is their response to one of Mr. Fleming's interrogatories (Dkt. No. 138, Defendants' Opp. Br., p. 46, citing Dkt. No. 122, pp. 24-29, citing Exhibit X, Escort's Response to Fleming Interrog. No. 13), but a party's own self-serving interrogatory response is not admissible evidence.

*Haskell Plumbing and Heating Co. v. Weeks,* 237 F.2d 263, 266 (9th Cir. 1956); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 312-313 (7th Cir. 1986) (a party's interrogatory responses are hearsay when offered by the responding party); *Thorpe v. Jones & Co.,* 1990 WL 102763 at *1-2 (9th Cir. 1990) (interrogatory response excluded from summary judgment evidence as hearsay).[13]   Because Mr. Fleming advanced evidence sufficient to conclude that defendants willfully infringed and defendants have offered no contrary evidence, Mr. Fleming is entitled to summary judgment for this reason alone.   *Matsushita,* 475 U.S. 574, 586-87 (1986); *Celotex,* 477 U.S. 317, 322 (1986).

### B.    Defendants' Arguments Show They Willfully Infringed

Willful infringement requires that Fleming show only two things: (1) that defendants acted despite an objectively high likelihood that their actions were infringing; and (2) that this objectively-defined risk was either known or so obvious that it should have been known by defendants.  *In re Seagate Tech.,* 497 F.3d 1360, 1368 (Fed. Cir. 2007).  The facts, including the arguments in defendants' motion, irrefutably show that defendants willfully infringed Mr. Fleming's patents both before and after Mr. Fleming filed suit.

### 1.    Defendants admit they infringe

Defendants admitted during discovery that they infringe claim 45 in the '038 patent, and their testifying expert admitted the same thing in his expert report.  (Exh. 5, Defendants' Second Supp. Response to Fleming Interrogatory No. 3; Exh. 6, Defendant's

---

[13] While Fed. R. Civ. P. 56 contemplates the use of interrogatories for summary judgment purposes, their use is only proper where they would otherwise be admissible.  The most typical use, contrary to defendants' use here, is of an opponent's interrogatory response, which is admissible under Fed. R. Evid.801(d)(2).

Rule 26 Supp. Rebuttal Expert Report of Dr. Grindon, pp. 11-12.) Defendants also admit they knew about the '038 patent by February 2008, which is more than one year before this case was filed and before they even started selling three of their four accused infringing products (the Passport 9500ix, the Passport iQ, and the GX65). (Exh. 28, Defendants' Second Supp. Response to Fleming Interrogatory No. 8; Exh. 8; Exh. 9; Exh. 10.) Thus, nearly every one of defendants' accused sales was made knowing they infringe Mr. Fleming's patent. This is willful infringement *per se* under *Seagate*.

Defendants' hearsay evidence, even if it was admissible, does not help them. Defendants argue they did not copy Mr. Fleming's invention, they did not desire to harm Mr. Fleming, and that Mr. Orr and a couple of other engineers employed by defendants concluded that no one (other than them) could have invented anything in their accused products because they continuously worked on those products for a number of years. (Dkt. No. 138, Defendants' Opp. Br., pp. 44-47.) Defendants' first and second arguments are demonstrably false; their third is frivolous.

> ## 2. Defendants copied and tried to steal Mr. Fleming's invention through fraudulent activity before the U.S. Patent Office

The fact that defendants copied and tried to steal Mr. Fleming's invention through fraudulent activity before the U.S. Patent Office is irrefutable. Indeed, defendants did it twice that Mr. Fleming can prove.

Defendants filed a patent application on March 15, 2002 relating to police radar detectors. On March 13, 2002, defendants copied every single one of Mr. Fleming's then-existing patent claims into their patent application. (Exh. 29, March 15, 2002 Preliminary Amendment at p. 11 ("Claims 96-116 are copied verbatim from claims 1-21 of U.S. Patent 6,204,798 granted March 20, 2001 to Fleming, III, which issued from an

application filed on April 14, 1999.")  While the claims defendants copied were in Mr. Fleming's original '798 patent, some of them (claims 1, 3, and 5-8) carried over identically into Mr. Fleming's reissue '038 patent and are asserted in this case against defendants.  (Fleming Declaration, ¶ 34.)  Thus, in their own words, defendants copied "verbatim" (and tried to take as their own via Patent Office procedure) six of the same patent claims they are now accused of infringing.

When the Patent Office blocked defendants' copying of Mr. Fleming's invention, defendants tried to get away with it yet again in another patent application.  On March 25, 2003, defendants filed a patent application relating to police radar detectors and again copied every single one of Mr. Fleming's patent claims into that application.  (Exh. 30, March 25, 2003 Preliminary Amendment at p. 13.)  When the Patent Office figured out what defendants were up to, it again blocked their attempt.  (Exh. 31, May 30, 2006 Office Action, p. 2.)  Thus, defendants' argument that they never copied Mr. Fleming's invention or sought to harm him is plainly false and, as such, forms no defense to Mr. Fleming's motion.  To the contrary, this and other of defendants' actions show they were so intent on using Mr. Fleming's patented technology that there was nothing they would not do to get it.

Specifically, not only did defendants attempt to copy and steal Mr. Flemings' inventions, defendants attempted to do so by submitting a fraudulent declaration to the Patent Office.  For example, Mr. Orr's August 19, 2005 declaration (submitted in support of defendants' second attempt to copy and steal Mr. Fleming's invention) states:

> As demonstrated above and evidenced by the corroborating files discussed above, and indexed in the attachment to this declaration, I conceived of and created a system that was as described in claims 86-105 and 113-136 presently pending in this application, prior to January 27, 1998, and I used

that system to perform the steps and methods recited in each and every one of the claims 86-105 and 113-136, prior to January 27, 1998.

(Exh. 32 at ¶ 13.)  Take for example claim 116, which is word-for-word identical to claim 21 in Mr. Fleming's '798 patent.  (Exh. 30, March 25, 2003 Preliminary Amendment at p. 8; Exh. 22, '798 patent.)  Claim 116, includes the following limitation:

> generating an alert if the velocity of a radar detector is greater than a predetermined velocity.

(*Id*. at Exh. 30.)   During Mr. Orr's November 20, 2009 deposition, the following exchanges occurred:

> Q.     Did the system that you implemented ever use the stored velocity information in order to decide whether to lock out an alert?
>
> A.     It – the demo that I created did not use velocity.  In fact, all I did was store it.

(Exh. 33, Orr Depo., p. 130, lns. 17-21.)

> Q.     Fair enough.  Prior to April 14, 1999, did you ever construct a physical system that implemented the velocity-constraint concept that you describe in paragraph 14 in Exhibit 2?
>
> A.     No.

(Exh. 33, Orr Depo., p. 170, lns. 19-24.)   Mr. Orr's deposition testimony directly contradicts paragraph 13 of the declaration defendants utilized in their attempt to copy and steal Mr. Fleming's inventions.  During Mr. Orr's deposition, Mr. Orr made it clear that, prior to the April 14, 1999 filing of Mr. Fleming's patent application, Mr. Orr never created a system that utilized velocity to determine whether to generate an alert. However, Mr. Orr declared exactly the opposite on August 19, 2005 before the U.S. Patent Office.   Using a fraudulent document in an attempt to copy and steal Mr. Fleming's invention is clear and convincing evidence that defendants had no reservations about harming Mr. Fleming and willfully taking and using what was not theirs.

### 3. Defendants' "continuous development" theory is frivolous

Defendants' next argument (again with no admissible support) is simply bizarre.

Defendants argue their infringement could not have been willful because:

> They considered that the products that are now accused of infringement were a continuous development of the work that Mr. Orr had undertaken as early as April or May 1996. Because the products that are accused of infringement were a direct result of work undertaken by this time, Defendants' representatives determined that no intellectual property coming into existence after that time could be the basis for any legitimate infringement allegations.

(Dkt. No. 138, Defendants' Opp. Br., p. 46.) That, respectfully, makes no sense. Henry Ford started Ford Motor Company in 1901. Pictured below is a Model T he sold in 1908. Pictured beside it is a 2012 Ford Shelby GR-1 Luxur. While Ford has been continuously

 

developing automobiles for more than 100 years, it would hardly make sense for Ford to claim that Chrysler, General Motors, Chevrolet, Honda, Toyota, or even the now famous inventor of the intermittent windshield wiper did not develop some automobile intellectual property in the meantime.

Notably, this outlandish "continuous development" theory is the *only* defense defendants raised with respect to claim 45 in the '038 patent, *i.e.*, the patent claim defendants admit they have been knowingly infringing since February 2008. (Dkt. No. 65, Defendants' First Supp. Patent Invalidity Contentions.) Not only is this defense nonsensical, the circumstances in which defendants relied on it raise the type of

Plaintiff's Reply In Support Of His
Motion For Summary Judgment (Dkt. No. 120)

objectively reckless behavior that compels a willfulness finding. *See e.g., Avia Group Int'l., Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1566-67 (Fed. Cir. 1988) (affirming summary judgment of willful infringement).

Specifically, defendants argue that it was Mr. Orr who held the belief that his "continuous activity" would supposedly exonerate defendants' willfulness. This is the same Mr. Orr who testified under oath at his deposition that he was totally unqualified and incapable of reading a patent claim and assessing the relationship between that claim and any of his alleged prior work.

> Q.      Do you see the text on this page that begins one, period, and then the words a radar warning receiver comprising? Did you compose the text that's on this page, Mr. Orr?
>
> Mr. Schatz:    I'm just going to caution you not to reveal any attorney/client communications.
>
> A.      I have never composed a claim of any kind.
>
> Q.      Okay. So you didn't write this claim?
>
> Mr. Schatz:    Objection, vague, and I'll caution the witness not to reveal any attorney/client communications.
>
> A.      I did not write it.
>
> Q.      All right. So I'm going to ask you to read the claim that's contained here on page ESC002525 and with this question in mind: When you read that, Mr. Orr, is anything that's written in that claim – does anything that's written in that claim reflect work that you did during the time period July, '98 through March 13th, 1999, as opposed to work you had done before or after that time period.
>
> A.      I do not feel qualified to read your claims---
>
> Q.      Well, they're not my claims, Mr. Orr.
>
> A.      --- to read the claims of you attorney ---
>
> Q.      Look at Mr. Schatz why don't you.
>
> A.      --- and relate them to actual concepts.
>
> Q.      So your testimony is, to the best of your ability, you don't feel comfortable answering my last question?
>
> A.      That is true.

(Exh. 33, November 20, 2009 Deposition of Steven K. Orr, at pp. 240-42.)[14]  Defendants never explain how a gentleman who cannot read a patent claim or perform an invalidity analysis is supposed to have developed an invalidity theory that was objectively reasonable enough for the corporate defendants to reasonably rely on.

Making matters worse, if that were possible, defendants have also admitted they never bothered to vet their "non-willfulness theory" with their lawyers:

> [N]one of the 'conclusions' and/or 'determinations' regarding the alleged non-infringement and/or invalidity of the asserted Fleming patents mentioned in that supplemental [interrogatory] response were in any way made, based, or premised on the conclusions of a lawyer or with the assistance or input of a lawyer.

(Exh. 34, Defendants' Resp. to Req. for Admiss., No. 19; Exh. 35, Defendants' Supp. Resp. to Fleming Interrog. No. 13; Exh. 36, October 22, 2010 letter; Exh. 37, November 1, 2010 email; Exh. 38, November 2, 2010 letter.)  *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1339 (Fed. Cir. 2008) (failure to seek legal advice influences willfulness finding); *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 700 (Fed. Cir. 2008) (same).

Having engaged a team of intellectual property lawyers to assist their effort to copy and steal Mr. Fleming's inventions, defendants' simultaneous decision to conceal their "continuous development theory" from those same lawyers (or any lawyer for that matter) shows that defendants' theory was either (1) illicitly inspired in hopes of later claiming "ignorance of the law" or (2) a desperate defense of last resort conjured after suit was filed.  Either way, there is nothing redeeming—much less objectively reasonable under *Seagate*—about defendants' corporate approach to avoiding their infringement of Mr. Fleming's patents.

---

[14] Defendants admit that Mr. Kuhn and Mr. Blair, just like Mr. Orr, have no legal training or experience that qualifies them to assess issues of patent infringement or invalidity.  (Exh. 18, Defendants' Resp. to Req. for Admiss., Nos. 20-57 and 97-193.)

### 4.    Defendants' remaining arguments are irrelevant

Defendants' final arguments—that they have "presented strong invalidity and unenforceability defenses" and that Fleming did not give defendants notice of his patents—again entirely miss the mark.  (Dkt. No. 138, Defendants' Opp. Br., p. 46.)  A finding of willful infringement only requires that defendants willfully infringe one asserted patent claim.  *See e.g., Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,* 2000 WL 34334583 (N.D. Cal. March 31, 2000).  Defendants admit they have been infringing claim 45 in the '038 patent since February 2008, and the only invalidity defense defendants have raised with respect to their willful infringement of that claim is the above-mentioned illogical, un-vetted "continuous development" theory.  The fact that defendants have raised an unenforceability defense to the '653 patent is irrelevant to their willful infringement of claim 45 in the '038 patent since defendants have not alleged that any claim in the '038 patent is unenforceable.  (Dkt. No. 30, Defendants' First Amended Answer.)

Lastly, there is no prerequisite to a willful infringement finding that Mr. Fleming provide defendants notice of his patents.  Willful infringement only requires defendants' knowledge of the patent, and defendants admit they had knowledge of the '038 patent by February 2008—more than one year before suit was filed.  (Exh. 28, Defendants' Second Supp. Response to Fleming Interrogatory No. 8); *Nike, Inc. v. Wal-Mart Stores, Inc.,* 138 F.3d 1437, 1446 (Fed. Cir. 1998) ("[T]he issue of willfulness turns on the actual knowledge of the infringer, and is unrelated to the adequacy of constructive notice by the patentee.").

Accordingly, the undisputed facts show that defendants are naked of any evidence

or objectively reasonable excuse for their admitted infringement, and this is precisely the circumstance that requires a summary judgment finding of willful infringement.

### C. Defendants' Post-Complaint Willful Infringement

Relying on *In re Seagate*, defendants argue that Mr. Fleming's decision not to seek a preliminary injunction when filing his complaint is a *per se* prohibition of his ability to recover for defendants' post-complaint willful infringement. (Dkt. No. 138, Defendants' Opp. Br., p. 46.) The portion of *In re Seagate* cited by defendants, italicized below, relates to extending a waiver of privilege to trial counsel in the context of a willful infringement defense. So the Court can see the proper context of defendants' citation, a more complete citation is presented below:

> Further outweighing any benefit of extending waiver to trial counsel is the realization that in ordinary circumstances, willfulness will depend on a infringer's prelitigation conduct. It is certainly true that patent infringement is an ongoing offense that can continue after litigation has commenced. However, when a complaint is filed, a patentee must have a good faith basis for alleging willful infringement. Fed. R. Civ. Pro. 8, 11(b). So a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct. *By contrast, when an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for post-filing willful infringement. . . . A patentee who does not attempt to stop an accused infringer's activities in this matter should not be allowed to accrue enhanced damaged based solely on the infringer's post-filing conduct.*
>
> . . .
>
> We also recognize that in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced. In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case.

*In re Seagate*, 497 F.3d at 1374 (emphasis added to show portion cited by defendants).

In this case, the waiver of trial counsel's privilege is not at issue, nor (as discussed

extensively above) is Mr. Fleming seeking enhanced damages based *solely* on defendants' post-filing conduct. Thus, the proposition for which defendants cite *In re Seagate* has no applicability to this case.

Further, defendants ignore the second above-cited paragraph of *In re Seagate* that states:

> [I]n some cases a patentee may be denied a preliminary injunction... such as when the remaining factors are considered and balanced. In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case.

*Id*. Mr. Fleming is an individual inventor. He is not a manufacturer of radar detectors. Thus, Mr. Fleming could not have prevailed on an early preliminary injunction motion (requiring a showing of irreparable harm) when he filed this case. It was not until it became clear that defendants' finances would not support the damages they were going to have to pay that Mr. Fleming could show the required irreparable harm needed for a preliminary injunction.

In addition, it was not until defendants admitted they infringed claim 45 in the '038 patent and the Court struck their only invalidity defense to that claim that Mr. Fleming believed that he could successfully seek a preliminary injunction. Thus, within 2 weeks of the Court's ruling striking defendants' alleged prior invention defense, Mr. Fleming sought a preliminary injunction. (Dkt. No. 117, April 21, 2011 Order striking defendants' invalidity contentions; Dkt No. 130, May 3, 2011 Fleming Motion for Judgment and Injunction.)

Numerous courts have held in these circumstances that *In re Seagate* does not teach the *per se* rule sought by defendants. Indeed, the court in *Webmap Tech v. Google* discussed that issue and provided the following case cites and parenthetical explanations:

*Affinity* Labs *of Texas, LLC v. Alpine Elecs. of Am., Inc.,* No. 9:08-CV-171, slip op. at 2 (E.D. Tex. Sept. 2, 2009) ("[T]here is no *per se* rule that a patentee who relies solely on post-filing conduct for his willfulness claim is foreclosed from receiving enhanced damages if he does not also seek preliminary injunctive relief") (Clark, J); *see also ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.,* 592 F.Supp.2d 1208, 1227 (N.D. Cal. 2008) (holding that, under *Seagate,* once a patentee files for a preliminary injunction, a defendant's conduct from before the filing for preliminary injunction may be considered in determining willfulness); *St. Clair Intellectual Prop. Consultants, Inc. v. Palm, Inc.,* 2009 WL 1649751, at *1 (D. Del. Jun.10, 2009) (holding that, when a patent in a pending case exited reexamination without narrowed claims, the patentee had established sufficient high likelihood that defendant infringed a valid patent that patentee could allege willful infringement without first seeking a preliminary injunction); *Krippelz v. Ford Motor Co.,* 636 F.Supp.2d 669, 675 (N.D. Ill. Mar. 25, 2009) (holding that a patentee's failure to seek a preliminary injunction is irrelevant to the availability of enhanced damages for willful infringement where the defendant had engaged in willful infringement prior to filing); *Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.,* 2009 WL 483865 (D.N.J. Feb. 25, 2009) (refusing to dismiss a patentee's willful infringement claim after denying patentee a preliminary injunction and holding that failure to obtain preliminary injunction did not preclude a finding of willful infringement under *Seagate*).

2010 WL 3768097 at * 2 (E.D. Tex 2010).

In light of the above, there is no evidence, disputed facts, or authority supporting defendants' attempt to procedurally whitewash their post-complaint willful infringement.[15] Accordingly, there is no genuine dispute that defendants have willfully infringed Mr. Fleming's patents, both before and after Mr. Fleming filed suit. Mr. Fleming respectfully requests summary judgment to that effect.

## IX. CONCLUSION

Mr. Fleming respectfully submits that the absence of evidence in defendants' opposition warrants entry of summary judgment for Mr. Fleming on each of the foregoing issues.

---

[15] Defendants' desperate motion seeking to strike Mr. Fleming's willful infringement allegations is the subject of other briefing. (Dkt. No. 136; [opposition and reply briefs not yet filed].)

June 8, 2011                            Respectfully Submitted

                                        _____/s/_____
                                        Michael S. Dowler
                                        Park, Vaughan, Fleming & Dowler, LLP
                                        5847 San Felipe, Suite 1700
                                        Houston, TX 77057
                                        (713) 821-1540
                                        (713) 821-1401 (facsimile)

                                        Attorneys for Plaintiff Hoyt A. Fleming

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of June 2011, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons.  To the extent any of the foregoing was filed under seal, I have also concurrently served the following persons by email as indicated below.

> Brett A. Schatz
> Gregory F. Ahrens
> WOOD, HERRON & EVANS, L.L.P.
> 441 Vine Street
> 2700 Carew Tower
> Cincinnati, OH 45202
> bschatz@whepatent.com
> gahrens@whepatent.com

> _____/s/_____
> Michael S. Dowler

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | |
| Plaintiff, | Case No. 1:CV-09-105-BLW |
| v. | MEMORANDUM DECISION AND ORDER |
| ESCORT, INC. and BELTRONICS USA, INC., | |
| Defendants. | |

**INTRODUCTION**

The Court has before it cross-motions for summary judgment and various other motions. The Court heard oral argument and took the motions under advisement. For the reasons expressed below, the Court will grant in part plaintiff Fleming's motion for summary judgment and deny Escort's motion for summary judgment. A full summary of the Court's rulings is contained in a chart at the end of this decision.

**FACTUAL BACKGROUND**

Plaintiff Fleming accuses defendants – collectively referred to as Escort – with infringing two patents that the Court will refer to as the '038 patent and the '653 patent. Both patents describe a radar detector used to identify police radar signals measuring the speed of passing cars. The radar detector is mounted in a vehicle and provides an audible or visual alert when it detects police radar nearby. The alerts on some early detectors

**Memorandum Decision & Order - 1**

had revealed this litigation, Escort argues, the PTO would have become aware of Orr's claims to the invention in his '881 patent application. But the PTO already knew about Orr's claims because Fleming disclosed Orr's '905 patent, as discussed above. Escort has failed to identify the material information that was withheld from the PTO because it was not told of the Coverstone litigation. Once again, *Therasense* requires a heightened showing of materiality, and these allegations regarding the Coverstone litigation do not come close to meeting that standard.

Finally, Escort argues that Fleming committed inequitable conduct with regard to his reissue declarations. However, Escort concedes that it did not raise this defense in its Amended Answer and Counterclaim. *See Escort Brief (Dkt. No. 138)* at p. 40, n. 7. That failure bars Escort from now raising the defense. *Exergen Corp. v. Wal-mart Stores, Inc.*, 575 F.3d 1312, 1318, 1325-31(Fed. Cir. 2009) (allegations of inequitable conduct must be specifically pled); *Coleman*, 232 F.3d at 1294-95 (defenses that are not pled cannot be raised in response to a summary judgment motion).

For all of these reasons, the Court will grant Fleming's motion for summary judgment and deny Escort's motion for summary judgment. The result is that Escort's allegations that Fleming engaged in inequitable conduct are dismissed.

## Reissue Validity

Both parties seek summary judgment on their claims regarding the validity of the two patents under the reissue statute, 35 U.S.C. § 251. More specifically, Fleming seeks a summary judgment striking Escort's defense that the patents are invalid under § 251

Memorandum Decision & Order - 25

while Escort seeks summary judgment that the patents are invalid under § 251 as a matter of law.

The resolution of this issue requires a review of the reissue process in this case. In January of 2003, two years after the '798 patent issued, Fleming claims that he "became aware for the first time" of two other patents that convinced him that he "had inadvertently claimed more [in the '798 patent] than I was entitled to claim." *See Fleming Declaration (Dkt. No. 139-2)* at ¶¶ 12-13, 15. He also became aware of a "Uniden GPRS" radar detector, confirming his "hunch from years ago that radar detectors were going to be becoming intelligent." *See Fleming Deposition (Dkt. No. 122-2)* at p. 51. Observing this market development, he was now convinced that "my belief in an intelligent radar detector had a lot higher probability of success in this time frame." *Id*. at p. 52.

Thus, it appears that two factors led Fleming to seek a reissue of his '798 patent: (1) He wanted to narrow some claims because they might be invalid as written in light of two patents he recently discovered; and (2) He wanted to broaden other claims to include new "intelligent" products – like the Uniden GPRS – now coming onto the market. Consequently, Fleming filed his reissue application on January 28, 2003. About a year later, he surrendered his '798 patent to the PTO, and about two years after that surrender, the PTO granted to Fleming the reissued patent '038.

While he was prosecuting his reissue application, Fleming claims that he had another realization that he had not claimed enough:

**Memorandum Decision & Order - 26**

3809

> I had failed to appreciate the full scope of my invention and had inadvertently claimed less than I had a right to claim. In particular, I determined that I had not claimed a method, which is performed by a radar detector, that included detecting an incoming police radar signal and determining the heading of the radar detector. Based upon that determination, I decided to seek a second reissue patent.

*See Fleming Declaration, supra* at ¶ 25. Fleming explained that the claims of his second reissue patent application – a continuation of the '038 patent – were "tailored specifically to Cobra" and "were intended . . . to cover various Cobra products." *See Fleming Deposition, supra* at pp. 43, 49. The PTO granted that second reissue patent as patent '653 on March 10, 2009.

Escort argues that the two reissued patents are invalid because there was no "error" in the original patent that would authorize a reissued patent. Escort argues that when Fleming received the '798 patent, he got "precisely what he expected," and that his reissue application was not prompted by a mistake in the original patent but by the emergence of new products on the market. The lack of an error in the original patent is fatal to a reissue application under § 251, argues Escort.

Under the reissue statute, a patentee may surrender a patent and seek reissue if "through error without any deceptive intent" he claimed "more or less than he had a right to claim in the patent." *See* 35 U.S.C. § 251. The statute "is remedial in nature, based on fundamental principles of equity and fairness, and should be construed liberally." *MBO Labs, Inc. v. Becton, Dickinson & Co.,* 602 F.3d 1306 (Fed. Cir. 2010).

Notwithstanding its remedial nature, the reissue statute has limits. "The reissue

Memorandum Decision & Order - 27

statute was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute de novo his original application." *In re Weiler*, 790 F.2d 1576, 1582 (Fed.Cir.1986). For example, reissue claims are invalid when the patentee broadens the scope of a claim in reissue to cover subject matter that he surrendered during prosecution of the original claims. *See Hester Indus., Inc. v. Stein, Inc.*, 142 F.3d 1472, 1480 (Fed.Cir.1998). A related limit is that an "error" under § 251 cannot include the deliberate action of an inventor or attorney during prosecution. *See In re Serenkin*, 479 F.3d 1359, 1362 (Fed.Cir. 2007). "The distinction is between a genuine error, or mistake, and a deliberate, but subsequently found to be disadvantageous, choice." *Id.*

Escort argues that Fleming is not relying on any error in the '798 patent because he sought to broaden his claims to cover new products like the Uniden GPRS and the Cobra detectors. The Court disagrees; seeking to broaden a patent to cover new products is not necessarily improper for two reasons. First,

> there is nothing improper, illegal, or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application.

*Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed.Cir. 1988). Second, one of the most commonly asserted "errors" in support of a broadening reissue is the failure of the patentee "to appreciate the full scope of the invention during the prosecution of the original patent application." *Hester*, 142 F.3d at 1479. "This form

**Memorandum Decision & Order - 28**

of error has generally been accepted as sufficient to satisfy the 'error' requirement of §
251." *Id.*

Escort cites no case holding that a patentee is barred from seeking a reissued patent
to cover new products. While Escort relies heavily on *In re Weiler*, 790 F.2d 1576
(Fed.Cir.1986), that case merely held that correctable error under § 251 does not include
the voluntary failure to fully prosecute some aspects of the original patent. *Id.* at 1582
(holding that during original patent prosecution, patentee "acquiesc[ed]" in the PTO's
ruling that narrowed his claims and "fail[ed]" to pursue those excluded claims).

Under *Hester* and *Serenkin*, the Court must discern what error the patentee is
seeking to correct. As discussed above, not all error is correctable by § 251. If the
patentee is seeking to correct a deliberate or voluntary miscalculation he made during the
prosecution of his original patent, he cannot rely on § 251. On the other hand, if he failed
to recognize the full scope of his invention during the prosecution of his original patent,
he can rely on § 251 to correct his shortsightedness.

Both circumstances could be prompted by new products. For example, during the
original patent prosecution, the patentee may deliberately decide not to pursue claims
covering anticipated products, believing that they will never come to market and that his
narrower patent application will stand a better chance of approval by the PTO. Later,
those anticipated products may appear in the market, prompting the patentee to seek a
reissued patent; but § 251 is not available to correct deliberate strategic decisions that turn
out to be wrong. *Serenkin*, 479 F.3d at 1362. On the other hand, a new product might

**Memorandum Decision & Order - 29**

prompt an inventor to realize for the first time that his invention was much broader in scope than he claimed in his original patent.  In that case, § 251 is available.  *Hester*, 142 F.3d at 1479.

Given this law, the Court rejects Escort's argument that Fleming is barred from seeking reissue because he was trying to rewrite his claims to cover new products.  That alone is not enough to make § 251 off-limits.  Accordingly, the Court will deny Escort's motion for summary judgment on this issue.

At the same time, however, the Court refuses to grant Fleming's motion for summary judgment.  As discussed above, Fleming testified that part of the reason he sought reissue of the '798 patent was that he became aware of a "Uniden GPRS" radar detector, confirming his "hunch from years ago that radar detectors were going to be becoming intelligent and seeing the growth of the market in that direction."  *See Fleming Deposition (Dkt. No. 122-2)* at p. 51.  The Uniden product "was an indication that my belief of intelligent radar detectors was going to come into fruition. . . . What was important was that my belief in an intelligent radar detector had a lot higher probability of success in this time frame."  *Id*. at p. 52.

It is not entirely clear from this testimony what Fleming anticipated when he drafted the claims that became the '798 patent and prosecuted it before the PTO.  His "hunch" was from "years ago," an imprecise designation that may or may not place it at the time of the '798 patent prosecution.  On the other hand, he might mean that he anticipated products like the Uniden GPRS when he prosecuted the '798 patent but chose

**Memorandum Decision & Order - 30**

not to cover them with his claims because he guessed there was a low probability that they would come onto the market anytime soon.  Later, when he saw the Uniden product being sold, he realized his deliberate strategic choice to not cover such products was wrong because there was a "higher probability of success" of intelligent detectors coming onto the market.

This interpretation places Fleming right on the fine line described in *Serenkin*: "The distinction is between a genuine error, or mistake, and a deliberate, but subsequently found to be disadvantageous, choice."  *Serenkin*, 479 F.3d at 1362.  Fleming's testimony creates a genuine issue of material fact as to whether there was an "error" in the '798 patent entitling Fleming to seek a reissue under § 251, or merely a deliberate and disadvantageous choice that does not merit § 251 relief.  For that reason, the Court will deny Fleming's motion for summary judgment.

## Intervening Rights

Fleming seeks summary judgment dismissing Escort's defense based on intervening rights.  Under this defense, Escort argues that it engaged in substantial research and development of its products before the date of the reissued patents, giving it certain intervening rights to engage in what would otherwise be infringing conduct.

The second paragraph of 35 U.S.C. § 252 provides for two separate and distinct defenses to patent infringement under the doctrine of intervening rights:  "absolute" intervening rights and "equitable" intervening rights.  *Shockly v. Arcan, Inc*., 248 F.3d 1349, 1359 (Fed. Cir. 2001).  The doctrine of absolute intervening rights protects an

**Memorandum Decision & Order - 31**

Steven B. Andersen, ISB No. 2618
HOLLAND & HART LLP
101 South Capitol Boulevard, Suite 1400
Post Office Box 2527
Boise, Idaho 83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869
E-mail: sandersen@hollandhart.com

Gregory F. Ahrens, *Pro Hac Vice*
Brett A. Schatz, *Pro Hac Vice*
WOOD HERRON & EVANS LLP
2700 Carew Tower
441 Vine Street
Cincinnati, Ohio 54202-2917
Telephone: (513) 241-2324
Facsimile: (513) 241-6234
E-mail: gahrens@whepatent.com
        bschatz@whe-law.com

Attorneys for Defendants Escort Inc. and Beltronics USA, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>     Plaintiff,<br><br>vs.<br><br>ESCORT INC. and BELTRONICS USA, INC.,<br><br>     Defendants. | No. 1:09-cv-00105-BLW<br><br>MOTION FOR ALLOCATION OF TRIAL TIME |

Defendants Escort, Inc., and Beltronics USA, Inc., (collectively "Escort") respectfully

request the Court allocate 60% of the scheduled trial time to Escort and 40% to Plaintiff Hoyt

Fleming ("Fleming"). Escort brings this motion under Federal Rule of Evidence 611 and the

Court's April 25, 2012 Order re: Trial Schedule (Dkt. 194).

**MOTION FOR ALLOCATION OF TRIAL TIME - 1**

3939-1

## I.  INTRODUCTION

The claims and defenses that remain in this case warrant an unequal division of trial time that allocates 60% of the time to Escort.  On March 5, 2012, the parties submitted their lists of trial issues on which they respectively bear the burden of proof.  The contrast between Escort's and Fleming's lists shows that Escort bears the burden of proof on substantially more issues than Fleming.  In total, Escort bears the burden of proof on 92 issues that will be tried.

## II.  IT IS WITHIN THE COURT'S DISCRETION TO GRANT ESCORT'S REQUEST FOR A 60% TIME ALLOCATION

The Court has broad discretion to "impose reasonable time limits on trial."  *Navellier v. Sletten,* 262 F.3d 923, 941 (9th Cir. 2001); *see also Monotype Corp. PLC v. Int'l Typeface Corp.,* 43 F.3d 443, 450-51 (9th Cir. 1994).  The Court's discretion includes allocating time based on the parties' estimates of the time needed and may include an unequal allocation of trial days.  *See, e.g., Amarel v. Connell*, 102 F.3d 1494, 1513 (9th Cir. 1996); *Navellier*, 262 F.3d at 942.

In this case, the Court should consider the number of claims for which Escort has the burden of proof.  Escort's defense rests in large part on its affirmative defenses, for which it bears the burden of proof.  Even without considering the affirmative defenses, rebutting Fleming's infringement claims will require Escort to demonstrate and differentiate the functionality of Escort's four accused products from 27 asserted claims in the '038 and '653 patents.  Escort cannot rely entirely on Fleming's case-in-chief and cross examinations, it may have to spend additional time through direct examination and expert testimony to fully educate the jury on its products and differentiate them from the asserted claims.  Further, the Court's summary judgment ruling narrowed the claims on which Fleming bears the burden, reducing Fleming's need for trial time relative to Escort.

**MOTION FOR ALLOCATION OF TRIAL TIME - 2**

**A.    Escort Bears the Burden of Proof on Substantially More Issues than Fleming**

    **1.    Escort's Burdens of Proof at Trial**

**The '038 Patent**

Escort bears the burden of proof on its invalidity and intervening rights defenses for 37 issues regarding the '038 Patent.  It bears the burden of proof of showing invalidity based on Prior Art on Claims 1, 3, 5-8, 18, 23, 25-28, and 45-48 (16 total) of '038 Patent.  Each of these issues has multiple sub-issues such as the Orr Prior Invention and Murakami Anticipation, among others.  For the '038 Patent, Escort bears the burden of proof of showing invalidity based on Invalid Reissue on Claims 18, 23, 25-28, and 45-48 (10 total).  It bears the burden of proof on Intervening Rights for Claims 18, 23, 25-28, and 45-58 (10 total).  And, it bears the burden of proof on invalidity based on Indefiniteness on Claim 23.

**The '653 Patent**

Escort bears the burden of proof on its invalidity and intervening rights defenses for 55 issues regarding the '653 Patent.  It bears the burden of proof of invalidity based on Prior Art and Invalid Reissue, and Intervening Rights on Claims 22, 24, 26, 30-33, 38, 41, 42, 45, 46, and 48-50 (15 total claims, 3 issues per claim, 45 total issues).  It bears the burden of proof on invalidity based on Indefiniteness for Claims 26, 30-33, 41, 42, 45, 46, and 48 (10 total).

    **2.    Fleming's Burdens of Proof at Trial**

Fleming bears the burden of proof on infringement for 27 Claims.  For the '038 Patent, he bears the burden of proof on infringement on Claims 1, 3, 5, 6, 7, 8, 23, 25, 26, 27, 28, and 46 (12 total).  For the '653 Patent, Fleming bears the burden of proof on infringement on Claims 22, 24, 26, 30-33, 38, 41, 42, 45, 46, and 48-50 (15 total).

If he proves infringement, Fleming then bears the burden of proof on damages, willful infringement, and his request for an injunction.

**MOTION FOR ALLOCATION OF TRIAL TIME - 3**

**B.**     **Escort's Defense Will Require Substantially More Witnesses, Exhibits, and Expert Testimony**

Escort should be allocated 60% of the trial time because its defense case will require substantially more witnesses, exhibits, and expert testimony than Fleming's case. Escort disclosed 12 witnesses, many of whom have extensive and very technical testimony, and 371 exhibits, many of which are quite lengthy and contain highly technical subject matter. To prove its invalidity defenses, which requires a higher burden of proof than Fleming is required to prove his infringement claims, Escort will have to present evidence of how the prior art functions. Fleming's case, on the other hand, does not require him to spend trial time explaining the intricate details of how his product works, because he has no products.

While—to meet his burden of infringement—Fleming will have to present some evidence about how Escort's products work, Escort has the primary interest in demonstrating, in painstakingly accurate detail, how its products work in order to lay the predicate facts for its non-infringement affirmative defense. Escort's defense to Fleming's damage claim will likely consume at least as much time as Fleming's damage case-in-chief. This is due to the significant amount Fleming is claiming and the vigorous dispute about the propriety of Fleming's damages case, as more fully detailed in the *Daubert* Motion filed by Escort on this date.

With regard to technical expert testimony, Escort bears the burden of proving invalidity by clear and convincing evidence on 92 separate issues. These issues are technically complicated and will require substantial technical testimony, as well as the use of several complex demonstrative aids.

**C.**     **Fleming's Remaining Claims Were Simplified by the Court's Summary Judgment and Other Pretrial Rulings**

The Court's summary judgment ruling and other pretrial rulings have reduced the scope and complexity of Fleming's infringement case, but not so for Escort's case. E.g., the Court's

**MOTION FOR ALLOCATION OF TRIAL TIME - 4**

resolution at summary judgment of certain infringement claims in Fleming's favor eliminated

Fleming's burden of proof on those claims, but left intact one or more of Escort's affirmative

defenses for those claims. For such claims, Escort needs more time to present its defense

whereas Fleming needs no time to present his case in chief.

### III.     CONCLUSION

For the above stated reasons, Escort requests that the Court allocate 60% of the trial time

to Escort and 40% to Fleming.

DATED this 7th day of May 2012.

HOLLAND & HART LLP


By  /s/ Steven B. Andersen
    Steven B. Andersen, of the firm
    Attorneys for Defendants Escort Inc. and
    Beltronics USA, Inc.


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of May 2012, I filed the foregoing
electronically through the CM/ECF system, which caused the following parties or counsel to be
served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **Gregory F Ahrens**
  gahrens@whepatent.com,tyoung@whepatent.com
- **Michael S Dowler**
  mike@parklegal.com
- **Brett A Schatz**
  bschatz@whe-law.com,afreeman@whe-law.com,plinden@whe-law.com
- **Steven F Schossberger**
  sfs@hteh.com,kforuria@hawleytroxell.com,bfrazer@hawleytroxell.com


        /s/ Steven B. Andersen
      for HOLLAND & HART LLP


5580138_1.DOCX

**MOTION FOR ALLOCATION OF TRIAL TIME - 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>Plaintiff,<br><br>v.<br><br>ESCORT, INC. and BELTRONICS<br>USA, INC.,<br><br>Defendants. | Case No. 1:CV-09-105-BLW<br><br>**Special Verdict Form** |

## Special Verdict Form Instructions

When answering the following questions and filling out this form, please follow the directions provided throughout this form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

## Special Verdict Findings

We, the jury, unanimously agree to the answers to the following questions:

## Findings on Infringement

A.    *Direct Infringement*

Did Mr. Fleming prove that it is more likely than not that any of the following asserted claims of the '038 patent and/or the '653 patent are infringed by the Beltronics

Special Verdict Form - 1

GX65, Passport 9500i, Passport 9500ix, and PassportiQ radar detectors ("the accused products")? Place a "Yes" in each blank that corresponds to a claim that you find is infringed by one of Escort's accused products, or a "No" in each blank that corresponds to a claim that you find is not infringed by one of Escort's accused products. Note, the Court has entered "Yes" for '038 patent claims 18, 45, 47, and 48 for each accused product because-as instructed-it has already found that Escort's and Beltronics' accused radar detectors infringe those claims. An "X" has been placed in the chart with respect to claim 24 in the '653 patent because Mr. Fleming is not accusing the Passport 9500i of infringing that claim. Accordingly, please answer claim 24 for the remaining accused radar detectors.

| As to the '038 Patent | | | | |
|---|---|---|---|---|
| '038 Patent Claim | Beltronics GX65 | Passport 9500i | Passport 9500ix | Passport iQ |
| Claim 1 | Yes | Yes | Yes | Yes |
| Claim 7 | Yes | Yes | Yes | Yes |
| Claim 18 | Yes | Yes | Yes | Yes |
| Claim 25 | Yes | Yes | Yes | Yes |
| Claim 28 | Yes | Yes | Yes | Yes |
| Claim 45 | Yes | Yes | Yes | Yes |
| Claim 47 | Yes | Yes | Yes | Yes |
| Claim 48 | Yes | Yes | Yes | Yes |

**Special Verdict Form - 2**

| As to the '653 Patent | | | | |
|---|---|---|---|---|
| '653 Patent Claims | Beltronics GX65 | Passport 9500i | Passport 9500ix | Passport iQ |
| Claim 22 | Yes | Yes | Yes | Yes |
| Claim 24 | Yes | X | Yes | Yes |
| Claim 31 | Yes | Yes | Yes | Yes |
| Claim 32 | Yes | Yes | Yes | Yes |
| Claim 33 | Yes | Yes | Yes | Yes |
| Claim 38 | Yes | Yes | Yes | Yes |
| Claim 41 | Yes | Yes | Yes | Yes |

For purposes of answering some of the questions that follow, the Court instructs you that claims 3, 5, 6, 26, and 27 in the '038 patent are infringed if you find that claim 1 in that patent is infringed. Knowing this may impact some of your answers below.

Special Verdict Form - 3

4058

B. *Induced Infringement*

Did Mr. Fleming prove that it is more likely than not that Escort and Beltronics have induced infringement of the '038 patent or the '653 patent?  Answer "Yes" (infringement) or "No" (no infringement) for each listed Claim

| Induced Infringement of the '038 Patent | |
|---|---|
| **'038 Patent Claim** | **"Yes" *or* "No"** |
| Claim 1 | NO |
| Claim 3 | NO |
| Claim 5 | NO |
| Claim 6 | NO |
| Claim 7 | NO |
| Claim 25 | NO |
| Claim 28 | NO |

| Induced Infringement of the '653 Patent | |
|---|---|
| **'653 Patent Claims** | **"Yes" *or* "No"** |
| Claim 22 | NO |
| Claim 24 | NO |
| Claim 31 | NO |
| Claim 32 | NO |
| Claim 33 | NO |

Special Verdict Form - 4

## C. *Contributory Infringement*

Did Mr. Fleming prove that it is more likely than not that Escort and Beltronics have contributed to the infringement of the '038 patent or the '653 patent? Answer "Yes" (infringement) or "No" (no infringement) for each listed Claim

| Contributory Infringement of the '038 Patent | |
|---|---|
| **'038 Patent Claim** | **"Yes"** *or* **"No"** |
| Claim 1 | Yes |
| Claim 3 | Yes |
| Claim 5 | Yes |
| Claim 6 | Yes |
| Claim 7 | Yes |
| Claim 25 | Yes |
| Claim 28 | Yes |

| Contributory Infringement of the '653 Patent | |
|---|---|
| **'653 Patent Claims** | **"Yes"** *or* **"No"** |
| Claim 22 | Yes |
| Claim 24 | Yes |
| Claim 31 | Yes |
| Claim 32 | Yes |
| Claim 33 | Yes |

Special Verdict Form - 5

D.  *Willful Infringement*

Has Mr. Fleming proven that it is highly probable that Escort's infringement of the '038 patent

was willful?

Check either "Yes" or "No".

Yes _____    No ___✓___


E.  *Willful Infringement*

Has Mr. Fleming proven that it is highly probable that Escort's infringement of the '653 patent

was willful?

Check either "Yes" or "No".

Yes _____    No ___✓___

**Special Verdict Form - 6**

# FINDINGS ON INVALIDITY

A. *Anticipation*

Has Escort proven that it is highly probable that any of the following asserted claims of the '038 Patent and/or the '653 Patent are invalid as anticipated because Mr. Orr reduced to practice the same device or method as embodied in those claims?  In this regard, see Instructions 19 and 20.  Place a "Yes" in the corresponding blank of claims that you find that Escort has proven a claim invalid as anticipated, or place a "No" in the corresponding blank of claims that you find Escort has not proven invalid as anticipated.

| Findings on Invalidity – Anticipation | | | |
|---|---|---|---|
| '038 Patent | Yes or No | '653 Patent | Yes or No |
| Claim 1 | NO | Claim 22 | NO |
| Claim 3 | NO | Claim 30 | NO |
| Claim 5 | NO | Claim 31 | NO |
| Claim 6 | NO | Claim 38 | NO |
| Claim 7 | NO | Claim 41 | NO |
| Claim 18 | Yes | | |
| Claim 25 | NO | | |
| Claim 26 | NO | | |
| Claim 27 | NO | | |
| Claim 28 | NO | | |
| Claim 45 | Yes | | |
| Claim 47 | NO | | |
| Claim 48 | NO | | |

**Special Verdict Form - 7**

B.  *Abandonment, Suppression, Concealment*

Has Escort and Beltronics proven that it is highly probably that Mr. Orr did not abandon, suppress, or conceal what Escort and Beltronics contend he built in April-May of 1996?

Yes ___✓___ (Mr. Orr did not abandon, suppress, or conceal)


No _____ (Mr. Orr did abandon, suppress, or conceal)

**Special Verdict Form - 8**

C. *Obviousness*

**Question 1**: Has Escort and Beltronics proven that it is highly probable that the following claims in the '038 patent are invalid due to obviousness in view of Mr. Orr's alleged prior invention and the Hoffberg reference? Insert "YES" (claim invalid) or "NO" (claim valid) for each claim.

| '038 patent | |
|---|---|
| Claim 1 | Yes |
| Claim 3 | NO |
| Claim 5 | NO |
| Claim 6 | NO |
| Claim 7 | NO |
| Claim 18 | Yes |
| Claim 27 | NO |
| Claim 47 | NO |
| Claim 48 | NO |

**Question 2**: Has Escort and Beltronics proven that it is highly probable that the following claim in the '038 patent is invalid due to obviousness in view of Mr. Orr's alleged prior invention and the Ross reference? Insert "YES" (claim invalid) or "NO" (claim valid) for each claim.

| '038 patent | |
|---|---|
| Claim 18 | Yes |

Special Verdict Form - 9

**Question 3:** Has Escort and Beltronics proven that it is highly probable that the following claims in the '038 patent are invalid due to obviousness in view of Mr. Orr's alleged prior invention and the '554 reference? Insert "YES" (claim invalid) or "NO" (claim valid) for each claim.

| '038 patent | |
|---|---|
| Claim 3 | NO |
| Claim 5 | NO |

**Question 4:** Has Escort and Beltronics proven that it is highly probable that the following claims in the '038 patent are invalid due to obviousness in view of Mr. Orr's alleged prior invention and the '007 reference? Insert "YES" (claim invalid) or "NO" (claim valid) for each claim.

| '038 patent | |
|---|---|
| Claim 3 | NO |
| Claim 5 | NO |
| Claim 6 | NO |
| Claim 7 | NO |

Special Verdict Form - 10

**Question 5:** Has Escort and Beltronics proven that it is highly probable that the following claims in the '038 patent are invalid due to obviousness in view of Mr. Orr's alleged prior invention and the Valentine reference? Insert "YES" (claim invalid) or "NO" (claim valid) for each claim.

| '038 patent | |
|---|---|
| Claim 3 | NO |
| Claim 27 | NO |
| Claim 28 | NO |
| Claim 47 | Yes |
| Claim 48 | Yes |

## FINDINGS ON DAMAGES

What royalty do you find that Mr. Fleming has proven is more likely than not to fairly and reasonably compensate him for Escort's infringement of the '038 patent and the '653 patent?

A royalty payment of $ __750,000.00__. Lump Sum

DATED: July 3 , 2012

Special Verdict Form - 11

1:09-cv-105-BLW

Hoyt Fleming v. Escort Inc., et al

Jury Instructions

Instruction 1

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law which applies to this case. A copy of these instructions will be available in the jury room for you to consult if you find it necessary.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions or into anything the court may have said or done any suggestion as to what verdict you should return—that is a matter entirely up to you.

Instruction 2

The evidence from which you are to decide what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers have agreed or stipulated.

Instruction 3

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition some testimony and exhibits have been received only for a limited purpose; where I have given a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received

**4070**

at the trial.

Instruction 4

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Instruction 5

In deciding the facts in this case, you may have to decide which testimony to
believe and which testimony not to believe. You may believe everything a witness says,
or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the

things testified to;

(2) the witness' memory;

(3) the witness' manner while testifying;

(4) the witness' interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness' testimony;

(6) the reasonableness of the witness' testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of
witnesses who testify.

Instruction 6

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Instruction 7

Certain charts, summaries and demonstrative exhibits, although not received into evidence, have been shown to you in order to help explain the contents of records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts, summaries and demonstrative exhibits, and determine the facts from the underlying evidence.

Instruction 8

All parties are equal before the law and a corporation is entitled to the same fair
and conscientious consideration by you as any party.

Instruction 9

## Summary of Contentions

I will first give you a summary of each side's contentions in this case. I will then

tell you what each side must prove to win on each of its contentions. As I previously told

you, Mr. Fleming seeks money damages from Escort for allegedly infringing his patents

by making, importing, using, selling, and offering for sale certain radar detectors that Mr.

Fleming argues are covered by claims of his patents. Mr. Fleming also argues that Escort

has actively induced infringement of these claims of his patents by others, and contributed

to the infringement of these claims of his patents by others. The radar detectors that are

alleged to infringe are the Escort Passport 9500i, the Escort Passport 9500ix, the Escort

Passport iQ, and the Beltronics GX65 radar detectors. Again, I will refer to these radar

detectors as the "accused radar detectors."

Escort denies that it has infringed the asserted claims of the patents and argues

that, in addition, the asserted claims are invalid.

I have already determined that the accused radar detectors infringe claims 18, 45,

47, and 48 of the '038 patent. Your job is to decide whether the remaining asserted claims

of the '038 and the '653 patents have been infringed, and whether any of the asserted

claims of the '038 or the '653 patents are invalid. If you decide that any claim of the

patent has been infringed and is not invalid, you will then need to decide any money

damages to be awarded to Mr. Fleming to compensate it for Escort's infringement. You

will also need to make a finding as to whether Escort's infringement was willful. If you

decide that any infringement was willful, that decision should not affect any damage

award you make. I will take willfulness into account later.

Instruction 10

**Interpretation of Claims**

Before you decide whether Escort has infringed the claims of Fleming's patents or whether Fleming's patents are invalid, you will have to understand the patent claims. The patent claims are numbered sentences at the ends of the patents. The patent claims involved here are claims 1, 3, 5-7, 18, 25-28, 45, 47, and 48, beginning at column 6, line 49 of the '038 patent, and claims 22, 24, 31-33, 38, and 41, beginning at column 8, line 12 of the '653 patent.

The claims are intended to define, in words, the boundaries of the invention. Only the claims of the patent can be infringed. Neither the written description, nor the drawings of a patent can be infringed. Each of the claims must be considered individually. You must use the same claim meaning for both your decision on infringement and your decision on invalidity.

It is my job as judge to explain to you the meaning of any language in the claims that must be interpreted. You must accept the meanings I give you and use them when you decide whether any claim of the patent has been infringed and whether any claim is invalid. I will now tell you the meanings of the following words and groups of words from the patent claims:

| Interpretation of Terms | |
| --- | --- |
| **Claim Term** | **Meaning** |
| "Velocity" | Speed |
| "Non-volatile memory" | Memory that is retained when power is switched off |
| "Mute button" | Button for muting |
| "Predetermined" | Determined in advance |

You should give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history.

Instruction 10A

There are two standards of proof that you will apply to the evidence, depending on the issue you are deciding. On some issues, you must decide whether something is more likely true than not. On other issues you must use a higher standard and decide whether it is highly probable that something is true. The following instructions will tell you which standard to use for each issue you must resolve.

Instruction 11

**Infringement – Burden of Proof**

I will now instruct you on the rules you must follow in deciding whether Mr.

Fleming has proven that Escort has infringed one or more of the asserted claims of the

'038 and the '653 patents. To prove infringement of any claim, Mr. Fleming must

persuade you that it is more likely than not that Escort has infringed that claim.

Instruction 12

**Direct Infringement**

A patent's claims define what is covered by the patent. A product directly infringes a patent if it is covered by at least one claim of the patent. Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision, and I have already instructed you as to the meaning of the asserted patent claims.

The second step is to decide whether Escort has made, used, sold, offered for sale or imported within the United States a radar detector covered by a claim of the '038 or '653 patents. If it has, it infringes.

With one exception, you must consider each of the asserted claims of the patent individually, and decide whether Escort's radar detectors infringe that claim. The one exception to considering claims individually concerns dependent claims. A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own. By way of example only, recall the sample patent in your notebooks. In that sample patent, the first claim described a 3-legged stool. The fourth claim described a 4-legged stool by incorporating the first claim (the 3-legged stool) and adding a 4th leg. In this example, the first claim is an independent claim, while the fourth claim – which includes all the requirements of the first claim plus an additional requirement of its own – is a dependent claim.

If you find that an independent claim is not infringed, you must also find that its dependent claims are not infringed. In my example above, if you find that the first claim

for the 3-legged stool is not infringed, you must necessarily find that the fourth claim for the 4-legged stool is also not infringed.

On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.   Again, using my example above, even if you found that the first claim for the 3-legged stool is infringed, you must still make an independent decision as to whether the fourth claim for the 4-legged stool is infringed.

Whether or not Escort knew its radar detectors infringed or even knew of Mr. Fleming's patents does not matter in determining direct infringement.

I will now instruct you on the elements of direct infringment.

Instruction 13

**Infringement**

To decide whether an Escort radar detector infringes a claim of Mr. Fleming's patents, you must compare that radar detector with the patent claim and determine whether that radar detector meets every requirement of the claim. If so, the radar detector infringes that claim. If, however, the radar detector does not meet every requirement of the patent claim, the radar detector does not infringe that claim. You must decide infringement for each asserted claim separately.

If the patent claim uses the term "comprising," that patent claim is to be understood as an open claim. An open claim is infringed as long as the radar detector meets every requirement of the claim. The fact that a radar detector also includes other parts will not avoid infringement, as long as it meets every requirement in the patent claim.

Instruction 14

**Contributory Infringement**

Mr. Fleming also argues that Escort has contributed to infringement by another. Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims. In order for there to be contributory infringement by Escort, someone other than Escort must directly infringe a claim of the '038 and the '653 patents; if there is no direct infringement by anyone, there can be no contributory infringement.

If you find someone has directly infringed the '038 and the '653 patents, then contributory infringement exists if:

(1)     Escort supplied an important component of the infringing part of the product or method;

(2)     The component is not a common component suitable for substantial noninfringing use; and

(3)     Escort supplied the component with the knowledge of the '038 and/or the '653 patents and knowledge that the component was especially made or adapted for use in an infringing manner.

A "common component suitable for substantial non-infringing use" is a component that has uses other than in the patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

**4086**

Instruction 15

**Inducing Infringement**

Mr. Fleming argues that Escort has actively induced another to infringe the '038 and the '653 patents. In order for there to be inducement of infringement by Escort, someone else must directly infringe a claim of the '038 and the '653 patents; if there is no direct infringement by anyone, there can be no induced infringement. In order to be liable for inducement of infringement, Escort must:

(1)    have intentionally taken action that actually induced direct infringement by another;

(2)    have been aware of the '038 and/or the '653 patents; and

(3)    have known that the acts it was causing would be infringing.

If Escort did not know of the existence of the '038 and '653 patents or that the acts it was inducing were infringing, it cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of those patents and it took intentional acts to avoid learning the truth. It is not enough that Escort was merely indifferent to the possibility that it might encourage infringement of those patents. Nor is it enough that Escort took a risk that was substantial and unjustified.

If you find that Escort was aware of Mr. Fleming's '038 and '653 patents, but believed that the acts it encouraged did not infringe those patents, or that the patents were invalid, Escort cannot be liable for inducement.

Instruction 16

**Willful Infringement**

In this case, Mr. Fleming argues that Escort willfully infringed the his patents. To prove willful infringement, Mr. Fleming must first persuade you that Escort infringed a valid claim of the Mr. Fleming's patent. The requirements for proving such infringement were discussed in my prior instructions.

In addition, to prove willful infringement, Mr. Fleming must persuade you that it is highly probable that Escort acted with reckless disregard of the claims of the his patents. To demonstrate such "reckless disregard," Mr. Fleming must persuade you that Escort actually knew, or it was so obvious that Escort should have known, that its actions constituted infringement of a valid patent.

In deciding whether Escort acted with reckless disregard for Mr. Fleming's patent, you should consider all of the facts surrounding the alleged infringement including, but not limited to, whether Escort acted in a manner consistent with the standards of commerce for its industry.

Instruction 17

**Copying of Claims**

You have heard evidence that Escort copied Fleming's patent claims in a submission to the Patent and Trademark Office (PTO). A party seeking to provoke an interference proceeding before the PTO will file an application that includes a copy of the claims the party asserts are interfering. There is nothing improper about copying claims in an application seeking to provoke an interference proceeding. However, it is evidence you may consider to resolve other issues in the case.

Instruction 18

## Invalidity – Burden of Proof

I will now instruct you on the rules you must follow in deciding whether Escort has proven that the asserted claims of the '038 and the '653 patents are invalid. Before discussing the specific rules, I want to remind you about the standard of proof that applies to this defense. To prove invalidity of any patent claim, Escort must persuade you that it is highly probable that the claim is invalid.

During this case, Escort has submitted prior art, some of which was not considered by the United States Patent and Trademark Office (PTO) during the prosecution of the patents. Escort contends that such prior art invalidates certain claims of the '038 and the '653 patents. In deciding the issue of invalidity, you may take into account the fact that some of the prior art was not considered by the PTO when it issued the '038 and the '653 patents. Prior art that differs from the prior art considered by the PTO may carry more weight than the prior art that was considered and may make Escort's burden of showing that it is highly probable that a patent claim is invalid easier to sustain.

Instruction 19

## ANTICIPATION

A patent claim is invalid if the claimed invention is not new. For the claim to be invalid because it is not new, all of its requirements must have existed in a single device or method that predates the claimed invention, or must have been described in a single previous publication or patent that predates the claimed invention. In patent law, these previous devices, methods, publications or patents are called "prior art references." If a patent claim is not new, we say it is "anticipated" by a prior art reference.

The description in the written reference does not have to be in the same words as the claim, but all of the requirements of the claim must be there, either stated or necessarily implied, so that someone of ordinary skill in the field of radar detectors looking at that one reference would be able to make and use the claimed invention.

Escort contends that claims 1, 3, 5, 6, 7, 18, 25, 26, 27, 28, 45, 47, and 48 of the '038 patent and claims 22, 30, 31, 38, and 41 of the '653 patent are anticipated by the prior invention of Mr. Steven Orr (which I will refer to as "Orr's prior invention").

Instruction 20

## PRIOR INVENTION

As just mentioned, Escort contends that certain claims of the '038 and '653 patents were anticipated because the invention defined in these claims was invented by another person, Steven Orr, before Fleming invented his invention.

A patent claim is invalid if the invention defined by that claim was invented by another person in the United States before it was invented by the patentee, and that other person did not abandon, suppress, or conceal the invention.

Escort must show that it is highly probable either that before Fleming invented his invention, Orr reduced to practice a product and method that included all of the elements of claims 1, 3, 5, 6, 7, 18, 25, 26, 27, 28, 45, 47, and 48 of the '038 patent and claims 22, 30, 31, 38, and 41 of the '653 patent or that Orr was first to conceive the invention and that he exercised reasonable diligence in later reducing the invention to practice. In addition, Escort must show that Orr's device was sufficiently developed that one skilled in the art would have recognized that it would work for its intended purpose.

Since priority of invention is in dispute in this case, you must determine a date of conception and reduction to practice for Fleming's invention and/or Orr's prior invention and whether Fleming and/or Orr was reasonably diligent in reducing the invention to practice. Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice. Reduction to practice occurs either as of the filing of the patent application or when the invention was actually

made and was shown to work for its intended purpose. Reasonable diligence means that the inventor worked continuously on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or others working with him or her do not prevent a finding of reasonable diligence.

The oral testimony of the alleged inventor, by itself, is not enough to prove that he conceived and/or reduced to practice the invention or did so by any certain date. The law requires that the oral testimony must be "corroborated," which means that there must be at least some documentary evidence that proves the alleged inventor conceived and reduced to practice the claims of the '038 and '653 patents.

Assuming you find some corroborating documentary evidence, you must then evaluate all the evidence – including testimony from the alleged inventors, other witnesses, and the corroborating documents – under a rule of reason analysis, which means that you must make a sound determination that the evidence credibly establishes that the alleged inventor conceived and reduced to practice the claims of the '038 and '653 patents.

If Orr's prior invention was abandoned, suppressed, or concealed, it does not anticipate the '038 and '653 patents. Escort must show that it is highly probable that Mr. Orr did not abandon, suppress, or conceal his invention between 1996 (when he claims to have made it) and 1999 (when he first filed a patent application).

Generally, an invention was not abandoned, suppressed, or concealed if the invention was made public, sold, or offered for sale, or otherwise used for a commercial purpose. A period of delay does not constitute abandonment, suppression, or concealment if the prior inventor was engaged in reasonable efforts to bring the invention to market.

Instruction 21

**Obviousness**

Not all innovations are patentable. A patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field. This means that even if all of the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim, a person of ordinary skill in the field of radar detectors who knew about all this prior art would have come up with the claimed invention. The ultimate conclusion of whether a claim is obvious should be based upon your determination of several factual decisions.

First, you must decide the scope and content of the prior art. In this case, Escort alleges that the following prior art references rendered obvious the claims of Fleming's patents that are listed below:

(1)    That claims 1, 3, 5-7, 18, 27, 47, and 48 of the '038 patent are rendered obvious by Orr's prior invention in combination with U.S. Patent Number 6,252,544 to Hoffberg (which I will refer to as the "Hoffberg patent");

(2)    That claims 3 and 5 of the '038 patent are rendered obvious by U.S. Patent Number 5,668,554 to Orr (which I will refer to as the "Orr '554 patent") in combination with Orr's prior invention;

(3)    That claims 3 and 5-7 of the '038 patent are rendered obvious by U.S. Patent Number 5,305,007 to Orr (which I will refer to as the "Orr '007 patent") in combination with Orr's prior invention;

(4)     That claims 3, 27, 28, 47, and 48 of the '038 patent are rendered obvious by U.S. Patent Number 5,146,226 to Valentine (which I will refer to as the "Valentine '226 patent") in combination with Orr's prior invention;

(5)     That claims 18, and 46 of the '038 patent are rendered obvious by U.S. Patent Number 5,977,884 to Ross (which I will refer to as the "Ross patent") in combination with Orr's prior invention;

Second, you must decide what difference, if any, existed between Fleming's '038and '653 patents and the prior art.

Finally, you should consider any of the following factors that you find have been shown by the evidence:

(1) commercial success of a product due to the merits of the claimed invention;

(2) a long felt need for the solution provided by the claimed invention;

(3) unsuccessful attempts by others to find the solution provided by the claimed invention;

(4) copying of the claimed invention by others;

(5) unexpected and superior results from the claimed invention;

(6) acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention;

(7) other evidence tending to show nonobviousness;

(8) independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and

(9) other evidence tending to show obviousness.

The presence of any of factors 1-7 may be considered by you as an indication that the claimed invention would not have been obvious at the time the claimed invention was made, and the presence of factors 8-9 may be considered by you as an indication that the claimed invention would have been obvious at such time. Although you should consider any evidence of these factors, the relevance and importance of any of them to your decision on whether the claimed invention would have been obvious is up to you.

A patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art. In evaluating whether such a claim would have been obvious, you may consider whether Escort has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention. There is no single way to define the line between true inventiveness on the one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable).

For example, market forces or other design incentives may be what produced a change, rather than true inventiveness. You may consider whether the change was merely the predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness. You may also consider whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent. Also, you may consider whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way. You may also consider whether the claimed invention would have been obvious to try, meaning that the claimed

innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art.

However, you must be careful not to determine obviousness using the benefit of hindsight; many true inventions might seem obvious after the fact. You should put yourself in the position of a person of ordinary skill in the field at the time the claimed invention was made and you should not consider what is known today or what is learned from the teaching of the patent.

Instruction 22

**Damages – Burden of Proof**

Now I will instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win on any issue. If you find that Escort infringed any valid claim of the '038 and the '653 patents, you must then determine the amount of money damages to be awarded to Mr. Fleming to compensate him for Escort's infringement.

The amount of those damages must be adequate to compensate Mr. Fleming for the infringement. A damages award should put the patent holder in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer.

Mr. Fleming has the burden to persuade you of the amount of its damages. You should award only those damages that Mr. Fleming more likely than not suffered. While Mr. Fleming is not required to prove his damages with mathematical precision, he must prove them with reasonable certainty. Mr. Fleming is not entitled to damages that are remote or speculative.

Instruction 23

**Reasonable Royalty**

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began. In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of .01 times the base revenue of $200.

**4100**

If the patent covers only part of the product that the infringer sells, then the base would normally be only that feature or component. For example, if you find that for a $100 car, the patented feature is the tires which sell for $5, the base revenue would be $5. However, in a circumstance in which the patented feature is the reason customers buy the whole product, the base revenue could be the value of the whole product. Even if the patented feature is not the reason for customer demand, the value of the whole product could be used if, for example, the value of the patented feature could not be separated out from the value of the whole product. In such a case, however, the rate resulting from the hypothetical negotiation would be a lower rate because it is being applied to the value of the whole product and the patented feature is not the reason for the customer's purchase of the whole product.

A second way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid, and the patentee would have accepted, at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future. This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays based on the revenue of actual licensed products it sells. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

Instruction 24

**Damages for Inducement or Contributory Infringement**

In order to recover damages for induced infringement, Mr. Fleming must either prove that Escort's accused radar detectors necessarily infringe the '038 or '653 patents or prove acts of direct infringement by others that were induced by Escort. Because the amount of damages for induced infringement is limited by the number of instances of direct infringement, Mr. Fleming must further prove the number of direct acts of infringement of the '038 or the '653 patents, for example, by showing individual acts of direct infringement or by showing that a particular class of products/uses directly infringe.

In order to recover damages for contributory infringement, Mr. Fleming must either prove that Escort's accused radar detectors necessarily infringe the patents in suit or prove acts of direct infringement by others to which Escort made a substantial contribution. Because the amount of damages for contributory infringement is limited by the number of instances of direct infringement, Mr. Fleming must further prove the number of direct acts of infringement of the patents in suit, for example, either by showing individual acts of direct infringement or by showing that a particular class of products/uses directly infringe.

Instruction 25

A Verdict Form has been prepared for your convenience. It is attached to the back of these instructions. Turn to it now and I will review it with you.

**[form of verdict read]**

You will take this Verdict Form with you to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the Verdict Form which sets forth the verdict upon which you agree. You will then return with your verdict to the courtroom.

We will now hear the closing arguments of counsel after which I will give you a few brief closing instructions.

# EXHIBIT B

1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

2

- - - - - - - - - - - - - - - - - - - x

3                                       :

HOYT A. FLEMING,                        :   Case No. 1:09-cv-00105-BLW

4                                       :

          Plaintiff,                    :      **JURY TRIAL DAY 3**

5                                       :

          vs.                           :

6                                       :

ESCORT, INC.,                           :

7                                       :

and                                     :

8                                       :

BELTRONICS USA, INC.,                   :

9                                       :

          Defendants.                   :

10   - - - - - - - - - - - - - - - - - - - x

11

12

13

14    **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15

      before B. Lynn Winmill, Chief District Judge

16

17    June 18, 2012

18    Pages 1 to 277

19

20

21

22

                    **Tamara I. Hohenleitner**

23         Idaho Certified Shorthand Reporter No. 619

24            Registered Professional Reporter

                 Certified Realtime Reporter

25          Federal Certified Realtime Reporter

            United States Courts, District of Idaho

      550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

<u>A P P E A R A N C E S</u>

**FOR PLAINTIFF**

       Michael S. Dowler
       PARK, VAUGHAN, FLEMING & DOWLER, LLP
       5847 San Felipe, Suite 1700
       Houston, TX 77057
       Tel: (713) 821-1540
       Fax: (713) 821-1401
       Email:  Mike@parklegal.com

       Stephen F. Schossberger
       HAWLEY TROXELL ENNIS & HAWLEY
       PO Box 1617
       Boise, ID 83701
       Tel: (208) 344-6000
       Email: Sfs@hteh.com

**FOR DEFENDANTS**

       Stephen B. Andersen
       HOLLAND & HART, LLP
       101 S. Capitol Blvd., Suite 1400
       Boise, Idaho  83701
       Tel: (208) 342-5000
       Fax: (208) 343-8869
       Email: Sandersen@hollandhart.com

       Gregory F. Ahrens
       Brett A. Schatz
       WOOD, HERON & EVANS, LLP
       441 Vine Street, 2700 Carew Tower
       Cincinnati, OH 45202-2917
       Tel: (513) 241-2324
       Fax: (513) 421-7269
       Email: Gahrens@whepatent.com
           Bschatz@whepatent.com

**I N D E X**

**P L A I N T I F F ' S   W I T N E S S**

**PAGE**

**FLEMING, Hoyt A.**
Direct Examination (Continued) by Mr. Dowler.......... 21
Cross-Examination by Mr. Ahrens....................... 98

**P L A I N T I F F ' S   E X H I B I T S**

**ADMITTED**

1082    Patent License Agreement – K40
     (Fleming 25973–81).................... 81
1083    Patent License Agreement –
     TigerDirect (Fleming 25988)........... 85
1084    Patent License Agreement –
     Objective Products Limited
     (Fleming 26050–62).................... 94
1085    Patent License Agreement –
     HJC (Fleming 26063–76)................ 95

**D E F E N D A N T S '   E X H I B I T S**

**ADMITTED**

2001    Plaintiff Hoyt A. Fleming's Response
     to Defendants' First Set of
     Interrogatories, dated 7/13/09....... 200
2046    Deposition of Hoyt A. Fleming
     1/12/2011 – Exhibit 5 (Manual of
     Patent Examining Procedure,
     Section 2301.02-2309, Rev. 4 October. 148
2121    U.S. Patent No. 6,252,544
     (FLEMING 8690-8712)................... 158
2155    Henderson – U.S. Patent 5,530,447
     (ESC 184–197)........................ 170
2159    Orr – U.S. Patent 5,668,554
     (ESC 235–242)........................ 162
2160    Orr – U.S. Patent 5,305,007
     (ESC 243–264)........................ 168

```
 1    money?
 2         A.   Yes.  Not as much as K40, but they did.
 3    It was $4,850.  So, they had sold 194 products.
 4    It wasn't a lot, but they -- 4,850 is a lot, but
 5    197 products -- 194 is not all that big of a
 6    number.
 7         Q.   Let's go back to the K40 agreement,
 8    Mr. Fleming.  How much has K40 paid you to date?
 9         A.   Yes.  K40 has actually paid
10    $289,000 --
11         MR. AHRENS:  Your Honor, may we approach on
12    this?
13         THE COURT:  Yes.
14              (Sidebar commences as follows:)
15         THE COURT:  What's the objection?
16         MR. AHRENS:  Sometime shortly after the
17    license agreement, we had produced to us the sales
18    information about payments of around 24-or-so
19    thousand dollars.  And we have had no production
20    to us of any subsequent payments by K40.
21              Unless you can cite me to some
22    documents that were submitted to us.
23         THE COURT:  Address the court.
24              Mr. Dowler.
25         MR. AHRENS:  I'm sorry.
```

1          MR. DOWLER:  Obviously, they -- when we

2     reported to them what they had paid, that's what

3     they had paid to that point.  Discovery closed and

4     they have been paying ever since.  So now we're

5     talking about what they have paid to date.

6          MR. AHRENS:  And we have had no

7     supplementation, just like we have been asked

8     repeatedly.  And we have an obligation, of course,

9     to continue to supplement sales figure throughout

10    the case, even after discovery closes.  So we,

11    obviously, never got any further discovery

12    documentation from them.

13          It seems --

14          THE COURT:  I'll hear some further argument,

15    perhaps later, but at this point I think we need

16    to back up.  Let's tie the figures only to the

17    dates that were disclosed, but you can tie it to a

18    date certain, and you can indicate there have been

19    other amounts that have not been -- well, it

20    doesn't even need to be referred to, other

21    amounts.

22          I will just instruct the jury that at

23    this point they are only to consider the amounts

24    that were paid through the date that discovery

25    closed and what information was conveyed at that

```
 1    time.
 2           MR. DOWLER:  Okay.
 3           MR. AHRENS:  Thank you.
 4               (Sidebar concluded.)
 5           THE COURT:  Ladies and gentlemen, I'm going
 6    to sustain the objection and ask counsel to
 7    restate the same question, but tied to a -- an
 8    earlier time frame.
 9               There is an obligation of disclosing
10    additional information about sales.  I'm going to
11    limit the testimony that's going to be coming
12    before you only to those amounts that were paid up
13    to the date of what we call the close of discovery
14    in this case.
15               So you are to disregard the earlier
16    testimony about the dollar amount of the royalty
17    payments that have been made by K40 through
18    today's date, and you are to consider only the
19    amounts paid through the date that discovery
20    closed in this matter.
21               If you're prepared to go into that now,
22    Mr. Dowler, you may.
23           MR. DOWLER:  Sure.
24    BY MR. DOWLER:
25           Q.  Mr. Fleming, do you recall the date
```

1    opinion, so --

2          MR. AHRENS:  I'm asking for --

3          THE COURT:  -- I'm going to sustain that.

4          MR. AHRENS:  I'm asking whether or not he

5    agrees with it.  He is a fact witness.

6    BY MR. AHRENS:

7          Q.  Well, you also heard --

8          THE COURT:  Just a moment.  Just a moment.

9              Well, I don't know what the relevance

10   would be, that the witness does or does not agree.

11   I'll allow it.

12             If you have -- I suppose if you have

13   some disagreement, you can so indicate, with

14   something that was on the videotape that the court

15   showed, produced by the Federal Judicial Center.

16         THE WITNESS:  To be honest, I don't know it

17   that well to give --

18         THE COURT:  All right.

19         THE WITNESS:  -- an opinion either way.

20         THE COURT:  That's fine.

21         MR. AHRENS:  That's fine.  Thank you.

22   BY MR. AHRENS:

23         Q.  So when you pursued your reissue patent

24   applications, you had made some mistakes in your

25   original patent; correct?

1      A.   That's correct.

2      Q.   And so you utilized the process that

3 the Patent Office permits for trying to correct

4 those mistakes; is that right?

5      A.   Yes.

6      Q.   And I'm not sure if we heard from you

7 before, but would you be able to tell us

8 specifically what the mistakes were that you made

9 in your '798 patent that caused you to seek the

10 reissues that you made?

11      A.   Yes.  There were -- there were actually

12 several.

13           The first mistake that I located -- and

14 this was January 2003, which is two years after my

15 patent had issued -- just under.  Two years would

16 have been March 2003.  So about three months

17 before that date, I went off and did what I call a

18 patent search, and I found a patent that I didn't

19 know about before.  And it was issued to a

20 gentleman by the name of Ross.

21           And he came up with a velocity-based

22 intelligent radar.  It wasn't the lockout distance

23 or anything like that, but it was velocity-based,

24 and kind of similar to what I put in my invention

25 disclosure, similar -- it's a little different,

1    but similar.

2           And that one, I looked at it and I saw

3    a couple of my claims, and it looked like my

4    claims would read on what Mr. Ross did.

5        THE COURT:  Just a moment.  When you use the

6    words "read on," could you -- that's kind of a

7    word of art.  For the jury, could you kind of

8    explain what you mean by "read on"?

9        THE WITNESS:  Yes, sir.

10           It -- that my claims would map to

11    Mr. Ross's patent.  So I needed to change my

12    claims.

13           That was the first error that I wanted

14    to correct.  I wanted to tweak my claims so they

15    would not read on -- excuse me -- so they would

16    not map to what Mr. Ross had in his patent.  And I

17    didn't know about Mr. Ross's patent until in the

18    2003 time frame.

19           So that was the first mistake.

20           The second mistake was I, you know,

21    was, you know, looking at my patent many years

22    after I drafted it, and perhaps I wasn't as

23    involved in the details.  I was kind of looking at

24    it from the 10,000-foot level.  And it looked like

25    I wrote the claims a little bit over- --

1    hypertechnically.

2              I think when you see claim 1 and try to

3    read it, you will probably agree.  And I tried to,

4    you know, just describe it from a different

5    perspective.

6         Q.  So you had a belief that your original

7    claims were not properly worded; is that right?

8         A.   There were two claims, if I recall,

9    that may or may not have been a problem with

10   Mr. Ross's patent, and I wanted to make sure they

11   weren't.  So, you know, I filed a reissue to clean

12   that up.

13        Q.   Okay.  So that was the first point you

14   made about finding prior art that you thought

15   invalidated your claims.

16             And so you had at least some belief at

17   that point in time that you had invalid patent

18   claims; correct?

19        A.   Not --

20        MR. DOWLER:  Objection.  Mischaracterizes

21   his testimony.

22        THE WITNESS:  Not at all.

23        THE COURT:  All right.

24        THE WITNESS:  I'm sorry.

25        THE COURT:  The answer will stand.  The

1    witness has indicated he doesn't agree.

2           Go ahead.

3    BY MR. AHRENS:

4           Q.   And then, you described a second aspect

5    of the mistake in your '798 patent, and that had

6    to do with the claims being overly hypertechnical

7    or too wordy or something like that; is that

8    right?

9           A.   Hypertechnical, yes.

10          Q.   Okay.  When you filed your original

11   '798 claims, did you spend reasonable time in the

12   preparation of those claims?

13          A.   Yes, I did.

14          Q.   I mean, you indicated in your testimony

15   that you're -- you're a meticulous guy; right?

16          A.   I'm a nerd, yes.  I mean, I don't know

17   about meticulous, but engineer, technology, sure.

18          Q.   In fact, when you were at Texas

19   Instruments, you learned that it was very

20   important to write things with great detail and be

21   very precise in how you memorialized what your

22   thoughts and ideas were, didn't you?

23          A.   You know, what I learned at TI, we used

24   to call it --

25          Q.   May I just ask you to answer yes or no,

**4241**

1    and then if you would like to explain, just do

2    that, please.

3         A.   Could you repeat the question?

4         Q.   Sure.

5              When you were at TI, were you -- did

6    you receive training such that you were taught to

7    write in great detail and to put details and be

8    meticulous in your writings?

9         A.   No.

10        Q.   Oh, you weren't taught that at TI?

11        A.   No.

12        Q.   Where did you learn that?

13        A.   I'm not sure that I have learned to do

14   that yet.  But what we were taught at TI is to

15   document inventions, and I learned that in 1986.

16        Q.   Okay.  So, you did learn to document

17   your inventions?

18        A.   That's correct.

19        Q.   And it is your belief that every one of

20   the claims in the two patents that are asserted

21   here were invented by you on May 20th of 1998;

22   right?

23        A.   Yes.

24        Q.   So if we were to look at your invention

25   disclosure document, we should find a description

```
 1          MR. AHRENS:  Okay.  Fair enough.
 2               (Sidebar concluded.)
 3          THE COURT:  Proceed.
 4     BY MR. AHRENS:
 5          Q.  So we were looking at Plaintiff's
 6     Exhibit 1077.  Do you see that?
 7          A.  Yes, I do.
 8          Q.  And do you recall, in looking at that,
 9     there was a declaration of Steven Orr that was
10     submitted to the Patent Office?
11          A.  Yes, I do.
12          Q.  Okay.  And that declaration of Steven
13     Orr -- which I assume you've reviewed to some
14     extent?
15          A.  Yes, I have.
16          Q.  That declaration of Steven Orr is not
17     found on the face of the '038 patent; correct?
18          A.  That's correct.
19          Q.  The declaration of Steven Orr is not
20     identified on the face of the '653 patent.
21          A.  That's correct.
22          Q.  Now, you gave a bit of an explanation
23     regarding the chronology of certain activities,
24     and I would just like to go back to that.
25               You indicated that in 2007, January,
```

1    you got a prompt from some sort of an

2    automatic -- well, I'm not exactly sure -- from

3    Google, I guess, a Google Alert, telling you about

4    articles and things that get published that

5    reference GPS and radar; correct?

6         A.   GPS and radar detector, specifically.

7         Q.   And so I think you had put on what has

8    been admitted as Plaintiff's Exhibit 1043.  And do

9    you recall this as being that document?

10        A.   Yes, I do.

11        Q.   So in January of -- and it even says

12   January 18th, 2007, right in the upper corner.

13   That's probably the date you printed it; right?

14        A.   I saved it to PDF; correct.

15        Q.   And so, you talked about how you

16   were -- I don't know if you used the word

17   "surprised," but you saw that, and then you

18   actually bought a product, right?

19             You went out and bought a 9500i.  And I

20   think that was in February of 2007.  And you got

21   the manual and you studied it in great detail,

22   didn't you?

23        A.   I bought this product.  This is the

24   exact one that I bought.  I don't recall if it was

25   February or not.  I just don't recall the date.

1    But I bought one shortly thereafter.

2         Q.  Okay.  So -- and you noted something

3    about the product when you saw the printout,

4    Exhibit 1043, or at least when you saw the

5    product, and that had something to do with the

6    mute button.

7         Do you recall that testimony?

8         A.  I definitely recall speaking about the

9    mute button, yes.

10        Q.  Okay.  And so I'm going to ask if you

11   would look at certain portions of Defendant's

12   Exhibit 2119?

13        MR. AHRENS:  And if this has been admitted

14   as a Plaintiff's Exhibit, I will --

15        THE COURT:  What is the exhibit?

16        MR. AHRENS:  It's 2119, and it's the file

17   history of the '653 patent.

18        THE COURT:  Mr. Dowler, do you have your own

19   trial exhibit number?

20        MR. DOWLER:  Yeah, we do.  Let me find it.

21   '653 file history?

22        MR. AHRENS:  Yeah.

23        MR. DOWLER:  That's Exhibit 1042.

24        MR. AHRENS:  I'll just refer to it

25   as -- it's been admitted already, I believe.

1        THE COURT:  Yes, it has.  1042 has been

2   admitted.

3   BY MR. AHRENS:

4        Q.  Now, in your -- before we get to the

5   1043, in your '798 patent, if you were to have a

6   quick look at that.

7             Do you have that one up there?

8        A.  No, I do not.

9        Q.  I would like you to have a look at the

10  claims.  Take the time, whatever you time you

11  need, and I'll flip the page.  I guess since you

12  didn't take your computer back up there,

13  we -- I'll be at the mercy of you telling me when

14  you're ready for me to flip the page.

15            Tell me if any of those claims there, 1

16  through 6, has anything in them about a mute

17  button.

18        A.  I can save some time.  None of the

19  claims in the '798 expressly require the mute

20  button.

21        Q.  Okay.  So that would be true for that

22  page.

23            And then the next page -- well, you'll

24  acknowledge that there is no claims to the mute

25  button in the '798.

1          And what about the '038; is that same

2     thing true?

3          A.   I don't remember that.

4          Q.   What caused you to be so quick to

5     remember that there was no mute-button claims in

6     the '798?

7          A.   You know, I didn't like the claims very

8     much when I looked at them in 2003, so I kind of

9     remembered I didn't like them, and there was not a

10     lot of -- there is better claims that are later.

11          Q.   Well, you have the '038 patent up there

12     in your book; right?

13          A.   Yes, I do.

14          Q.   So would you just take a moment and

15     tell me if you find any claims in the '038 patent

16     that relate to the mute button and, if so, tell us

17     which claim or claims those are.

18          A.   I don't see it.  I did it pretty much

19     as quick as I could, but I didn't see any.

20          Q.   So no claims in the '038 patent that

21     involved a mute button?

22          A.   That's correct, as best as I can tell.

23          Q.   Okay.  So then at some point in time it

24     must have occurred to you, "Wow, I need to put

25     some claims into my patent.  I have got this

1    application for the '653 that's pending so now I'm

2    going to modify my claims and claim something

3    about a mute button"; right?

4              Is that generally how it happened in

5    your mind?

6         A.   Yes.

7         Q.   Okay.  So you had thought of it before,

8    but you had not chosen -- excuse me.  You had the

9    idea of the mute button and all that goes into how

10   it operates, and that was written up in your

11   patent, but you consciously chose not to write

12   claims directed to the mute-button features in

13   your invention; right?

14        A.   No, not at all.

15        Q.   So you didn't consciously decide not to

16   include claims to the mute button?

17        A.   No, I did not.

18        Q.   So -- I don't want to probe into

19   your -- how your mind works when you're writing

20   patent claims because having done that myself for

21   a long time it's definitely an unusual process.

22             But, you have various things that are

23   written in your patent application as what your

24   invention is, right?

25             You have described it in some amount of

1    detail; correct?

2          A.   Yes.

3          Q.   And then, you -- you don't just, you

4    know, randomly, you know, close your eyes and put

5    your finger down and say, "Oh, I'm going to write

6    a claim to this part."

7                I mean, you have to make some sort of a

8    conscious decision or go through some process to

9    decide, "Oh, I'm going to write a claim about

10   this"; correct?

11         A.   You know, maybe it's different when

12   you're an inventor than when you draft patents for

13   somebody else.  It's a little bit more linear

14   when, you know, somebody says, "Here is an

15   invention," and you go write it out.  It's a

16   little more logical.

17               But for me, I drafted what I thought

18   was my invention at the time; best I could do.

19         Q.   So let me ask you this:  How many

20   patent -- how many patent applications have you

21   prosecuted?

22         A.   Again, it's -- prosecuted.  That's

23   going to be less than the number I gave earlier.

24   I have written probably 50 to a hundred over my

25   lifetime, starting in '94.  I have prosecuted

1    to have you look through this at the same time.

2    So maybe I'll come back to this in a minute, if we

3    can try to get a copy of that.  Could I

4    provide -- it's a lengthy document.  It's just

5    hard for me to flip through it on the ELMO.

6          THE COURT:  Yes.

7               Mr. Metcalf, if you could get a copy of

8    the --

9          MR. AHRENS:  It might take just a second.

10   I'll ask another couple of questions until

11   Ms. Young can come back.

12   BY MR. AHRENS:

13         Q.   So you filed a reissue declaration in

14   connection with this patent application; correct?

15         A.   Yes.  I believe there are several.

16         Q.   You have several of them.

17              And so, you indicate that one error is

18   the -- and this is at about the bottom

19   paragraph -- one error is the "omission of a claim

20   directed to a method performed by a radar detector

21   for alerting an operator of a motor vehicle to an

22   incoming radar signal."

23              Do you see that?

24         A.   Yes, I do.

25         Q.   Okay.  And so you had previously

—234—

1   invented that concept and described it, but had

2   just not written claims to it in your patent

3   application; right?

4           A.   I had disclosed it in the specification

5   of my patent application.

6           Q.   But you had not chosen to claim it in

7   your original patent application for the '798 nor

8   in your reissue application for the -- for the

9   '038 patent; correct?

10          A.   No, not at all.  I made no conscious

11  decision to not include a claim when I was

12  prosecuting my original patent.

13          Q.   Okay.  So let me just ask it this way:

14  You have a description of this aspect of your

15  invention, this -- where you say there is this

16  error, and it's written up in your patent

17  application in terms of the description of the

18  invention, but there is no claim to it; right?

19          A.   Yes.  That was the mistake that I found

20  two years later, after it issued.

21          Q.   Okay.  So you go back and you realize,

22  "Wow, I didn't claim this.  That was a mistake."

23  Is that your position?

24          A.   Yes.  It was a mistake.

25          Q.   And the whole time you had the

1    description in the patent that would have allowed

2    you to write that claim; correct?

3           A.   Yes.

4           Q.   So from the moment you filed your

5    patent application in 1999, you had the written

6    description and disclosure that would have allowed

7    you to write that claim.  You just didn't write

8    the claim until several years later in 2007;

9    correct?

10          A.   Well, claim 22 that it's referring

11   to -- I don't know which one that was, but if

12   claim 22 would have been in my mind years earlier,

13   I would have included it.  But it wasn't.  I

14   didn't, you know, understand the full scope of my

15   invention.

16          Q.   But you told us earlier that on

17   May 20th of 1998, you conceived of everything that

18   is your invention that's claimed in the '038 and

19   the '653 patent claims; everything, on May 20th;

20   right?

21          A.   Yes.  That's my belief.  Yes.

22          Q.   And virtually none of it is described

23   in your invention disclosure document that we saw

24   because that's limited to the velocity lockout

25   topic right?

1      MR. DOWLER:  Objection.  Mischaracterizes

2  the record.

3      THE COURT:  I'm sorry.  I couldn't hear the

4  objection.

5      MR. DOWLER:  Mischaracterizes the record --

6  the witness' testimony.

7      THE COURT:  To be honest with you, I'm not

8  sure.  I'll allow the witness -- if the witness

9  recalls what his prior testimony was, he can

10  clarify.

11          I'll overrule the objection, but the

12  witness free to agree or not agree with

13  Mr. Ahrens' characterization of the testimony.

14      THE WITNESS:  Yes.  I actually disagree with

15  his testimony [sic].  As I've said before, what

16  the invention disclosure draft disclosed was

17  using -- you know, taking a radar detector,

18  integrating a GPS, and then it was using some of

19  what he was saying, which is velocity-based if

20  you're under the speed limit.

21          But it goes beyond that.  It also uses

22  the position to determine the speed limit, and if

23  you're above the speed limit, it beeps; if you're

24  below the speed limit, it doesn't beep.

25          So it's much more than what he was

```
1    characterizing my invention as.
2    BY MR. AHRENS:
3         Q.   But it was the use -- I'm sorry -- it
4    was the use of the speed-limit database that you
5    were describing in your invention disclosure where
6    the radar detector goes out and it probes the
7    database to determine:  Wow, what street am I on?
8              It's Main Street.  The speed limit on
9    Main Street is 30.  I'm the car, and I'm only
10   going 25, so I'm not going to give you an alert.
11             It doesn't have anything to do with a
12   predetermined distance from a predetermined
13   location, at least in your invention disclosure;
14   correct?
15        A.   Yes.  Once again, I mean, I --
16        Q.   I mean, is that just a yes or a no?
17        A.   Well, it's not quite.
18             As I've tried to be very clear, my
19   invention disclosure does not disclose
20   predetermined distance, you know, the lockout
21   distance.  You move the cartoon, the drawing I
22   did.  And I have tried to be very clear about
23   that.
24        MR. AHRENS:  So I'm going to approach and
25   provide you with --
```

1      THE COURT:  Mr. Metcalf, could you assist

2  us?

3      MR. AHRENS:  Thank you.

4  BY MR. AHRENS:

5      Q.   That's a copy of Plaintiff's Exhibit

6  1042.  And if you would -- I mean, you can look at

7  any aspect of it that you want, but I'm going to

8  direct your attention to the page that has the

9  Bates number 5736 [sic] in the lower-right-hand

10 corner.

11     A.   You said 5776?

12     Q.   I'm sorry.  7536.  I may have

13 misspoken.

14     A.   7536; I have it.

15     Q.   It has "Amendments to the

16 Specification."  Do you see that?

17     A.   Yes, I do.

18     Q.   Okay.  So if you look in that

19 document -- and this document was filed on what

20 date, as far as you can tell?

21     A.   I'm not seeing a date.  Oh, wait.  I

22 don't see the amendment date on here.

23          Feel free to direct me.  I'm just not

24 seeing it.

25     Q.   Well, if you would look at -- feel free

1    to look at the page just before it.

2          A.   Oh, that's small text.

3               August 2nd, 2005.

4          Q.   Okay.  So August 2nd, 2005, you are

5    submitting amendments to your patent to the

6    Patent Office; right?

7          A.   Yes.

8          Q.   Okay.  And do you see in there any

9    claims that were added that relate to this mute

10   feature that we have been talking about?

11         A.   Could you define the mute feature we

12   were talking about?

13         Q.   Somewhat earlier we talked about -- and

14   you looked at it and immediately told me that the

15   mute button aspect of your invention wasn't in any

16   claims in the '798 patent.

17              Do you remember that?

18         A.   Yes.

19         Q.   Okay.  And then, we looked at the '038,

20   and I think you confirmed there was no claims to

21   the mute-button feature in the '038 patent,

22   either.

23              Do you remember that?

24         A.   That's correct.

25         Q.   Okay.  So now we're talking about the

1    '653, and what I'm trying to do is to help us

2    convey to the jury when it was that those claims

3    to the mute-button feature first came into the

4    '653 patent.  That's what we're doing.  Okay?

5         A.   Understood.

6         Q.   All right.

7              So this is the first place in the file

8    history where claim amendments are being made to

9    the patent examiner; correct?

10        A.   I don't know.

11        Q.   I mean, you can look at -- I gave you

12   the whole file history for that reason.  I'm just

13   trying to direct you to where I know where there

14   are amendments.  So --

15        A.   I just don't want to take a ton of the

16   jury's time going through this.  I mean, if you

17   can direct me to the page and maybe save everyone

18   a bunch of time.

19        Q.   Okay.  Well, I directed you to page

20   7536, which is something called "Amendments to the

21   Specification," and it actually includes "Claim

22   Amendments," which you can take a look at.

23             Would you confirm for the jury that as

24   of that date, which was, I think you just told us

25   August 2nd of 2005, you were not adding claims to

1    the mute feature?

2        A.   Let me look.

3        Q.   Okay.

4        A.   Yes.  These claims are focused on

5    heading, so they're not focused on the mute-button

6    aspect.

7        Q.   I'm sorry.  Could you repeat that?

8        A.   Yes.  These series of claims are

9    focused on using the heading of the device, not

10   the mute-button feature.

11        What I mean by that is we have talked a

12   little bit about using velocity and using

13   position.  Well, you can also use heading to

14   determine whether to alert or not.  And that's

15   what these claims -- that's what I was focusing on

16   when I wrote these.

17        Q.   Okay.  So at least as of August 2nd,

18   2005, when you're now prosecuting your second

19   reissue application, you still haven't recognized

20   the mistake that you supposedly made by not

21   claiming the mute-button feature.  Is that what

22   your testimony is?

23        A.   That's correct.

24        Q.   Okay.  And so in -- if we want to page

25   a little further through this document, I think

```
 1    that the -- over at page 7530, here is a -- an

 2    actual office action from the examiner.

 3              Maybe you can explain to the jury

 4    what -- I'm not sure we ever heard much about

 5    office actions before.  What is an office action

 6    from the examiner?

 7         A.   Yes.  An office action is the Patent

 8    Office's response to an amended claim or your

 9    initial patent application.

10              And 99 percent of the time, at least

11    for me, you know, there is always something wrong

12    and they tell you to fix it.  And you do, and then

13    you send a response back to them.  And an office

14    action is where he tells you to fix it.

15         Q.   Okay.  So here are the examiner's

16    writing and then if you actually look at the next

17    page -- and I hope that that's --

18         A.   Could you give me the page number,

19    please.

20         Q.   I just flipped the page, so it's 7581.

21         A.   '81?

22         Q.   7581 is the Bates number.

23         A.   I have it.

24         Q.   And that's an office action summary

25    document; is that right?
```

1       A.   Yes.

2          It looks like he told me I had a lot of

3  things wrong because he rejected all my claims.

4       Q.   And that's this area over here, right?

5       A.   Yes.

6       Q.   Claims 22 through 46 are pending, and

7  then claims 22 through 46 are rejected.

8          And so he -- you go through this

9  back-and-forth process with the examiner a few

10  times, and at various times you make amendments to

11  the claims; correct?

12       A.   Correct.

13       Q.   Okay.  So if you would look at page

14  7594 of this document, Exhibit 1042.  Have you

15  found that?

16       A.   Yes, I have.

17       Q.   And this is an amendment.  And if you

18  could tell us the date of the amendment.

19       A.   It appears to be April 11, 2007.

20       Q.   There is a certification or a

21  certificate of mailing.  I think you have

22  introduced us to your wife, and I guess that's her

23  who signed this.

24       A.   That is correct.

25       Q.   Okay.  So on April 11th of 2007, you

1    submit amendments to the claims.  And if you want

2    to look through those, please feel free, and tell

3    me if you find, for example, claim 58, where now

4    you're including claims that relate to or that

5    involve the mute button.

6            A.   Yes.  Definitely.  The mute button is

7    on claim 58.

8            Q.   Okay.  So -- and we haven't seen and

9    you don't believe -- or you can certainly confirm

10   this, but at no point prior to April of 19- -- or

11   excuse me -- April of 2007, at no time prior to

12   then did you add claims to your reissue patent

13   application that were focused on the mute button;

14   is that right?

15           A.   Likely so.

16           Q.   Okay.  So some -- at some point in time

17   after you filed the application for reissue, you

18   concluded that you had made a mistake and not

19   included claims, for example, to this mute-button

20   feature; right?

21           A.   Yes.

22           Q.   Okay.  And we saw, from something that

23   you talked about a little bit earlier and

24   yesterday [sic] with your counsel, that --

25           MR. DOWLER:  Your Honor, this is going to be

1    the subject of a motion in limine.  Can we

2    approach the bench, please?

3            THE COURT:  All right.  Approach.

4               (Sidebar commences as follows:)

5            THE COURT:  Sorry, Counsel.  I was trying to

6    avoid the sidebar.

7               Go ahead.

8            MR. DOWLER:  Yeah.  So in our motion for

9    summary judgment there was an issue about whether

10   it was legally proper or not proper to draft

11   claims on existing products.

12               And your ruling was, is that it's

13   perfectly fine.  You cited a bunch of cases.

14               He is about to go into exactly that.

15   He is going to pull -- he has established that

16   Mr. Fleming didn't claim the mute button until a

17   certain date, and now he is going to pull out

18   the -- the Escort advertisement and correlate the

19   two dates and say, "Look, this product came out

20   and you wrote a claim on the mute button on this

21   product."

22               And it's a legal issue that the jury

23   shouldn't be confused by.  And we have a specific

24   motion in limine on it.

25            MR. AHRENS:  I mean, your summary judgment

1    order actually made it clear that the reason

2    summary judgment couldn't be granted in either

3    direction is because the -- if somebody is

4    redrafting claims to cover a product, it can be

5    proper, but it can also be improper.  And so, it's

6    right on the fence.

7         MR. DOWLER:  That's the error issue.  That's

8    the issue of whether or not the patent should have

9    issued as a proper reissue.

10        MR. AHRENS:  Right.

11        MR. DOWLER:  This is totally different.

12        MR. AHRENS:  No, that's what I'm talking

13   about.

14        MR. DOWLER:  This is the -- he is about to

15   get into, "So you wrote the claim on the product

16   right after it came out.  You saw the" --

17        THE COURT:  Just so we're clear, though, the

18   rewriting has to be to correct a mistake; correct?

19        MR. DOWLER:  It has to be to correct a

20   mistake; that's correct.

21        THE COURT:  Right.

22        MR. DOWLER:  But there is -- but you ruled,

23   as a matter of law, that it's okay to write the

24   claims --

25        THE COURT:  But it still has to correct a

1    mistake.

2         MR. DOWLER:  If he wants to ask questions

3    about whether or not you thought that not claiming

4    the mute button was a mistake, that's fine.

5              But he is about to correlate it to

6    writing it onto a product --

7         THE COURT:  Well --

8         MR. DOWLER:  -- which is a question of law.

9         THE COURT:  -- I'm going to have to instruct

10   the jury as to what is or is not a proper --

11        MR. DOWLER:  Right.

12        THE COURT:  -- reissue.

13        MR. DOWLER:  Well --

14        THE COURT:  Go ahead.

15        MR. DOWLER:  Well, I was going to say, if

16   you were going to instruct them, I think the

17   instruction should be there is nothing wrong in

18   the law to writing claims on products.

19        THE COURT:  So long as you're still

20   correcting a mistake.

21        MR. DOWLER:  Yes.

22        THE COURT:  You see, that's the point.

23        MR. DOWLER:  Yes.

24        THE COURT:  I think the jury can consider

25   it, but they need to consider it in the context

```
 1    that it's not improper to write on an existing

 2    product so long as you are still correcting a

 3    mistake.

 4         MR. AHRENS:  All I'm trying --

 5         THE COURT:  I'll just tell them that right

 6    now and then we'll clean it up --

 7         MR. DOWLER:  Yeah.

 8         THE COURT:  -- a little bit later.

 9         MR. AHRENS:  So I feel as though I should be

10    able to at least --

11         THE COURT:  You will be allowed to, but I'm

12    going to instruct them, as I have indicated, there

13    is nothing wrong with writing on an existing

14    product so long as you're still correcting a

15    mistake.

16         MR. DOWLER:  Right.

17         MR. AHRENS:  So I can elicit --

18         THE COURT:  You will be able to get into it.

19         MR. AHRENS:  Okay.  Thank you.

20         (Sidebar concluded.)

21         THE COURT:  Ladies and gentlemen, I'm going

22    to give you an instruction.  I may clean it up a

23    little bit and reread it to you tomorrow.

24         Basically, you have heard testimony

25    about reissuing to correct mistakes in the claims
```

1   set forth in an existing patent.  And that is

2   entirely proper, of course, and that's --

3   obviously, you've heard a great deal about the

4   process here.

5              There is nothing wrong, by itself, for

6   the holder of a patent to make changes in the

7   patent through a reissue, which in essence applies

8   to an existing product that's already on the

9   market.

10             However, the process -- the change

11  still has to be to correct a mistake in the

12  original patent that was issued.

13             It's going to be for you to determine

14  whether or not the reissue was, in fact, to

15  correct a mistake in the original patent or not.

16             I'm going to allow counsel to get into

17  the question of whether or not the patent as

18  reissued, in fact, covered an existing product.

19  But the point is there is nothing wrong with that,

20  so long as the request for reissue was, in fact,

21  to correct a mistake.

22             We'll clarify this a little bit more,

23  perhaps with a written instruction that I'll read

24  to you tomorrow.  I might even allow you to

25  include that in your binder to clarify this issue.

1          So I'm going to give counsel some

2     leeway to get into this area, but you need to

3     understand there is nothing wrong with correcting

4     a patent in a way that applies to an existing

5     product so long as the effort was undertaken to

6     still correct a mistake in the original patent.

7          All right?

8          With that, Mr. Ahrens, you may proceed.

9     MR. AHRENS:  Thank you.

10    BY MR. AHRENS:

11    Q.   So in connection with your '653

12    reissue, it's true, is it not, Mr. Fleming, that

13    it wasn't in until April of 2007 that you put in

14    claims directed to the mute-button feature of your

15    invention?

16    A.   That's correct.

17    Q.   And you previously indicated to the

18    jury that -- through Exhibit 1043, that in January

19    of -- January of 2007 -- so that's a good three

20    months before April of 2007 -- that you actually

21    saw this press release from Escort; correct?

22    A.   Perhaps I can save us a lot of time.

23    Q.   I just --

24    A.   I drafted that claim onto the 9500i.

25    Q.   Okay.  So you specifically, and with

1    purpose, drafted your claims in the '653 patent to

2    cover the -- to cover the 9500i?

3         A.   That's correct.

4         Q.   So you had the product in your hands

5    and you certainly had this press release, but you

6    actually acquired a product and you analyzed it,

7    and then you specifically wrote claims to cover

8    that product?

9         A.   Yes.

10        Q.   Okay.  So there is no doubt about that.

11             And did you do that with respect to any

12   of the other products of Escort or just the 9500i?

13        A.   I don't think there were any other

14   products of Escort at that time that I can recall.

15        Q.   Okay.  But just to be clear, you

16   absolutely, without a doubt, on purpose, drafted

17   claims to cover the Escort product?

18        A.   Yes.

19        Q.   Okay.  So in -- in your '038 reissue,

20   did you likewise draft claims for that, or in that

21   reissue application for the purpose of covering

22   the products of someone else, some other company?

23        A.   Perhaps the Uniden product.  It was on

24   the market very shortly.

25        Q.   So in connection with your '038 reissue

1    patent, you likely drafted claims specifically to

2    cover a Uniden product that was out at that point

3    in time?

4         A.   Yes.

5         Q.   Okay.  So a similar scenario; it just

6    happened to be a Uniden product in 2003 and an

7    Escort product in 2007 that you were rewriting

8    your claims to cover; is that right?

9         A.   A little different with Escort because

10   I knew that Escort had -- at this point in time

11   had spent four years trying to take my invention

12   from me, but similar, yes.

13        Q.   Okay.  So you, in 1999, wrote -- or

14   actually, in -- well, we'll start with your patent

15   application in 1999.

16             You wrote your patent application in

17   1999, and you described in there certain things

18   about mute buttons and their usage, but you chose

19   not to claim them; right?

20        A.   Again, Mr. Ahrens, I never made a

21   conscious decision not to claim anything.  I

22   claimed it as best as I could, and I failed to

23   appreciate the scope of the invention.  Later on,

24   two years after it issued, I reviewed it and said,

25   you know, "Hey, I screwed up.  I need to fix it."

1      Q.   Well, I appreciate the fact that you

2   were helping to move us along just by

3   acknowledging that you specifically covered the

4   Escort product with the 9500i -- or with the

5   claims in the '653.

6           And indeed, this press release that you

7   saw and the product that you got, which you have

8   up there, has a mute button; right?

9      A.   Yes, it does; right here on the top.

10     Q.   Okay.  And so in 2001, when your '798

11  patent had issued, you had a written description

12  in your patent that would have allowed you to

13  write claims to cover a mute button, but you just

14  didn't do it; right?

15     A.   I have support in my original patent

16  application that would have allowed me the ability

17  to write a claim that I later put into the '653;

18  correct.

19     Q.   And there isn't such support in your

20  invention disclosure because it doesn't talk about

21  mute buttons at all back in May of 1998; correct?

22     A.   That's correct.

23     Q.   So it doesn't -- you don't have any

24  support in May of 1998 for the claims to the mute

25  button; right?

1        A.   That's correct.

2        Q.   Okay.  So starting at least in April of

3   '99, and you march along and then you get your

4   patent in 2001.

5             During April of 1999 and March of 2001,

6   when your '798 patent issued, what were you

7   thinking about with respect to the radar detector

8   industry?

9        A.   I'm not sure I had any thoughts along

10   that line.

11        Q.   You indicated that, earlier when

12   Mr. Dowler was asking you questions, that you had

13   done quite extensive research into the radar

14   detector industry, and I think you gave some

15   indication of who you thought were the biggest

16   companies.

17             And so you did that research; right?

18        A.   That was not in the '99 time frame.

19   That was -- most of it was in the 2007-2008 time

20   frame.

21        Q.   Oh, okay.  I thought when he asked you,

22   you said starting in about 2001.  Because he said,

23   "Oh, so you've been doing that for, like, 11

24   years."

25             You don't recall that testimony this

1    morning?

2         A.   I don't recall researching the

3    companies.  As far as researching radar systems

4    and things like that, yes.

5         Q.   How about researching the radar

6    detector market?

7         A.   I mean, you know, it's Valentine,

8    Cobra, Whistler, K40; that's the ones I can think

9    of right now.

10        Q.   Well, let's put it this way:  You had

11   an invention disclosure in May of 1998, and you

12   turned it in to Micron, and Micron said, "We don't

13   want this invention.  We're not going to patent

14   this invention.  But if you want to pursue it on

15   your own, you can."

16             Is that accurate?

17        A.   That's pretty accurate, yes.

18        Q.   Okay.  And that was because they

19   weren't in the business of radar detectors; right?

20        A.   That's right.  They were making PCs and

21   didn't want to get into consumer electronics.

22        Q.   So you, of course, had the question

23   presented to you:  Well, should I file a patent

24   application or not on this invention?

25             And you decided, obviously, in April of

```
 1    1999, to file a patent application.  In fact, you
 2    spent some time writing various drafts and then
 3    you filed the patent application.
 4            So why were you -- why did you decide
 5    to file a patent application on that invention?
 6        A.   Because I think the invention is neat.
 7        Q.   That's the only reason you decided to
 8    file a patent application, because you thought the
 9    invention was "neat"?
10        A.   You know, when -- the way I decide
11    whether to file an application is if it's
12    something you would tell somebody and you're proud
13    of it, and you go, "That's cool," you know, nifty,
14    whatever.  And I thought it met those
15    requirements, so that's why I did it.
16        Q.   So you didn't give any consideration to
17    the -- what was going on in the radar detector
18    market or industry in 1999?
19        A.   I'm not sure in '99 I even knew what
20    was going on in the radar detector industry, other
21    than I had a very nice Valentine 1 radar detector.
22        Q.   And you were aware of Escort; correct?
23        A.   No, I'm not sure that I was.
24        Q.   You don't think you were aware of
25    Escort in 1999?
```

1           A.   You know, the only radar detectors that

2     I remember from that time frame -- and Mr. Kuhn

3     can probably tell me I'm getting my time frame

4     wrong here -- but the FuzzBuster -- and I'm not

5     trying to be derogatory.  That's what it was

6     called.  And it was kind of a box radar detector.

7     And I remembered Valentine 1.  I know in 2003 I

8     learned about the Uniden product.

9           That's just -- that's all I can recall

10    right now.

11          Q.   So you said that when you -- after you

12    did your Albertsons thing in May of 1998, you

13    spent some time doing research, and you were

14    researching, I think you said researching prior

15    art; right?

16          A.   You know, it was -- it was researching,

17    you know, how to build a radar detector, and in

18    particular the Mike Valentine patent.  It was --

19    it described very well how to build the innards of

20    a radar detector.  And that was the research that

21    I was doing, yes.

22          Q.   And in that research, you didn't learn

23    anything about the radar detector market as it

24    existed in 1998?

25          A.   You know, I wasn't looking at

1    commercial issues or, you know, who was selling

2    what and all that.  I was really looking at the

3    technology side.  And it was, you know, patent

4    searches and things like that.

5         Q.   So you did patent searches yourself?

6         A.   Yes.

7         Q.   And did you learn about -- did you do

8    that on the Internet?

9         A.   Yes, I did.

10        Q.   And so did you just search for patents,

11   or did you search for literature on actual

12   products and things of that nature?

13        A.   I know at some time I submitted some

14   literature of this RadioStat or RadioSat prior

15   art.  I don't remember when that was.  But I do

16   recall finding that and submitting it to the

17   Patent Office.

18        Q.   In fact, you had a hunch at that point

19   in time that the radar detector market was going

20   to go in the direction of intelligent -- as you

21   call it, intelligent radar detectors, didn't you?

22        A.   I thought in the future that that is

23   a -- an area that could really grow, yes.

24        Q.   And you thought that in -- sometime in

25   the 1999 to 2001 time period, didn't you?

1      A.   I really don't recall the date.  I'm

2   sorry.  That's the best I can do.

3      Q.   Well, in any event, you chose to

4   spend -- because it costs money -- it's not free

5   to file a patent application; right?

6      A.   Yeah.  A patent application for an

7   individual is, right around in that time frame,

8   about $300 to $325, somewhere in that

9   neighborhood.

10      Q.   Of course, since you were writing it

11   yourself, I assume you weren't paying yourself the

12   legal fees to write your own patent application.

13      A.   That is correct.

14      Q.   Okay.  But if somebody was -- came to

15   you and you were writing a patent application for

16   them, there would be a fee associated with that,

17   right?

18      A.   Unless it's a friend or something, yes.

19      Q.   Okay.  But in any event, there is at

20   least a several hundred dollar fee to the Patent

21   Office to file a patent application.

22           So do you routinely file patent

23   applications on inventions that you just -- just

24   because you think they're neat, or do you

25   typically file on patent -- file patent

1    applications on inventions that you think might be

2    viable in some way in the future?

3         A.   Neat is the requirement.  I mean, the

4    last patent application I filed is on a parachute

5    for an airplane that does some nifty things.

6              Do I think that that has any commercial

7    viability going for it?  Absolutely not.

8              Is it very neat?  You betcha.

9         Q.   Okay.  And did you do any research into

10   the market for airplane parachutes?

11        A.   Yes.  There is one company that sells

12   products like that.  It's called Serious Aircraft.

13        Q.   So it is your practice to do research

14   into the market that relates to the invention that

15   you just had invented?

16        A.   (Witness coughing).

17        Q.   I feel that I'm going to be suffering

18   from the same problem in a moment.

19        A.   Sorry, it's been a long day.

20             You know, with the patent I just

21   described -- sorry -- I know for a fact there is

22   no market.

23             But it's neat.  I think it can save

24   lives.  And that's important.

25             And the little instrument that we

1    showed you earlier that, you know, had the circuit

2    board, you know, that was something that saved

3    lives.

4              We have -- you know, my dad and I have

5    feedback from people where it literally saved

6    their life.  And that meets the neat requirement.

7              So it's not a go off and try to find,

8    you know, some huge volume and write patents on

9    it.  No.  It's:  Does it meet the neat

10   requirement?

11        Q.   Okay.  And you said you determined that

12   there would be no market for it, and you did that

13   by doing some sort of market analysis; right?

14        A.   No.  I know how many planes are built

15   because I'm an airplane nut.

16        Q.   Okay.  So that's just knowledge that

17   you have about the market; right?

18        A.   Yes.  And I know that for the product

19   that I have, you know, patented, got two patents

20   on it, it's not something that's, frankly,

21   commercially viable.

22              But is it cool?  You betcha.

23        Q.   So in 1999 through 2001, you had -- you

24   had no belief of any kind about what was going to

25   happen to the radar detector market in the future;

1  is that your testimony here?

2       A.  I'm not sure I had any information on

3  the radar detector market at all in 1999.

4       Q.  And what about 2000?

5       A.  The first market information that I

6  believe that I found was a document we gave you,

7  the CES -- or C-something -- what was it?

8            It told, you know, how many consumer

9  products were sold, and it was a document that

10  costs 500 bucks, and somebody gave it to me for

11  free because he thought I could use it.

12       Q.  Where did the information that you put

13  into the background of your patent application

14  come from?

15       A.  I remember the background talks about

16  that people publish data on how bad false alarms

17  are.  And it probably came from Mike Valentine,

18  either his websites -- if people had websites back

19  then.  I had to think.  But probably from

20  Valentine.

21       Q.  So here is the background as it's

22  described in your -- well, this is the '653

23  patent, but it's the same specification for the

24  '798; correct?

25       A.  Yes, it is.

1        Q.   Okay.  So the wording here that's on

2   the screen, the wording that's on the screen here

3   would have been the wording that was placed into

4   your patent application filed in 1999; right?

5        A.   Yes.

6        Q.   Okay.  And so you first describe that

7   the -- what the invention relates to, motor

8   vehicles and radar detection, and then you go on

9   to describe about false alarms; right?

10       A.   Yes.

11       Q.   And you even talk about -- at this

12   point in time you talk about conventional radar

13   detectors.  So that -- that would seem to be a

14   reference to radar detectors that were actually on

15   the market at that point in time.

16          Is that what that reference is to?

17       A.   Yes.

18       Q.   Okay.  So at least you had some

19   knowledge about what the state of the market of

20   radar detectors was so you could write this

21   description that's on the screen; correct?

22       A.   Well, as I've said, I had a Valentine 1

23   radar detector, and I do believe it was state of

24   the art.  It was -- is, and was, a very good radar

25   detector.

1          Q.   Okay.  So you describe at least some of

2     the conventional radar detectors that were in the

3     market at the time.

4          A.   I don't believing I describe any radar

5     detectors in the market at any time.

6          Q.   Well, I'm sorry.  You say "conventional

7     radar detectors."

8          A.   Yes.  It says "conventional radar

9     detectors."

10         Q.   So was that a reference to a radar

11    detector that was available at the time that you

12    wrote those words in 1999?

13         A.   It was a reference to my Valentine 1

14    radar detector.

15         Q.   Okay.  Which was a conventional radar

16    detector that was available in the market in 1999.

17         A.   Yes.

18         Q.   Okay.  And then, you have some

19    discussion -- excuse me -- some discussion about

20    the FCC and what is the bandwidth that's used and

21    assigned for police radar.

22              Do you see that description?

23         A.   Yes, generally.  Yes.

24         Q.   Okay.  And then you talk about another

25    annoying -- you go down a little further and you

1    say, "Still another annoying source of false

2    alarms occurs," and then you describe, you know,

3    the fact that when you're going under the speed

4    limit -- and this is back to the idea of, gee, if

5    you're going a certain speed, why bother to be

6    alerted to the police radar because you're going

7    under the speed limit anyway, right?

8         A.   Correct.

9         Q.   And then, the last paragraph -- the

10   last paragraph here in the "Background" says that,

11   "Operators have become accustomed to radar

12   detectors activating in certain locations," and so

13   there is another reference to radar detectors that

14   were in the market at the time; right?

15        A.   That's a reference to me driving to

16   work every day.  I'm the operator.

17        Q.   Okay.  And so you knew that, in 1999,

18   when you wrote this in your patent application,

19   that there were radar detectors, and you knew

20   enough about them to describe them here.

21             And then you say that, "A need exists

22   for a radar detector that can avoid generating a

23   false alarm due to such accustomed radar signals";

24   right?

25        A.   Yes.

1          Q.   So you perceived that there was a need

2     in the market for a radar detector that would

3     [sic] generate a false alarm under those

4     conditions; right?

5          A.   Actually, I say a need exists for a

6     radar detector.  I don't think I have any

7     reference to a market.  I just wanted a better

8     radar detector.

9          Q.   Okay.  But what would be the need for a

10    radar detector, if it wasn't human beings buying

11    them to use for the purpose that you've described

12    in your invention?

13         A.   The need is so that when somebody uses

14    a radar detector, it doesn't annoy them.

15         Q.   Right.  So that would be a need that

16    would relate to a market for radar detectors,

17    wouldn't it?

18         A.   It may be for you.  For me, it's a

19    better radar detector.

20         Q.   But just having a better radar detector

21    that's described in a patent is doing nothing for

22    the public who might want to buy an improved radar

23    detector, would it?

24         MR. DOWLER:  Objection, relevance.

25         A.   I completely disagree.  Completely.

1    Q.  Okay.  So you don't believe that your

2   reference to a need existing for a radar detector

3   has anything to do with an actual product that you

4   perceived would be beneficial to the public; is

5   that your testimony?

6    A.  The need exists for a better product,

7   an improvement.  I mean, I recognize that your

8   client is in the business of building radar

9   detectors.  I'm in the business or the fun of

10  inventing and then building and creating state of

11  the art and making it better.

12   Q.  And then --

13   A.  That's what I'm saying.

14   Q.  -- settling for --

15   THE COURT:  Just a moment.  Let's not speak

16  over each other.

17   MR. AHRENS:  Sorry.

18   THE COURT:  Go ahead and finish your

19  statement.

20   THE WITNESS:  That's -- I'm through, sir.

21  BY MR. AHRENS:

22   Q.  Okay.  So you're in the business of

23  just getting patents on things, regardless of

24  whether there is any commercial reality that's

25  available for them; is that what you're saying?

1    A.   It's not a business.  It's a joy.  It's

2    a fun.  Some people write songs.  I like writing

3    about technology.  That's what I do.

4        Q.   And so you, in 2001, got your patent

5    issued and you had all this description in there

6    of all these various types of features, and you

7    didn't claim anything that was related to the

8    Escort 9500i product; right?

9            But you could have; right?

10            You had sufficient information in your

11   patent application that you could have written the

12   claims in 2001, Two Thousand and -- Two Thousand

13   and Zero -- in 2000 or 1999, you could have

14   written those claims to cover the Escort 9500i

15   product right then; right?

16       A.   I believe that Escort infringes a

17   number of the original claims in --

18       Q.   I -- that --

19       A.   -- the '798.

20       MR. AHRENS:  I'm going to have to move to

21   strike.  That was not responsive at all.

22       THE COURT:  I'll strike the last response,

23   instruct the jury to disregard it.

24            Put the question back before the

25   witness.

1    BY MR. AHRENS:

2        Q.   The claims that you said that you wrote

3    in the '653 file history, you said you wrote them

4    specifically to cover the 9500i product in April

5    of 2007; right?

6        A.   I don't recall the date, but I did

7    write claims for the '653 to read on Escort.

8        Q.   Okay.  And you could have written those

9    claims in 2000 -- 1999, 2000, 2001 -- you could

10   have written them back then; right?

11       A.   If I would have perceived the full

12   scope of my invention; correct.

13       Q.   Well, the only difference between what

14   was happening in 2000 and 2001 and then 2007, is

15   that in 2007 you saw the Escort product.  It

16   didn't exist in 2000 and 2001; right?

17       A.   That's correct.

18       Q.   So what you're saying is that you saw

19   the Escort product and then you thought to

20   yourself, "Wow, I didn't write any claims that

21   covered that.  I made a mistake six years ago

22   because I could have written those claims then,

23   but I didn't because I didn't know about the

24   product."

25             Is that what happened?

1        A.    No.

2        Q.    Well, I'm not understanding what the

3   mistake was that you made and how you were

4   prompted to fix that mistake during your reissue

5   process.

6        A.    Would you --

7        Q.    So --

8        A.    -- like me to explain?

9        Q.    Well, I would like you to tell me how

10  in -- seeing a product in 2007, which causes you

11  to write claims to cover it, how that is an

12  indicator that you made a mistake in 2001, when

13  you could have written those very same claims then

14  but just, for whatever reason, didn't write those

15  claims.

16       A.    Again, would you like me to explain?

17       Q.    Well, if you can answer the question --

18       THE COURT:  Well, go ahead.  The question

19  calls for you to explain how.

20       THE WITNESS:  Thank you.

21            When I drafted my patent in '99, '89 --

22  '98, '99, I put all of the description of what I

23  thought would be the nifty, the cool, intelligent

24  radar detector into the body of the spec.  That's

25  the first part of the patent.

1       And that tells all of the different
2    flavors and permutations of a nice radar detector.
3    It had velocity.  It had position.  It had speed
4    limits.  It had the lockout distance, and all of
5    that, and a lot of other stuff, too.  It had the
6    mute button, you know, and lots more.
7           And there is still lots more in there
8    that we haven't talked about today.  And that was
9    my description of what would be kind of the
10   ultimate radar detector to build.
11          And then at the end of that you have
12   claims.  And those claims are different statements
13   of your invention.  They're one sentence long.
14   You know, when I wrote those claims, you know,
15   when I look at them today and when I looked at
16   them back in 2003, I mean, they're written like a
17   programmer.  I'm sorry, that's just -- it looks
18   like, truly, it's the way that a programmer would
19   write it because that's the way I was thinking
20   back then.
21          And when I, you know, walked away and
22   came back and looked at it again in 2003, I
23   recognized I didn't claim the full scope of my
24   invention.  There was a whole lot more in my
25   invention than what I got -- what I put in the

```
 1    claims.
 2              So, you know, the Patent Office again
 3    has this procedure called reissue.  One of the
 4    requirements of that is it has to be for the,
 5    quote, same invention.  And the Patent Office has
 6    a section on that.  You know, it's in 14- --
 7    actually, I think it's, you know, 1412.01, and
 8    it's in that big book I told you about.
 9              And they have got all these
10    requirements for claiming the --
11          MR. AHRENS:  Your Honor --
12          THE WITNESS:  -- same invention.
13          MR. AHRENS:  -- we have been told --
14          THE WITNESS:  You asked me to explain.
15          MR. AHRENS:  I know.
16          THE WITNESS:  Will you let --
17          THE COURT:  Counsel --
18          THE WITNESS:  -- me explain?
19          THE COURT:  Just a moment.
20          MR. AHRENS:  We have been on the edge of, he
21    is not qualified to give opinions, and now it
22    sounds like his answer, which is an explanation,
23    he is giving a lot of opinions on patent law.
24          THE COURT:  Well, I'm going to ask the
25    witness to focus directly on the basis for your
```

```
1    conclusion of how this was a correction of a
2    mistake.
3           THE WITNESS:  Understood.
4           THE COURT:  All right.  Go ahead.
5              And we're going to recess here for the
6    day in a few minutes, so I'm going to ask you to
7    direct it to that, and then we'll take a break
8    until tomorrow morning.
9              Go ahead.
10          THE WITNESS:  Two minutes.
11             The mistake was to claim this amount of
12   my invention, when my invention was here
13   (indicating).
14             You don't claim it -- I didn't -- when
15   I claimed it the first time, it was like a
16   programmer, and as opposed to claiming it more
17   broadly.
18             When I detected that mistake, which was
19   in January 2003, two years after my patent issued,
20   almost two years -- three months before that, I
21   fixed it.
22             That's it.
23   BY MR. AHRENS:
24        Q.  And the thing that prompted you to fix
25   the mistake was seeing the Uniden product and
```

**4290**

1    then, in 2007, seeing the Escort product; correct?

2         A.   No.   That's not correct.

3         Q.   Well, in fact, you just said that you

4    saw the Escort product and then you drafted your

5    claims specifically to cover that product.

6    Correct?

7         A.   That is correct.

8         Q.   And those are claims that weren't

9    present in your application at all before that;

10   correct?

11        A.   That is correct.

12        Q.   And so if you had never seen the Escort

13   9500i product, you never would have sought to add

14   those claims to your patent application because

15   that's what prompted you to seek the correction.

16        A.   That's not correct.

17        MR. AHRENS:  Okay.

18             Well, I think this would be a --

19        MR. DOWLER:  I think now is when we need the

20   clarifying instruction, Your Honor.

21        THE COURT:  What's that?

22        MR. DOWLER:  I think now is when --

23        THE COURT:  We will have it first thing in

24   the morning.

25        MR. DOWLER:  Okay.

```
 1              THE COURT:  Ladies and gentlemen, this is an
 2      area of -- you know, I hate to use the word
 3      "complexity," but it's an area where I do need, I
 4      think, to give you a clear instruction on this
 5      issue of reissue of patents to correct mistakes,
 6      and also writing -- I think the term has been
 7      "writing on an existing product."
 8              As I have already indicated, writing on
 9      an existing product, that does not constitute any
10      improper conduct or any -- anything that would in
11      any way invalidate it.
12              However, there is still the requirement
13      that it must be a correction of a, I guess a
14      mistake in the original issue.  And the court will
15      give you an instruction tomorrow morning that will
16      somewhat clarify this.
17              I'm sure we'll hear more in the next
18      few days on this, plus I will instruct you at the
19      end of the trial, which will presumably just kind
20      of restate that and remind you of this principle.
21              I think we have had discussion gone
22      back and forth, but I still think to have the
23      court provide you with some clarity on this issue
24      tomorrow morning will be very helpful.  So we will
25      have something for you at that time.
```

1              At this time, we'll take the recess

2    until tomorrow morning at 8:30.

3              I'll again admonish you not to discuss

4    the case among yourselves or with anyone else, nor

5    should you form or express any opinion about the

6    case until it is submitted to you.

7              When I use that phrase, as I have on

8    each recess, what I'm trying to do is embody the

9    broader principles that were included in my

10   initial instruction on juror conduct, which I read

11   to you and I think you have a set of or a copy of

12   in your jury notebook.

13             The important thing is to not expose

14   yourself to any outside information of any kind,

15   including discussing the case with anyone else,

16   conducting any outside inquiry or investigation.

17   Don't go on any website.  Don't communicate with

18   anyone about this case.  Just put it out of your

19   mind until we return tomorrow morning at 8:30.

20             Also, be very careful to avoid all

21   contact with the attorneys, the witnesses, and the

22   parties as you leave the courthouse this afternoon

23   and return tomorrow morning.

24             Counsel, I think given the nature -- we

25   may need to start a little earlier than 8:15.  It

```
1     might be prudent to at least be here by five
2     after, ten after, give us a little bit more of a
3     window of opportunity to take up issues without
4     invading the jury's time.  We want to be able to
5     start promptly at 8:30.
6               So if you could be here, we'll try ten
7     minutes after tomorrow, and I'll try to be walking
8     in at ten after, if need be, to take up matters.
9     I think this instruction is one issue we will
10    probably want to visit about, plus there may be
11    some other motions in limine that we'll try to
12    address this evening that maybe are still creating
13    some issues for us.
14              But in any event, we'll be in recess,
15    then, until 8:30 tomorrow morning.
16              (Court Recessed at 2:31 p.m.)
17
18
19
20
21
22
23
24
25
```

1      R E P O R T E R' S   C E R T I F I C A T E

2

3

4

5      I, Tamara I. Hohenleitner, Official

6 Court Reporter, State of Idaho, do hereby certify:

7      That I am the reporter who transcribed

8 the proceedings had in the above-entitled action

9 in machine shorthand and thereafter the same was

10 reduced into typewriting under my direct

11 supervision; and

12      That the foregoing transcript contains a

13 full, true, and accurate record of the proceedings

14 had in the above and foregoing cause.

15      IN WITNESS WHEREOF, I have hereunto set

16 my hand August 6, 2012.

17

18

19

20               -s-
     Tamara I. Hohenleitner
21    Official Court Reporter
     CSR No. 619
22

23

24

25

1

1    **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO**

2

- - - - - - - - - - - - - - - - - - - x
3                                       :
     HOYT A. FLEMING,                    :   Case No. 1:09-cv-00105-BLW
4                                        :
             Plaintiff,                  :      **JURY TRIAL DAY 4**
5                                        :
             vs.                         :
6                                        :
     ESCORT, INC.,                       :
7                                        :
     and                                 :
8                                        :
     BELTRONICS USA, INC.,               :
9                                        :
             Defendants.                 :
10   - - - - - - - - - - - - - - - - - - - x

11

12

13

14       <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

15

     before B. Lynn Winmill, Chief District Judge
16

17   June 19, 2012

18   Pages 1 to 277

19

20

21

22

23               **Tamara I. Hohenleitner**
             Idaho Certified Shorthand Reporter No. 619
24                Registered Professional Reporter
                    Certified Realtime Reporter
25              Federal Certified Realtime Reporter

             United States Courts, District of Idaho
     550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

1                                  **A P P E A R A N C E S**

2
   **FOR PLAINTIFF**
3
               Michael S. Dowler
4              PARK, VAUGHAN, FLEMING & DOWLER, LLP
               5847 San Felipe, Suite 1700
5              Houston, TX 77057
               Tel: (713) 821-1540
6              Fax: (713) 821-1401
               Email:  Mike@parklegal.com
7
               Stephen F. Schossberger
8              HAWLEY TROXELL ENNIS & HAWLEY
               PO Box 1617
9              Boise, ID 83701
               Tel: (208) 344-6000
10             Email: Sfs@hteh.com

11
   **FOR DEFENDANTS**
12
               Stephen B. Andersen
13             HOLLAND & HART, LLP
               101 S. Capitol Blvd., Suite 1400
14             Boise, Idaho  83701
               Tel: (208) 342-5000
15             Fax: (208) 343-8869
               Email: Sandersen@hollandhart.com
16
               Gregory F. Ahrens
17             Brett A. Schatz
               WOOD, HERON & EVANS, LLP
18             441 Vine Street, 2700 Carew Tower
               Cincinnati, OH 45202-2917
19             Tel: (513) 241-2324
               Fax: (513) 421-7269
20             Email: Gahrens@whepatent.com
                      Bschatz@whepatent.com
21

22

23

24

25

1                                     I N D E X

2                         P L A I N T I F F ' S   W I T N E S S E S

3                                                                    PAGE

4
BARTONE, Chris Gregory
5       Direct Examination by Mr. Dowler....................   172

6  FLEMING, Hoyt A.
        Continued Cross-Examination by Mr. Ahrens...........    23
7       Redirect Examination by Mr. Dowler..................    67
        Recross-Examination by Mr. Ahrens...................   121
8       Further Redirect Examination by Mr. Dowler..........   123
        Further Redirect Examination by Mr. Dowler..........   128
9       Further Recross-Examination by Mr. Ahrens...........   137

10  MILLER, Harold Mark
        Direct Examination by Mr. Dowler....................   140
11      Cross-Examination by Mr. Ahrens.....................   161
        Further Direct Examination by Mr. Dowler............   170
12

13
                          P L A I N T I F F ' S   E X H I B I T S
14
                                                                ADMITTED
15
        1204     Screen shot of directory from Fleming
16               computer....................................   107

17

18                        D E F E N D A N T S '   E X H I B I T S

19                                                              ADMITTED

20      2042     Deposition of Hoyt A. Fleming January 12,
                 2011 - Exhibit 1 (FLEMING 010252-FLEMING
21               10266 - Second Amended Complaint for Breach
                 of Contract and Extortion, U.S. District
22               Court, Southern District of California,
                 Case No. 3:08-cv-00355 WQH-NLS).............    52
23      2083     Email Fleming to Peter Detkin (Intellectual
                 Ventures) (6/25/07) (FLEMING 1746)..........    35
24      2087     September 7, 1998 Draft Patent Application
                 (Fleming 8495-97)...........................    39
25      2094     Email Fleming to Elston (8/14/07) (FLEMING
                 1971-1972)..................................    37

4

1                                         I N D E X

2                         D E F E N D A N T S '  E X H I B I T S

3                                                          ADMITTED

4      **2101**   Email Fleming to Coverstone (1/22/08)
                 (Fleming 2364).............................   42
5      **2102**   Email Coverstone to Fleming (1/22/08)
                 (FLEMING 2365-2366).........................   45
6      **2104**   April 12, 1999 Draft Patent Application
                 (Fleming 8502-16)...........................   34
7      **2106**   Signed Engagement Letter between Fleming
                 and Coverstone (FLEMING 2455-2456)..........   48
8      **2107**   Email Fleming to Coverstone (2/9/08)
                 (FLEMING 2542-2543).........................   49

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

1    MR. AHRENS: But the language that's quoted
2  from Kingsdown, I mean, Kingsdown is not a case
3  relating to a reissue. It's an inequitable
4  conduct case that had to do with late claiming and
5  recapture. It's just not a case on reissue. So
6  that's the part of the instruction that gives us
7  the most concern.
8    MR. DOWLER: Recapture is exact -- one of
9  the exact issues in the reissue. In a reissue,
10 you can't go back and recapture information that
11 you gave up during the original prosecution. That
12 would not be an error. So recapture is exactly a
13 topic of a reissue.
14   THE COURT: All right. Okay. Well, let me
15 mull it over a bit more, but we need to get
16 started with the jury.
17   MR. DOWLER: Your Honor, for the record,
18 could I make it clear --
19   THE COURT: Yes.
20   MR. DOWLER: -- we had mentioned identifying
21 some demonstratives yesterday. And just for the
22 record, I would like to note that the opening
23 demonstratives that we used, we'll marked as
24 PDX1201, and the demonstratives we used with
25 Mr. Fleming will be marked as PDX1202.

18

1    THE COURT: Okay.
2    MR. DOWLER: And then --
3    THE COURT: Could you describe those so
4  we're clear what the -- well, I guess you've
5  shared them with counsel, so they know the
6  designation.
7    MR. DOWLER: Yeah. They have been
8  exchanged, and they just were never marked with a
9  demonstrative exhibit number.
10   THE COURT: So we're going to use "PDX" for
11 the plaintiffs and --
12   MR. DOWLER: I think that's the notation
13 that we have been using.
14   THE COURT: And the defendants, for their
15 demonstratives?
16   MR. ANDERSEN: We haven't numbered them,
17 Your Honor. We didn't know --
18   THE COURT: They were numbered?
19   MR. DOWLER: They're on the exhibit list.
20   THE COURT: Okay. Well, as long as they're
21 designated in some fashion, I think that's the
22 critical thing.
23   MR. DOWLER: Okay.
24   THE COURT: All right. We'll be in recess
25 and hopefully start with the jury here just

19

1  momentarily.
2    (Recess.)
3    (Jury present.)
4    THE CLERK: The court will now hear Civil
5  Case 09-105-S-BLW, Hoyt Fleming versus Escort,
6  Inc., et al., for day four of jury trial.
7    THE COURT: Ladies and gentlemen, good
8  morning.
9    I'm going to note the jurors are all
10 presently.
11   Mr. Metcalf is going to hand out to you
12 an instruction that's essentially intended to
13 duplicate what I told you yesterday, just before
14 we recessed, on this issue of a reissue patent
15 writing on, I think is the term of art used, of a
16 product that subsequently comes onto the
17 marketplace. You can follow along with me.
18   Now, let me point out before I actually
19 read the instruction, though, as I believe I told
20 you on the first day of trial -- if not, I should
21 have -- from time to time things occur during the
22 course of the trial that necessarily change the
23 court's instructions.
24   Therefore, although I gave you some
25 preliminary instructions that laid out some of the

20

1  broad legal principles involving patents, and
2  again during the course of the trial, as I'm going
3  to right now, we may instruct you on legal issues
4  that we think you need to have to provide a
5  context to a fact issue that's being presented to
6  you, what is critical is that you understand that
7  if, at the end of the trial, the final
8  instructions which I give you vary in any way from
9  my earlier instructions, you are to disregard the
10 earlier instructions and follow the final
11 instructions, because those will embody the law
12 that I feel is relevant to the issues that the
13 jury must decide.
14   And there be may some minor changes in
15 language or instructions that are not included.
16 The critical thing is that in your deliberations
17 you must follow my final instructions, and
18 disregard any inconsistency between those
19 instructions and anything I may have told you
20 earlier during the course of the trial.
21   So let me read this instruction to you.
22   The two patents at issue here, the '038
23 and the '653 patents, are known as reissue
24 patents. They were reissued from the original
25 patent, the '798 patent, which Fleming was

21

1 required to surrender to the Patent and Trademark
2 Office in order to obtain the two reissue patents.
3        Under the law a patentee, like Fleming,
4 may surrender a patent and seek reissue if,
5 through error, without any deceptive intent, he
6 claimed more or less than he had a right to claim
7 in the patent.
8        An example of an error that will
9 support a valid reissue patent is a failure by the
10 patentee in his original patent to appreciate the
11 full scope of the invention during the prosecution
12 of the original patent application.
13        While an error or mistake will support
14 a reissue patent, a deliberate action by the
15 patentee will not. The distinction is between a
16 genuine error or mistake and a deliberate, but
17 subsequently found to be disadvantageous, choice.
18        If the patentee is seeking to correct a
19 deliberate miscalculation he made during the
20 prosecution of his original patent, he cannot rely
21 on the reissue process. On the other hand, if he
22 failed to recognize the full scope of his
23 invention during the prosecution of his original
24 patent, he can obtain a valid reissue patent.
25        Both circumstances could be prompted by

22

1 new products. For example, a new product coming
2 onto the market after the original patent issued
3 might prompt the patent holder to realize for the
4 first time that his invention was much broader in
5 scope than he claimed in his original patent. In
6 that case, the patent holder made an error in his
7 original patent that he can properly correct
8 through a reissue patent.
9        However, there is no mistake or error
10 when the patentee deliberately decides, during the
11 prosecution of his original patent, not to pursue
12 claims covering anticipated products, believing
13 that they will never come to market and that his
14 narrower patent application will stand a better
15 chance of approval by the PTO.
16        Later, those anticipated products may
17 appear in the market, prompting the patentee to
18 seek a reissue patent. But a reissue patent is
19 not available to correct deliberate strategic
20 decisions that turn out to be wrong.
21        It is Escort's burden to persuade you
22 that it is highly probably that Fleming sought the
23 two reissue patents only because he made a
24 deliberate decision during the prosecution of his
25 original '798 patent that turned out to be

23

1 disadvantageous.
2        All right. Now, with that, I believe,
3 Mr. Ahrens, you were engaged in cross-examination
4 of Mr. Fleming.
5        Mr. Fleming, I'll remind you, you are
6 still under oath.
7        MR. AHRENS: Thank you, Your Honor.
8        Good morning, ladies and gentlemen.
9        Mr. Fleming.
10        THE WITNESS: Good morning.
11        CONTINUED CROSS-EXAMINATION
12 BY MR. AHRENS:
13        Q. Mr. Fleming, you stated yesterday that
14 in 1999 you had conceived of your -- or,
15 sorry -- in May of 1998 you had conceived of your
16 invention, and then you included some claims in
17 your '798 patent that were, I believe you said,
18 written like a computer programmer would write
19 them.
20        Do you --
21        A. Yes.
22        Q. -- recall that?
23        Those were claims in your '798 patent
24 that you were referring to?
25        A. Yes. Claim 1 is written kind of like a

24

1 programmer would write it.
2        Q. Do you have the '798 patent there?
3        A. No, I do not.
4        Q. Is the white book that you had up there
5 yesterday no longer up there?
6        A. The white book did not have the '798 in
7 it.
8        Q. Okay. Well, let me show you the '798
9 patent then.
10        So claim 1, you're talking about, was
11 written like a computer programmer would write it?
12        A. That's the way I would characterize it,
13 particularly element C.
14        Q. Okay. And claim 1 of the '798 patent,
15 in fact, is duplicated in and is a part of your
16 '038 reissue patent; is that correct?
17        A. Yes, it is. It's identical.
18        Q. Let me show you your September 1998
19 draft patent application. Do you see that?
20        Can you see that on the screen?
21        A. Yes, I do.
22        Q. Do you see claim 1 there?
23        A. Yes, I do.
24        Q. Now, claim 1 in your 1998 draft
25 application has steps (a) through (f), six steps,

**25**

1  and then step (f) has three subparts; right?
2      A.  That's correct.
3      Q.  So that's a far more complicated and
4  detailed claim than claim 1 of your '798 patent;
5  right?
6      A.  That's correct.
7      Q.  So when you drafted this claim 1 in
8  1998, when you ultimately filed for your '798
9  patent you simplified this very detailed claim
10  down to just the three steps that are identified
11  in the '798 patent claim 1; correct?
12      A.  No.  Actually, claim 1 in the '798
13  patent is the result of claim 8 in the draft that
14  you have in front of you.
15      Q.  Right.  And you decided not to include
16  a claim, such as this very complicated claim 1 in
17  your draft patent application; that claim never
18  made it into the '798 patent, did it?
19      A.  Actually, it did.  If you look at
20  claim 7, that contains the section from
21  element (f) there.  I just included them as
22  dependent claims.
23      Q.  Right.  So you did not include an
24  independent complicated claim such as this claim
25  in 1998; correct?

**26**

1      A.  That's correct.  As I said, I put the
2  elements in dependent claims.
3      Q.  So you made the conscious decision,
4  when drafting your claims in the '798 patent, to
5  specifically simplify and include in them the
6  subject matter that's covered by them, right?
7          I mean, that's your decision.  You were
8  the patent lawyer that was writing the claims.
9      A.  You know, I was trying to draft the
10  patents as best I could -- or the claims.
11      Q.  And, indeed, the claim 1 from the '798
12  patent was carried over into the '038 patent
13  reissue; correct?
14      A.  That's correct.
15      Q.  Now, at any point in either the '038
16  reissue or the '653 reissue, did you identify for
17  the Patent Office that you were submitting claims
18  that were intended to cover products that you came
19  upon in the marketplace?
20      A.  No, I did not.
21      Q.  So you never told the Patent Office
22  that, even though that's what you were doing?
23      A.  That's correct.
24          My understanding, there is no duty to
25  do so.

**27**

1      MR. AHRENS:  Move to strike, Your Honor.
2      THE COURT:  Sustained.
3          I'll direct the jury to disregard the
4  witness' last comment, which was not responsive.
5  BY MR. AHRENS:
6      Q.  So you never told the Patent Office
7  about your drafting claims to cover the Escort and
8  Uniden products.
9          And, in fact, when you submitted your
10  '038 patent application, do you know how many
11  claims you added to the '798 patent in your '038
12  reissue?
13      A.  I believe it was 29.
14      Q.  So there was originally 21 claims in
15  the '798 patent and you added 29 new claims, so
16  more than double the number of original claims; is
17  that right?
18      A.  That's correct.
19      Q.  And does each of those 29 claims
20  represent some sort of an error or mistake that
21  you made in the original prosecution?
22      A.  Yes, they do.
23      Q.  Each and every one.
24          And did you --
25      A.  That's correct.

**28**

1      Q.  -- describe for the Patent Office what
2  the mistakes were in connection with each and
3  every one of those 29 new claims that you added?
4      A.  No.  I described a single error --
5  actually, two errors.
6      Q.  And then when you filed for the '653
7  reissue, you added 30 new claims; correct?
8      A.  I don't remember the number.  It's
9  close to that.
10      Q.  Well, the '653 patent started off with
11  21 and it ended up with 51; so roughly 30 new
12  claims there as well; right?
13      A.  Correct.
14      Q.  And so, during the prosecution of the
15  '798 original patent, during that two-year period
16  it was being prosecuted by you, you filed
17  amendments and responses to the Patent Office on
18  at least a couple of different occasions; correct?
19      A.  Correct.
20      Q.  And in all of those occasions, you had
21  the opportunity to amend and add claims of
22  whatever kind that you so chose; correct?
23      A.  That's correct.
24      Q.  And so the fact is that none of the 29
25  claims that were added in the '038, nor the 30

29                                                              30

1  claims that were in added in the '653, were added
2  by you, or even believed by you to be added,
3  during the prosecution of the '798; right?
4      A.  I didn't understand that.  Could you
5  maybe break it up a little shorter.
6      Q.  Sure.  You had no intention during the
7  prosecution of the '798 to add the claims that
8  ultimately were submitted in the '038 application,
9  did you?
10      A.  I didn't know of the claims that I
11  submitted.  They didn't exist.
12      Q.  The subject matter of those claims is
13  contained within the written description of the
14  '798 patent; correct?
15      A.  That's correct.
16      Q.  And, indeed, the 30 new claims that you
17  added in the '653, you had no intention to add
18  those claims during the prosecution of the '798
19  patent, did you?
20      A.  The claims did not exist, so I don't
21  know how I can answer that.
22      Q.  Well, you had -- you didn't submit
23  those claims during the prosecution of the '798;
24  right?
25      A.  That's right.  Because I didn't draft

1  them back then.
2      Q.  Right.
3          But, yet, the subject matter that those
4  claims relate to was within the specification of
5  the '798 patent, so it was available to you to
6  claim; correct?
7      A.  That was the error.  I didn't recognize
8  that it was there.  You're right, it was in the
9  patent.  I wrote it, that that defined my
10  invention.  And, you know, the issue is I didn't
11  recognize it.  That's the error.
12      Q.  So you wrote it in your patent
13  application, and when you described in great
14  detail in the summary of the invention -- you have
15  a lengthy discussion here in the '798 patent, your
16  summary of your invention -- well, I guess I
17  shouldn't say it's too lengthy, but it comes over
18  here to the top of the next page, more of a
19  summary, and then you provide a detailed
20  description that goes on for that full column, and
21  then a couple of columns -- this is the '798
22  patent -- where you describe in further detail
23  your invention.
24          So you did describe in great detail
25  what you believed your invention was at the time;

31                                                              32

1  correct?
2      A.  I described what I thought my invention
3  was at the time; correct.
4      Q.  Now, you made some references to
5  becoming aware of the Escort product in January of
6  2007, I believe.  Is that correct?
7      A.  That's correct.
8      Q.  And your '6- -- or your '038 patent had
9  issued at that point in time; correct?
10      A.  Yes.  It issued in 2006.
11      Q.  And at no time between January of 2007,
12  when you first learned of Escort's product, and
13  March of 2009, when you sued Escort -- at no point
14  in time during that period did you notify Escort
15  of your patents and that you alleged that they
16  infringed them; correct?
17      A.  That's correct.
18      Q.  You have no product that you ever made
19  that you allege was copied by Escort.
20          And bear in mind my question is limited
21  to any product that you ever made.
22      A.  That's correct.
23      Q.  So Escort simply could not have copied
24  a product of yours, because you had no product;
25  correct?

1      A.  Yes.  I have never made a GPS-enabled
2  radar detector.
3      Q.  Now, you talked about some of your
4  activities with regard to commercializing or
5  monetizing your patent portfolio.  Do you remember
6  that discussion yesterday?
7      A.  Are you referring to licensing my radar
8  detector patents?
9      Q.  Right.
10      A.  Yes.  I do remember that.
11      Q.  Okay.  And did you describe all of the
12  situations in which you had sought to -- or had
13  discussions with other companies about potentially
14  selling your patent?
15      A.  I don't think I spoke about IPotential,
16  Ron Epstein.
17      Q.  Did you talk about Cobra and
18  Intellectual Ventures and Acacia?
19      A.  Yes, I did.
20      MR. AHRENS:  Okay.
21          So in connection with the Cobra, I have
22  some exhibits which -- some of which have been
23  objected to, Your Honor.
24          The first I would like to put on the
25  screen is Defendant's Exhibit 2104.

**81**

1 did sound -- I understand Mr. Ahrens' concern.
2 I'll again caution the witness not to
3 get into specific statements attributed to other
4 individuals.
5 But go ahead. You may complete your
6 answer.
7 THE WITNESS: My understanding is that
8 shortly Mr. Coverstone agreed to purchase my
9 patents for a million dollars, he contacted
10 Escort. And then Mr. Coverstone believed, after
11 that communication with Escort, that --
12 MR. AHRENS: Objection. Move to strike,
13 Your Honor. He is clearly --
14 THE COURT: Well, the witness is testifying
15 as to what he understood Mr. Coverstone
16 believed --
17 MR. AHRENS: What I --
18 THE COURT: -- and what's the basis for
19 Mr. Coverstone's decision to withdraw from it.
20 Proceed.
21 MR. AHRENS: Well, then I object on the
22 basis of foundation.
23 THE WITNESS: After Mr. --
24 THE COURT: Well, I'm going to overrule it.
25 You may answer. Go ahead.

**82**

1 THE WITNESS: After Mr. Coverstone
2 communicated with Escort in particular --
3 THE COURT: Just -- that's all right.
4 THE WITNESS: After he communicated with
5 Escort, Mr. Coverstone then believed my patents
6 were completely worthless and he backed out of the
7 deal, based almost exclusively upon a
8 communication with Escort.
9 THE COURT: Well, I'm going to strike that
10 last response. We know the basis for it. But
11 when you refer to "almost exclusively," you're
12 now, I think, going beyond the court's ruling.
13 So let's go ahead and proceed,
14 Mr. Dowler.
15 BY MR. DOWLER:
16 Q. Did Mr. Coverstone attempt to sell your
17 patent?
18 A. Yes, he did.
19 Q. Was he able to?
20 A. No, he was not.
21 Q. Who did he try to sell it to?
22 A. Escort.
23 MR. AHRENS: Objection. Foundation.
24 THE COURT: Sustained.
25 MR. DOWLER: Okay.

**83**

1 BY MR. DOWLER:
2 Q. Let's move on to the issue of the
3 reissue.
4 MR. DOWLER: Can everybody see that?
5 BY MR. DOWLER:
6 Q. This is a copy of the court's
7 instruction that was given today.
8 Mr. Fleming, I would like to go through
9 it and get -- get an understanding of your
10 understanding of how the facts apply to some of
11 the issues that are raised by this.
12 MR. AHRENS: Your Honor.
13 THE COURT: Yes.
14 MR. AHRENS: This is an instruction on the
15 law, and he is going to be seeking what would
16 appear to be opinion testimony about your jury
17 instruction.
18 THE COURT: I think it's not being used for
19 that purpose, but if it is I will sustain the
20 objection.
21 Mr. Dowler, you will be cautioned not
22 to inquire of the witness as to his view of the
23 law. He can simply testify as to what occurred.
24 But my understanding is you're using
25 the instruction as kind of a template of sorts.

**84**

1 MR. DOWLER: Yeah. I just want to -- I just
2 want to launch into the factual underpinnings.
3 THE COURT: Yes. You may proceed, but with
4 the caution that we're not to get into having the
5 witness opine as to the law.
6 MR. DOWLER: Of course.
7 BY MR. DOWLER:
8 Q. Now the second paragraph, Mr. Fleming,
9 says, "Under the law, a patentee like Fleming may
10 surrender a patent and seek reissue if, through
11 error, without any deceptive intent, he claimed
12 more or less than he had a right to claim in the
13 patent."
14 Have you seen that before?
15 A. Yes.
16 You may recall -- and I know it's been
17 a long time, but when I filed my reissue
18 application, I talked about checking the box, and
19 there were three different boxes you could check.
20 And I believe it was the middle one,
21 and it says claiming more than I had a right to
22 claim or claiming less than I had a right to
23 claim. And that was the basis that I gave the
24 Patent Office, telling them, this is why I want a
25 reissue.

85

1   **Q.** Okay. And then, the next sentence
2   says, "An example of an error that will support a
3   valid reissue is a failure by the patentee in his
4   original patent to appreciate the full scope of
5   the invention during the prosecution of the
6   original patent application."
7       Now, is that essentially what you just
8   testified to?
9   **A.** Yes. That's exactly right.
10      There were two reasons I reissued my
11  first patent. One was this patent I learned about
12  from Mr. Ross. I had a couple of claims that I
13  thought were too close to him and I wanted to fix
14  that.
15      And the other one was, you know, I
16  didn't anticipate or fully understand the full
17  scope of the invention. What I mean is, how big
18  the invention is.
19      And I've tried to explain, you know,
20  I'm a programmer and I looked at it a certain way.
21  I kind of looked at it inside out as opposed to
22  outside in and, you know, I didn't appreciate the
23  scope of it, plain and simple.
24  **Q.** Then, the next sentence says, "While an
25  error or mistake will support a reissue, a

86

1   deliberate action by the patentee will not."
2       Did you take any deliberate action
3   during the prosecution of your '798 patent that
4   was -- was -- that -- that -- I don't know how to
5   say it.
6       Did you take any deliberate action
7   during the prosecution of your original patent to
8   not get the claims that issued in your '038 and
9   '653 patent?
10      MR. AHRENS: Objection. Leading and calls
11  for an opinion.
12      THE COURT: Sustained.
13      MR. DOWLER: Okay.
14  BY MR. DOWLER:
15  **Q.** What deliberate actions, if any, did
16  you take in the prosecution of your original
17  patent?
18  **A.** Well, the prosecution begins -- the day
19  prosecution begins is when you file the patent.
20  So, Mr. Ahrens discussed a lot of stuff about how
21  I drafted claims when I was sitting, you know, in
22  my spare bedroom. And that's -- I don't -- I call
23  that drafting. That's not prosecution.
24      Prosecution begins the day you file the
25  patent, and it ends when the patent issues. So

87

1   that's -- that's the window. So, you know, the
2   window that we're talking about is March -- excuse
3   me -- April 14th '99 to, I believe, March 20th,
4   2001. So that's the window we're talking about.
5       So, you know, is there a deliberate
6   action in there where I did not claim certain
7   things that I knew about, or could have known
8   about or whatever?
9       No. I claimed it the best way I could,
10  did it, you know, to the best of my abilities at
11  the time. And later I recognized, you know, there
12  is a whole lot more to my invention than, you
13  know, what I claimed.
14      I mean, you know the type of deliberate
15  actions, like if the Patent Office says, you
16  know --
17      MR. AHRENS: Objection.
18      THE COURT: Sustained.
19      THE WITNESS: Okay.
20      THE COURT: I think we're now getting into a
21  legal opinion.
22  BY MR. DOWLER:
23  **Q.** Do you see -- do you see the sentence
24  there, Mr. Fleming, starting with, "On the other
25  hand..."?

88

1   **A.** Yes, I do.
2   **Q.** -- "if he" -- and I think that's
3   referring to you, or the patentee -- "failed to
4   recognize the full scope of his invention during
5   the prosecution of his original patent, he can
6   obtain a valid reissue patent."
7   **A.** I see that.
8   **Q.** You see that? Okay.
9       Can you -- did you fail to recognize
10  the full scope of your invention?
11  **A.** I did. Again, in between the filing
12  and the issue date, which, you know, ends in 2001,
13  which is before any of these products came out, or
14  whatever, that Mr. Ahrens was referring to
15  earlier, I didn't understand how broad my
16  invention was.
17  **Q.** Okay. Then let's go on to the next
18  paragraph.
19      "Both circumstances could be prompted
20  by new products."
21      Do you see that?
22  **A.** Yes, I do.
23  **Q.** And then it says, "For example, a new
24  product coming onto the market after the original
25  patent issued might prompt the patent holder to

89

1 realize for the first time that his invention was
2 much broader in" -- "was much broader in scope
3 than he claimed in his original patent."
4         Let me read that again since it got
5 kind of messed up.
6         It says, "For example, a new product
7 coming onto the market after the original patent
8 issued might prompt a patent holder to realize for
9 the first time that his invention was much broader
10 in scope than he claimed in his original patent."
11         Do you see that?
12     A. Yes, I do.
13     Q. Do you understand what that means?
14     A. Yes, I do.
15     Q. And what happened in the prosecution of
16 your original patent, and subsequently, that
17 relates to that?
18     A. Well, when I was prosecuting my
19 original patent, you know, again, I programmed it
20 like I would kind of build one, like I would code
21 it. And again, I'm a software guy, so that's the
22 way I was thinking of it. You know, I've got
23 these detailed, you know, claims that talk about,
24 you know, the logic that would be in, you know,
25 software code.

90

1         And when I saw a product that came
2 out -- it was called -- a company by the name of
3 Uniden that was on the market for a very short
4 period of time, it just made me think, you know,
5 instead of looking at it from the programming
6 side, look at it from the outside, and, you know,
7 like what is it? What does it do, as opposed to,
8 kind of, how you would build it.
9         And it's just really looking at the
10 same invention, instead of this way, looking at it
11 this way. And that's where the claims came from,
12 the new ones.
13     Q. And so, then the instruction says, "In
14 that case, the patent holder made an error in his
15 original patent that he can properly correct
16 through reissue"; correct?
17     A. That's correct.
18     Q. Is that what you feel that you did?
19     MR. AHRENS: Objection. Calls for an
20 opinion.
21     THE COURT: Overruled.
22     THE WITNESS: That's exactly what I thought
23 I did. You know, again, when I was claiming it,
24 you know, back during the prosecution, which is
25 the time before 2001 and after the filing, I wrote

91

1 the claims like I would write the code. And, you
2 know, I believe I made an error, screwed up.
3 BY MR. DOWLER:
4     Q. Okay. Now let's be fair. Let's cover
5 the good and the bad.
6         The next thing says, "However, there is
7 no mistake or error when the patentee deliberately
8 decides, during the prosecution of his original
9 patent, not to pursue claims covering anticipated
10 products."
11         Did you ever, during the prosecution of
12 your '798 patent, deliberately decide not to
13 pursue claims covering an anticipated product?
14     A. You know, absolutely not.
15         If I would have known in my head, you
16 know, this claim or that claim, like one of the
17 ones I added, you know, in the later patents, I
18 would have just put it in, you know; give the
19 Patent Office some more claims to evaluate.
20         You know, if, again -- you know,
21 Mr. Ahrens was asking me about these claims. They
22 didn't exist. If they existed, it would be on a
23 piece of paper and shot off to the Patent Office.
24 They can look at other claims as well as the ones
25 I gave them.

92

1         So, no, I mean, I never said, "Oh, I'm
2 going to write this claim; oh, I'm not going to
3 submit it." I mean, that would have been a
4 deliberate decision. I never did anything like
5 that.
6         If I would have written it, A, I would
7 have it, and it would be, you know, shoved off to
8 the Patent Office.
9     Q. Okay. And finally -- let's just back
10 up on this whole reissue thing, because it's
11 it -- well, I won't characterize it.
12         But you had claims in your original
13 '798 patent; correct?
14     A. That's correct.
15     Q. And ten or so of those carried over
16 directly into the '038 patent; correct?
17     A. That's correct.
18     Q. And so whether or not you reissued the
19 '038 patent or not [sic], those ten claims are the
20 same as that were originally in the '798 patent;
21 correct?
22     A. That's correct. The first ten are
23 identical.
24     Q. So -- so the issue in this case doesn't
25 even need to turn on a reissue; right?

93

```
1        Because those claims were original;
2   they --
3        MR. AHRENS:  Objection.
4   BY MR. DOWLER:
5        Q.  -- evolved into the '038; right?
6        MR. AHRENS:  Objection.  It calls for an
7   opinion.
8        THE COURT:  I'm going to sustain the
9   objection.
10       MR. DOWLER:  Okay.
11  BY MR. DOWLER:
12       Q.  Let's talk about another thing that
13  kind of relates to the reissue, and it's something
14  that Mr. Ahrens talked about in his
15  cross-examination of you.
16       Do you remember this (indicating)?
17       A.  Yes, I do.
18       Q.  Okay.  So you had your original '798
19  patent; correct?
20       A.  Yes.
21       Q.  And then Mr. Ahrens said, "Well, you
22  went and reissued your '038 patent and you moved
23  the fence."
24       Do you remember that?
25       He doesn't have the document to give
```

94

```
1   me, so I will have to kind of recreate it by
2   memory, but he kind of -- he said something like
3   this:  He says, you know, the -- I think he said
4   like, kind of, the '653 comes out here.
5        And then, I don't know, I think he did
6   something like this for the '038.
7        Do you remember that?
8        A.  Yes, I do.  I recall that I disagreed
9   with it.
10       Q.  Right.
11       Why do you disagree with that?
12       A.  I disagree with his analogy.  And I
13  attempted to explain it, but he didn't really want
14  me to do so.
15       MR. AHRENS:  Objection, Your Honor.
16       THE COURT:  Let's -- I'll caution the
17  witness not to offer comments about what counsel's
18  motivation was.
19       But go ahead and -- you can now
20  explain.  Proceed.
21       THE WITNESS:  The invention -- the picket
22  fence is set when the patent application gets sent
23  to the Patent Office.  That is the invention, you
24  know.  And when you reissue a patent, you have to
25  have the same invention.
```

95

```
1        The document that Mr. Ahrens showed,
2   you know, when I was talking about interference --
3   we'll talk about that later maybe -- but it's part
4   of a book, the MPEP.  And, you know, when I filed
5   my reissue application, I read that chapter,
6   chapter 1400, 122 pages.
7        And it talks about --
8        MR. AHRENS:  Your Honor, he is giving
9   opinion testimony that was disallowed yesterday.
10       THE COURT:  Well, the witness can
11  explain -- can explain why he felt that he was not
12  extending beyond, in his own view, or was not
13  expanding improperly the patent through the
14  reissue process.
15       So I'll allow some leeway.  But again,
16  it should not be an opportunity to offer any legal
17  opinions here.  The witness can only testify as to
18  his own understanding.
19       Ladies and gentlemen, to the extent
20  that there are -- you know, the court will
21  instruct you on the law that you need to decide
22  the case.
23       So I'll caution the jury in that
24  regard, as well, in considering Mr. Fleming's
25  views as to why he did what he did, or what his
```

96

```
1   understanding was, you have to be careful to the
2   extent that there may be some legal understanding
3   embedded in that, but if that's contrary to my
4   instructions, my instructions must govern your
5   deliberations.
6        Mr. Dowler, proceed.
7        MR. DOWLER:  Okay.
8   BY MR. DOWLER:
9        Q.  Could you please finish your answer?
10       A.  Yes.
11       When I filed my reissue application, I
12  was required to prove -- on every single claim
13  that I added, every single one, I had to show
14  where support for that claim was in my original
15  patent specification, the one that goes all the
16  way back to '99.
17       And in the correspondence, the file
18  history we have talked about, the back and forth,
19  there is table after table for every claim.  And
20  like, you know, if I had claim 10, there is going
21  to be, you know, cite, line and -- I mean, column
22  and line for every single claim.
23       And the reason that I did that is I had
24  to prove -- again, it was my burden to prove that
25  I was claiming the same invention.
```

97

1 And this fence, this picket fence, it
2 can't move. The invention is set when I filed my
3 1999 application.
4 If I try to claim something that is not
5 in there, in this same invention concept, and I'm
6 outside of the fence like, you know, the two black
7 boxes there, the Patent Office (indicating
8 audibly), you know, I can't do that.
9 Again, it's my responsibility to prove
10 that what is claimed, you know, years later was
11 disclosed in 1999.
12 So this -- this concept of moving the
13 fence and putting stuff on the outside, I just
14 don't understand it. I think it's just completely
15 wrong.
16 Q. Okay. So let's see if we can
17 illustrate what you're talking about, Mr. Fleming.
18 Actually, the fence -- I apologize for my
19 handwriting. It's terrible.
20 The fence is actually your invention;
21 correct?
22 A. That's correct.
23 Q. Is that what you're trying to say?
24 A. Yes. It's -- it's the invention.
25 Q. And it's the invention that you

98

1 disclosed originally in April of '99 in your
2 original patent application; correct?
3 A. That's correct.
4 Q. Okay. And then with -- inside the
5 fence, you can have the '798 patent --
6 MR. AHRENS: Can we avoid leading the
7 witness, Your Honor?
8 THE COURT: I think -- I'll sustain that
9 objection.
10 Counsel, we're probably where we take
11 the morning break. I'll let you continue for a
12 few minutes to finish this thought.
13 But please avoid leading the witness.
14 Proceed.
15 BY MR. DOWLER:
16 Q. So how -- how then does -- you have
17 your invention, and how do you get a reissue
18 patent without moving the fence?
19 A. What I had to do was to prove that
20 every single claim I submitted was in the fence.
21 And again, I mean, there was literally table after
22 table, you know, claim 55 or 35, whatever, then
23 it's, you know, support for each element in there.
24 And I had to prove that I'm in the fence.
25 If you get outside of the fence, you

99

1 know, you're violating procedures. You can't do
2 that. So this whole concept of moving the fence,
3 it's just -- it doesn't make any sense to me. I
4 think it's just completely wrong.
5 Q. Okay. So it's your understanding,
6 then, that all the claims that you got --
7 MR. AHRENS: Objection. Leading.
8 THE COURT: Well, it is leading, Mr. Dowler.
9 Restate.
10 BY MR. DOWLER:
11 Q. What is your understanding with respect
12 to the claims that you got in the '038 and '653
13 patent with respect to where they fall in the
14 fence?
15 A. What I was doing with all those
16 additional claims was filling in this area
17 (indicating) with lots and lots of claims and, you
18 know, just putting more claims in the fence.
19 And, you know, when I initially, you
20 know, filed the '798, I was probably doing
21 something like that. That's the programming side.
22 And then when it came to the '038, I was over
23 here, because I was kind of working on the
24 structural side.
25 And then with the '653, it's the

100

1 interface, pushing the buttons and doing stuff
2 like that. I'm over there.
3 I have got another one. There is a
4 '905 patent, that's later. It's not in this case.
5 It came out too late. That's over here. That's
6 working on some other stuff. And I'm filling in
7 the area in the fence with claims. Each of those
8 arrows is supposed to be a claim. There is many
9 of them.
10 Q. Is it your understanding -- well, how
11 does that filling in of the fence correspond to
12 your understanding of the reissue procedure?
13 MR. AHRENS: Objection; calls for an
14 opinion.
15 THE COURT: I think I'll sustain the
16 objection.
17 BY MR. DOWLER:
18 Q. When you went to reissue your patents,
19 what was your intent?
20 A. My intent was to fill in the fence with
21 claims.
22 Q. Okay. Because you hadn't filled it in
23 before; is that correct?
24 A. That's correct. You know, the claims
25 that I started out with were kind of in this area

1 here (indicating).  I added another patent that
2 covered that area.  My last patent is over there.
3 And, you know, I'm trying to fill in the fence.
4      THE COURT:  Counsel, we need to take the
5 morning break fairly soon.
6      MR. DOWLER:  Yeah.  I have got a minute and
7 a half.
8      THE COURT:  Go ahead.
9 BY MR. DOWLER:
10     Q.  So if your '798 patent was here, like
11 you said, '038 was here, your '653 is here, when
12 you got your '798 patent, Mr. Fleming, did you
13 make any conscious decision to not get what's
14 inside the circles of the '038 and '653?
15     A.  No, I did not.  That's my screw up.
16     MR. DOWLER:  Okay.  Thank you.  We're ready
17 to take a break, Your Honor.
18     THE COURT:  Ladies and gentlemen, we'll take
19 the morning break at this time.  We'll be in
20 recess for 15 minutes.
21     I'll again admonish you not to discuss
22 the case among yourselves or with anyone else, nor
23 should you form or express any opinions about the
24 case until it is submitted to you.
25     We'll be in recess.

1      (Recess.)
2      (Jury present.)
3      THE COURT:  For the record, I'll note that
4 the jury is present.  Mr. Fleming has retaken the
5 witness stand.
6      I'll remind you, Mr. Fleming, you are
7 still under oath.
8      Mr. Dowler, you may resume your
9 redirect examination.
10     MR. DOWLER:  Thank you, Your Honor.
11 BY MR. DOWLER:
12     Q.  Mr. Fleming, would you please pull up
13 Exhibits 1037, 1038, and 1039, which have been
14 previously admitted.
15     A.  (Witness complied).
16     Q.  If we can, let's look at these one at a
17 time, just so we're reminded of what they are.
18 Which exhibit is that?
19     A.  This is 1037.
20     Q.  1037.  So could you remind the jury
21 what that is?
22     A.  This is my first draft, September 7,
23 1998.
24     Q.  Okay.  And then, let's look at the next
25 one, if you can, 1038.  Remind the jury what that

1 one is.
2      A.  This is my second patent application
3 draft, March 14th, 1999.
4      Q.  Okay.  And then, the next one,
5 Exhibit 1039, please.
6      A.  This is my third draft, April 12th,
7 1999.
8      Q.  All right.  And each of these have
9 handwritten dates on the top-right corner; is that
10 correct?
11     A.  That's correct.
12     Q.  And there has been some discussion
13 about the accuracy of those dates; is that
14 correct?
15     A.  Yes; during opening.
16     Q.  Can you prove that those dates are
17 accurate?
18     A.  Yes, I can.
19     Q.  How can you do it?
20     A.  These dates have -- these files are all
21 electronic files.  Initially, they were Word
22 files, .doc files.  What you're looking at here is
23 a scanned piece of paper, but -- that's how I was
24 able to write on it.  But the electronic files are
25 actually with me right now, and they have date

1 stamps that identify not only the date but the
2 time and the minute, the hour and the minute.
3      Q.  Okay.  Can you pull those up, please?
4      A.  Yes.
5      MR. DOWLER:  Your Honor, we may -- thank
6 you.  You may want to leave it off for just one
7 minute.
8      THE COURT:  Okay.
9      THE WITNESS:  Back in 1999, I was not a Mac
10 guy.  I was a PC person, so I have to pull up a
11 PC.
12     (Pause.)
13     And now I see why I switched to a Mac.
14     (Pause.)
15     THE COURT:  Counsel, this -- we discussed
16 yesterday, I think, whether or not there was the
17 header.  I assume these are reflected somehow in
18 some kind of a header, whether those were
19 produced --
20     MR. DOWLER:  Exactly.
21     THE COURT:  -- produced to counsel.
22     MR. DOWLER:  That's exactly right,
23 Your Honor.
24 BY MR. DOWLER:
25     Q.  What is shown on the screen here,

```
1         R E P O R T E R ' S   C E R T I F I C A T E

2

3

4

5              I, Tamara I. Hohenleitner, Official

6    Court Reporter, State of Idaho, do hereby certify:

7              That I am the reporter who transcribed

8    the proceedings had in the above-entitled action

9    in machine shorthand and thereafter the same was

10   reduced into typewriting under my direct

11   supervision; and

12             That the foregoing transcript contains a

13   full, true, and accurate record of the proceedings

14   had in the above and foregoing cause.

15             IN WITNESS WHEREOF, I have hereunto set

16   my hand August 14, 2012.

17

18

19

20                       -s-
     Tamara I. Hohenleitner
21   Official Court Reporter
     CSR No. 619
22

23

24

25
```

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

- - - - - - - - - - - - - - - - - - -   x
                                         :
HOYT A. FLEMING,                         :  Case No. 1:09-cv-00105-BLW
                                         :
            Plaintiff,                   :  **JURY TRIAL PARTIAL TRANSCRIPT**
                                         :  **Rule 50 Motions**
            vs.                          :  **Instructions conference**
                                         :  **Closing Arguments**
ESCORT, INC.,                            :
                                         :
and                                      :
                                         :
BELTRONICS USA, INC.,                    :
                                         :
            Defendants.                  :
                                         :
- - - - - - - - - - - - - - - - - - -   x


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

before B. Lynn Winmill, Chief District Judge

July 2, 2012

Pages 1 to 151


### Tamara I. Hohenleitner
Idaho Certified Shorthand Reporter No. 619
Registered Professional Reporter
Certified Realtime Reporter
Federal Certified Realtime Reporter

United States Courts, District of Idaho
550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

1                               **A P P E A R A N C E S**

2
   **FOR PLAINTIFF**
3
               Michael S. Dowler
4              PARK, VAUGHAN, FLEMING & DOWLER, LLP
               5847 San Felipe, Suite 1700
5              Houston, TX 77057
               Tel: (713) 821-1540
6              Fax: (713) 821-1401
               Email:  Mike@parklegal.com
7
               Steven F. Schossberger
8              HAWLEY TROXELL ENNIS & HAWLEY
               PO Box 1617
9              Boise, ID 83701
               Tel: (208) 344-6000
10             Email: Sfs@hteh.com

11
   **FOR DEFENDANTS**
12
               Steven B. Andersen
13             HOLLAND & HART, LLP
               101 S. Capitol Blvd., Suite 1400
14             Boise, Idaho  83701
               Tel: (208) 342-5000
15             Fax: (208) 343-8869
               Email: Sandersen@hollandhart.com
16
               Gregory F. Ahrens
17             Brett A. Schatz
               WOOD, HERON & EVANS, LLP
18             441 Vine Street, 2700 Carew Tower
               Cincinnati, OH 45202-2917
19             Tel: (513) 241-2324
               Fax: (513) 421-7269
20             Email: Gahrens@whepatent.com
                       Bschatz@whepatent.com
21

22

23

24

25

```
1                                                    I N D E X

2    Date           Proceeding                              Page

3    07/02/12       Rule 50 motions..........................    4
                    Jury instruction conference..............   10
4                   Closing argument for the Plaintiff.......   18
                    Closing argument for the Defendants......   82
5                   Rebuttal argument for the Plaintiff......  132
                    Closing argument for the Defendants......  142
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**4**

1  P R O C E E D I N G S
2  July 2, 2012
3  (Jury absent.)
4  THE COURT: Counsel, we have just -- we're
5  still trying to get the final touches on the
6  instructions, but I think we -- the jury has been
7  here almost two hours waiting for us. We have to
8  get moving.
9  So I'm going to ask you each to state
10  your Rule 50 objections for the record.
11  Mr. Metcalf actually needs to provide
12  me with a copy of the final instructions, because
13  there was a renumbering here -- just a moment --
14  which he is now working through. I think he has
15  provided you a copy, but I didn't get that set.
16  He will have it to me here momentarily.
17  So with that, probably the order would
18  be to allow the plaintiff to state their Rule 50
19  objection for the record -- or their Rule 50
20  motion for judgment as a matter of law on the
21  invalidity defenses, and any other matters on
22  which the defendant had the burden of proof.
23  I will note that I have already advised
24  counsel that my intention is to reserve ruling on
25  those objections. They have been informally

**5**

1  stated during our jury instruction conference, so
2  I think I'm well aware of the objections. But I
3  intend to submit the issue to the jury, and then
4  we'll take these matters up in the posttrial
5  Rule 50 motions.
6  I'm not at all reluctant to grant them
7  posttrial. I just, in fact, within the last week
8  granted a Rule 50 after reversing a jury's verdict
9  in large part in a discrimination case that I
10  tried a month or so ago. So take me at my word
11  that I will take a very serious look at all the
12  Rule 50 motions in posttrial proceedings.
13  So with that, Mr. Dowler.
14  MR. DOWLER: Thank you.
15  Your Honor, I noted that you indicated
16  that you only wanted to hear Rule 50 motions from
17  us on those issues which they bear the -- the
18  defendant bears the burden of proof, and --
19  THE COURT: Well, I suppose you could also
20  argue that you're entitled to it on those on which
21  you have the burden of proof, although that's a
22  bit more of a dicey proposition for the plaintiff.
23  But that's not to say it can't be done.
24  MR. DOWLER: Okay. I just want to make sure
25  that I don't waive anything.

**6**

1  THE COURT: No, you're not waiving any
2  rights. And I've tried to make that clear
3  throughout our proceedings that -- you know, I
4  suppose even stating that you're going to state a
5  Rule 50 motion without specificity may be enough
6  to preserve the issue. But I encourage you to go
7  ahead and at least tick off, if you will, each of
8  the grounds that you think justify granting the
9  Rule 50 motion.
10  MR. DOWLER: Okay. The plaintiff would move
11  for Rule 50 motion on direct infringement on all
12  of the accused products for the '038 patent, in
13  particular claims 1, 7, 25 and 28, and for the
14  '653 patent, claims 22, 24, 25, 31 through 33, 38
15  and 41.
16  Plaintiff would also move for a
17  directed verdict on the issue of inducement of
18  infringement for claims -- excuse me -- for the
19  '038 patent, claims 1, 3, 5 through 7, 25, 28, and
20  for the '653 patent, claims 22, 24, 25, and 31
21  through 33.
22  Plaintiff would also move for a
23  directed verdict on the issue of contributory
24  infringement, in particular for the '038 patent,
25  claims 1, 3, 5 through 7, 25 and 28, and for the

**7**

1  '653 patent, claims 22, 24, 25, and 31 through 33.
2  To the extent that I haven't ticked off
3  each of the asserted claims, that was my
4  intention, to make sure that I included all of the
5  asserted claims for each of those causes of
6  action.
7  Plaintiff would also move for directed
8  verdict on the issue of willful infringement for
9  both the '038 and '653 patents.
10  Next, plaintiff would move for directed
11  verdict on the issue of prior invention. There is
12  no evidence of prior invention in the case by
13  Mr. Orr or anybody else.
14  Plaintiff would also move for a
15  directed verdict on the issue of abandonment,
16  suppression, or concealment. There was no -- the
17  evidence showed that Mr. Orr concealed,
18  suppressed, and abandoned his invention since at
19  least 1996.
20  Plaintiff would also move for a
21  directed verdict on the issue of the reissue
22  invalidity defense. There is no evidence that
23  Mr. Fleming did not make a --
24  THE COURT: That's a matter the court will
25  take up posttrial.

8

1    MR. DOWLER: Okay.
2    THE COURT: So it won't be submitted to the
3 jury in any event.
4    MR. DOWLER: Correct.
5    And then on the issue of obviousness,
6 plaintiff would move for a directed verdict that
7 none of the asserted claims are obvious in view of
8 the Orr plus Hoffberg combination. None of the
9 asserted claims are invalid as obvious, in view of
10 the Orr plus Ross reference.
11    None of the asserted claims are invalid
12 due to obviousness in view of the Orr plus the
13 '554 reference. None of the asserted claims are
14 invalid due to obviousness in view of Orr plus the
15 '007 reference. And none of the asserted claims
16 in either patent are invalid in view of the Orr
17 plus Valentine reference.
18    Finally, plaintiff would move for a
19 directed verdict on the issue of damages, and have
20 a judgment entered that the royalty rate should be
21 $25 per unit for each of the four accused
22 products.
23    THE COURT: Okay.
24    MR. DOWLER: Thank you.
25    THE COURT: Thank you.

9

1 I'm not going to invite a response
2 because I'm going to reserve ruling, and we'll
3 undoubtedly hear more by way of posttrial briefing
4 on the issue, and we'll have the transcript you
5 can refer to.
6    So I think rather than hear argument,
7 since I'm reserving ruling, in any event, I'll
8 just allow Mr. Ahrens, if you want to restate your
9 Rule 50 motion -- or, I guess, Mr. Andersen,
10 whoever is going to do it.
11    MR. AHRENS: Can I just do it right here?
12    THE COURT: Yes, you may.
13    MR. AHRENS: So we had moved under Rule 50
14 on the issue of willfulness, inducing
15 infringement, the royalty date, and the Doctrine
16 of Equivalents, which has become moot at this
17 point.
18    We'll just renew our motion on those
19 other bases and --
20    THE COURT: All right.
21    MR. AHRENS: -- then we'll certainly respond
22 to motions of the plaintiff.
23    THE COURT: Counsel, regardless of the jury
24 verdict, we will set up a briefing schedule for
25 all of that. Plus there are several issues that

10

1 the court still has to address posttrial, in any
2 event. So we'll come up with an overall game plan
3 for the submission of both the evidence, which
4 I'll need to hear, when that will occur, and
5 posttrial briefing.
6    Probably the first order of business
7 would be to make sure the court has heard all the
8 evidence. I think there is going to be the one
9 issue which we were going to take up outside the
10 presence of the jury but decided to perhaps take
11 it up by way of a video hearing, with evidence
12 presented from a remote location, and then
13 following will be all the posttrial briefing,
14 including the Rule 50 motions and those issues
15 which were going to be submitted to the court.
16    Counsel, let's move into the jury
17 instruction conference.
18    Before I -- Ms. Gearheart, if you'll
19 remember, I need to give Mr. Metcalf, to make sure
20 he has printed out, the stipulation of counsel as
21 to the date of origin of the various files, the
22 Orr files. We need to make sure we get that done.
23    Counsel, we have submitted to you, and
24 spent a great deal of time in informal sessions
25 going over instructions. We have submitted to you

11

1 a final, I think, set of instructions numbered 1
2 through, I believe, 25, although there may be some
3 break in the numbering.
4    One of the reasons we delayed just now
5 was to try to clear up some confusion in the
6 numbering. But I think you now have a properly
7 numbered set of instructions.
8    This is your opportunity to state your
9 objections for the record. All of our informal
10 work sessions were not on the record, and,
11 therefore, any objections you stated then will be
12 lost unless you restate them at this time.
13    So at this time, starting with the
14 plaintiff, if you would state your objections to
15 the court's proposed charge.
16    Also, I would note, of course, the
17 verdict form has also been provided, which is a
18 special verdict form, I think 11 pages in length.
19    Mr. Dowler.
20    MR. DOWLER: Thank you, Your Honor.
21    Plaintiff would object to the verdict
22 form to the extent it does not include a question
23 on whether or not documents have been submitted
24 into evidence that corroborate Mr. Orr's invention
25 of the asserted claims and Mr. Fleming's '653 and

1        R E P O R T E R' S   C E R T I F I C A T E

2

3

4

5            I, Tamara I. Hohenleitner, Official

6  Court Reporter, State of Idaho, do hereby certify:

7           That I am the reporter who transcribed

8  the proceedings had in the above-entitled action

9  in machine shorthand and thereafter the same was

10  reduced into typewriting under my direct

11  supervision; and

12          That the foregoing transcript contains a

13  full, true, and accurate record of the proceedings

14  had in the above and foregoing cause.

15          IN WITNESS WHEREOF, I have hereunto set

16  my hand April 19, 2013.

17

18

19

20                 -s-
    Tamara I. Hohenleitner
21    Official Court Reporter
    CSR No. 619
22

23

24

25

# EXHIBIT 3

1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

2

- - - - - - - - - - - - - - - - - - x
3                                    :
HOYT A. FLEMING,                     :  Case No. 1:09-cv-00105-BLW
4                                    :
             Plaintiff,              :  **JURY TRIAL DAY 7**
5                                    :
             vs.                     :
6                                    :
ESCORT, INC.,                        :
7                                    :
and                                  :
8                                    :
BELTRONICS USA, INC.,                :
9                                    :
             Defendants.             :
10                                   :
- - - - - - - - - - - - - - - - - - x
11

12

13

14    **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15

     before B. Lynn Winmill, Chief District Judge
16

17    June 22, 2012

18    Pages 1 to 295

19

20

21

22

                    **Tamara I. Hohenleitner**
23         Idaho Certified Shorthand Reporter No. 619
                Registered Professional Reporter
24                Certified Realtime Reporter
             Federal Certified Realtime Reporter
25

            United States Courts, District of Idaho
     550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

2

1                          **A P P E A R A N C E S**

2
  **FOR PLAINTIFF**
3
              Michael S. Dowler
4                        PARK, VAUGHAN, FLEMING & DOWLER, LLP
              5847 San Felipe, Suite 1700
5                        Houston, TX 77057
              Tel: (713) 821-1540
6                        Fax: (713) 821-1401
              Email:  Mike@parklegal.com
7
              Steven F. Schossberger
8                        HAWLEY TROXELL ENNIS & HAWLEY
              PO Box 1617
9                        Boise, ID 83701
              Tel: (208) 344-6000
10                       Email: Sfs@hteh.com

11
  **FOR DEFENDANTS**
12
              Steven B. Andersen
13                       HOLLAND & HART, LLP
              101 S. Capitol Blvd., Suite 1400
14                       Boise, Idaho  83701
              Tel: (208) 342-5000
15                       Fax: (208) 343-8869
              Email: Sandersen@hollandhart.com
16
              Gregory F. Ahrens
17                       Brett A. Schatz
              WOOD, HERON & EVANS, LLP
18                       441 Vine Street, 2700 Carew Tower
              Cincinnati, OH 45202-2917
19                       Tel: (513) 241-2324
              Fax: (513) 421-7269
20                       Email: Gahrens@whepatent.com
                 Bschatz@whepatent.com
21

22

23

24

25

1                                        I N D E X

2                        D E F E N D A N T ' S   W I T N E S S

3

4                                                        PAGE

5   ORR, Steven K.
         Direct Examination by Mr. Ahrens.....................   4
6        Cross-Examination by Mr. Dowler......................  158

7

8                        P L A I N T I F F ' S   E X H I B I T S

9
                                                        ADMITTED
10
         1206      Patent 5,079,553 filed 10/13/89......  233
11       1207      Digital signal processing patent.....  236
         1208      Digital signal processing patent.....  238
12

13                       D E F E N D A N T ' S   E X H I B I T S

14

15                                                      ADMITTED

16       2173      CLIFTON Excel Spreadsheet (ESC 1087).   59
         2174      CMICIN Excel Spreadsheet (ESC 1088)..   67
17       2191      Gps_Dgps Adobe Acrobat Document
                   (ESC 1105)..........................  119
18       2192      HOME Excel Spreadsheet (ESC 1106)...   27
         2220      RAIN Excel Spreadsheet (ESC 1134)...   69
19       2230      TOWRK425.GPS GPS File (ESC 1144)....   70
         2231      TOWRK425 Excel Spreadsheet (ESC 1145)  51
20       2232      TWOROUTE Excel Spreadsheet (ESC 1146)  39
         2233      WORK Excel Spreadsheet (ESC 1147)....   71
21       2282      Pilot Lamp Folder-10/96 (from Orr)
                   (ESC 5599-5604).....................  108
22       2285      Orr Time Sheets with copy of
                   corresponding Check (7/8/98-12/15/98)
23                 (ESC 5758-5782).....................  111
         2286      Orr Time Sheets with copy of
24                 corresponding check (7/8/98-12/15/98)
                   (ESC 5758-5782).....................  115
25

1    Q. And in this patent application that you
2 filed four to five months after saying you made
3 Mr. Fleming's invention, it never mentions locking
4 out a false alert based on the location; correct?
5    A. That's correct.
6    Q. Okay. Now, let's keep going on this
7 time line that we're on.
8    MR. DOWLER: And let's pull up Exhibit 1001,
9 please.
10 BY MR. DOWLER:
11    Q. And just so you remember, Mr. Orr, that
12 application was filed -- the last one we saw was
13 filed in September 23rd of 1996. Okay?
14    Now this is Mr. Fleming's patent, his
15 '038 patent. Have you seen this document?
16    A. Yes.
17    Q. Did you know that he filed his
18 application on April 14 of 1999?
19    A. No, I did not.
20    Q. You didn't know that?
21    So, a couple years after you filed the
22 last patent application that we saw; correct?
23    A. Yes.
24    Q. Okay. Now, do you understand that
25 Mr. Fleming's patent application disclosed

1 combining -- or putting a GPS inside a radar
2 detector that did a lockout distance and a lockout
3 frequency and whatnot?
4    MR. AHRENS: Objection, foundation.
5    THE COURT: Well -- the question is, are you
6 aware? And if you're not aware of the details,
7 you can so indicate.
8    THE WITNESS: I'm not aware of these
9 details.
10    MR. DOWLER: Okay. That's okay.
11    So let's go -- continue on the time
12 line. Mr. Fleming's application was filed April
13 14 of '99, and then you filed an application two
14 months later, on June 14 of '99. Remember that
15 one?
16    That's Exhibit 1078. We will pull it
17 up --
18    A. Yes.
19    Q. -- so you don't have to take my word
20 for it.
21    Do you remember this one?
22    This is -- again, it's Exhibit --
23    A. This is the --
24    Q. -- 1078?
25    A. Yes.

1    Q. This is your patent application filed
2 two months after Mr. Fleming's?
3    A. Yes.
4    Q. Okay. Now, as to the subject matter in
5 this patent application, had you kept it secret
6 from the public?
7    A. Yes.
8    Q. Okay. Was this your first patent
9 application disclosing a radar detector combined
10 with a GPS?
11    A. Yes.
12    Q. All right. So even though you had the
13 idea in 1988, you filed five patent applications
14 thereafter without ever disclosing that idea,
15 didn't you?
16    A. Makes perfect sense.
17    Q. And even though you had the idea in
18 1988, you didn't file a patent application until
19 11 years later, two months after Mr. Fleming's;
20 isn't that right?
21    A. The filing date isn't relevant here.
22    Q. That wasn't my question. Do you want
23 me to ask it again?
24    A. The --
25    Q. Okay.

1    A. As you compared the dates, your
2 statement was correct on filing events.
3    Q. Okay. And even though you say you
4 built a system in 1996, you didn't file a patent
5 application on it until three years later, two
6 months after Mr. Fleming filed his --
7    MR. AHRENS: Objection, relevance.
8 BY MR. DOWLER:
9    Q. -- is that right, Mr. Orr?
10    THE COURT: Overruled.
11    THE WITNESS: Yes.
12 BY MR. DOWLER:
13    Q. "Yes"? You have to answer. You can't
14 shake your head.
15    A. Oh. I said yes.
16    Q. Okay. Now, do you remember when we
17 took your deposition and you were asked if you
18 know why Escort did not file a patent application
19 on any aspect of the GPS concept prior to filing
20 your provisional application in 1999?
21    Do you remember what you said?
22    A. That one requires a best mode.
23    Q. You said, "I don't know."
24    MR. AHRENS: Your Honor, I'm not sure that
25 that's a proper way to use his deposition for

252

1 impeachment.
2 BY MR. DOWLER:
3    Q. I'll show it to you.
4    THE COURT: Sustained. Sustained.
5    Let's back up and --
6    MR. DOWLER: Okay.
7    THE COURT: -- give the witness an
8 opportunity to answer the same question precisely
9 as phrased, and then point out any contrary
10 response.
11 BY MR. DOWLER:
12    Q. Well, let me -- I'll just -- I'll start
13 over.
14    Do you remember, when your deposition
15 was taken, how you answered the question: "Do you
16 know why Escort did not file a patent application
17 on any aspect of the GPS concept prior to the
18 filing of your provisional application in 1999?"
19    A. I don't remember the question during
20 the deposition, but I -- I could answer that
21 question now.
22    Q. Okay. Well, let's take a look and see
23 exactly what you said. This was from your --
24    MR. AHRENS: Could we have the monitor off.
25    THE COURT: I'm going to turn it off until

253

1 it's up. But my practice generally is when there
2 is deposition testimony being read to the witness,
3 I allow the jury to see it. But it needs to be
4 limited just to that question and answer if you
5 want it shown to the jury.
6    MR. DOWLER: Okay.
7    Is that good enough, Your Honor, to
8 narrow it down?
9    THE COURT: It really should be limited just
10 to --
11    MR. DOWLER: Yeah, we can do it better.
12    THE COURT: All right. I'll allow it.
13    MR. DOWLER: That's okay there?
14    THE COURT: Yes.
15    MR. DOWLER: Okay.
16 BY MR. DOWLER:
17    Q. Do you see the question, Mr. Orr?
18    A. You didn't highlight the whole
19 question.
20    Q. Well, I'll read it to you. It's --
21    THE COURT: Take off the blue highlights.
22 That was just, I think, to identify the text.
23 BY MR. DOWLER:
24    Q. It says:
25    "Question: Do you know why Escort did

254

1 not file a patent application on any aspect of the
2 GPS concept prior to the filing of your
3 provisional application in 1999?"
4    How did you answer?
5    A. I said, "I don't know," which I --
6    Q. No, you said, you don't know why.
7    A. I don't know why --
8    Q. Okay. That's --
9    A. -- Escort does what they do.
10    Q. That's --
11    A. That wasn't my --
12    Q. Mr. Orr, you're going to have a
13 chance --
14    THE COURT: Mr. Dowler, that's fine. There
15 is a question and an answer. Let's move on.
16    MR. DOWLER: All right.
17 BY MR. DOWLER:
18    Q. Now, let's go to Exhibit 1078.
19    THE COURT: The jury monitor is off until we
20 get the document up.
21    This is what exhibit number?
22    MR. DOWLER: 1078.
23 BY MR. DOWLER:
24    Q. Now, we have seen this document before,
25 right, Mr. Orr?

255

1    A. Yes.
2    Q. Okay. And just so the record is clear
3 and so the jury remembers, this is the patent
4 application that you filed on June 14, 1999;
5 correct?
6    A. Yes.
7    Q. Two months after Mr. Fleming filed his
8 patent application; correct?
9    A. Yes.
10    Q. Okay. Now let's go to --
11    THE COURT: Counsel, I'm just concerned. My
12 notes don't reflect that we have brought up
13 Exhibit 1078; although, it was admitted by
14 stipulation.
15    Is that the right exhibit number? I
16 mean, do we have that --
17    MR. DOWLER: I'm pretty sure. I thought we
18 used this one a bunch. But I could be mistaken.
19    THE COURT: Maybe my notes just didn't keep
20 up. Let's go ahead and proceed. There is no
21 problem since it was admitted by stipulation. Go
22 ahead.
23    MR. DOWLER: Okay.
24 BY MR. DOWLER:
25    Q. So, again, this is your patent

```
1          R E P O R T E R ' S   C E R T I F I C A T E

2

3

4

5          I, Tamara I. Hohenleitner, Official

6  Court Reporter, State of Idaho, do hereby certify:

7          That I am the reporter who transcribed

8  the proceedings had in the above-entitled action

9  in machine shorthand and thereafter the same was

10  reduced into typewriting under my direct

11  supervision; and

12          That the foregoing transcript contains a

13  full, true, and accurate record of the proceedings

14  had in the above and foregoing cause.

15          IN WITNESS WHEREOF, I have hereunto set

16  my hand June 24, 2012.

17

18

19

20                    -s-
    Tamara I. Hohenleitner
21  Official Court Reporter
    CSR No. 619
22

23

24

25
```

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on the 25th day of August 2014, I caused this document to be filed electronically with the clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Gregory Ahrens
> Brett Schatz
> WOOD, HERRON & EVANS, L.L.P.
> 441 Vine Street
> 2700 Carew Tower
> Cincinnati, OH 45202
>
> Counsel for Defendants-Appellees

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of this document will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

Dated:  August 25, 2014                          _____/s/_____

Michael Dowler
*Attorney For Plaintiff-Appellant*